08 CV. 00445 (KMK)

**UNIVERSITY OF THE STATE OF NEW YORK**
**STATE EDUCATION DEPARTMENT**

**RECEIVED**

OCT 1 2 2007

OFFICE OF
STATE REVIEW

**IN THE MATTER OF THE IMPARTIAL**
**HEARING BROUGHT UPON THE**
**REQUEST OF PARENTS ON BEHALF**
**OF THEIR CHILD,**

**AGAINST**

**Decision and Order**

MAY 1 4 2008

S.D. OF N.Y.
W.P.

**CARMEL CENTRAL SCHOOL DISTRICT.**

## INTRODUCTION

This document constitutes the Decision and Order of the undersigned, the duly designated
Impartial Hearing Officer in an Impartial Hearing brought pursuant to the Individuals with
Disabilities Education Act (IDEA) and the New York State Education Laws. The Carmel
Central School District will be referred to as District, the parents as Parents and the child will be
referred to as Student.

## ISSUES

8/23/2006 Complaint Notice

The record reflects that the Parents filed a Complaint Notice on separate occasions. Because the
substance of each document is virtually identical (Ex. 2a-2c), I focus on the 8/23/06 Complaint
Notice. On 8/23/06 the Parents informed the school that they were rejecting the 2006/07
Individual Education Program (IEP) and placing the Student at Kildonan School for students
with dyslexia. According to the Parents, the 08/06 IEP was inappropriate for the following
reasons: The Student will not reach her academic potential in a class that has consultant teachers

tending to the aid of regular students. As of the time of the complaint notice, the District had been unwilling to discuss the Student's dyslexia in relation to her ability to learn. The Student needs are specific, e.g. as a student with dyslexia and one that learns at a slow rate, and distinct from the needs of other students (Ex. SD 2a).

The Parent's proposed that Kildonan School is appropriate for the following reasons: Kildonon strives to remediate the Student's skills in reading, writing, and spelling at the Student's pace. The Student has had past success at Kildonan in learning and relearning subject matter at her own pace. Kildonan fosters confidence through identification with students having dyslexia. The Student needs Orton-Gillingham one-on-one tutoring multi-sensory daily (Ex. SD 2a).

The Parents clearly expressed their intention to seek full tuition reimbursement in the amount of $30,000 as well as all related costs (Ex. SD 2a).

Opening Statement regarding Parent issues

Further sharpening the issues presented in the complaint, the District answered in opening argument taking issue with Parental assertions: That the Student works at a slow rate and needs to learn and relearn subject matter at her own rate (Tr p 15-16). To this, the District pointed out that recent testing revealed she was average in this area; That the Student needs to be educated in small classes with other student's with dyslexia (Tr. p 16-17). Here, the District claimed that the consultant teacher model offered by the District is appropriate to meet her needs; and, That the Student needs to be taught using the Orton-Gillingham methodology and one-on-one instruction (Tr. p 17). The District asserted that methodology is a District prerogative.

According to the District, the fundamental, "threshold issue in this case [was] whether or not the IEP that was developed in August is reasonably calculated to enable [the Student] to make educational gains". Further, "are [the Student]'s deficits such that she could only be educated in a private school like Kildonan; that she would not in any other environment, in a less restrictive environment make educational gains" (Tr p 17-18). In concert with the District's interpretation, the Parents acknowledged that the "essential burden [was] to establish that the district's IEP [was] inappropriate" (Tr. p 9-10).

Therefore, in relation to the issues presented in the Complaint Notice, as well as those acknowledged by the District, the essential focus of this decision will be to determine whether the contested IEP was substantively appropriate. Before continuing with an analysis of the appropriateness of the Student's placement at the District, a snapshot of the Student as presented in the record will suffice to reveal the Student's present levels of performance (PLOPS) in her management, academic, physical and social realms (MAPS) that were apparent at the time of the 08/2006 IEP meeting.

# BACKGROUND

Student Progress

05/09/2003 educational evaluation

The record reflects that the Student was evaluated on several occasions between 2003 and 2006. The earliest cognitive and educational evaluation on record was performed on 05/09/2003 when the Student was 11 years, two months old. This evaluation indicates that the Student's "mother

requested that her daughter be re-tested. She believe[d] her learning disabilities [were] hindering her progress" (Ex. SD 21). There it was noted that the Student's conversational proficiency seemed limited for her age level. While the evaluator indicated the Student was slow and careful in responding to test questions she also showed signs of impulsivity.

The 05/09/2003 evaluation summarized the Student as

…a fifth grade student attending Crossroads, a private school in Brewster. She reported to this evaluator that there are eleven students in the school. [The Student] has math, English, and social studies daily. She wasn't sure how often they had science. She believed they had it on Mondays. They have a field trip each Thursday. That is one of her favorite things about Crossroads. [The Student] also likes that there is no homework. She reported that math is her least favorite subject, but that she does better at math than at reading. They have not been doing spelling since vacation. Prior to vacation the students had ten words a week…

…[The Student]'s overall intellectual ability…, is in the low average range

[The Student]'s verbal ability (acquired knowledge and language comprehension) is in the average range when compared to others at her age level. Her thinking ability (intentional cognitive processing) is also in the average range. Her cognitive efficiency (automatic cognitive processing) is in the low average range.

When compared to others at her age level, [the Student]'s performance is average in fluid reasoning and low in processing speed.

[The Student]'s English oral language skills are average when compared to others at her age level. Her overall level of achievement is low average. Her ability to apply academic skills is average. [The Student]'s academic skills and fluency with academic tasks are both within the low average range.

When compared to others at her age level, [The Student]'s performance is average in mathematics and written expression; and low average in broad reading, basic reading skills, math calculation skills, and written language. Her knowledge of phoneme-grapheme relationships is average.

