**UNIVERSITY OF THE STATE OF NEW YORK**
**STATE EDUCATION DEPARTMENT**

---

**IN THE MATTER OF THE APPEAL OF THE**
**BOARD OF EDUCATION OF THE CARMEL**
**CENTRAL SCHOOL DISTRICT,**

                           **PETITIONER,**

    **-against-**

**MR. E.D. AND MS. L.D., ON BEHALF OF THEIR**
**DAUGHTER, C.D.,**

                    **RESPONDENTS.**

08 CV 00445 (KMK)

PLEADINGS # 1

**NOTICE WITH**
**PETITION**

**RECEIVED**
OCT 0 3 2007
OFFICE OF
STATE REVIEW

*[stamp: U.S. DISTRICT COURT FILED MAY 14 2008 S.D. OF N.Y. W.P.]*

---

**NOTICE:**

    You are hereby required to appear in this review and to answer the allegations contained in this petition. Your answer must conform with the provisions of the regulations of the Commissioner of Education relating to reviews of this nature, copies of which are available from the Office of State Review of the New York State Education Department, 80 Wolf Road, Suite 203, Albany, New York 12205-2643.

    Please take notice that such regulations require that an answer to the petition must be served upon the petitioner, or if petitioner is represented by counsel, upon such counsel, within ten (10) days after the service of the petition for review, and that a copy of such answer must, within two (2) days after such service, be filed with the Office of State Review of the New York State Education Department, 80 Wolf Road, Suite 203, Albany, New York 12205-2643.

The decision of the State Review Officer shall be based solely on the record before the State

Review Officer and shall be final, unless an aggrieved party seeks judicial review.


DATED:      **POUGHKEEPSIE, NEW YORK**
                    **OCTOBER 1, 2007**

                                    **SUBMITTED BY:**

                                    **SHAW, PERELSON, MAY & LAMBERT, LLP**
                                    **(MICHAEL K. LAMBERT, OF COUNSEL)**
                                    **ATTORNEYS FOR THE CARMEL**
                                    **CENTRAL SCHOOL DISTRICT**
                                    **OFFICE AND P.O. ADDRESS**
                                    **2-4 AUSTIN COURT**
                                    **POUGHKEEPSIE, NEW YORK**

**RECEIVED**

OCT 0 3 2007

OFFICE OF
STATE REVIEW

UNIVERSITY OF THE STATE OF NEW YORK
STATE EDUCATION DEPARTMENT

---

IN THE MATTER OF THE APPEAL OF THE
BOARD OF EDUCATION OF THE CARMEL
CENTRAL SCHOOL DISTRICT,

                    PETITIONER,

           -against-
MR. E.D. AND MS. L.D., ON BEHALF OF THEIR
DAUGHTER, C.D.,

                    RESPONDENTS.

---

**RECEIVED**

OCT 0 3 2007

OFFICE OF
STATE REVIEW

VERIFIED PETITION

Petitioner, by its attorneys, Shaw, Perelson, May & Lambert, LLP (Michael K. Lambert, Esq., Of Counsel), states the following:

## STATEMENT OF FACTS

1    C.D. is a 15 year old student who attended the ninth grade in the 2006-2007 school year. She has been classified as learning disabled by the Committee on Special Education (CSE) of the Carmel Central School District (hereinafter referred to as "the District).

2.    The primary source of background information concerning C.D. in the hearing record was contained in Joint Exhibits 4 through 20, which were excluded from evidence by the Hearing Officer, over the objection of the District, after they had already been introduced into evidence upon consent.

3.    C.D. was initially classified as learning disabled in December, 1998 while she was attending first grade in the District's schools. She was determined to be functioning in the average range of cognitive ability with deficits in reading, spelling and math. Her classification was not then and is not now in dispute.

4.    C.D. attended the District's schools through the end of the 2001-2002 school year, after which she was privately placed at the Crossroads School, a Montessori school, for fifth grade. Her

consultant teacher model at the High School. The discussions had at the March 28, 2006 CSE meeting are memorialized in minutes that were admitted in evidence as Joint Exhibit 1-C.

7.    The second CSE meeting took place on August 10, 2006. Present at that meeting were Maureen Karoglanian, a School Psychologist who was serving as CSE Chairperson, Michele Pineyro, a School Psychologist, Judith Tomassi, a High School Special Education Teacher, Patricia Womack, a High School Regular Education Teacher, the mother, C.D. and a parent member. Joint Exhibit 1-D.