No discrepancies were found among [the Student]'s cognitive and achievement abilities.

To help determine if any ability/achievement discrepancies exist, comparisons were made between [the Student]'s cognitive and achievement scores. No significant discrepancies were found between [the Student]'s overall intellectual ability and her measured reading, mathematics, written language, or oral language achievement. Based on a mix of cognitive tasks associated with performance in each area, [the Student] is performing at predicted levels in reading, mathematics, written language, and oral language (Ex. SD 21 p3).

06/16/2004 educational evaluation

Another cognitive and educational evaluation was performed by Sharon Chichester, Educational Evaluator, on 6/16/2004, when the student was 12 years, three months old. The Student was referred for testing by the CSE as part of her annual review at a 4/28/2004 meeting. The Student had been attending Kildonan school the past year as a sixth grade student, although George Fisher Middle School, Carmel, NY was her home district (Ex. SD 24).

The 06/16/2004 evaluation reported that

Previous cognitive testing results (5/9/2003) indicate average skills in verbal comprehension…, visual-auditory learning…, special relations…, concept formation…, numbers reversed…, and analysis-synthesis… [The Student]'s areas of relative weakness within the cognitive area include visual matching…, and decision speed… WJ III Cognitive areas that fall within the average range are not readily re-tested within a short period of time between evaluations (5/9/2003 and 6/16/2004). There is no an area of weakness within this part of cognitive abilities.

…Although [the Student]'s processing speed standard score range… is within the low average range when compared to others her age, her performance varied on two different types of tasks. [The Student]'s performance is average on tasks requiring speed in correctly processing simple concepts… Her performance is very limited on tasks requiring visual perceptual speed…

When compared to others of her age, [the Student]'s academic achievement is in the average range in reading comprehension… and written expression…

Basic reading skills includes sight vocabulary, phonics, and structural analysis skills. [The Student]'s basic reading skills are comparable to those of the average individual at age 8-10. Passage completion score falls within the average range…, indicating a slight improvement in

this area from last year's testing... Her standard score is within the low average range... for her age. Her basic reading skills are limited. Tasks measuring reading skills above the age 9-10 level will be quite difficult for her.

Basic writing skills includes spelling skills and knowledge of English language usage. [The Student]'s basic writing skills are comparable to those of the average individual at age 8-5. Her standard score is within the low to low average range... for her age. Her basic writing skills are limited. Tasks measuring effective expression in written language above the age 9-3 level will be quite difficult for her...

...[The Student]'s conversational proficiency seemed typical for her age level.... During the examination, she seemed attentive to the tasks, but at times she appeared tense or worried. Although [the Student] responded slowly and carefully to test questions, she gave up easily after attempting difficult tasks.

During letter-word identification in achievement area, [the Student] applied the strategy of syllabication to decode unfamiliar words. As items became increasingly more difficult, she was not able to correctly respond, [the Student] continued to apply herself and did not appear frustrated. Passage comprehension tasks were initially within [the Student]'s ability to comprehend. Occasionally, she read the passage orally, possibly to use this as a strategy as items became more difficult. [The Student] continued to make a good effort to complete each item.

6/23/2004 technology evaluation

A technology evaluation was performed on 6/23/2004. The report concluded that "[The Student] appear[ed] to be a great candidate for assistive technology to support her educational experience (Ex. SD 25). In that report it is recorded that the Student enjoys using the computer for leisure and educational applications. She uses the internet and Microsoft Word while in school; She was familiar with the Qwerty keyboard; had learned to use a calculator. The following recommendations were made:

[The Student] should have access to copies of class notes
Testing modification as necessary such as direction and questions read and scribed
Classroom modifications as needed such as minimal in class reading, provide a copy of chalkboard material
Experiment with the use of Speaking Homework Wiz to aid in spelling

Have a word processing device available to [the Student] as necessary

Trial over an extended period of time within her educational setting: Dragon Naturally Speaking, Case-E-Reader, Text Help, Inspiration (See sub-heading *High Tech* (Ex. 25 p 2)

Participate in keyboarding instruction

Trial the need for books on tape and scanning documents into a computer for electronic reading (Ex. SD 25)

Teacher input forms

The District provided teacher input forms for the Student, based on the weeks between 9/9/2004 and 10/1/2004 at the Kildonan School, in the areas of literature, math, science, history, and tutor. The Student was in the 7th grade (Ex. SD 26).

The tutor's report described the Student as having " a willingness to learn and achieve. When something [was] wrong she want[ed] to fix it. She ask[ed] questions. When something [didn't] make sense, she [got] to the bottom of it and figure[d] it out. She [was] self-aware and diligent." "Spelling and reading multisyllabic sounds" were weaknesses and "[they were] learning/reviewing vowel teams. This [was] a struggle for her. The writing process [was] also a struggle" (Ex 26 p 2). The tutor reported that the Student was "opening up" and joking around. The Student also had "a very close relationship with her best friend" and seemed "to be developing new friendships with other girls her age" (Ex. 26 p 2).

The Student's earth science teacher reported that the Student "work[ed] well independently and in groups. She follow[ed] class rules and participate[d] during each class. She ask[ed] for help when needed." However, "she often hesitate[d] when answering questions and lack[ed]

confidence in her work." Also, "[the Student] usually [sat] and talk[ed] only with the girls. She seem[ed] to socialize well with them" (Ex. SD 26 p 3).

The literature teacher emphasized the Student's attentiveness and ability to listen well, reporting a strength in reading comprehension. Also, although the Student was "quiet, she seem[ed] to have many friends and [was] well liked by peers." (Ex. SD 26 p 6).