8.    The hearing record contains considerable information concerning the planning and discussions that took place at the August 10, 2006 CSE meeting. Updated evaluative information was reviewed, including information that had been provided by the Kildonan School. The CSE discussed in detail CD's strengths and weaknesses, reviewed proposed goals to address the identified areas of deficit and discussed in detail how the consultant teacher program at Carmel High School, with an additional period of special class reading and counseling, program and test modifications and accommodations, could appropriately address C.D.'s needs. This educational program would enable C.D. to access the regular education curriculum in her neighborhood school, with her non-disabled peers, and obtain a Regents Diploma.

9.    Several times during the course of the August 10, 2006 CSE meeting, C.D. and her mother were provided with the opportunity to voice any questions, concerns or disagreements with the recommendations that were being discussed. At no time did either of them, or anyone else who was present at the meeting, express even a hint that they questioned the appropriateness of the educational program that was being developed. Such omission on the part of the parent in particular deprived the CSE of the opportunity to address any questions or concerns that may have existed.

10.    After the August 10, 2006 CSE meeting concluded, an IEP was prepared memorializing the recommendations that had been made at that meeting. Unfortunately, the first draft of the IEP that

was forwarded to the parents contained a clerical error on pages 1 and 3. Specifically, the IEP erroneously indicated that C.D. was to be placed in 10th grade consultant teacher English (See Parent Exhibit T). This was obviously a clerical error, in that the CSE had knowledge of the fact that she would be entering 9th grade, had 9th grade teachers at the CSE meeting and limited their grade discussions to 9th grade (see District Exhibit 42 and Parent Exhibit GG). The fact that this was obviously a clerical error did not stop the mother from writing a somewhat disingenuous letter on August 27, 2006 objecting to the "grade 10 placement". A corrected IEP (Joint Exhibit 1-D) was quickly sent to the parents.

11.    By letter dated September 18, 2006, the parents requested an impartial due process hearing seeking reimbursement for the costs associated with the unilateral placement at the Kildonan School in the 2006-2007 school year.

12.    The hearing request alleged that the educational program offered by the District was inappropriate on three specific bases.

13    Hearings were thereafter conducted over seven separate days, during which time testimony was elicited from seven separate witnesses.

14.    The hearing officer thereafter issued an August 25, 2007 Decision granting the Parent's tuition reimbursement request. This appeal ensued.

## THE IHO IMPROPERLY BASED HIS DETERMINATION AS TO THE APPROPRIATENESS OF THE CHALLENGED IEP UPON CLAIMS THAT WERE NOT ASSERTED IN THE SEPTEMBER 18, 2006 COMPLAINT LETTER

15.    Under the new amendments to the Individuals with Disabilities Education Act (IDEA) and corresponding State law and regulations, the party requesting an impartial due process hearing may not raise issues at the due process hearing that were not raised in the original due process request unless the original request is properly amended prior to the hearing (20 U.S.C. §1415[c][2][E]), or the other party agrees (20 U.S.C. §1415[f][3][B]). *See also* 8 NYCRR §200.5(j)(1)(ii).

16.    In the instant case, there was no amended hearing request filed. Moreover, counsel for the District, from the opening statement to the end of the hearing, repeatedly objected to the attempted introduction of evidence relating to additional issues that were not contained in the original hearing request. Thus, there clearly was no agreement on the part of the District to expand the scope of the hearing beyond the issues that were identified in the hearing request. Accordingly, the issues that were properly before the hearing officer were limited to those that were contained in the original hearing request. The hearing officer was without jurisdiction to decide any other issues. *See Application of a Child with a Disability*, Appeal No. 07-051; *Application of a Child with a Disability*, Appeal No. 07-047; *Application of a Child with a Disability*, Appeal No. 06-139; *Application of a Child with a Disability*, Appeal No. 06-065; *Application of a Child with a Disability*, Appeal No. 04-019.

17.    The hearing request was set forth in the record as Joint Exhibits 2-A, 2-B and 2-C. Each of the three letters are virtually identical. The following bases were claimed as prompting the parents' rejection of the 2006-2007 IEP developed by the District's CSE:

1.    C.D. will not reach her academic potential in a class that has consultant teachers providing assistance to other students who learn at faster rates of speed than she does.

2.    C.D. needs to be taught in small classes with other children with dyslexia.

3.    C.D. needs to be taught through the use of a specific methodology - that being the Orton-Gillingham methodology with daily one-to-one tutoring.

18.    While the hearing officer acknowledged that he was without jurisdiction to decide issues that were not raised in the complaint letter (see discussion regarding goals on page 18 of the [unnumbered] Decision), he then proceeded to assess the appropriateness of the challenged IEP based solely upon an issue that was not raised in the complaint letter.

19.    The hearing officer held that, "the pivotal issue which leads to the conclusion that the District did not provide a FAPE is the uninspired rendition of the Student's present levels of performance in the IEP.  Although adequate information was gathered and much found its way into the IEP, indeed much discussion occurred during the August 10, 2007 CSE meeting, very few details of the student's baseline performance were articulated in the IEP." See page 19 of [unnumbered] Decision.