Both the history and math teachers noted a reticence "to share insights with class or ask for clarification when needed" and that the Student "may not [have] always alert[ed] the teacher when she [was] confused" (Ex. SD 26 p 4-5). The math teacher commented that the Student "need[ed] work on her self-advocacy" (Ex. SD 26 p 5).

04/03/2005 educational evaluation

On 04/03/2005, an educational evaluation was performed by Joanmarie A. Sackles, Ph. D, Licensed Psychologist. The evaluation summarizes the Student as:

...present[ing] a diverse set of skills on different aspects of reading. She performed much better on tasks that assessed her capability to read sentences and paragraphs and answer questions about what was read than on tasks that required her to correctly apply phonetic decoding rules when reading a series [of] words (The Student scored in the 97th percentile in oral expression, the 95th percentile in reading comprehension and listening comprehension and in the 68th percentile in pseudoword decoding.) The latter indicated "that she ha[d] well developed phonetic skills" (Ex. SD 28 p 3). It should be noted however that she read slowly and visual tracking times was difficult and she lost her place (The Student's vision was 160/20 and 30/20 as of 4/3/05 (Ex. SD 27)). In overall mathematics skills [the Student] performed in the low average range, as indicated by her mathematics composite standard score. [The Student]'s performance on tasks that required her to add, subtract, multip[ly], and divide one-to-three digit numbers is comparable to her performance on tasks that requires her to understand number, consumer math concepts, geometric measurement, basic graphs, and solve one-step word problems. [The Student] performed in the very superior range in overall language skills, as indicated by her standard score

on oral language composite. [The Student] performed comparably on tasks that required her to identify the picture that best represents an orally presented descriptor or generate a word that matches the picture and generate words within a category, describe scenes, and give directions. [The Student]'s skills in written language are diverse. She performed much higher on tasks that evaluated her ability to generate words within a category, generate sentences to describe visual cues, combine sentences, and compose an organized, persuasive essay on a named topic than on tasks that required her to correctly spell verbally presented words. [The Student]'s skills in spelling are in the low average range.

Observation of the Student

At about the same time, on 5/12/05, The Student was observed attending a 7th grade history class at Kildonan. The classroom was in a large group (7 boys, 2 girls), traditional physical environment. A lecture was presented by a history teacher and a textbook and supplementary handouts were used for materials. The Student was reported to be on time and prepared with homework completed. The students were handed notes on the Renaissance, and were required to fill in the blanks as the teacher lectured. The observation report emphasized this teaching strategy, noting that "typed notes and fill in the blanks" are a common strategy employed in special education classes. The Student was observed to be on task and attentive, raising her hand and answering questions and "to enjoy the lesson, [interacting] with her teacher and classmates" (Ex. SD 30 p 2).

08/08/06 educational evaluation

An educational evaluation dated 08/08/06 by S. Chichester was the final evaluation performed before the 08/06 IEP. The evaluation mirrors other reports completed to date, summarizing the Student's oral language skills and her ability to apply academic skills as average. Her academic skills were low average and her fluency with academic tasks was low. Further, "When compared

to others at her age level, [the Student]'s performance is low average in broad reading, mathematics, and written expression; and low in math calculation skills." These results were to be reviewed by the CSE to determine eligibility for special education services (Ex. SD 33 p 3).

Synopsis of District's program

A synopsis of the District IEP is useful before evaluating its appropriateness. The transcript of the 08/2006 IEP is also discussed as it relates to the Student's recommended placement.

08/08/2006 IEP

The most recent IEP that the Parents contest is the 08/06 IEP (Ex. SD 2). The comments portion of the 08/06 IEP reports:

The CSE is meeting today to finalize [the Student]'s IEP and as a continuation of her annual review 3/28/06. An educational evaluation was administered on 8/8/06. Results indicated low average scores in broad reading, mathematics, written language; and low math calculation skills. [The Parents] had question regarding the Consultant Teacher program. Mrs. Tomassi explained how the program works and addressed further questions. [The Student] would also benefit from receiving Special Class Reading which uses a multi sensory approach. [The Student] will receive counseling as part of her educational service; counseling will be provided on an individual basis. Educational as well as counseling goals were discussed and explained as they will appear on the IEP (Ex. SD 1d).

The 08/08 IEP was based upon:

Educational Evaluation, 08/08/2006
Teacher Report, 02/27/2006
Observation, 05/12/2005
Educational Evaluation, 04/03/2005
Psychological Evaluation, 04/03/2005
Social History, 04/03/2005

Assistive Technology Evaluation, 06/23/2004

Writing Sample, 06/16/2004

Physical Evaluation, 06/08/2004 (Ex. SD 1d)

The committee considered other options, including "a general education setting with support

services such as related services, consultation services and a resource room program". "This

option was rejected because the student's current academic functioning indicate[d] that a more

intensive setting with support is needed to address the student's needs." (Ex. SD 1d).

At the time of the 08/06 IEP the Student was in ninth grade.  While the Student's designated

school was Carmel High school, the Parent chose to unilaterally enroll the Student at Kildonan.

The IEP indicated that the Student was dually enrolled at both Carmel High School and

Kildonan.  Previous IEPs indicate that the Student was enrolled at Kildonan as early as the 2004-

2005 school year and continued there to date.

The Student was classified as Learning Disability (Ex. 1d) which is not in dispute. The 08/06 IEP

recommended consultant teachers in the subjects of English, Math, Science and Social Studies to

occur 39 minutes each, daily, in a 15-1+1 class ratio at an integrated location.  Special class

reading at the same frequency and class ratio at a non-integrated location was also

recommended.  Counseling was recommended for 30 minutes once per week in a 5:1 group

setting at a non-integrated location (Ex. SD 1d).