20.    The hearing officer held that, "based upon the deficiencies in the reported present levels of performance alone, I find the 2006-2007 IEP failed to offer a FAPE." See page 23 of [unnumbered] Decision.

21.    Thus, the hearing officer based his determination as to the appropriateness of the challenged IEP solely upon his assessment of the current functioning levels section of the IEP, an issue that was not raised in the complaint letter.  Moreover, in doing so, the hearing officer applied an incorrect legal standard, holding that the current functioning levels needed to be "inspired" as opposed to simply identifying the student's strengths and weaknesses in a manner that enabled the CSE to identify appropriate educational supports, the provision of which was reasonably calculated to lead to educational gains.

22.    Accordingly, as the hearing officer's finding as to the appropriateness of the challenged IEP was expressly based upon a claim that was not asserted in the complaint letter, such Decision must, as a matter of law, be overturned.

**THE PARENTS FAILED TO MEET THEIR BURDEN OF
DEMONSTRATING THAT THE CHALLENGED IEP WAS
INAPPROPRIATE BASED UPON THE CLAIMS ASSERTED
IN THE COMPLAINT LETTER**

23.    The burden of proof in an administrative hearing under IDEA is properly placed upon the party seeking relief. *Schaffer v. Weast*, 126 S.Ct. 528, 537 (2005).  Although the Supreme Court declined to address the issue of whether a State could, by statute, place the burden of proof upon the school district, New York clearly had not, as of the dates of this hearing, done so through the

adoption of a statutory or regulatory provision purporting to define the burden of proof in administrative hearings assessing IEP's. Accordingly, the parent in this case had the burden of proof with respect to each of the claims asserted in the complaint letter. *See, e.g., L.E. and E.S. ex. rel. M.S. v. Ramsey BOE*, 44 IDELR 269 (3d Cir. 2006). Parents in this case have clearly failed to meet that burden.

24.     The hearing record demonstrated that C.D.'s educational needs were not unlike many of the students who were being successfully educated within the high school's consultant teacher program.

25.     The hearing record demonstrated that C.D.'s processing speed was assessed as being in the 50th percentile (see page 2 of Joint Exhibit 29). This functioning level compared quite closely and, in fact, favorably to the processing speed of the IDEA-classified students with which she would be educated at the Carmel High School (see Joint Exhibit 36, which indicated that the average processing speed of the IDEA-classified students with whom C.D. would have been educated at Carmel High School was a standard score of 92 [with a standard score of 100 being equal to the 50th percentile]).

26.     Thus, to the extent that accommodations needed to be made to address processing speed deficits (notwithstanding the fact that the only standardized test in the hearing record failed to demonstrate any such processing speed deficit), the special education staff who were implementing the IEP would be able to provide such accommodations to C.D. and to a group of students who had quite similar needs and who would be in need of quite similar accommodations.

27.     Parents next alleged that C.D. could only be properly educated with dyslexic students. There is absolutely no support in the record for such a conclusion. Indeed, the unchallenged hearing testimony of Maureen Karoglanian, Judy Tomassi and Kim Paetsch was that C.D. presented with a profile that was quite similar to that of many students with needs in the area of language arts.

28.    The position that placing the label of "dyslexia" upon a child and such child's proper grouping in an educational setting is an oversimplification of a considerably more complex process. In this case, C.D.'s strengths and weaknesses were properly and thoroughly assessed through a comprehensive evaluative process, the latest of which occurred two days prior to the August 10, 2006 CSE meeting.    The adequacy of the evaluative information collected by the CSE was acknowledged by the hearing officer.    See page 19 of [unnumbered] Decision.

29.    Upon identifying her strengths and weaknesses, the CSE recommended that C.D. be placed in an educational environment which had a successful history in remediating such academic deficits while enabling the child in question to access the regular education curriculum in their neighborhood school.    The District would respectfully suggest that this is exactly what Congress intended in enacting IDEA.

30.    Finally, the parents contend that Orton Gillingham is the only methodology that may properly be used to educate C.D. The record fails to support this conclusion.

31.    The law is clear that public school districts have considerable discretion in choosing a methodology or methodologies through which a child with special needs may be educated. Counsel for the parents is well-aware of this matter of black-letter law. See, e.g., *Application of a Child with a Disability*, Appeal No. 98-31.

32.    In this case, the CSE determined that C.D.'s needs could properly be met through a series of special education supports, including but not limited to the Orton-Gillingham methodology, provided through qualified special education teachers, a regular education teacher and a teaching assistant in each core academic class and by a highly-trained special education teacher in a daily intensive reading class.    There is simply no evidence in the hearing record to suggest that the CSE erred in making this determination or that the educational program that they developed was not reasonably calculated to confer educational benefit upon C.D.    Indeed, no educator testified during the course

of the instant hearing that the educational program offered by the District for the 2006-2007 school year would not have appropriately met C.D.'s educational needs.