Service and supports of refocusing and redirection, preferential seating, copy of class notes, extended time for in-class assignments, books on tape, use of calculator and modified homework assignments were listed for Program Modifications, Accommodations and Supplementary Aids and Services (Ex. SD 1d).

Assistive technology devices and services included the use of a word processor, books on tape and assistive technology consultation (Ex. SD 1d). The 08/06 IEP did not require support for school personnel on behalf of the Student (Ex. SD 1d).

Testing accommodations included extended time, direction to be read/explained, clarification of test questions, a special location, a waiver of spelling requirements and the use of a word processor (Ex. SD 1d). The Student was required to participate in the same state or local assessments that are administered to general education Students as well as the general education physical education program. For reading reasons, the Student would not participate in regular education; and the Student was exempt from the language other than English requirement because the Student's disability adversely affects her ability to learn a language (Ex. SD 1d).

The Student's disability was described to affect involvement and progress in the general education curriculum because the Student possesses "a significant processing speed deficit [that] impacts the acquisition of skills needed to progress in the general education curriculum." (Ex. SD 1d).

Annual goals included the areas of study skills, reading, writing, mathematics, and social/emotional/behavioral.  Representative of the goals: the Student will seek out appropriate assistance from teachers and other support staff; the Student will independently alert the teacher to arrange for special needs or accommodations for tests; the Student will display assertive communication skills; the Student will identify 3 strategies for fostering positive relationships with peers, and; the Student will identify and display appropriate reaction and appropriate alternative solutions to challenging social situation that occur in the school, addressed the Student's conjunctive social/academic needs by promoting assertive behavioral strategies. "[I]nitiating and asking for help" was something the CSE wanted the Student to "work toward" because "you have to be your own best advocate when you are in High School and entering college" (Ex. SD 42 p. 13).  Because "some students have a plethora of testing modifications... but they don't remind the teacher" and a "teacher [may have] 125 students", the goal that the Student "will independently alert the teacher to arrange for special needs or accommodations per test" was added.  The District did not " expect [the Student] to do it right away, that is where [the] special ed teacher comes in".  The intention, again, was to promote self-advocacy (SD 42 p. 14).Other goals addressed the Student's organizational, and subject specific needs (Ex. SD 1d).


Transcript of 08/2006 CSE meeting regarding the District Program

At the 08/2006 CSE meeting, the District described their recommended placement for the Student for the 2006/07 school year to both the Parents and the Student.  The "recommendation on the table [was] consultant teacher for all [the Student's] regular classes" including Math, English, Global Studies and Earth Science (Ex. SD 42 p. 7).  The District's program also offered reading and art classes (Ex. SD 42 p. 8-10).  Gym was offered every other day on a 6 day cycle.

The proposed classes would not be segregated between students with IEPs and general education students, with IEP students comprising about 1/3rd the class size. Class size was described to vary from 8 students in global lab, 10 for reading, 15 or less in Math and up to 25 in English, the maximum allowed per class in general education. The entire ninth grade at Carmel High School would be 400 students (Ex. SD 42 p. 7-8, 10).

The consultant teacher would be provided to "help everybody" in the class, including both general education and IEP students. For each subject, the consultant teacher would be different to provide specialization in that subject. The consultant teacher would be able to provide individualized instruction per the needs of the students and content would be re-taught "when necessary". The consultant teacher would act as a second teacher in the classroom, creating a team approach to teaching, while the general education environment would provide "that very rich curriculum" (Ex. SD 42 p. 7-8).

Emphasis was made on the "continuation of. a multi-sensory reading instruction" using the "Wilson Program". Word attack, decoding and fluency would be addressed and the special education teacher also would use reading comprehension and fluency programs. The reading classes would be comprised of students from "[a]ll different levels" and is "very individualized." Sometimes the reading classes have two teaching assistants, therefore, the students are "worked with on a one-to-one basis" (Ex. SD 42 p. 8-9).

Daily assessments would be made, with an eye toward observing who "who is mastering the topics covered and who isn't". The consultant teacher would takes notes and "then... speak to the general ed teacher later who is more focused on the group" (Ex. SD 42 p. 8).

Counseling would be provided by either of the two school psychologists or the school's social worker, in a 5:1 group ratio. However, since it is difficult to schedule students for group counseling, counseling would "very likely be individual". When the Parents expressed concern over their child being taken from class for counseling, the District replied that "[they] try not to" do that. Counseling could be scheduled during lunchtime or on a day that the students didn't have gym or science lab (Ex. SD 42 p. 11-12).

## LEGAL FRAMEWORK
## Reimbursement Generally

This case deals with possible reimbursement by a school district to parents for tuition and related expenses incurred in the placement of a child in a private school. With respect to the issue of reimbursement for money spent on educational services, the standard is set forth in School Committee of the Town of Burlington vs. Department of Education Massachusetts, 471 US 359 (1985); Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]: [A] "Board of Education may be required to pay for educational services obtained for a child by the child's parents, if the services offered by the Board of Education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parents' claim."

The central purpose of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq.,

(IDEA) is to ensure that students with disabilities have available to them a Free Appropriate

Public Education (FAPE) (Frank G. v. Bd. of Educ., 459 F.3d 356, 363 [2d Cir. 2006]; see

Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81,

200-01 [1982]; 20 U.S.C. § 1400[d][1][A]). A FAPE includes special education and related

services designed to meet the student's unique needs, provided in conformity with a written IEP

(20 U.S.C. § 1401[9][D]; see 20 U.S.C. § 1414). "The IEP is the central mechanism by which

public schools ensure that their disabled students receive a free appropriate public education"

(Polera v. Bd. of Educ., 288 F.3d 478, 482 [2d Cir. 2002]). The student's recommended program

must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34

C.F.R. §§ 300.114, 300.116[a]3; 8 NYCRR 200.6[a][1]). The burden of persuasion in an

administrative hearing challenging an IEP is on the party seeking relief (Schaffer, 126 S. Ct. at

537).