33.     Accordingly, as the parents failed to sustain their burden of demonstrating that the challenged IEP was inappropriate for the bases alleged in the hearing request, the hearing officer's Decision as to the appropriateness of the challenged IEP must be overturned.

## THE CHALLENGED IEP WAS, IN FACT, APPROPRIATE

34.     Pursuant to the Individuals with Disabilities Education Act (IDEA), all children with disabilities are entitled to a "free appropriate public education" ("FAPE") which must include "special education and related services" tailored to meet the unique needs of the child and be "reasonably calculated to enable the child to receive educational benefits.

35.     A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP. A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits.

36.     While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA. Pursuant to the IDEA, when procedural violations are alleged, an administrative officer may find that a child did not receive a FAPE only if the procedural inadequacies (a) impeded the child's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits. The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received FAPE.

37.     A school district offers FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (*Rowley*, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." Additionally, school districts are not required to "maximize" the potential of students with disabilities. Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement.'" The IEP must be "reasonably calculated to provide some 'meaningful' benefit."

38.     The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; *see Walczak*, 142 F.3d at 132). The LRE is defined as "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled" (*Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 [3d Cir. 1995]).

39.     The hearing evidence demonstrated that the IEP developed by the CSE on August 10, 2006 was entirely appropriate for C.D. and would have led to continued educational gains for her during her 9th grade year at the Carmel High School, a view that was shared by everyone who participated in the CSE meeting.  To the extent that the parent disagreed with this conclusion, she neither said nor did anything to express such belief at the CSE meeting.

40.     The August 10, 2006 CSE meeting was chaired by Ms. Karoglanian, a school psychologist with an advanced certification in school neuropsychology and between 28-29 years of experience in the District (T. 410-12).  Her last five years had been as a school psychologist at the Carmel High

School, during which time she obtained a great familiarity with the consultant teacher model employed thereat (T. 414; 418-19).

41.    Ms. Karoglanian described the manner in which the CSE meeting had been conducted. It was made clear that the meeting was a follow-up to the March 28, 2006 CSE meeting and that a primary purpose was to provide additional information concerning the consultant teacher program at Carmel High School (T. 415-18).

42.    Ms. Karoglanian testified that C.D.'s standardized test scores were, in fact, stronger than a number of the students who had been placed in the consultant teacher model during the past five years (T. 419-20). In this regard, she noted that C.D. was of average intelligence, was in the average range with respect to reading and oral language skills and in her ability to apply academic skills, and in the low average range with respect to broad reading, mathematics, written language and written expression. These scores all led Ms. Karoglanian to conclude that she would be appropriate for the consultant teacher program (T. 425-30). This conclusion was supported by Ms. Karoglanian's observation that students with below average oral language skills had enjoyed success in the consultant teacher program (T. 427). Ms. Karoglanian also noted that C.D.'s performance on academic testing appeared to have been impacted by a fluency deficit. However, such deficits are routinely addressed in educational settings through accommodations such as extended time for tests and assignments, special location and program modifications and are very common in public schools (T. 428-29). C.D.'s IEP, in fact, contains each of these accommodations. Joint Exhibit 1-D.

43.    The evaluative information reviewed from Kildonan likewise supported the conclusion that C.D. would be successful in the high school program that was then under discussion (T. 431-37). In fact, Ms. Karoglanian testified that she was unaware of any information which suggested that C.D. would not have been successful in the consultant teacher program at the Carmel High School (T. 437).

44.    In preparation for the August 10, 2006 CSE meeting, updated educational testing had been done two days prior to the meeting (Joint Exhibit 33) by Sharon Chichester, a District special education teacher who was familiar with C.D. based upon prior testing that she had administered (Joint Exhibit 24).

45.    Judith Tomassi testified that she presented the results of this updated testing at the August 10, 2006 CSE meeting (T. 960). She indicated that she had been trained with respect to the administration of the tests that had been administered by Ms. Chichester and that she had, in fact, administered them to other students in the District (T. 961).

46.    Such testing revealed a great deal of information regarding C.D.'s strengths and weaknesses. Initially, her oral language skills were average when compared to others at her age level. Ms. Tomassi opined that the educational relevance of this finding was that C.D. would be able to access the curriculum information presented by the general education teacher during lectures (T. 963).