The initial burden is to show that the program proffered in the IEP was not "reasonably

calculated to enable the child to receive educational benefits." Walczak vs. Florida UFSD, 142

F.3d 119 2d cir. (1998). The IDEA, mandates that all disabled students receive a "free

appropriate public education".  The purpose of this law is to provide such students with a "basic

floor of opportunity" of access to specialized instruction and related services that are individually

designed to provide educational benefits. Board of Education, Hendrick Hudson CSD v.

Rowley, 458 U.S. 176, 189-190, 102 S. Ct. 3034 (1982); Walczak v. Florida UFSD, 142 F.3d

119 (2nd Cir. 1998). Importantly, in this regard, the elements of a particular student's FAPE are

set forth in an IEP that is specifically tailored to meet the unique and individual needs of that

disabled student.  Mavis v. Sobel, 839 F. Supp. 968, 981 (N.D.N.Y. 1993).

Neither the IDEA, nor Article 89 of the New York State Education Law, requires a school

district to provide special education and related services designed to maximize the potential of a

disabled student.  Nor do federal and state education laws require a school district to provide the

best possible educational program and related services, or match those services requested by a

parent.  Application of a Child With a Disability (City School District of Buffalo), S.R.O.

Decision 04-20 (2004). Rather, the goals and mandates of the IDEA and N.Y. Education Law are

relatively modest: namely, to provide appropriate specialized education and related services

sufficient for the disabled student to benefit from his/her education.  Straube v. Florida UFSD,

801 F. Supp. 1164, 1175-1176 (S.D.N.Y. 1992); Moubry v. Independent School District, 9 F.

Supp.2d 1086, 1104 (D. Minn. 1998) (citing Rowley).  In the instant case the Parents contend

there are numerous procedural and substantive violations which have individually and

collectively denied the Student a FAPE.

## DISCUSSION
## PRONG I

My findings conclude that the District orchestrated a routine CSE meeting in March, 2007 when

they announced that the consultant teacher model was appropriate.  The Parents, aware of some

of their procedural rights, correctly objected to the improper composition of the CSE.  The

District demurred on this point, and promptly ceded a subsequent CSE meeting to be held on

August 10, 2007. The CSE, on that date, was supplied with an updated evaluation dated August 8, 2007. That evaluation substantially supported the March, 2006 CSE recommendation which were received by the Parents in due course. Following the August CSE meeting the IEP was prepared and sent to the Parents. It was erroneous in that it listed the tenth grade in part, when the student was actually going into ninth grade. The Parents advised the District of this error and the IEP was modified to reflect the correct school year. In the meantime the Parents unilaterally placed the child in the then pending placement of Kildoanan. They notified the District on 8/23/06.

The Parents' attorney argues many procedural issues which are not within the corners of the complaint. She also argues that the goals are substantively related to the District's failure to provide FAPE and they are therefore fair game for review.

On the myriad procedural improprieties alleged, I rule that I am without jurisdiction because the Complaint Notice fails to alert the District, as argued by District Counsel. See, 8 NYCRR §200.5(j)(1)(ii) and SRO 07-051. Regarding the allegations referencing inadequate goals I find that the facts of this case warrant the admission of this evidence. From the testimony in this case I find that there exists a substantial overlay between the end result, or substantive aspects of the goals and the manner in which they are formed (the "procedural" aspects which were not in the Complaint Notice). However, based on my findings below, I do not undertake a rigorous analysis of the goals and I do not make specific findings with respect to the goals.

Notwithstanding the above, I view the pivotal issue which leads to the conclusion that the District did not provide a FAPE is the uninspired rendition of the Student's present levels of performance in the IEP. Although adequate information was gathered and much found its way into the IEP, indeed much discussion occurred during the August 10, 2007 CSE meeting, very few details of the students baseline performance were articulated in the IEP.

Per academic achievement, functional performance and learning characteristics, the Student's levels and abilities were reported to be average with the exception of processing speed, that the Student's math skills are in the low average range and reading and writing skills are below average. Here, the Student was reported to need to improve reading and writing skills (Ex. SD 1d).

The Student's social and emotional levels and abilities were reported to be within age expectations, overall. However, the Student was reported to be reticent toward initial social interaction. It was recommended that the Student needed counseling to address this reticence (Ex. SD 1d).

The Student's physical development indicates that her hearing is within normal limits and that she wears corrective lenses. No physical or motor needs were to be addressed through special education at that time (Ex. SD 1d).

Management needs indicated that the Student has significant delays and requires some subjects

to be taught in a small teacher-to-student ratio program with minimal distractions within a

regular school environment (Ex. SD 1d).


Comparing these present levels of performance with the two previous deficient IEPs (Exhibits 1a

(2004-2005, See SRO 05-063) and 1b (2005-2006, See SRO 06-005)), I cannot see that the

earlier present levels of performance were supplemented in any meaningful way. To the

contrary, the narrative included in the 2006-2007 IEP (Exhibit 1b) is exactly the same as the

previous year. Although the IEP contains the student's subtest scores from her standardized tests

(See SRO 01-092, ".. percentile test scores provide only general information about the child's..

skills in relation to those of other students. They do not identify the child's current functioning

level, the specific skills he has acquired and the areas that present difficulties for him.), it

includes no new descriptive or anecdotal information to assist in articulating a baseline. Thus, I

must conclude that the admonition contained in SRO decision 06-005 @p.8 was either

disregarded or misunderstood: The SRO stated:

"Although testimony indicates that the results of these evaluations were fully considered at the
May 17, 2005 CSE meeting, the 2005-2006 IEP developed on May 17, 2005 fails to reflect this
and does not adequately or accurately describe the student's present levels of
performance......Despite the CSE having sufficient current evaluative information to detail the
student's present levels of performance and individual needs, the IEP as written contains an
inadequate and inaccurate baseline from which to develop goals and objectives. The present
levels of performance and individual needs outlined on a student's IEP serve as the foundation
on which the CSE builds to identify goals and services to address the student's individual needs."