47.    CD's ability to apply academic skills was average. Ms. Tomassi testified that so long as the consultant teacher was able to ensure that the information from the general education teacher was delivered to her in such a way as to meet her strengths and ameliorate her weaknesses, C.D. would be successful in the course (T. 964). C.D.'s academic skills were low average. Ms. Tomassi testified that these scores were often seen in the student receiving educational supports within the high school's consultant teacher program. Through a combination of direct instruction and program modifications, these students are able to enjoy success within a regular education setting (T. 965-66).

48.    C.D.'s fluency with academic tasks was low, but there were a number of educational accommodations that could be provided to address such deficit (T. 967-68; 973-74).

49.    C.D.'s performance levels in broad reading, mathematics, written language and written expression was low average, and low in math calculation. Joint Exhibit 33. However, Ms. Tomassi

was able to confidently state that she had worked with many similar students within the consultant teacher model and had enjoyed success in doing so (T. 970-71).

50.    In short, C.D.'s academic skills were stronger than many of the students who were being successfully educated within the consultant teacher model at Carmel High School. Ms. Tomassi testified that she was confident that C.D.'s academic needs could have been appropriately met within the consultant teacher program that had been recommended for her (T. 972; 975). Indeed, relative to the other students who had been successfully educated within the consultant teacher model, Ms. Tomassi characterized the level of severity of C.D.'s learning disability as "Mild" (T. 1072-73).

51.    The IEP that was prepared at the August 10, 2006 CSE meeting contains a comprehensive description of C.D.'s current functioning levels in each of the four areas set forth at §200.6 of the Commissioner's Regulations.

52.    The challenged IEP sets forth goals, each of which was individually reviewed, program modifications, test accommodations and assistive technology.

53.    The August 10, 2006 CSE meeting resulted in a recommendation that C.D. be educated at the Carmel High School in a program consisting of consultant teacher support in English, Math, Science and Social Studies. Although the maximum number of classified students in each such class was 15, it was indicated to the parent that the actual number of classified students would, in fact, be less. Joint Exhibit 35 sets forth class profiles for each of these classes which identifies the number of classified students in each. Joint Exhibit 35 also demonstrates that the individual functioning levels of these students were quite similar to each other.

54.    The IEP that was thereafter generated indicated that each such class would include a regular education teacher, a special education teacher and a teaching assistant. C.D. was also recommended to receive a daily period of special class reading, which would have been composed of six students with similar needs. Finally, the IEP developed at the August 10, 2006 CSE meeting contains a

recommendation that C.D. receive weekly counseling to address any transitional issues that may result from her movement from the Kildonan School to her neighborhood school.

55.     The District presented evidence during the course of the hearing with respect to the daily special class that was recommended to provide C.D. with reading support. In this regard, Kimberly Paetsch testified that she had been a teacher in the Carmel School District for approximately 20 years (T. 879), that she held a BA in Psychology, a Master's Degree in Special Education and had been certified at both Level I and Level II in the Wilson reading program, which she identified as an Orton-Gillingham based reading program, for approximately 10 years (T. 875-77; 879-80). The Wilson reading program was further described as a language-based programs for students specifically with dyslexia who have reading decoding and reading encoding problems as fell as fluency deficits. It consisted of a more systematized, sequential Orton-Gillingham program with 12 sequential steps that covered every rule of the English language (T. 877-79).

56.     Ms. Paetsch's testified that her special class for reading met daily for 40 minutes (T. 883-84). There were five students in the class that C.D. was recommended for (T.910-111). There was a teaching assistant assigned to the class with Ms. Paetsch who had worked with her for 12 years (T. 948-49). In addition, there was also a backup teaching assistant to provide additional support (T. 890-91).

57.     The typical profile of a student placed in her class was a dyslexic student who had difficulties with reading decoding, spelling and fluency (T. 881). Ms. Paetsch reviewed the most current educational testing for C.D. in detail and concluded that C.D.'s profile made her very much appropriate for placement within her class (T. 884-894). C.D.'s educational profile was quite similar to that of many students who had been placed in and who had benefitted from placement in Mr. Paetsch's reading class. In fact, C.D. academic profile was stronger than that of many students who had benefitted from Ms. Paetsch's reading class (T. 912-13).

58.    For the students placed in her reading class, Ms. Paetsch would utilize a variety of methodologies, to include the Wilson Reading Program, Lindamood Bell and Read Naturally, to address their needs.  Each such program involved pre-testing and post-testing so that the child's current functioning and progress could be constantly and accurately monitored (T. 879; 881-83). Ms. Paetsch testified in detail as to how she would have addressed C.D.'s specific deficits in the areas of decoding, encoding and fluency using the Reading Naturally program, the Wilson Reading program and the Kurzweil reader (T. 885-913).  Notably, she testified that she would be working on the very same skills that Kildonan had been working on during C.D.'s time in attendance at Kildonan (T. 894-97; Joint Exhibits 39-D and E).