Likewise, SRO Decision 05-063@p.8, ( same child in the 2004-2005 school year) criticizes the

CSE's lack of an adequate description of the present levels of performance in the 2004-2005 IEP

(Exhibit 1b). State and federal regulations require that an IEP include a statement of the student's

present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; 8 NYCRR 200.4[b][5][ii][b] and [d][2][i][a]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Question 1). See also, SRO Decision 05-052. But, this information must be included in the operative document, the IEP.

For example, I point to the assumptions of the CSE that calculator skills are a given for this Student. This critical bit of evidence underscores the need for a well-articulated baseline. The IPE assigns a rigorous set of goals for Mathematics to be completed, all with 70% or better success (Ex. 1 d). This, despite the report of 66% "ss" and "nce" of 1% on the August 8. 2006 Woodcock Johnson III, ACH Tests (Ex. 33 @P. 4). While the School Psychologist who chaired the 8/06 CSE meeting attempted to defend the consultant teacher model by indicating that the extremely low math fluency score would be compensated by use of a calculator, and use of a calculator is listed as an accommodation, by the District's admission they had no knowledge of this Student's ability to participate in math in a consultant teacher capacity (Tr. Pp. 493 497). This is the type of information that educators need.

The explanation that the "..we have different levels of math—they have changed the names so many times but you can take the regents after one year of instruction, you can take that same regents after a year and a half of instruction. We have different levels of how we help math people" (Tr. P495-496) is simply insufficient. The CSE was on notice that this Student "may not

always alert the teacher when she is confused [in math class]." And "She needs to work on her

self advocacy " (Exhibit 26 10/1/04 Math Teacher Input Form). Furthermore, even if the Student

may have acquired the skills needed to use a calculator (see, 6/04 Technology Evaluation (Ex.

25) and 6/04 teacher notes from Kildonan (Ex. 39a @ P. 18), the educators using the

recommended IEP were left without a translation of the information from Woodcock Johnson III,

ACH Tests to clear, concise statements of need.  There is no identification of the instructional

implications of evaluations; nor is there language whereby the Parents and professionals can

understand, the unique needs of the Student that the IEP will address.


Along the same lines, the IEP fails to specify which Math program would be appropriate for the

Student.  As it turns out, the Student was targeted by the District for an "extended-year" math

program where the curriculum would be delivered over a year and a half. This program was

designed to give her extra time.  Importantly, however, the IEP does not indicate this

programming choice, the length of time the material would be delivered or the basis for it (Tr. P.

1123).


The previous year's SRO decision issued on March 1, 2006, provided clear guidelines for a

future IEP.  There the SRO (SRO 06-005) explicitly states: "Statements such as the student's

cognitive abilities are average with the exception of processing speed and the students reading

and writing skills are below average do not provide a meaningful description of the student's

abilities or needs or suggest specific deficits that need to be addressed." Of course, this is the

exact language which remained on the 2006-2007 recommendation (Ex 1d @p3) without

amplification. In that decision the SRO specifically targeted the failure to indicate if the Student

needed to "improve her decoding skills, reading comprehension skills, spelling, penmanship or some other aspects of reading and writing such as fluency or paragraph development". (SRO 06-005 @p.8) Importantly, the SRO placed the District on notice that this Student deserved attention in this area. The failure to communicate this SRO alert to the CSE chair before the August 2007 meeting (Tr. pp 101-102; 109; 133; 134 & 523) does not excuse the shortcoming in the IEP. As a result, based upon the deficiencies in the reported present levels of performance alone, I find the 2006-2007 IEP failed to offer a FAPE[i].


## Prong II


Having determined the Parents' have met their burden of proving that the District failed to provide a FAPE to the Student during the 2006-2007 school year, I must now consider whether Parents have met their burden of proving that the services offered to the child by Kildonan were appropriate (School Committee of Burlington v. Department of Education of Massachusetts, 471 U.S. 359 (1985); Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-080).


A child's entitlement to relief under IDEA does not depend upon the vigilance of his or her parents, nor should it be abridged because a school district's behavior does not rise to the level of slothfulness or bad faith. M.C. v. Central Regional School District, 81 F.3d 389 (1996). But rather, a Board of Education may be required to pay for educational services obtained for a child by the child's parents if the services offered by the Board of Education were inadequate or

inappropriate, if the services selected by the parents were appropriate, and if equitable considerations support the parent's claim. See, Burlington, 471 U.S. 359

The second prong of the Burlington test is whether the private school in which the student has been placed offers that student appropriate services. Where a hearing officer reviews the question of educational progress or benefit, the hearing officer must examine the record for any "objective evidence" indicating precisely what benefit or progress, if any, was made. What constitutes appropriate "progress" or "benefit" is **not** generic, but rather must be adjudicated with reference to the individual child's particular strengths and deficits. Walczak, 142 F.3d at 130; Mrs. B. v. Milford Board of Education, 103 F.3d 1114, 1121(1997); Ridgewood Board of Educ. V. N.E., 172 F.3d 238 (3rd Cir. 1999).