59.    Ms. Paetsch concluded her testimony by rendering an opinion that C.D. would have been entirely appropriate for placement within her reading class (T. 912-13).

60.    The records that were introduced during the course of the hearing from the Kildonan School also demonstrated that C.D. was ready for a return to the Carmel public schools in the 2006-2007 school year.  In particular, the District respectfully requests that the State Review Officer closely review the comments that are set forth throughout Joint Exhibit 39-A suggesting that C.D. is a student who was reading with confidence, whose fluency had improved, who was achieving good scores in her academic areas.

61.    There was simply no reason why such a child could not be appropriately educated within a public school setting.  If there ever was a time that C.D.'s educational needs were such that she required a restrictive, out-of-district placement such as Kildonan, that time had, by the 2006-2007 school year, long since passed.

62.    Placement of C.D. in an educational program at his neighborhood school was clearly consistent with the LRE requirements of State and Federal law. The IDEA's preference is that disabled children be educated in the least restrictive environment (LRE) capable of meeting their

needs. The IDEA mandates that all students with disabilities be educated with nondisabled children

to the maximum extent appropriate and may only be removed to a more restrictive environment

when the nature and severity of the disability is such that education in regular classes with the use

of supplementary aids and services cannot be achieved satisfactorily (20 USC 1412[a][5][A]; 34

CFR 300.550[a][2]; *Oberti v. Bd. of Educ.* 995 F2d 1204, 1213 [3rd Cir. 1993; *Briggs v. Bd. of Educ.*,

882 F2d 688, 691 [2nd Cir. 1989]; *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 [5th cir.

1989]).

63.    A Board of Education is legally obligated to place a disabled student in the least restrictive

environment.

> "The fact that a student with a disability might make greater academic progress in a
> special education class may not warrant excluding the student from a regular
> education program (*Oberti v. Borough of Clementon Sch. Dist.*, 995 F.2d 1204 [3rd
> Cir. 1993]). The CSE must also consider the unique benefits, academic and
> otherwise, which a student may receive by remaining in regular classes such as
> language and role modeling with nondisabled peers (*Greer v. Rome City Sch. Dist.*
> 950 F.2d 688 [11th Cir. 1991]).

64.    The CSE considered the issue of LRE in making its placement decision and made reasonable

efforts to accommodate C.D. in the regular education environment to the maximum extent

appropriate. Since there was no evidence to support the need for a more restrictive placement, there

was no basis to disturb the CSE's recommendations. While the Parent may prefer to have C.D.

placed in a private school, the hearing officer erred in finding that the District's program and

placement would not have provided a FAPE in the LRE.

### THE HEARING OFFICER'S FINDINGS RELATIVE TO THE APPROPRIATENESS OF KILDONAN IGNORED THE LEGAL REQUIREMENT THAT STUDENTS BE EDUCATED IN THE LEAST RESTRICTIVE ENVIRONMENT.

65.    In *School Committee of the Town of Burlington v. Department of Education, Massachusetts,*

471 U.S. 359 (1985), the U.S. Supreme Court held that the parents of a child with an educational

disability could be reimbursed for tuition payments for a private unilateral placement, if the District's

IEP was inappropriate, the private placement selected by the parent was proper pursuant to the IDEA, and equitable considerations supported the parents' claim.

66.    In establishing the appropriateness of a unilaterally selected placement, the parents must demonstrate that such placement met all of the student's needs and was in the least restrictive environment, *(Application of a Child with a Disability*, Appeal No. 92-34). The Second Circuit Court of Appeals held in *M.S. ex rel S.S. v. Board of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96 (2nd Cir. 2000), that in reviewing the appropriateness of a parent selected placement, the issue of LRE must be considered. The parents failed to meet their burden of proof with respect to the second *Burlington/Carter* criterion (i.e., the appropriateness of the services which they selected), a fact that is ignored in the hearing officer's Decision..

67.    None of C.D.'s educational providers testified during the course of the instant hearing. The sole witness from Kildonan was their designated witness, Dr. Robert Lane. The District would respectfully suggest that there was nothing in the testimony of Dr. Lane which supported the conclusion that C.D. required a placement such as Kildonan in order to meet her educational needs in the 2006-2007 school year. The District would respectfully suggest that the following factors support a conclusion that the hearing record fails to support the conclusion that Kildonan was an appropriate educational placement for C.D. in the 2006-2007 school year:

a.    Kildonan is a non-approved private school which employs non-certified teachers (T. 326; 341-45).

b.    There are no non-disabled students at Kildonan. Thus, C.D. has no opportunity to interact with her non-disabled peers (T. 326-27).