The fact that the facility selected by the parents to provide special education services to the child is not approved or certified as a school for children with disabilities does not preclude an award of reimbursement. See, Florence County School District Four v. Carter by Carter, 510 U.S. 7, 114 S.Ct. 361 (1993); Still v. DeBuono, 101 F.3d 888 (2d Cir. 1996). In Ridgewood, the court explained that under the Supreme Court's earlier decision in Florence County, a student may be entitled to reimbursement if it can be shown that the public placement violated IDEA in some respect, and the child's private school placement was proper and appropriate under IDEA. Ridgewood, 172 F.3d at 248. The Ridgewood court made quite clear that "the parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA." 172 F.3d at 249 n.8.

In order to meet that burden, the parents must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

In the instant case the Parents selected a nearby school for students with the same type of learning disability they suspected their daughter to have, dyslexia (Ex EE, Ex 2a & Tr. p255, amblyopia & slow processing).They reasonably calculated that their child could make progress in the area of her deficits in the school specially established to remediate such deficits. Kildoanan has been established for over twenty-five years and they have developed and implemented systematic interventions for teaching the dyslexic child (Ex. AA, CC).

Dr. Robert Lane was called as the Parents' witness who explained the student's involvement with Kildonan School. His credentials are in evidence (Ex. BB). He provided an overview of the philosophy and programming at Kildonan (Tr. 281-291). The student benefited from small classes, the Orton-Gillingham reading methodology taught one-to-one and daily (Ex. DD), assistive technology instruction (Exhibit X, Tr. P 292) and the opportunity to be taught with classmates who shared a similarity of needs. It was his opinion that the Student did progress throughout the 2006-2007 school year while at Kildonan (Tr. pp. 322-323). I agree.

## Prong III

Regarding the equities, I find the fact that the evaluator during the August 8, 2006 evaluation,

apparently questioned the child concerning her choice between the District and Kildonan for the

Fall of 2006 weighs in favor of the Parents (Ex. 46 @P.2, Tr. P. 644)  The District did not rebut

the testimony which alleged concern over this issue. On the other hand, shortly after the August

2006 CSE meeting the Parents notified the District of their intent to unilaterally place their child

at Kildonan (Ex. 2a).  I find no equities which would diminish an award of tuition reimbursement

and related costs to the Parents.


IT IS THEREFORE ORDERED,

That the District's shall reimburse the parents for 100% of the tuition and related costs for the

attendance of their child at Kildonan School for the 2006-2007 school year.

Dated: August 24, 2007

Martin Kehoe, III

Impartial Hearing Officer

RECEIVED

OCT 1 2 2007

OFFICE OF
STATE REVIEW


List of Exhibits considered 1-3, 21-39e, 41-43, 45-46 & A-J, L, N-O, Q-HH[ii]

# APPEAL RIGHTS

## APPEAL TO A STATE REVIEW OFFICER OF THE STATE EDUCATION DEPARTMENT

A review of the decision of a hearing officer rendered in accordance with New York State Rules and Regulations may be obtained by either the parent or the Board of Education by an appeal to a State Review Officer of the State Education Department. Such a review shall be initiated and conducted in accordance with the provisions of part 279 of Title 8 of The New York State Code of Rules and Regulations. The written decision of the State review Officer, a copy of which will be mailed to the parent and the Board of Education, shall be final, provided that either party may seek Judicial Review by means of a proceeding pursuant to Article 78 of the Civil Practice Law and Rules or 20 U.S.C. section 1415.

Title 8 NYCRR § 279.2 Notice of intention to seek review.

(a) The parent or person in parental relationship of a student with a disability who intends to seek review by a State Review Officer of the State Education Department of the decision of an impartial hearing officer shall serve upon the school district, in the manner prescribed for the service of a petition pursuant to section 275.8(a) of this Title, a notice of intention to seek review in the following form:

Notice:

The undersigned intends to seek review of the determination of the impartial hearing officer concerning the identification, evaluation, program or placement of (name of student with a disability). Upon receipt of this notice, you are required to have prepared a written transcript of the proceedings before the impartial hearing officer in this matter. A copy of the decision of the impartial hearing officer, a bound copy of the written transcript, including a word index for the written transcript, as well as an electronic transcript, and the original exhibits accepted into evidence at the hearing and an index to the exhibits must be filed by the Board of Education with the Office of State Review of the New York State Education Department within 10 days after service of this notice.

(b) The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period.

(c) A notice of intention to seek review shall not be required when the board of education initiates an appeal from an impartial hearing officer's decision. A copy of the board's notice of petition, petition, memorandum of law and any additional documentary evidence shall be served upon the parent within 35 days from the date of the impartial hearing officer's decision. If the decision has been served by mail upon the board, the date of mailing and the four days subsequent thereto shall be excluded in computing the 35-day period.

[i] Although not raised by counsel it appears that the IEP is devoid of required information relative to Transitional Services. The Student was fourteen at the time of the meeting but there are no Post School Outcome Statements addressing post-school employment, postsecondary education, community living aspirations of the student; no mention of the student's transition service needs or identification of the skills necessary for educational success or success in the work place and in community living; no identification of instructional services related to development of transition skills, knowledge and abilities; nor services related to development of transition skills, knowledge and abilities. For students 14 years of age and older, the IEP must include a statement of the student's transition service needs (34 C.F.R. § 300.347[b][1]; 8 NYCRR 200.4[d][2][viii]). For students 15 years of age and older, it must include a statement of the student's needs, taking into account the student's preferences and interests as they relate to transition from school to post-school activities including post-secondary education, vocational training, integrated competitive employment, continuing and adult education, adult services, independent living, or community participation (8 NYCRR 200.4[d][2][i][c], 200.1[fff]) See, SRO 04-014.