c.    There was no information presented as to the functioning levels of the students in C.D.'s various classes. Indeed, Dr. Lane testified that the reading levels of the students was not taken into account in determining grade placement and that it was

possible that students could be in the same class who are reading many years apart in terms of grade level (T. 329-30). Moreover, students are not grouped in classes based upon the similarity of their respective individual needs (T. 332-33).

d.  No individualized education plan is prepared for students at the Kildonan School (T. 331).

e.  Dr. Lane was unable to articulate any coherent yardstick for measuring when a student who has been attending school at Kildonan is ready to return to the public school system. Indeed, based upon the subjective guidelines that Dr. Lane did identify (skill levels in reading and writing, levels of independence, academic attitudes) (T. 333-34), it is respectfully suggested that Kildonan's own records (Joint Exhibit 39-A) clearly demonstrate that C.D. was ready to be returned to the District's schools for the 2006-2007 school year. In this regard, Dr. Lane testified that teacher feedback was perhaps the most important factor in determining when a child is ready to leave Kildonan and return to his/her public school (T. 356-57; 360). Such teacher feedback was consistent with the comments contained in Joint Exhibit 39-A (T. 358; 361-62). In addition, Dr. Lane's account of C.D.'s academic strengths also supported the conclusion that she was ready to return to the Carmel schools (T. (T. 363-99). Unfortunately, Dr. Lane was unable to produce any notes or other documentation which memorialized the process, if there was any process other than recognizing the fact that the District was obligated to continue to fund the Kildonan placement by virtue of the pendency provisions of State and Federal law, through which it was determined that C.D. should continue at Kildonan for the 2006-2007 school year or through which the parents were notified of any such purported recommendation (T. 334-39). What is clear, however, is that any such recommendation would have been

made without regard to the appropriateness of what the Carmel School District had

to offer in terms of educational supports, an issue as to which Dr. Lane had no

knowledge (T. 340-41).

f.  The fact that C.D. was transitioning from one academic house in Kildonan (8th grade0

to another academic house (9th grade) and to a new school in the Carmel Central

School District (Carmel High School) made the 2006-2007 school year a particularly

appropriate time to make the transition back to the public school district (T. 334).

g.  None of the teaching staff providing educational services to C.D. at Kildonan had any

level of certification with respect to the Orton-Gillingham methodology (T. 347-49).

h.  C.D. received specific language instruction at Kildonan for only one period per day

(T. 368). This was precisely the same amount of time as she would have received

reading instruction in the educational program recommended by the CSE on August

10, 2006.

68.  Based upon the above information, as well as the information otherwise referenced in this

brief, it is clear that the hearing evidence failed to support the need for C.D. to remain in a restrictive,

segregated program such as Kildonan for the 2006-2007 school year. Accordingly, as the parents

failed to meet their burden of demonstrating the necessity of C.D.'s placement at Kildonan during

such year, the hearing officer's Decision granting them such reimbursement must be overturned.

## CONCLUSION

69.  For these reasons, the SRO should overturn the decision of the IHO in its entirety and find

that the Parents failed to meet their burden of demonstrating that the challenged IEP was

inappropriate for the reasons set forth in the complaint letter, that District offered C.D. an

appropriate program and placement for the 2006-07 school year, and that the Parents failed to

demonstrate that the placement of C.D. at the Kildonan School in the 2006-2007 school year was

consistent with IDEA's requirement that students with disabilities be educated in the least restrictive environment and deny the parents' request for tuition and transportation reimbursement at the Kildonan School during the 2006-2007 school year.

DATED:    POUGHKEEPSIE, NEW YORK
          OCTOBER 1, 2007

                        SUBMITTED BY:

                        SHAW, PERELSON, MAY & LAMBERT, LLP
                        (MICHAEL K. LAMBERT, OF COUNSEL)
                        ATTORNEYS FOR THE CARMEL
                        CENTRAL SCHOOL DISTRICT
                        OFFICE AND P.O. ADDRESS
                        2-4 AUSTIN COURT
                        POUGHKEEPSIE, NEW YORK

TO:    OFFICE OF STATE REVIEW
       NEW YORK STATE EDUCATION DEPARTMENT
       80 WOLF ROAD, SUITE 203
       ALBANY, NEW YORK 12205-2643

       ROSALEE CHARPENTIER, ESQ.
       FAMILY ADVOCATES, INC.
       209 CLINTON AVENUE
       KINGSTON, NEW YORK 12401

       KATHRYN ROHE
       DIRECTOR OF PUPIL SERVICES
       CARMEL CENTRAL SCHOOL DISTRICT
       P.O. BOX 296
       81 SOUTH STREET
       PATTERSON, NEW YORK 12563

RECEIVED
OCT 0 3 2007
OFFICE OF
STATE REVIEW

# VERIFICATION

STATE OF NEW YORK

                              SS:

COUNTY OF PUTNAM


**KATHRYN ROHE**, being sworn says: I am the Director of Pupil Services for the Carmel Central School District, the Petitioner to the action; I have read the annexed **PETITION** and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

My belief as to those matters therein not stated upon knowledge, is based upon books, records and other documents maintained at the School District.