[ii] Please see colloquy and ruling restricting the time period of the hearing and redacting exhibits 4-20 & 40 from the record Tr.pp.50-92)

**Carmel Central School District**
**Exhibit List for Chloe Dabrowski**

1.  IEP's
    a.   08-17-04 IEP 2004-2005 (8 pages)
    b.   05-17-05 IEP 2005-2006 (8 pages)
    c.   03-28-06 Committee Meeting Information (2 pages)
    d.   08-10-06 IEP 2006-2007 (8 pages)
2.  Rejection of 2006-2007 IEP and Complaint Letter
    a.   08-23-06 Letter to Kathryn Rohe from Parents (1 page)
    b.   08-23-06 Due Process Complaint Notice (3 pages)
    c.   09-15-06 Letter to Letter to Kathryn Rohe from Laura Davis (1 page)
3.  Cumulative Health Record (1 legal page)
4.  05-15-98 Child Study Team Minutes (1 page)
5.  10-13-98 Educational Report Form (1 page)
6.  10-14-98 Psycho-Social History (4 pages)
7.  10-12/22-98 Psychological Evaluation (5 pages)
8.  11-08-98 Compuscore for the WJ-R (8 pages)
9.  11-7-98 thru 11-09-98 Educational Learning Assessment (15 pages)
10. 11-09-98 Speech and Language Evaluation (3 pages)
11. 11-10-98 CSE Case Conference Report (2 pages)
12. 04-15-99 IEP Teacher Progress Report Form (6 pages)
13. 04-03-00 CSE Meeting Summary Form (1 page)
14. 10-02/04-01 Compuscore Version 1.1b Score Report (7 pages)
15. 10-26-01 Psycho-Social History (3 pages)
16. 01-03-02 Behavior Assessment System for Children by Cecil Reynolds and Randy
    Kamphaus (14 pages)
17. 02-11-02 WISC-III Test Scores Report to Parents/Guardians (15 pages)
18. 02-22-02 Interpretive Report of WISC-III Testing (5 pages)
19. 03-2002 Triennial Observations by Mrs. Mordecki/Mrs. MacDougall (1 page)
20. 04-05-02 Behavior Assessment System for Children by Cecil Reynolds and Randy
    Kamphaus (12 pages)
21. 05-09-03 Cognitive And Educational Evaluation (10 pages)
22. 06-08-04 Annual Physical Examination (1 page)
23. 06-16-04 Unedited Writing Sample (2 pages)
24. 06-16-04 Cognitive and Educational Evaluation (15 pages)
25. 06-23-04 Technology Evaluation (3 pages)
26. 10-13-04 Teacher Input Forms (6 pages)
27. 04-03-05 Guidance Center Report - Social History (1 page)
28. 04-03-05 Guidance Center Report - Educational Evaluation (5 pages)
29. 04-03-05 Guidance Center Report - Psychological Evaluation (7 pages)
30. 05-12-05 Observation Form (2 pages)

31.    07-13-06 Letter to Kathryn Rohe from Parents (1 page)
32.    07-25-06 Letter to Parents from Kathryn Rohe (3 pages)
33.    08-08-06 Educational Evaluation (7 pages)
34.    08-20-06 Letter to Kathryn Rohe from Parents (1 page)
35.    09-13-06 Letter to Parents from Louis Valesey with attached class profiles (6 pages)
36.    Processing Speed Comparison (1 page)
37.    Staff Building Information - Tomassi (1 page)
38.    Staff Building Information - Womack (1 page)
39.    Kildonan Records
    a.    Progress Reports and Report Cards from 11-03 through 01-07 (84 pages)
    b.    2003-2004 Student Profile (4 pages)
    c.    2004-2005 Student Profile (4 pages)
    d.    05-05 Kildonan Language Training Skills Checklist (4 pages)
    e.    05-06 Kildonan/Dunnabeck Skills Checklist (4 pages)
40.    Carmel Report Cards (K-4) and standardized test results (20 pages)
41.    Audiotape
42.    Transcription of tape
43.    letter
44.    letter 7/12/06
45.    letter 7/22/06
46.    drAFT TRANSCRIPT

**Carmel Central School District**
**Parent exhibit List**

| | |
|---|---|
| A. | 9-2005 Kildonan Testing results permission (1 page) |
| B. | 9-5-05 Consent to share info. |
| C. | Area summary |
| D. | 3-29-06 letter to Tim Simond |
| E. | 5-24-06 Letter to Tim Simond |
| F. | 7-13-06 Letter to Rohe |
| G. | 7-13-06 Consent to Evaluate |
| H. | 7-14-06 Letter to Rohe |
| I. | 7-24-06 Letter to Rohe |
| J. | 7-7-06   Grades released when paid |
| N. | 7-24-06 Person time off |
| ~~M.~~ (out) | 7-25-06 Consent for information |
| N. | 7-25-06 Consent to Evaluate |
| O. | 7-26-06 Letter to Rohe |
| Q. | 8-23-06 Letter to Rohe |
| R. | 8-10-06 Committee Meeting info (15 pages) |
| S. | 8-27-06 Letter to Rohe |
| T. | Student Information (9 pages) |
| U. | 9-6-06 Corrected IEP notice |
| V. | 9-14-06 Letter to Rohe |
| W. | 9-18-06 Letter to Rohe |
| X. | Assistive Technology Evaluation (7 pages) |
| Y. | 4-30-06 Interim Report |
| Z. | Academy of Orton-Gillingham |
| | |
| AA. | Kildonan Booklet |
| BB. | Curriculum Vita (3 pages) |
| CC. | Kildonan School |
| DD. | Orton-Gillingham Approach (2 pages) |
| EE. | Dyslexia (4 pages) |
| FF. | Student Profile |
| GG. | Transcription (20 pages) |
| HH. | Audio Tape |

RECEIVED
OCT 1 2 2007
OFFICE OF
STATE REVIEW