_____

**KATHRYN ROHE**

Sworn to before me this
1st day of October, 2007

_____

**NOTARY PUBLIC**

**MICHAEL K. LAMBERT**
Notary Public, State of New York
No. 02LA5014705
Qualified in Dutchess County
Commission Expires July 6, 2007

**RECEIVED**

OCT 0 3 2007

OFFICE OF
STATE REVIEW

**UNIVERSITY OF THE STATE OF NEW YORK**
**STATE EDUCATION DEPARTMENT**

---

**IN THE MATTER OF THE APPEAL OF THE**
**BOARD OF EDUCATION OF THE CARMEL**
**CENTRAL SCHOOL DISTRICT,**

                              **PETITIONER,**

    -against-
**MR. E.D. AND MS. L.D., ON BEHALF OF THEIR**
**DAUGHTER, C.D.,**

                          **RESPONDENTS.**

**AFFIDAVIT OF SERVICE**

**RECEIVED**
OCT 0 3 2007
OFFICE OF
STATE REVIEW

---

STATE OF NEW YORK    )
                        ) SS.:
COUNTY OF DUTCHESS   )

      SANDRA BUCKNER, being sworn says: I am not a party to the action, am over 18 years of age, and reside at Poughkeepsie, New York.

      On October 1, 2007 I served a true copy of the annexed NOTICE OF PETITION AND VERIFIED PETITION, by facsimile transmission to facsimile number (845) 339-8089 located at Family Advocates, Inc., 209 Clinton Avenue, Kingston, New York 12401. Attached herewith is a facsimile receipt indicating delivery; and by mailing the same in a sealed envelope, with postage prepaid thereon, in a post office, or an Official Depository of the U.S. Postal Service, within the State of New York, addressed to the last known address of the addressee, as indicated below: as indicated below:

            **ROSALEE CHARPENTIER, ESQ.**
            **FAMILY ADVOCATES, INC.**
            **209 CLINTON AVENUE**
            **KINGSTON, NEW YORK 12401.**

                                  SANDRA BUCKNER

Sworn to before me this
1st day of October, 2007

NOTARY PUBLIC

MARGO L. MAY
NOTARY PUBLIC, STATE OF NEW YORK
Reg. # 4780278
Qualified in Dutchess County
Commission Expires May 31, 2011

# TRANSACTION REPORT

OCT-01-2007 MON 03:24 PM

## TX (MEMORY)

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|------|------|
| 1 | OCT-01 | 03:16 PM | 93398089 | 0:07:40 | 25 | G3    OK | | 521 |
| | | | TOTAL | 0:07:40 | 25 | | | |

## SHAW, PERELSON, MAY & LAMBERT, LLP

**ATTORNEYS AT LAW**
2-4 AUSTIN COURT
POUGHKEEPSIE, NEW YORK 12603
(845) 486-4200
FAX (845) 486-4268

STEPHEN A. PERELSON (1941-2002)
DAVID S. SHAW
MARGO L. MAY
MICHAEL K. LAMBERT
MARC E. SHARFF
LISA S. RUSK

BETH L. SIMS
STEVEN M. LATINO
JEFFREY J. SCHIRO
JILLIAN E. JACKSON

MARK C. RUSHFIELD
OF COUNSEL
GARRETT L. SILVEIRA
OF COUNSEL
JOHN E. OSBORN, P.C.
OF COUNSEL

HIGHLAND OFFICE
40 SOUTH ROBERTS ROAD
HIGHLAND, NEW YORK 12528
(845) 691-8100
FAX (845) 691-8246

WESTCHESTER OFFICE
115 STEVENS AVENUE
VALHALLA, NEW YORK 10595
(914) 741-9870
FAX (914) 741-9875

PLEASE RESPOND TO:  **POUGHKEEPSIE**

PLEASE DELIVER THE FOLLOWING PAPERS TO:

NAME:    ROSALEE CHARPENTIER, ESQ.

FIRM:

THIS INFORMATION WAS SENT BY:

NAME:   MICHAEL K. LAMBERT, ESQ./SANDY

DATE:___OCTOBER 1, 2007_____TIME:___3:00 P.M.____NO. OF PAGES__25___
                                        (INCLUDING COVER)

IF YOU DO NOT RECEIVE ALL PAGES IN LEGIBLE FORM, PLEASE CALL: (845) 486-4200

THIS TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.  THANK YOU.