UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LAURA DAVIS and EDWARD DABROWSKI
as parent of a disabled student, C.D.

               **Plaintiffs,**

               **vs.**

CARMEL CENTRAL SCHOOL DISTRICT,

               **Defendant.**

Civil Action 08 -CIV- 04450 (KMK)

**AFFIDAVIT IN OPPOSITION
TO PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION ON THE ISSUE
OF PENDENCY**

---

STATE OF NEW YORK)
COUNTY OF PUTNAM) s.s:

    KATHRYN ROHE, being duly sworn and upon her oath, deposes and says:

1.    I am the Director of Pupil Services for the defendant Carmel Central School District ("District") and, as such, am fully familiar with all the facts and proceedings heretofore had herein. I make this affidavit in opposition to the motion of the plaintiff's for injunctive relief as concerns the pendency obligations of the defendant.

2.    As more fully set forth below, the District has fully complied with its pendency obligation in making payments to the plaintiff in reimbursement, or to the Kildonan School, as appropriate, for tuition for C.D.

3.    As more fully detailed below, the District has paid all such reimbursements or direct tuition payments upon invoices received except direct tuition payments to Kildonan for September, October, November and December and ½ of January of the 2007-2008 school year. As set forth in the memorandum of law submitted herewith, the District was not obligated to make tuition payments during that 5 ½ month period

because the current educational placement of C.D. had effectively changed as of September of 2007 as a consequence of the issuance of a new IEP for C.D. for the 2007-2008 school year which the plaintiff had determined not to challenge and the plaintiff's decision to submit the issue of pendency for the 2007-2008 school year to an Impartial Hearing Officer.

4.    I have reviewed the plaintiffs' submissions to the Court in terms of the affirmation of their counsel and the affidavit of Laura Davis. While the plaintiffs there set forth a number of factual allegations, many of which I understand might arguably be relevant to their challenge to the decision of the State Review Officer ("SRO") in SRO Decision 07-114, on advice of counsel, it appears that many are not relevant to the pendency issue now before the Court on the instant motion for injunctive relief. Furthermore, the plaintiffs omit certain salient and, we submit, determinative, facts relating to their motion.

5.    C.D. attended the District's schools through the end of the 2001-2002 school year, after which she was privately placed at the Crossroads School, a Montessori school, for fifth grade. Her parents thereafter privately placed C.D. in the Kildonan School for the 2003-2004 (sixth grade), 2004-2005 (seventh grade) and 2005-2006 (eighth grade) school years. *Application of a Child with a Disability*, SRO Decision No. 05-063 (Exhibit A hereto); *Application of a Child with a Disability*, SRO Decision No. 06-005 (Exhibit B hereto); *Application of a Child with a Disability*, SRO Decision 07-114 (Exhibit C hereto) at p. 2.

6.    Impartial due process hearings were requested by the plaintiffs for the 2004-2005

2

(seventh grade) and 2005-2006 (eighth grade) school years, through which the plaintiffs sought reimbursement for the costs associated with such private placements. SRO Decision No. 05-063; SRO Decision No. 06-005.

7. For the reasons set forth in SRO Decisions Numbers 05-063 and 06-005, the IEP's that had been developed during each of those school years were found to be procedurally and/or substantively inappropriate and the Kildonan School was found to be appropriate for each such year. SRO Decision No. 05-063; SRO Decision No. 06-005.

8. None of the procedural and/or substantive deficiencies noted by the SRO in SRO Decision No. 05-063 or SRO Decision No. 06-005 are present in this action, or were asserted in the hearing request that prompted the proceedings that led to the SRO decision that are the subject of this action. SRO Decision 07-114; SRO Decision No. 05-063; SRO Decision No. 06-005.

9. Plaintiffs make reference at paragraph 6 of plaintiff Davis' Affidavit to the payments made by the District to the plaintiffs for the 2004-2005 school year (the first year for which a due process proceeding was held relating to the plaintiffs' unilateral placement of C.D. at Kildonan) that was covered by SRO Decision No. 05-063. They complain that the District did not promptly pay reimbursement to her for that school year and that tuition is still outstanding for that school year in the amount of $7,500.00.

10. While counsel advises that the 2004-2005 school year is not a relevant matter for this Court's consideration of the instant application for injunctive relief, plaintiff Davis'

3

representations therein are not accurate, appear to be designed to cast the District in a negative light and, consequently, require a response.

11.    SRO Decision No. 05-063 was rendered on August 10, 2005, after the conclusion of the 2004-2005 school year. It required the District to reimburse the plaintiffs for tuition they paid to the Kildonan School for that 2004-2005 school year. Consequently, the plaintiffs were advised that upon receipt by my office of evidence of payments to Kildonan by them for the 2004-2005 school year the District would make reimbursement to them as ordered by the SRO.

12.    The District did not, however, receive any evidence of payments made by the plaintiffs to the Kildonan School for the 2004-2005 school year for over a year after the SRO's Decision No. 05-063 and it appears that the plaintiffs did not pay Kildonan anything for the 2004-2005 school year until August 21, 2006.

13.    Commencing in September of 2006, without regularity the plaintiffs have submitted cancelled checks on plaintiff Davis' checking account payable to Kildonan for the 2004-2005 school year. The District has processed those cancelled checks, the first of which is dated August 21, 2006, as invoices and has generally issued reimbursement checks to plaintiff Davis for those payments within a week or two of our receipt of the cancelled check. The cancelled checks, related correspondence and notations and evidence of payments are attached hereto as Exhibit D. They reflect a total of ten payments of $2,500.00 each, or $25,000.00 made by the plaintiffs and reimbursed by the District as set forth below:

4

| Date of receipt of Cancelled Check | Amount of Cancelled Check and Payment | Date of Payment |
|---|---|---|
| 9/18/06 | $2500.00 | 10/11/06 |
| 11/17/06 | $2500.00 | 1/05/07 |
| 2/28/07 | $2500.00 | 3/09/07 |
| 8/15/07 | $2500.00 | 8/30/07 |
| 9/14/07 | $2500.00 | 9/21/07 |
| 12/19/07 | $2500.00 | 1/7/08 |
| 1/14/08 | $2500.00 | 1/18/08 |
| 3/26/08 | $2500.00 | 4/3/06 |
| 4/16/08 | $2500.00 | 5/2/08 |
| 5/13/08 | $2500.00 | 5/30/08 |

Total: $25,000.00

14.    Contrary to plaintiff Davis allegations, there has been no inordinate delay in processing her reimbursement requests.

15.    The District does not know what the plaintiffs' payment arrangements with Kildonan were or are for the 2004-2005 school year and has no knowledge of what promises the plaintiffs may have made to Kildonan concerning payment for that school year that resulted in Kildonan not being paid by the plaintiffs during the period of their unilateral placement of C.D. for the 2004-2005 school year and the plaintiffs delaying making any payments whatsoever for that school year until August 21, 2006. It is submitted that the "strains" in plaintiff Davis' relationship with Kildonan, if any, are

5

not the consequence of any delay by the District in processing plaintiff Davis' requests for reimbursement.

16. Nor does the District know if the plaintiffs owe any more money for the 2004-2005 school year to Kildonan. While plaintiff Davis asserts at paragraph 6 of her affidavit that she still owes $7,500.00 to Kildonan for the 2004-2005 school year, I note that the October 20, 2006 letter from Kildonan at the third page to Exhibit D hereto states that tuition was $28,000.00. Unless that changed, at most the plaintiffs owe $3,000.00 for that school year. In any event, should the plaintiffs provide us with cancelled checks showing they were required to pay additional tuition to Kildonan beyond the $25,000.00 we have reimbursed to plaintiff Davis for Kildonan tuition for the 2004-2005 school year, we shall – as we have in the past – promptly reimburse them.

17. While counsel advises that the 2005-2006 and 2006-2007 school years are not a relevant matter for this Court's consideration of the instant application for prospective injunctive relief, there is no dispute that the District has already fully paid C.D.'s tuition to Kildonan for the 2005-2006 and 2006-2007 school years.

18. The District does not pay tuition for a month until it receives evidence that the student has attended that month. Concerning the 2007-2008 school year and beyond, the District has directly paid to Kildonan tuition for the attendance of C.D. during that school year for the period of January 17, 2008 through April of 2008, based upon invoices it has submitted to us, as reflected by Exhibit E hereto. It is paying C.D.'s tuition at Kildonan for May of 2008 contemporaneous with the date of this affidavit

6

and will be paying the tuition for June of 2008 shortly after the close of that month, presuming that C.D. has continued in attendance during the month of June. The District understands that it is obligated to continue its tuition payments for C.D. at Kildonan henceforth during the pendency of this action initiated on January 17, 2008, despite the decision of the SRO on November 14, 2007 that the Districts IEP calling for a public school education of C.D. for the 2007-2008 school year provides her with a free appropriate public education.

19.  The District did not pay tuition for C.D. at Kildonan for the months of September, October, November and December of 2007 and the first 16 days of January of 2008 for the reasons set forth below.

20.  During the summer of 2007, C.D.'s 2007-2008 IEP, calling for her education in a public school (Exhibit F hereto) was generated and forwarded to the plaintiffs. Thereafter, by letter dated August 22, 2007, attached hereto as Exhibit G, the plaintiff's requested an impartial due process hearing challenging the appropriateness of that IEP. However, after an impartial hearing officer was appointed, by letter dated September 7, 2007, attached hereto as Exhibit H, the plaintiffs withdrew their August 22, 2007 request for an impartial due process hearing as concerned the IEP for the 2007-2008 school year.

21.  Following the November 14, 2007 decision rendered by the SRO that is the subject of this action (Exhibit C hereto), by letter to me dated November 17, 2007, the plaintiffs requested an impartial hearing solely regarding the District's failure to provide a pendency placement at Kildonan for the plaintiff student during the 2007-

7

2008 school year. A copy of that letter is attached hereto as Exhibit I. Pursuant to that request, an impartial hearing officer ("IHO"), Eric Nachman, Esq., was appointed on November 27, 2007 by the District to hear that matter.

22.    On January 17, 2008, the plaintiffs, through their current counsel, made a motion before IHO Nachman, for a "preliminary order on the plaintiff student's pendency placement" during the 2007-2008 school year. A copy of that "Motion for Preliminary Order on the Student's Pendency Placement" (hereinafter "IHO Pendency Motion"), misdated January 17, 1 007 on the cover, is annexed hereto as Exhibit J. Attached to the IHO Pendency Motion was a copy of the Complaint in this action.

23.    In the plaintiffs' IHO Pendency Motion before IHO Nachman, the plaintiffs complained of the District's non-payment of C.D.'s tuition at Kildonan for September, October and November of 2007 and confirmed the plaintiffs' request on November 17, 2007 that an impartial hearing officer, i.e., IHO Nachman, "resolve the District's non-compliance with the pendency provision of the IDEA" and further stated that C.D.'s "placement is in jeopardy." See page 4 of plaintiffs' IHO Pendency Motion.[1]

24.    In the plaintiffs' IHO Pendency Motion before IHO Nachman, the plaintiffs requested that he "consider the fact and history of this case and declare that the student's 'pendency' placement for the period beginning September 2007 and continuing

---

[1] The pages of the plaintiffs' IHO Pendency Motion were unnumbered. Page numbers have been placed on the IHO Pendency Motion annexed hereto for ease of reference.

8

through today's date is the Kildonan School" and "an order directing the School

District to immediately undertake necessary steps to ensure the student's 2007-08

tuition payments are up-to-date."

25. Following an argument substantially identical to that made in their memorandum of

law in support of their motion to this Court, in the concluding Wherefore Clause of

their IHO Pendency Motion, the plaintiffs requested that IHO Nachman "grant a

preliminary and interlocutory judgment on the issue of 'status quo' enjoining the

School District from imposing its illegal policy and practice of terminating funding

for the disabled child's current educational placement." IHO Pendency Motion at

page 15.

26. On the same day that they filed their IHO Pendency Motion with IHO Nachman, the

plaintiffs filed their Complaint in this action. However, they did not serve the

Complaint upon the District until February 25, 2008. No application to this Court

concerning pendency was then made.

27. By a decision on the "Student's Pendency Motion" of February 15, 2008 (misdated

as "3/15/08"), annexed hereto as Exhibit K, IHO Nachman reviewed the history of

the proceeding before him, including SRO Decision No. 07-114 of November 14,

2007, the fact that SRO Decision No. 07-114 was not appealed to this Court until

January 17, 2008 and the fact that the plaintiff had initiated a due process proceeding

on August 22, 2007, but withdrew it on September 7, 2007 (misdated as September

7, 2008). Ruling that the parents request for Kildonan tuition payments under the

theory of pendency was denied, IHO Nachman held at pages 5 to 6:

9

There is currently no due process proceeding for pendency to attach. On August 22, 2008 when a due process proceeding hearing was requested, pendency was the last unappealed SRO decision (No. 07-114) denying tuition reimbursement. The parents withdrew there (sic) due process requests on September 7, 2008 (sic);from that date through the present there are no due process requests that the requested pendency could attach. If there was a due process request; pendency might have attached on January 17, 2008 when the when (sic) unappealed SRO decision (No. 07-114) was appealed.

For the purpose of this motion I need not and have not made a decision regarding future pendency and any future due process requests.

I will allow the parents time to amend there (sic) pendency request to include any other appropriate due process requests.

28.    On February 25, 2008 I received the plaintiffs' amended due process complaint dated February 22, 2008, a copy of which is annexed hereto as Exhibit L. By that complaint, the plaintiff also reinstated their "request to the hearing officer for the stay put order and ask he tell the District to make necessary payment arrangements with Kildonan School." IHO Nachman accepted the amended due process complaint and the renewed pendency motion by the plaintiffs on February 26 and 28, 2008 . See Exhibit M hereto.

29.    Thereafter on March 12, 2008, IHO Nachman rendered a decision and order upon the plaintiffs' renewed pendency motion, a copy of which is annexed hereto as Exhibit N. Noting that the plaintiffs continued to assert entitlement to pendency placement for the period beginning September 2007 and that the District contended that such pendency should not run until the commencement of the plaintiffs' appeal of SRO Decision No. 07-114 to this Court on January 17, 2008, IHO Nachman held that he

10

agreed with the District's position and that the District was responsible for C.D.'s Kildonan tuition from January 17, 2008 through the completion of the appeal process. In reaching this conclusion, he stated:

> There is now a due process proceeding for pendency to attach. On August 22, 2008, when a due process proceeding hearing was first requested pendency was the last unappealed SRO decision (No. 07-114) denying tuition reimbursement. The parents withdrew there (sic) due process request on September 7, 2008; from that date through the present there are no due process requests that the requested pendency could attach. A due process request was made on February 26, 2008 and pendency now attaches on January 17, 2008 when the when (sic) unappealed SRO decision (No. 07-114) was appealed.

30.    The District has complied with IHO Nachman's Order in every respect. Neither side has appealed that Order to the SRO. Counsel advises me that about a month after that Order was rendered, by letter dated April 17, 2008 to the Court, a copy of which is annexed hereto as Exhibit P, the plaintiff first alerted this Court to a desire to seek pendency payments for, in effect, the period of September of 2007 through January 16 of 2008.

31.    The District will continue to make tuition payments to the Kildonan School for C.D. so long as she continues to attend that school pending the decision of the Court on whether or not the decision of the SRO in SRO Decision No. 07-114 is entitled to due deference and the plaintiff's action challenging that decision should be dismissed.

WHEREFORE, it is respectfully requested that the Court deny the plaintiffs' motion in all respects and grant the defendant such other and further relief as the Court may deem just and proper,

11

including an expedited resolution of the issue as to whether SRO Decision No. 07-114, attacked

through the instant action, should be confirmed and the Complaint dismissed.

KATHRYN ROHE

Sworn to before me this 12th day
of June, 2008

Notary Public

JEANNE M. GALLIANO
Notary Public, State of New York
No. 01GA6007627
Qualified in Ulster County
Commission Expires 5/26/20_10_

12

# EXHIBIT A



# The University of the State of New York

## The State Education Department
### State Review Officer

No. 05-063

**Application of the BOARD OF EDUCATION OF THE CARMEL CENTRAL SCHOOL DISTRICT for review of a determination of a hearing officer relating to the provision of educational services to a child with a disability**

**Appearances:**

Kuntz, Spagnuolo, Scapoli & Schiro, P.C., attorney for petitioner, Leah L. Murphy, Esq., of counsel

Family Advocates, Inc., attorney for respondents, RosaLee Charpentier, Esq., of counsel

## DECISION

Petitioner, the Board of Education of the Carmel Central School District, appeals from the decision of an impartial hearing officer which found that it failed to offer an appropriate educational program to respondents' daughter and ordered it to reimburse respondents for their daughter's tuition costs at the Kildonan School (Kildonan) for the 2004-05 school year. The appeal must be dismissed.

Respondents' daughter was 12 years old and attending seventh grade at Kildonan when the impartial began on January 18, 2005 (Tr. pp. 387, 445). The Commissioner of Education has not approved Kildon with which school districts may contract to instruct students with disabilities. The student began attendir the beginning of the 2003-04 school year and had attended Crossroads School (Crossroads) for the 2002- (Tr. pp. 412-13, 418-19). The student attended petitioner's schools through the 2001-02 school year (fou (Parent Exs. 27, 28). The student's eligibility for special education as a student with a learning disability determined during the 1998-99 school year, is not in dispute (Tr. pp. 34, 77, 458-59; see 8 NYCRR 200.1

The student was initially classified as LD in December 1998 when she was attending first grade at petitioner's Kent Primary School (Tr. pp. 458-59). At the time, the student's overall intellectual functioning fell within the average range (Dist. Ex. 19 at pp. 2, 3), however, she demonstrated significant deficits in reading, math, and spelling, as well as fine motor delays (Dist. Ex. 19 at p. 5). In addition, the student failed both hearing and vision screenings (Dist. Exs. 21, 22) and evaluators noted that she had difficulty understanding information presented orally (Dist. Ex. 18 at p. 1, Dist. Ex. 19 at p. 2). The student received resource room and consultant teacher services to assist her in her first grade classroom (Tr. pp. 77, 393, 458-59; Dist. Ex. 62). For second through fourth grades the student was

placed in integrated classrooms where she received varying levels of consultant teacher services (Tr. pp. 78-80; Parent Exs. 27, 28).

In February 2002, the student was administered intelligence testing as part of a psychological reevaluation (Dist. Ex. 14). The student's scores on the Wechsler Intelligence Scale for Children-III (WISC-III) revealed that her general cognitive ability was within the average range of intellectual functioning (verbal IQ score 100, performance IQ score 98, and full scale IQ score 99) (Dist. Ex. 14 at p. 1). Although the student's processing speed index score was in the average range (SS 93) (Dist. Ex. 14 at p. 3), the psychologist testified that the student's response to test items was delayed and that as compared to the results of earlier testing the student's processing speed was slowing down (Tr. pp. 173-74). For fifth grade (2002-03) the Committee on Special Education (CSE) recommended that the student's reading, Mathematics, and writing instruction be provided in a special class (Tr. pp. 179, 413; Dist. Ex. 63 at pp. 1, 8). Consultant teacher services were also recommended for social studies and science (Tr. pp. 180, 413; Dist. Ex. 63 at pp. 1, 8) and weekly counseling services were added to the student's individualized education program (IEP) (Dist. Ex. 63 at p.1).

The student's mother reported that she was becoming concerned about her daughter's poor self-esteem and lack of desire to succeed (Tr. pp. 413-14). In September 2002, respondents decided to unilaterally enroll the student in Crossroads, a Montessori school, for fifth grade (Tr. p. 413). In April 2003, respondents referred the student back to petitioner's CSE for evaluation (Parent Ex. 16; Tr. pp. 415-16). In May 2003, petitioner administered the Woodcock-Johnson III Tests of Cognitive Abilities (WJ-III COG) and Woodcock-Johnson III Tests of Achievement (WJ-III ACH) to the student (Dist. Ex. 12; Tr. p. 1226). Compared to same-age peers, the student's performance was average in Mathematics and written expression; and low average in broad reading, basic reading skills, math calculation skills, and written language skills (Dist. Ex. 12 at p. 3). There were no discrepancies found among the student's cognitive and achievement abilities (Tr. p. 1229; Dist. Ex. 12 at p. 3). Based on the results of testing, petitioner's evaluator opined that the student would probably find age-level tasks requiring computational skills and automaticity with basic math facts difficult (Dist. Ex. 12 at p. 2). In addition, due to delays in processing speed and on tasks requiring visual perceptual speed, the evaluator suggested that the student would find age-level tasks requiring "cognitive speediness" very difficult (Dist. Ex. 12 at p. 2).

In September 2003, respondents unilaterally enrolled the student in Kildonan for the sixth grade (Tr. p. 419). At Kildonan the student studied phonetic concepts and sentence types, and learned to write basic paragraphs (Dist. Ex. 10 at p. 1, Dist. Ex. 68). In math, the student continued to have difficulty with multiplication facts (Dist. Ex. 10 at p. 6). On April 28, 2004, when the CSE met for the student's annual review, respondents expressed concern that updated testing was needed, and the CSE agreed to update the testing and reconvene (Dist. Ex, 5, Dist. Ex. 65 at pp. 3-4). Although the CSE reconvened on May 26, 2004, no updated educational or cognitive testing had been performed (Dist. Ex. 4 at p. 4). The academic dean from Kildonan participated in this meeting by phone and gave an overview of the student's program and progress (id.). His comments were summarized in the draft IEP generated from this meeting, which reflected that the student was progressing in decoding, comprehension, vocabulary, and fluency but needed continued intensive work in reading (id.). A discussion regarding touch-typing and computers led the CSE to recommend an assistive technology evaluation (id.; Parent Ex. 24 at pp. 34-40). The meeting was tabled with the understanding that another meeting would be scheduled to review the results of the recommended evaluations (Dist. Ex. 4 at p. 4).

In May 2004, Kildonan assessed the student's reading and writing abilities using a variety of standardized tests (Parent Ex. 8 at p. 2). According to her language tutor, the student's scores on the Gray Oral Reading Test, Fourth Edition (GORT-4) showed significant improvement in the student's reading rate and accuracy (Parent Ex. 11 at p. 1, Parent Ex. 8). The tutor also noted a marked

improvement in the student's spelling (Parent Ex. 11 at p. 1, Parent Ex. 8). As measured by the Gates-MacGinitie Reading Test the student's vocabulary had improved, however, the tutor reported that the student's reading comprehension score did not reflect the gains that she had made (Parent Ex. 11 at p. 1, Parent Ex. 8). The student's math teacher reported that the student had mastered most of her multiplication facts but that she had not reached a level of automaticity in relation to long division processes (Parent Ex. 11 at p. 2).

On June 16, 2004 the district conducted a cognitive and educational evaluation of the student using the WJ-III COG and WJ-III ACH (Tr. p. 243; Dist. Ex. 8). As measured by the WJ-III COG the student's overall processing speed score was in the low average range (Dist. Ex. 8 at p. 1) and the student's performance was described as "very limited" on tasks requiring visual perceptual speed (SS 74) (Tr. pp. 264-65, 294; Dist. Ex. 8 at p. 1). On the WJ-III ACH, the student's performance was average in reading comprehension and written expression, and low average in broad reading, basic reading skills and basic writing skills (Dist. Ex. 8 at p. 2). Significant weaknesses were noted in spelling (Tr. p. 271). The student's math skills were not reassessed (Tr. pp. 274, 317; Dist. Ex. 8 at p. 2). Also in June 2004, an assistive technology evaluation was completed by the school district, and both assistive technology devices and services were recommended for the student (Dist. Ex. 7).

On August 17, 2004 the CSE met, reviewed and discussed the results of petitioner's educational and cognitive and assistive technology evaluations (Dist. Ex. 3 at p. 4). For the 2004-05 school year (seventh grade) the CSE recommended that the student be placed in a special class part-time for English, math and reading and attend general education classes with resource room support for social studies and science (id.). Recommended program modifications included refocusing and redirection, preferential seating, copy of class notes, extended time for in class assignments and books on tape (Dist. Ex. 3 at p. 2). Assistive technology devices and services included access to a word processor, books on tape, Dragon Naturally Speaking and an unspecified assistive technology consultation (id.). The student was afforded the following testing modifications: extended time (1.5), directions read/explained, clarification of test questions, special location, and spelling requirements waived (Dist. Ex. 3 at pp. 1-2). The proposed IEP contained goals and objectives related to study skills, reading, writing, Mathematics and social/emotional/behavioral needs (Dist. Ex. 3 at pp. 4-6).

Respondents rejected the proposed 2004-05 placement by letter dated August 19, 2004, which was received by petitioner on August 20, 2004 (Parent Ex. 30). Respondents stated their belief that the student would not succeed in the Carmel school system due to her slow processing speed and her problems with reading (id.). They opined that their daughter required one-to-one instruction for language arts and also the multisensory nature of the Orton-Gillingham approach, used at Kildonan, due to their assertion that she had dyslexia, amblyopia, and had one eye that was "almost completely unusable" (id.). Respondents informed the district that they would be sending the student to Kildonan and requested reimbursement for tuition and related costs (id.). Respondents signed the Kildonan contract on August 20, 2004 (IHO Ex. 6).

In response to respondents' letter, petitioner attempted to schedule a CSE meeting for August 30, 2004 but respondents were unable to attend (Dist. Ex. 51; Parent Ex. 29). The CSE reconvened with respondents on September 9, 2004 and modified the IEP by replacing the recommendation for mainstream social studies and science with resource room support with a recommendation for special class part-time for those subjects (Dist. Ex. 2). In addition the student was recommended for weekly group counseling sessions to support her transition (Dist. Ex. 2 at p. 4). Respondents kept the student at Kildonan (Tr. p. 445). By letter dated December 7, 2004, respondents requested an impartial hearing (Dist. Ex. 25).

The impartial hearing commenced on January 18, 2005 and concluded on April 15, 2005 after

ten days of testimony. On May 19, 2005, the impartial hearing officer rendered his decision finding that the district had failed to offer a free appropriate public education (FAPE) to the student for the 2004-05 school year, that respondents' unilateral placement was proper, and that equitable considerations supported granting tuition reimbursement to respondents for the 2004-05 school year. Specifically, he held as follows: 1) the CSE composition for the August 17, 2004 CSE meeting was improper due to the lack of a proper special education teacher and regular education teacher; 2) the evaluations considered by the CSE were deficient; 3) the goals and objectives listed on the IEP were inadequate and failed to properly account for the student's present levels of performance; 4) respondents' unilateral placement of the student met her needs and allowed her to progress; and 5) equitable considerations supported respondents' claim for tuition reimbursement (IHO Decision, pp. 16, 23, 27, 28).

On appeal, petitioner requests reversal of the impartial hearing officer's decision insofar as it found that the IEP offered to the student by petitioner for the 2004-05 school year was inappropriate, found that the placement of the student at Kildonan was appropriate and that equitable considerations supported awarding tuition reimbursement to respondents, and granted the award of tuition reimbursement for the 2004-05 school year.

I agree with the determination of the impartial hearing officer that the student's 2004-05 IEP was inappropriate, that respondents' unilateral placement was appropriate and that equitable considerations support tuition reimbursement. The purpose behind the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400 - 1487) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]).[1] A FAPE consists of special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20 U.S.C. § 1401[8][D]; 34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]). A board of education may be required to pay for educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]). The parent's failure to select a program approved by the state in favor of an unapproved option is not itself a bar to reimbursement (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]). The board of education bears the burden of demonstrating the appropriateness of the program recommended by its CSE (M.S. v. Bd. of Educ., 231 F.3d 96, 102 [2d Cir. 2000], cert. denied, 532 U.S. 942 [2001]; Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 [2d Cir. 1998]; Application of a Child with a Disability, Appeal No. 04-043).

To meet its burden of showing that it had offered to provide a FAPE to a student, the board of education must show (a) that it complied with the procedural requirements set forth in the IDEA, and (b) that the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). Not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]), e.g., resulted in the loss of educational opportunity (Evans v. Bd. of Educ., 930 F. Supp. 83, 93-94 [S.D.N.Y. 1996]), seriously infringed on the parents' opportunity to participate in the IEP formulation process (see W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 [D. Conn. 2001]; Brier v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromised the development of an appropriate IEP in a way that deprived the student of educational benefits under that IEP (Arlington Cent. Sch. Dist. v. D. K., 2002 WL 31521158 [S.D.N.Y. Nov. 14, 2002]). As for the program itself, the Second Circuit has observed that "'for an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression'" (Weixel v. Bd. of Educ., 287 F.3d 138, 151 [2d Cir. 2002], quoting M.S., 231 F.3d at 103 [citation and internal quotation omitted]; see Walczak, 142 F.3d at 130). This progress, however, must be meaningful; i.e., more than mere trivial

advancement (Walczak, 142 F.3d at 130). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Federal regulation requires that an IEP include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Section 1, Question 1).

An amended IEP supersedes the initial IEP (Application of a Child with a Disability, Appeal No. 05-021; Application of the Bd. of Educ., Appeal No. 02-076; Application of a Child with a Disability, Appeal No. 99-54). The August 17, 2004 IEP (Dist. Ex. 3) amended and superseded the April and May IEPs (Dist. Exs. 5, 4).

Petitioner argues that, contrary to the impartial hearing officer's findings, the August 17, 2004 CSE was properly composed and that the impartial hearing officer erred in finding that the evaluations used by the CSE were deficient. Petitioner also argues that the impartial hearing officer erred in finding that it had failed to properly describe the student's current levels of performance on her IEP and had failed to appropriately set forth annual goals and short-term objectives.

In New York State, a CSE must include the parent of the child, at least one regular education teacher of the child (if the child is, or may be participating in the regular education environment), at least one special education teacher of the child or, if appropriate, at least one special education provider of the child, a school psychologist, an additional parent of a student with a disability residing in the district, a representative of the school district who is qualified to provide or supervise the provision of special education, and an individual who can interpret the instructional implications of evaluation results, and persons having knowledge or special expertise regarding the student, and if appropriate, the student (34 C.F.R. § 300.344[a]; 8 NYCRR 200.3[a][1]).

The IDEA, its implementing regulations, and New York law require that the CSE include "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)" (20 U.S.C. § 1414[d][1][B][ii]; see 34 C.F.R. § 300.344[a][2]; 8 NYCRR 200.3[a][1][ii]). The regular education teacher member "shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate behavioral interventions and strategies and the determination of supplementary aids and services, program modifications, and support for school personnel" (20 U.S.C. § 1414[d][3][C]; see 34 C.F.R. § 300.346 [d]; 8 NYCRR 200.3[d]). The regular education teacher must also "participate in discussions and decisions about how to modify the general curriculum in the regular classroom to ensure the child's involvement and progress in the general curriculum and participation in the regular education environment" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 24), and participate in any review and revision of the IEP (20 U.S.C. § 1414[d][4][B]; 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]). In its official interpretation of the regulations, the U.S. Department of Education explains that the regular education teacher member "should be a teacher who is, or may be, responsible

for implementing a portion of the IEP, so that the teacher can participate in discussions about how best to teach the child" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 26).

The U.S. Department of Education has explained that the purpose behind the regular education teacher requirement is for that teacher to serve a critical role in providing input on modifications and supplementary aids and services that would allow the child to remain in the regular education environment to the maximum extent appropriate (64 Fed. Reg. No. 48, at p. 12591). State Review Officers have found that although a board of education cannot always be expected to know who the student's regular education teacher will be prior to the CSE meeting, it should nevertheless have sufficient information about the student to designate a regular education teacher who is not only appropriately certified to teach the student, but who is also teaching in the subject matter or grade level in one of the programs which might be appropriate for the student (Application of a Child with a Disability, Appeal No. 04-088; Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-100, n.1; Application of a Child with a Disability, Appeal No. 02-080; Application of the Bd. of Educ., Appeal No. 02-056; Application of a Child with a Disability, Appeal No. 00-060).

It is well established, however, that the existence of a procedural flaw in the formulation of a student's IEP does not automatically require a finding of a denial of a FAPE (Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-015; see also Grim, 346 F.3d at 381; Pawlet Sch. Dist., 224 F.3d at 69; Evans, 930 F.Supp. at 93-94; Pascarella, 153 F.Supp.2d at 153; Brier, 948 F.Supp. at 1255; Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158. Rather, a denial of a FAPE occurs only if the procedural violation results in a loss of educational opportunity for the child, or seriously infringes upon respondents' opportunity to participate in the process of formulating the IEP, or compromised the development of an appropriate IEP in a way that deprived the student of educational benefits under that IEP. Members of the August 17, 2004 CSE included the student's mother and father, the CSE Chairperson, a psychologist from the district's elementary school, a fifth grade special education teacher and a fourth grade general education teacher (Tr. pp. 188, 801-02; Dist. Ex. 3 at p. 4). The additional parent member did not attend pursuant to a written request made by respondent on August 17, 2004 that the additional parent member not attend the CSE meeting (Dist. Ex. 53; see 8 NYCRR 200.3[a][1][viii]; 200.5[c][2][v]).

I concur with the impartial hearing officer in his finding that the August 17, 2004 CSE meeting was improperly composed due to the lack of a proper regular education teacher. The student's recommended placement included participation in general education social studies and science classes as well as computer technology, art, music and physical education (Tr. pp. 105-06). The regular education teacher present at the August 17, 2004 CSE meeting was a fourth grade teacher (Tr. pp. 802, 1020; Parent Ex. 25 at p. 11).[2] It does not appear that she spoke or contributed at the August CSE meeting (Parent Ex. 25) and she did not testify at the impartial hearing. There was no evidence presented that she had any seventh grade teaching experience or that there was any possibility that she would have been the student's teacher (Tr. p. 987). Petitioner does not dispute the improper composition at the August 2004 meeting, but argues that respondents were able to meaningfully participate in the IEP process at the two prior CSE meetings in April and May 2004. It should be noted, however, that the April and May 2004 CSE meetings were tabled to enable petitioner to obtain updated educational and cognitive testing, which was not available for discussion until the August 17, 2004 meeting (Dist. Exs. 3-5).

The contribution from the proper regular education teacher was essential because petitioner was recommending mainstream classes for the student (Dist. Ex. 3). Consideration of curriculum modifications or other specialized instruction or support services is integrally related to an appropriate

program for a child with a learning disability (see 34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 24). The record reveals that the special education teacher on the committee expressed concern over the student's ability to be successful in the general education environment, even with additional support (Parent Ex. 25). I find that there was a lack of contribution at the August 17, 2004 CSE meeting from a required regular education teacher of the student, who could discuss the specific curriculum requirements and could provide input on the modifications and supplementary aides and services to ensure involvement and progress in the general curriculum, and participation in the regular education environment to the maximum extent appropriate. The lack of contribution compromised the development of the student's IEP, significantly impeded parental participation in the formulation of the IEP and denied the student educational benefits. I concur with the impartial hearing officer that the student was thereby not offered a FAPE for the 2004-05 school year (Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. Nov. 14, 2002]; Application of the Bd. of Educ., Appeal No. 02-056; Application of a Child with a Disability, Appeal No. 01-105; Application of a Child with a Disability, Appeal No. 01-083). Having found that the absence of an appropriate regular education teacher in the development of the student's IEP at the August 17, 2004 CSE meeting resulted in the development of an inadequate IEP, it is not necessary that I consider petitioner's contention regarding the special education teacher.

Even if the CSE had been properly constituted, I would be constrained to find that the 2004-05 IEP was deficient.

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). An IEP must include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Section 1, Question 1).

An IEP must also include a statement of the special education and related services and supplementary aids and services to be provided to or on behalf of the student, as well as a statement of the program modifications or supports for school personnel that will be provided to the student (34 C.F.R. § 300.347[a][3]; see 8 NYCRR 200.4[d][2][iv]). Such education, services and aids must be sufficient to allow the student to advance appropriately toward attaining his or her annual goals (34 C.F.R. § 300.347[a][3][i]; see 8 NYCRR 200.4[d][2][iv][a]).

An IEP must also include measurable annual goals, including benchmarks or short-term objectives, related to meeting the student's needs arising from his or her disability to enable the student to be involved in and progress in the general curriculum, and meeting the student's other educational needs arising from the disability (34 C.F.R. § 300.347[a][2]; see 8 NYCRR 200.4[d][2][iii]). In addition, an IEP must describe how the student's progress towards the annual goals will be measured and how the student's parents will be regularly informed of such progress (34 C.F.R. § 300.347[a][7]; 8 NYCRR 200.4[d][2][x]).

The impartial hearing officer found that the district's evaluations of the student that were available to the CSE at its August 17, 2004 meeting were deficient (IHO Decision, pp. 16-21). I agree.

When the CSE initially convened for the student's annual review in April 2004, respondents were concerned that the CSE did not have updated information and the CSE agreed to update the educational testing (Dist. Ex. 5). In June 2004, the CSE conducted an educational and cognitive evaluation, which included a writing sample and an assistive technology evaluation (Dist. Exs. 7, 8, 9). The August 17, 2004 IEP indicates that the CSE considered the following additional information: a social history dated October 14, 1998, a psychological evaluation dated February 22, 2002, a physical examination dated September 3, 1998, an observation dated October 22, 1998, an IEP teacher report dated April 15, 1999, a mainstream teacher report dated April 23, 1999, and a report card dated March 7, 2001 (Dist. Ex. 3 at p. 4).

Petitioner argues that during the hearing neither respondents nor their attorney raised any concern that the student's hearing or vision had not been properly evaluated or addressed. However, testimony from multiple school district representatives revealed that petitioner was aware that the student had vision and hearing problems that impacted her ability to benefit from instruction (Tr. 92, 155, 163, 164, 178, 264, 297-98, 299, 1274). Additionally, concerns about the student's vision and hearing had been noted in a prior IEP (Dist. Ex. 63). Further, respondents' August 2004 letter to petitioner, which was sent several months prior to their request for a hearing, noted that the student had severely impaired vision in one eye and that her eye was "almost completely unusable" (Parent Ex. 30). Despite this information, the CSE did not seek additional information from the student's physician or, in the alternative, recommend an updated physical examination.

The impartial hearing officer noted a classroom observation of the student in her current educational setting, i.e., Kildonan, was lacking (IHO Decision, p. 19). A classroom observation in the student's then "current educational placement" is required in an initial classification (34 C.F.R. § 300.533[a][1][ii]; 8 NYCRR 200.4[b][1][iv]), and, when appropriate, in any subsequent annual evaluation (34 C.F.R. § 300.533[a][1][ii]; 8 NYCRR 200.4[b][5][i]). Due to the fact that the student had been out of petitioner's school system for almost two years, an observation of respondents' daughter in her current classroom placement at Kildonan would have been appropriate in this instance in aiding in the determination of the child's present levels of performance and in setting individual goals and objectives for the upcoming school year (see Application of a Child with a Disability, Appeal No. 01-007). However, while the impartial hearing officer references a possible need for a functional behavioral assessment (FBA) (IHO Decision, pp. 21-22), there is nothing in the record to show that the student's behavior impedes her learning or that of others (see 8 NYCRR 200.1[r], 200.4[b][1][v]).

No Kildonan test results were considered according to the August 2004 IEP. (Dist. Ex. 3 at pp. 2-3). The record contains evidence that some CSE members may have reviewed some Kildonan testing prior to the August 17, 2004 CSE meeting, but there was no evidence that it was discussed at the meeting (Tr. pp. 138, 184, 188-89, 224, 1051-52).

I concur with the impartial hearing officer that the evaluative data considered by the CSE on August 17, 2004 was insufficient for the CSE to determine the student's present levels of performance and areas of need, and to develop appropriate goals and objectives for each of the student's need areas.

The lack of appropriate evaluations and anecdotal information regarding the student's performance in the classroom is reflected in the August 17, 2004 IEP, which fails to adequately describe the child's present levels of performance (Dist. Ex. 3). Global statements such as "[the student's] cognitive abilities are average with the exception of processing speed" and "[the student's] "reading and writing skills are below average," do not provide a meaningful description of the student's abilities or needs, or suggest specific deficits that need to be addressed (Dist. Ex. 3 at p. 2). For example, although the August 2004 IEP indicates that the student needs to improve her reading skills, it does not indicate if the student needs to improve her decoding skills, reading comprehension skills or some other aspect of

reading such as fluency (Dist. Ex. 3). Furthermore, the IEP does not describe the student's current reading abilities or state what grade level material the student is capable of reading (Dist. Ex. 3 at p. 2). The IEP as written contains no baseline from which to project goals and objectives. The present levels of performance and individual needs outlined on a student's IEP serve as the foundation on which the CSE builds to identify goals and services to address the student's individual needs (see 34 C.F.R. Part 300, Appendix A, Section 1, Question 1; see also Office of Vocational and Educational Services for Individuals with Disabilities (VESID), "Sample Individualized Education Program and Guidance Document," p. 40 [December 2002]). Without performing appropriate evaluations of the student and developing a detailed description of her present functioning, it is unclear how the CSE determined appropriate goals and objectives for respondents' daughter.

The student's specific needs are not addressed appropriately in the August 17, 2004 IEP. One goal is actually identical to a goal from the 2000-01 IEP ("Demonstrate an improvement in word recognition and decoding skills necessary to read for information and understanding.") (compare August 2004 IEP, Dist. Ex. 3, at p. 4 (goal 4), with 2000-01 IEP, Parent Ex. 27 at p. 4 [goal 1]). The goals and objectives section also fails to set forth appropriate short-term objectives because all objectives are evaluated at the end of the school year (Dist. Ex. 3 at pp. 4-6). It is not clear what intermediate progress the student would have been expected to achieve. The manner in which the objectives are written is not sufficient to allow a teacher to evaluate progress and conceptualize subsequent direction, to gauge the need for continuance of a task, or to identify the need to adjust the student's goals. Additionally, the goals are too vague and immeasurable to meet the requirements set forth in state and federal regulations. For example, the goals recite generally that the student should "demonstrate an improvement . . ." (Dist. Ex. 3 at pp. 4-6). The goals and objectives are not reflective of the student's present levels of performance and therefore are not reasonably calculated to enable this student to receive educational benefit (see Rowley, 458 U.S. at 206, 207).

Based upon the improper CSE composition at the August 17, 2004 meeting, the insufficiency of the evaluations considered by the CSE and the inappropriateness of the goals and objectives listed in the IEP generated on August 17, 2004, I find that the district failed to provide a FAPE to the student for the 2004-05 school year.

Having determined that petitioner has not met its burden of proving that it had offered to provide a FAPE to the student during the 2004-05 school year, I must now consider whether respondents have met their burden of demonstrating that the Kildonan placement selected for the student for that school year was appropriate (Burlington, 471 U.S. 359; Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-080). In order to meet that burden, the parents must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

There is sufficient evidence in the record to conclude that the student's special education needs were met during her 2004-05 school year at Kildonan. The academic dean of Kildonan testified in support of respondents' claim for tuition reimbursement. He testified that the student met the admissions criteria for Kildonan in that she had at least an average IQ and solid cognitive functioning but also had difficulty or lags in basic language skills (Tr. pp. 877, 882). He reported that curriculum used by Kildonan was approved by New York State and designed to be multisensory in nature (Tr. p. 886). Documents in the record indicate that Kildonan's academic program revolves around the intensive,

daily, one-to-one Orton-Gillingham tutoring (Parent Exs. 4, 5). According to the academic dean, the Orton-Gillingham philosophy that structures and dictates the language training sessions, also influences the subject matter teaching (Tr. p. 886). Reportedly all of the school's subject matter teachers are trained and mentored in Orton-Gillingham, as well as multisensory teaching methodology (Tr. p. 886). Visual, auditory, and kinesthetic presentations supplement textbooks in subject matter courses (Parent Ex. 5).

Testing conducted during the 2003-04 school year revealed weaknesses in the student's ability to perform tasks requiring visual perceptual speed (Dist. Ex. 8). In addition the student performed in the low average range on measures of basic reading skills, basic writing skills and spelling (Dist. Ex. 8; Parent Ex. 8 at p. 2-spelling). The student's performance on the GORT-4 suggests that she continued to struggle with reading fluency (Parent Ex. 8 at p. 2). The dean reported that at the beginning of seventh grade the student continued to have difficulties in the areas of spelling, basic written expression, comprehension, and decoding (Tr. pp. 881-82). He also reported that the student had difficulty in processing language (Tr. pp. 881, 926). Notes from the student's seventh grade teachers indicate that as of October 2004 the student's weaknesses included spelling and reading multisyllabic words, learning vowel teams, writing, and verbal expression (Dist. Ex. 6). The school psychologist suggested that the student had dysgraphia (Parent Ex. 25 at p. 24).

The record demonstrates that the Kildonan placement was appropriate to meet the student's needs at the time placement was effectuated and that the student's academic needs were in fact addressed by the private school. At Kildonan the student participated in a one-to-one tutorial designed exclusively for the student to address her strengths and weaknesses in the areas of reading, writing, and spelling (Tr. pp. 882-83). Notes from the student's tutor indicate that during language training sessions the student worked on handwriting, phonetic concepts, spelling, fluency, decoding, grammar and sentence structure, and writing sentences (Parent Ex. 9 at p. 1, Parent Ex. 39 at p. 1). Keyboarding or touch-typing was included in the student's academic program (Tr. p. 897). The academic dean reported that in terms of subject matter classes the student was at an appropriate cognitive level for science, social studies and literature and that those classes controlled for independent reading and writing demands (Tr. p. 883, see also Tr. p. 919). The academic dean testified that the student's processing delay was addressed within her language training tutorial and in her classes (Tr. pp. 953-54). Specifically, her teachers knew that the student might need information explained a second time or might need to spend additional time on a topic (Tr. pp. 953-54). The dean reported that the teachers would take information from a textbook and put it in note form at the student's reading level (Tr. p. 955). For seventh grade the student was placed in a math class consisting of six students with similar needs (Tr. p. 885). The dean opined that based on his observations of the student in her language training tutorial and her performance in academic classes she was continuing to make progress (Tr. p. 908). He acknowledged that the student had not made enormous progress but indicated the progress was highly appropriate given her processing speed and the one-to-one Orton-Gillingham teaching provided to the student (Tr. p. 909).

Petitioner challenged the appropriateness of Kildonan based on the lack of certified teachers employed by the school, the testimony of the academic dean that Kildonan had not recommended assistive technology for the student and a comment made by the academic dean related to subject area courses which is discussed below. Petitioner also suggested that the student was inappropriately placed in the upper school at Kildonan because the dean had commented that contact with the older students was overwhelming to the student. I find these arguments to be without merit. It is well settled that a private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. at 14; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105). Although Kildonan did not recommend assistive technology for the student, it was providing the student with several of the devices and services

recommended on the student's August 17, 2004 IEP. Specifically, the student had some access to a word processor and spellcheck (Tr. p. 897), the student was learning keyboarding and/or touch-typing (Tr. p. 897) and the Kildonan teachers provided students with textbook notes written at a reading level appropriate to the student (Tr. p. 955). The dean indicated that based on the student's age and abilities he thought it was better to spend time teaching the student remedial strategies rather than her spending that same time learning to use books on tape (Tr. pp. 907-08). He indicated that books on tape might eventually be appropriate for the student. Petitioner's assertion that the dean testified he thought it would be a "waste of time" for students to be educated in grade level science or social studies, as long as they had access to a curriculum that was appropriate to their abilities, does not appear to accurately characterize the dean's testimony (Tr. pp. 918-21, 948). Finally, while the dean did testify that the student had "come back into her shell a little bit" after moving to the upper school, he indicated that it was "not to the level that she was in the beginning of sixth grade" when the student first entered Kildonan (Tr. pp. 949-50).

Based upon the record, respondents have met their burden of demonstrating that Kildonan offered a program that met their daughter's special education needs.

The final criterion for an award of tuition reimbursement is that respondents' claim be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]); see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]). Such considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). With respect to equitable considerations, a parent may be denied tuition reimbursement upon a finding of a failure to cooperate with the CSE in the development of an IEP or if the parent's conduct precluded the CSE's ability to develop an appropriate IEP (Warren G. v. Cumberland Co. Sch. Dist., 190 F.3d 80, 86 [3rd Cir. 1999]; see Application of the Bd. of Educ., Appeal No. 04-102; Application of the Bd. of Educ., Appeal No. 04-026).

In the absence of evidence demonstrating that respondents failed to cooperate in the development of the IEP or otherwise engage in conduct that precluded the development of an appropriate IEP, equitable considerations generally support a claim of tuition reimbursement (Application of a Child with a Disability, Appeal No. 04-049). Petitioner asserts that respondents improperly failed to share Kildonan information, but this is not supported in the record. There is no evidence in the record establishing that respondents failed to sign consent forms for petitioner, that petitioner ever asked Kildonan for records and was refused, or that respondents were ever informed of an ongoing problem petitioner was having obtaining Kildonan records. The record reveals that respondents attended and participated in the CSE meetings and cooperated with petitioner's CSE in the student's evaluations and in preparing the student's IEP. I find that respondents' claim for tuition reimbursement is supported by equitable considerations.

I have considered petitioner's remaining contentions and I find them to be without merit.

**THE APPEAL IS DISMISSED.**

Dated:    **Albany, New York**
          **August 10, 2005**                                    _____
                                                                  **PAUL F. KELLY**

**STATE REVIEW OFFICER**

[1] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEIA], Pub. L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute as it existed prior to the 2004 amendments. Petitioner initiated this proceeding prior to the effective date of the 2004 amendments to the IDEA, therefore, the provisions of the IDEIA do not apply.

[2] I concur with the impartial hearing officer that the transcripts of the CSE meetings were established to be too inaccurate to be relied upon as accurate representations of the minutes of the meetings (Parent Exs. 24, 25). Parent Exhibit 25 is relied upon herein and is given its appropriate weight insofar as it consists of respondents' notes of the August 27, 2004 CSE meeting.

# EXHIBIT B



# The University of the State of New York

## The State Education Department
### State Review Officer

No. 06-005

Application of a **CHILD WITH A DISABILITY**, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Carmel Central School District

**Appearances:**

Family Advocates, Inc., attorneys for petitioners, RosaLee Charpentier, Esq., of counsel

Kuntz, Spagnuolo, Scapoli & Schiro, P.C., attorneys for respondent, Jeffrey J. Schiro, Esq., of counsel

## DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition costs at the Kildonan School (Kildonan) for the 2005-06 school year. The appeal must be sustained in part.

Petitioners attach to their Petition the following documents not introduced into evidence at the impartial hearing: 1) correspondence from May and September 2005 from respondent and respondent's attorney regarding class profile information; 2) hospital records showing treatment on October 14, 2005 for petitioner mother; 3) the student's 2004-05 individualized education program (IEP); and 4) correspondence from Kildonan dated September 9, 2005 regarding payment of tuition. Additionally, petitioners submitted an affidavit of the Kildonan Academic Dean, sworn to November 9, 2005, with the following documents annexed: 1) the Academic Dean's curriculum vita; 2) a Kildonan brochure; and 3) various Kildonan school records and test results from May 2003 through June 2005 pertaining to the student's academic performance at Kildonan. Respondent objects to petitioners' attempt to introduce new information, asserting that petitioners had the opportunity to present the information to the impartial hearing officer. Generally, documentary evidence not presented at a hearing may be considered in an appeal from an impartial hearing officer's decision only if such additional evidence could not have been offered at the time of the hearing and the evidence is necessary in order to render a decision (see, e.g., Application of a Child with a Disability, Appeal No. 05-080; Application of a Child with a Disability, Appeal No. 05-068; Application of the Bd. of Educ., Appeal No. 04-068). The impartial hearing concluded on October 14, 2005, and all of the above documents would have been available at the time of the hearing with the exception of the October 14, 2005 hospital records and the November 9, 2005

Affidavit of the Academic Dean of Kildonan. Neither the hospital records nor the affidavit are necessary for the rendering of my decision. Therefore, the additional documentary evidence submitted by petitioners is not accepted.

At the time of the impartial hearing in the fall of 2005, petitioners' daughter was thirteen years old and attending eighth grade at Kildonan. The Commissioner of Education has not approved Kildonan as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.7). The student's eligibility for special education services and classification as a student with a learning disability (see 8 NYCRR 200.1 [zz][6]) are not in dispute.

The student's prior educational history is described in Application of a Child with a Disability, Appeal No. 05-063 and will not be repeated here in detail. Briefly, the student experienced vision problems at an early age which were reportedly addressed through surgery and corrective lenses (Tr. p. 254). The student was initially reviewed and classified as learning disabled by the respondent's Committee on Special Education (CSE) in December 1998 when she was attending first grade (Tr. p. 13). According to psychological testing, the student's overall intellectual functioning fell within the average range; however, she demonstrated deficits in reading, math, and spelling (Tr. pp. 13-14). She received varying levels of special education services throughout her elementary school years.

The student's mother testified that when her daughter was to transition to the fifth grade in respondent's middle school, she became concerned about the size of the school and her daughter's ability to move from class to class in a typical middle school schedule (Tr. p. 282). Petitioners enrolled the student in a private school, identified in the record as Crossroads School, for the 2002-03 school year (Tr. pp. 16, 283) and in April 2003, referred her back to respondent's CSE for evaluation (Dist. Ex. 1 at p. 2). Respondent administered the Woodcock-Johnson III Tests of Cognitive Abilities (WJ-III COG) and the Woodcock-Johnson III Tests of Achievement (WJ-III ACH) (Dist. Ex. 1 at p. 2). The student achieved test scores in the average range in mathematics and written expression, and the low average range in broad reading (Dist. Ex. 1 at p. 2). Her subtest scores in basic reading skills, math calculation skills, and written language skills were also in the low average range (Dist. Ex. 1 at p. 2). There were no discrepancies identified among the student's cognitive and achievement abilities (id.).

In September 2003, petitioners unilaterally enrolled the student in Kildonan, which she attended for the 2003-04 school year (id.). In August 2004, respondent's CSE met for the student's annual review and to develop her IEP for the 2004-05 school year when the student would be in seventh grade (Dist. Ex. 1 at p. 3). Petitioners rejected the CSE's recommended program, unilaterally enrolled their daughter in Kildonan for seventh grade, and requested an impartial hearing seeking tuition reimbursement for the 2004-05 school year (Tr. p. 17; Dist. Ex. 1).

The impartial hearing related to the 2004-05 school year commenced on January 18, 2005 and concluded on April 15, 2005 (Dist. Ex. 1 at p. 4). An impartial hearing officer rendered a decision on May 19, 2005, holding that respondent had failed to offer petitioners' daughter a free appropriate public education (FAPE) for the 2004-05 school year because the CSE had been improperly composed, the evaluations considered were deficient, and because the goals and objectives on the IEP were inadequate and failed to properly account for the student's present levels of performance (id.). He further found that petitioners' unilateral placement of the student at Kildonan met the student's needs and allowed her to progress, and that equitable considerations supported granting tuition reimbursement to the parents for the 2004-05 school year (id.). Respondent subsequently filed a petition for review to a State Review Officer, resulting in a decision being issued on August 10, 2005 upholding the impartial hearing officer's decision and dismissing the appeal (Application of a Child with a Disability, Appeal No. 05-063).

Regarding the student's academic abilities, testing conducted during the 2004-05 school year

revealed a relative weakness in the student's ability to analyze and synthesize abstract visual stimuli (Dist. Ex. 9 at p. 4). In addition, the student performed in the low average range on measures of numerical operations, math reasoning, and spelling (Dist. Ex. 10 at p. 1). March 2005 progress reports from Kildonan indicated that the student was performing satisfactorily (Dist. Ex. 8). Narrative reports from the student's teachers at Kildonan indicate that as of March 2005 the student's weaknesses included the mechanical aspects of writing and inconsistent class participation (Dist. Ex. 8 at pp. 3, 5-6). The Kildonan instructor who provided individual language training tutorials to petitioners' daughter during the 2004-05 school year reported that the student was working on more advanced phonemic concepts, including learning the Latin roots for words, and was continuing to work with expanded paragraphs (Dist. Ex. 8 at p. 3). In mathematics, she was reported to have a thorough understanding of the material presented in class (Dist. Ex. 8 at p. 4).

On April 3, 2005, respondent conducted psychological and educational evaluations of the student as part of her triennial review (Dist. Exs. 9, 2). Administration of the Wechsler Intelligence Scale for Children-IV (WISC-IV) yielded a verbal comprehension score of 100, a perceptual reasoning score of 102, a working memory score of 110, a processing speed score of 100, and full scale IQ score of 105, which placed the student in the average range of cognitive functioning (id.). The evaluator reported that there was no significant discrepancy between any of the composite scores and that "her profile did not differ significantly from her previous assessment" (Dist. Ex. 9 at pp. 5-6). On the Wechsler Individual Achievement Test-II (WIAT-II), the student achieved standard (and percentile) scores of 108 (70) in reading, 81 (10) in mathematics, 89 (23) in written language, 133 (99) in oral language, and a total composite score of 101 (53) (Dist. Exs. 10, 2). Relative strengths were noted in oral expression, reading comprehension, and listening comprehension with notable weaknesses identified in spelling, numerical operations, and math reasoning (Dist. Ex. 10 at p. 5).

On May 17, 2005, while the decision of the impartial hearing officer was still pending regarding the 2004-05 school year, respondent's CSE met for the student's annual review and to develop her individualized education program (IEP) for the 2005-06 school year (eighth grade), which is the IEP in dispute in this proceeding (Dist. Ex. 2). Both parents and an additional parent member were present (Dist. Ex. 2 at p. 4). CSE meeting notes reflect that respondent's CSE considered the results of psychological and educational evaluations conducted in April 2005, the assistive technology evaluation conducted in June 2004, the student's April 2004 interim report card and reports from her teachers at Kildonan, and results of a classroom observation of the student conducted in May 2005 (id.). For the 2005-06 school year (eighth grade), the CSE recommended that the student be placed in a special class for reading and mathematics, and attend general education classes with consultant teacher support for social studies, science, and English (id.). Counseling was also recommended (id.). Recommended program modifications included refocusing and redirection, preferential seating, copy of class notes, extended time for in class assignments, and Books on Tape (Dist. Ex. 2 at p. 2). Assistive technology devices and services included AlphaSmart trials, access to a word processor, books on tape, and an unspecified assistive technology consultation (Dist. Ex. 2 at p.2). The student was afforded the following testing modifications: extended time (1.5), directions read/explained, clarification of test questions, special location, and spelling requirements waived (id.). The proposed IEP contained goals and objectives related to study skills, reading, writing, mathematics, and social emotional needs (Dist. Ex. 2 at pp. 4-7).

Petitioners were mailed the proposed IEP on August 9, 2005 (Dist. Ex. 22) and by letter dated August 18, 2005, they rejected the CSE's recommended program, gave notice of their unilateral enrollment of their daughter at Kildonan for the 2005-06 school year, and requested an impartial hearing seeking tuition reimbursement for the 2005-06 school year (Dist. Ex. 23).

The impartial hearing was held on August 30, October 7, and October 14, 2005. At the impartial

hearing, petitioners asserted that the IEP prepared at the May 17, 2005 CSE meeting failed to offer their daughter a FAPE for the 2005-06 school year. Respondent asserted that the recommendations contained within the May 17, 2005 IEP were made after considering updated evaluations and that they offered the student a FAPE. Respondent asserted that all procedural requirements were met and that the substantive program was appropriate and that therefore petitioners should be denied tuition reimbursement.

The impartial hearing officer issued a decision dated November 23, 2005 and held that respondent had made an appropriate recommendation for the student's eighth grade year (IHO Decision, pp. 15, 28, 41). She determined that the goals and objectives "may appear to have stayed the same" as the prior IEP, but that the student's "knowledge in each of these areas will grow" and that the goals were capable of implementation and were reasonably calculated to confer educational benefit (IHO Decision, pp. 15, 41). She concluded that the academic levels and goals and objectives in the IEP were appropriate, and that therefore petitioners were not entitled to tuition reimbursement for Kildonan (IHO Decision, p. 41).

On appeal, petitioners make the following assertions: 1) they were denied their due process right to present a complaint to the impartial hearing officer; 2) the CSE was improperly constituted due to the presence of a seventh grade regular education teacher as opposed to an eighth grade regular education teacher; 3) the recommended program that would have been provided was not reflected on the IEP; 4) the CSE had insufficient information about the student; 5) the goals and objectives were inappropriate and identical to the goals and objectives found deficient in a prior appeal regarding the 2004-05 IEP; 6) the IEP contained a typographical error; and 8) the evaluations conducted by the district did not support a change in the student's program from full time special education to part time special education and support in general education. On appeal, petitioners seek an annulment of the impartial hearing officer's decision and tuition reimbursement for their daughter's 2005-06 school year at Kildonan. Respondent submitted an answer with affirmative defenses disputing petitioners' assertions above, and also asserting that petitioners' failure to properly litigate the case before the impartial hearing officer precludes them from relitigating the matter on appeal to the Office of State Review.

First, I will address petitioners' argument that they were denied their due process right to present their special education complaint at an impartial hearing. Petitioners argue that the impartial hearing officer improperly terminated the impartial hearing and denied the parents an opportunity to present testimony by either their independent evaluator or representatives of Kildonan. I disagree. As set forth in more detail below, the impartial hearing officer granted multiple adjournments of the impartial hearing and any failure of petitioners to present evidence was not due to any improper actions or inactions of the impartial hearing officer.

The hearing was conducted in a manner consistent with the requirements of due process (34 C.F.R. § 300.510[b][2]; Education Law § 4404[2]). The timeframe for impartial hearings, as set forth in the IDEA implementing regulations, are as follows: "The public agency shall insure that not later than 45 days after the receipt of a request for a hearing - (1) A final decision is reached in the hearing; and (2) A copy of the decision is mailed to each of the parties." (34 C.F.R. § 300.511[a]; see also Engwiller v. Pine Plains Cent. Sch. Dist., 110 F. Supp. 2d 236 [S.D.N.Y. 2000]). New York regulations set forth the 45 day timeframe, but also allow an impartial hearing officer to grant extensions of time beyond the 45 days if requested by a party (8 NYCRR 200.5[i][4]).[1] Specific factors for an impartial hearing officer to consider prior to granting an extension are also set forth (8 NYCRR 200.5[i][4][ii]).

The impartial hearing officer may grant a request for an extension only after fully considering the cumulative impact of the following factors:

(a)  the impact on the child's educational interest or well-being which might be occasioned by the delay;

(b)  the need of a party for additional time to prepare or present the party's position at the hearing in accordance with the requirements of due process;

(c)  any financial or other detrimental consequences likely to be suffered by a party in the event of a delay;

(d)  whether there has already been a delay in the proceeding through the actions of one of the parties.

(8 NYCRR 200.4[i][4][ii]).  Additionally, the regulations provide that agreement of the parties is not a sufficient basis for granting an extension, and further that "[a]bsent a compelling reason or a specific showing of substantial hardship, a request for an extension shall not be granted because of school vacations, a lack of availability resulting from the parties' and/or representatives' scheduling conflicts, settlement discussions between the parties or other similar reasons." (8 NYCRR 200.4[i][4][iii]).

In the present case, the hearing was initially scheduled for August 30, 2005 and September 9, 2005 (IHO Ex. 1).  The first day of the hearing was held on August 30, 2005 as planned and the district presented their case and rested (Tr. p. 211-12).  The impartial hearing officer noted at the conclusion of the day on August 30, 2005 that on September 9, 2005 it would be the parents' turn to present their case and that "if they are going to have a witness from Kildonan to make sure that this witness appears on the 9th ..." (Tr. p. 212).

On September 7, 2005 petitioners' attorney sent a letter to the impartial hearing officer, requesting an adjournment of the September 9, 2005 hearing date on consent due to unavailability of parent witnesses due to the first week of school (IHO Ex. 2).  Respondent's attorney noted in a later letter on the same date that she had only agreed to an adjournment if a date certain could be set in the next few weeks (IHO Ex. 3), which condition was not included in the letter to the impartial hearing officer (IHO Ex. 2).  The impartial hearing officer scheduled a new date certain of October 7, 2005, granting close to the maximum extension permissible under state regulations (30 days) (8 NYCRR 200.4 [i][4][i]), and warning that there would not be further extensions (IHO Ex. 4).

A few days prior to the October 7, 2005 scheduled date certain, staff from petitioners' law firm contacted the impartial hearing officer to request an extension due to attorney scheduling conflicts due to a family emergency with one attorney and a court appearance for the other attorney in the firm representing petitioners (IHO Exs. 5, 6).  The impartial hearing officer neither granted an adjournment nor advised petitioners' attorneys that the October 7, 2005 hearing date was cancelled (Tr. pp. 300-01).  However, staff at petitioners' law firm reportedly believed that the hearing date was cancelled and immediately cancelled the parent witnesses (IHO Ex. 6).  Respondent's attorneys objected to this adjournment in light of the date certain that had been set and the detrimental financial consequences that would be suffered because respondent was paying for petitioners' daughter's private school during the pendency of the proceedings (IHO Ex. 5).  The impartial hearing officer ordered the hearing to proceed on October 7, 2005 (IHO Ex. 7).

On October 7, 2005, the impartial hearing officer listed her reasons for continuing the hearing on that day, noting that petitioners' law firm has two attorneys, that such a last minute adjournment would affect the schedules of many other attorneys and witnesses, and that the financial obligation of respondent for the pendency placement is continuing, all in addition to the 45 day timeline set for hearings (Tr. pp. 231-33).  Petitioners' attorney indicated on the October 7 hearing date that their independent evaluator and a Kildonan representative had been available but their appearances that day had been cancelled by petitioners' law firm, and that upon being re-contacted by the firm 2 hours later, they were both unavailable (Tr. pp. 245-46).  Petitioner mother began her testimony on October 7, 2005,

but had to leave early for work because she had believed the hearing had been cancelled after being so informed by her law firm (Tr. pp. 250-51, 294). The impartial hearing officer offered to take any exhibits that petitioners' attorney could offer into evidence, but petitioners' attorney indicated that he did not have exhibits to introduce with him (Tr. pp. 301-02). Over respondent's objection, the impartial hearing officer granted one further extension of five business days, setting October 14, 2005 as the final day of the hearing (IHO Ex. 8).

On October 12, 2005, petitioners' attorney requested an extension of the October 14, 2005 date to November 1, 2005, citing unavailability of witnesses as the reason (IHO Ex. 9). The impartial hearing officer denied the request for a further extension and reminded petitioners' attorney that witnesses could appear by phone (IHO Ex. 8). On October 14, 2005, petitioners did not have their independent evaluator or a Kildonan representative ready to testify and petitioner mother was unable to continue her testimony due to her own medical problem (Tr. pp. 331-32). Petitioners' attorney did not offer any exhibits to be entered into evidence (Tr. pp. 325-44). After considering all of the circumstances, including the best interests of the student, and the history of the proceedings, the impartial hearing officer closed the hearing on October 14, 2005 (Tr. p. 340-43).

The impartial hearing officer was well within her discretion to close the hearing and stop granting extensions in light of the circumstances and history of this case as detailed above. Notably, the October 7, 2005 date would have proceeded with petitioners' private evaluator and Kildonan representative, except for the fact that petitioners' own law firm erroneously cancelled their appearances and reportedly could not re-engage them 2 hours later (Tr. pp. 245-46). While recognizing that circumstances may arise that warrant consideration of a hearing extension, it must be noted that the granting of extensions is constrained by regulation, as the impartial hearing officer herein was aware. Although one of petitioners' attorneys suffered a family emergency and one of the petitioners had a medical problem for one day of the hearing, these situations do not mitigate the unrelated last minute requests for extensions, the inaccurate information circulated by petitioners' law firm (IHO Exs. 2, 3, 6; Tr. pp. 300-01) and the expressed lack of preparation for the hearing by petitioners' law firm.[2] The impartial hearing officer properly gave consideration to the factors listed in state regulations and acted appropriately in her correspondence with the parties regarding extensions and with her granting and denial of extensions. Therefore, petitioners' due process claim is dismissed.

Next, I will address petitioners' claim that the goals and objectives on the 2005-06 IEP were inappropriate and identical to the goals and objectives found deficient in a prior appeal regarding the 2004-05 IEP (Application of a Child with a Disability, Appeal No. 05-063). Although I find that the CSE had sufficient evaluative information for the student, I agree that the goals and objectives on the 2005-05 IEP were inappropriate and failed to offer the student a FAPE, and in light of this, I do not reach petitioners' remaining assertions that CSE composition was improper; that the recommended program that would have been provided was not reflected on the IEP; that the IEP contained a typographical error; and that the evaluations conducted by the district did not support a change in the student's program.

A purpose behind the IDEA (20 U.S.C. §§ 1400 - 1487)[3] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 126 S. Ct. 528 [2005]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20 U.S.C. § 1401[8]; 34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]).[4] A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Sch. Comm. of

Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). In Burlington, the court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (id.). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (Burlington, at 370-71; see Application of the Bd. of Educ., Appeal No. 05-073). The parent's failure to select a program approved by the state in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14).

A FAPE is offered to a student when the board of education (a) complied with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). A denial of a FAPE occurs when procedural inadequacies either result in a loss of educational opportunity for the student, or seriously infringe on the parents' opportunity to participate in the IEP formulation process (see Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005]; W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 [D. Conn. 2001]; Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that IEP (see Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. 2002]). In evaluating the substantive program developed by the CSE, the Second Circuit has observed that "'for an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression'" (Weixel v. Bd. of Educ., 287 F.3d 138, 151 [2d Cir. 2002] [quoting M.S. v. Bd. of Educ., 231 F.3d 96, 103 [2d Cir. 1998][citation and internal quotation omitted]). This progress, however, must be meaningful; i.e., more than mere trivial advancement (Walczak, 142 F.3d at 130). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d at 379; Walczak, 142 F.3d at 132; Antonaccio v. Bd. of Educ., 281 F. Supp. 2d 710, 726 [S.D.N.Y. 2003]).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Federal regulation requires that an IEP include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Section 1, Question 1).

In April 2005, respondent conducted psychological and educational reevaluations of the student in preparation for her annual review. Administration of the WISC-IV yielded a verbal comprehension score of 100, a perceptual reasoning score of 102, a working memory score of 110, a processing speed score of 100, and full scale IQ score of 105; which placed the student in the average range of cognitive functioning (Dist. Exs. 9, 2). On the WIAT-II, the student achieved standard (and percentile) scores of

108 (70) in reading, 81 (10) in mathematics, 89 (23) in written language, 133 (99) in oral language, and a total composite score of 101 (53) (Dist Exs. 10, 2). Relative strengths were noted in oral expression, reading comprehension, and listening comprehension with notable weaknesses identified in spelling, numerical operations, and math reasoning (Dist. Ex. 10 at p. 5). The CSE chairperson testified that the student's scores on the WISC-IV were in the average to high average range and opined that her cognitive ability to access learning and participate in the learning environment was very strong (Tr. p. 151). He further testified that based on the results of the psychological and educational assessments the CSE felt that the student would be able to "keep pace with her class" (Tr. p. 152).

Although testimony indicates that the results of these evaluations were fully considered at the May 17, 2005 CSE meeting, the 2005-06 IEP developed by the CSE on May 17, 2005 fails to reflect this and does not adequately or accurately describe the student's present levels of performance. The 2005-06 IEP contains global statements similar to those found to be deficient in the student's 2004-05 IEP (Dist. Ex. 1 at p. 10). Statements such as "[the student's] cognitive abilities are average with the exception of processing speed" and "[the student's] reading and writing skills are below average," do not provide a meaningful description of the student's abilities or needs, or suggest specific deficits that need to be addressed (Dist. Ex. 2 at p. 3). For example, the May 2005 IEP indicates that the student needs to improve her reading and writing skills; however, it does not identify the student's specific areas of weakness to be addressed. Descriptions of the student's present performance levels on the IEP do not indicate if the student needs to improve her decoding skills, reading comprehension skills, spelling, penmanship or some other aspects of reading and writing such as fluency or paragraph development (Dist. Ex. 2 at p. 3). Additionally, these statements appear to be discrepant with the record, which indicates that the student's processing speed score and reading composite score were in the average range (Dist. Ex. 9 at p. 2; Dist. Ex. 10 at p. 2; Tr. p. 145). Despite the CSE having sufficient current evaluative information to detail the student's present levels of performance and individual needs, the IEP as written contains an inadequate and inaccurate baseline from which to develop goals and objectives. The present levels of performance and individual needs outlined on a student's IEP serve as the foundation on which the CSE builds to identify goals and services to address the student's individual needs (see 34 C.F.R. Part 300, Appendix A, Section 1, Question 1; see also Office of Vocational and Educational Services for Individuals with Disabilities (VESID), "Sample Individualized Education Program and Guidance Document," p. 40 [December 2002]).

The student's specific needs are neither articulated accurately nor addressed appropriately in the May 17, 2005 IEP. For example, the IEP contains one goal and five short term objectives related to reading comprehension despite the fact that the student achieved a score in the superior range for reading comprehension when evaluated in April 2005 (Dist. Ex. 2 at p.5; Tr. pp. 146-47) and the evaluator who conducted the April 2005 educational and psychoeducational evaluations of petitioners' daughter reported that the student was able to decode the words in the passages she read, respond to questions requiring factual information and had no difficulty when required to draw an inference from the material read (Dist. Ex. 9 at p. 6). Additionally the CSE chairperson testified that the student's "really strong reading comprehension scores" were a factor in determining her ability to succeed in the general education classroom for English, social studies and science (Tr. p. 152). The IEP also contains a goal and a corresponding objective related to decoding, which is not consistent with the student's score in the 68th percentile on the pseudoword decoding subtest of the WIAT II in April 2005 or with the evaluator's report that "[the student] has well developed phonetic skills" (Dist. Ex. 10 at pp. 1, 3).

Another area of discrepancy can be seen in the objectives for proposed written language goals for the student, specifically those short-term objectives developed to address paragraph writing (Dist. Ex. 2 at p. 6). The CSE chairperson testified that the student had shown evidence of a "good foundation" to go into the next grade level in writing, which he described as "going into now three to five paragraph essays" (Tr. p. 160). The student's March 2005 report card from Kildonan indicates that

she was beginning to compose five paragraph essays (Dist. Ex. 8 at p. 3), however the 2005-06 IEP contains an objective to "write a short paragraph that includes a topic sentence" (Dist. Ex. 2 at p. 6).

In the area of mathematics, the 2005-06 IEP appropriately contains objectives related to word problems, consistent with statements in the April 2005 educational evaluation report indicating difficulty in this area (Dist. Ex. 10 at p. 3). However, the objectives as written do not contain sufficient specificity by which to guide instruction, evaluate the student's progress or gauge the need for continuation or revision of the objectives (Dist. Ex. 2 at p. 6). For example, one objective states that the student will "understand the language necessary to solve word problems" with mastery at the 80 per cent level, but does not describe how the student would demonstrate this understanding (id.). All of the objectives for the student's math goal indicate that evaluation will be conducted using "recorded observations, as assessed by the special education teacher" but do not provide any criteria by which these assessments and observations would have been measured (id.). In addition, although the evaluator noted that the student's performance on the numerical operations subtest of the WIAT-II suggested that "her addition and subtraction math facts are automatic," the IEP continues to include objectives related to addition and subtraction (Dist. Ex. 10 at p. 3; Dist. Ex. 2 at p. 6).

The student's 2005-06 IEP also contains a study skills goal with one objective to address attending skills (Dist. Ex. 2 at p. 5). Lack of attention was not reported as a problem by any of the student's teachers and the student achieved a score in the high average range on the working memory index of the WISC-IV (Dist. Ex. 9 at p. 5).

In the area of social emotional skills, the IEP contains a goal with objectives related to initiating and maintaining social interaction with both peers and adults (Dist. Ex. 2 at pp. 6-7), inconsistent with reports in the record indicating that the student "easily engaged in conversation about a variety of topics both adult and self selected" and "should work on eliminating private conversations with her friends during class time" (Dist. Ex. 9 at p. 1; Dist. Ex. 8 at p. 3). However, progress reports from the student's teachers at Kildonan consistently indicated that the student needed to participate more in class and add her own insights to the class discussions (Dist. Ex. 8), and respondent's CSE chairperson also testified that the student was reluctant to participate in class discussions (Tr. p. 155), yet the IEP does not contain goals and objectives which specifically address this identified need.

Overall, the goals and objectives in the 2005-06 IEP do not accurately reflect the student's needs and her present levels of performance. Additionally, the goals are not measurable and are too vaguely stated to meet the requirements set forth in state and federal regulations. For example, the goals recite generally that the student should "demonstrate an improvement . . ." (Dist. Ex. 2 at pp. 4-7) without articulating criteria or standards of measurement to assess improvement. The impartial hearing officer's conclusion that the goals were capable of implementation and blanket statement that the student's knowledge would grow is not supported is not supported by the record because the goals were not based upon an accurate statement of the student's needs, and because the goals and objectives are not only vague but inaccurate and not aligned with the student's actual needs. I disagree with the impartial hearing officer's conclusion that the IEP was reasonably calculated to confer educational benefit because, based upon the current evaluative data in the record, the goals and objectives are not reflective of the student's present levels of performance and are not aligned to address those needs. As a result the IEP is not reasonably calculated to enable this student to receive educational benefit (see Rowley, 458 U.S. at 206, 207). Although it is suggested in the record that the recommended program would have addressed many of the student's needs, without a detailed description of the student's present functioning and appropriate goals and objectives, it is not possible to conclude what specific instruction would have been provided to her. I conclude that the 2005-06 IEP failed to offer petitioners' daughter a FAPE.[5]

Having determined that petitioners' daughter was not offered a FAPE by respondent for the 2005-06 school year, I must now consider whether petitioners established that Kildonan offered an educational program which would meet the student's special education needs during that school year (Burlington, 471 U.S. 359; Application of the Bd. of Educ., Appeal No. 05-015). In order to meet that burden, the parents must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

There is sufficient evidence in the record to conclude that the student's special education needs were met during her 2004-05 school year at Kildonan and to anticipate that they would continue to be met during the 2005-06 school year. While noting that petitioner mother provided limited testimony at the impartial hearing and was the only witness for petitioners, as discussed above, I also note the test scores and Kildonan records that are a part of the record.

On testing conducted during the 2004-05 school year, the student performed in the low average range on measures of mathematics skills, and written language skills (Dist. Ex. 10). The evaluator reported that when reading aloud, the student read slowly and frequently lost her place, and often placed emphasis on the wrong syllables of words (Dist. Ex. 10 at p. 3). Additionally she exhibited difficulties in the areas of spelling, math reasoning, and numerical operations such as multiplication, division, and fractions (Dist. Ex. 10 at p. 1).

The record demonstrates that the Kildonan placement was appropriate to meet the student's needs at the time placement was effectuated and that the student's academic needs were in fact addressed by the private school. At Kildonan, the student participated in a one-to-one tutorial designed to address her strengths and weaknesses in the areas of reading, writing, and spelling (Tr. p. 292; Dist. Ex. 8 at p.3). Petitioner mother testified that the student's tutoring was "at her pace" and that the tutor provided review of information as required (Tr. p. 292). Notes from the tutor in March 2005 indicate that during language training sessions the student worked on handwriting, phonetic concepts, spelling, fluency, sentence structure, and writing paragraphs (Dist. Ex. 8 at p. 3). The student practiced typing as well as handwriting her compositions, which included expanded paragraphs (Dist. Ex. 8 at p. 3). Notes from the student's seventh grade math teacher in March 2005 indicate that instruction focused on multiplying and dividing, as well as prime and composite numbers and factorizations (Dist. Ex. 8 at p. 4) although respondent's CSE chairperson testified that the CSE questioned whether a standard math curriculum was utilized at Kildonan (Tr. pp. 159-60). An observation of the student at Kildonan was conducted by the district special education department chairperson in March 2005. The observation occurred in a history class and the chairperson reported that the teacher was teaching in a lecture style and had distributed typed "fill in the blank" notes for the students to complete while he read them aloud (Dist. Ex. 12 at p. 2). Petitioner's daughter was reported to be prepared with the necessary materials, attentive, answering questions, and interacting with her teacher and the other students (id.).

Based upon the record and under the circumstances of the present case, I find that Kildonan was an appropriate placement for this student for the 2005-06 school year. The program selected by the parents was appropriate to meet the student's special education needs for the 2005-06 school year.

The final criterion for an award of tuition reimbursement is that the parents' claim be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; Mrs. C v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]); see

Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]). Such considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). With respect to equitable considerations, a parent may be denied tuition reimbursement upon a finding of a failure to cooperate with the CSE in the development of an IEP or if the parent's conduct precluded the CSE's ability to develop an appropriate IEP (Warren G. v. Cumberland Co. Sch. Dist., 190 F.3d 80, 86 [3rd Cir. 1999]; see Application of the Bd. of Educ., Appeal No. 04-102; Application of the Bd. of Educ., Appeal No. 04-026). The record reveals that petitioners attended and participated in the CSE meeting and there was no evidence of any lack of cooperation with respondent's CSE in the student's evaluations and in preparing the student's IEP. In the absence of any other equitable factor, I find that petitioners' claim for tuition reimbursement is supported by equitable considerations.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

Dated:     **Albany, New York**
           **March 1, 2006**                            _____
                                                        **PAUL F. KELLY**
                                                        **STATE REVIEW OFFICER**

[1] The New York regulation regarding the 45 day limit was one of a group of regulations that were alleged to violate procedural due process in a complaint in the District Court of the Southern District of New York, however the court held that such regulations were in fact contemplated by IDEA (Does v. Mills, 2005 WL 900620 (S.D.N.Y.).

[2] Application of a Child with a Disability Appeal No. 05-086 determined that an impartial hearing officer properly declined to grant a request by petitioner's counsel for an adjournment made at the hearing after earlier in the day acceding to petitioner's counsel's demand for a hearing "that day" and driving two hours to preside at the evening hearing. Petitioner's counsel in that matter is the same as petitioner's counsel in the instant case. A petitioner should not request an impartial hearing and then impede the impartial hearing process (see generally, Application of a Child with a Disability, Appeal No. 04-105; Application of a Child with a Disability, Appeal No. 04-010)).

[3] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEIA], Pub L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute as it existed prior to the 2004 amendments. The relevant events in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA, therefore, the provisions of the IDEIA do not apply.

[4] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meets the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and,

(D) are provided in conformity with the individualized education program required under section 1414 (d) of this title.

20 U.S.C. § 1401[8]; <u>see also</u> 34 C.F.R. § 300.13; 20 U.S.C. § 1414[d].

---

[5]   This determination would remain if during the administrative hearing the burden had been placed on the parents, the parties challenging the IEP, as the Supreme Court recently established in <u>Schaffer v. Weast</u>, 126 S. Ct. 528, 537 (2005) (<u>see</u> <u>Application of the Bd. of Educ.</u>, Appeal No 05-120).

# EXHIBIT C



# The University of the State of New York

## The State Education Department
### State Review Officer

**No. 07-114**

**Application of the BOARD OF EDUCATION OF THE
CARMEL CENTRAL SCHOOL DISTRICT for review of a
determination of a hearing officer relating to the provision of
educational services to a child with a disability**

**Appearances:**

Shaw, Perelson, May & Lambert, LLP, attorney for petitioner, Michael K. Lambert, Esq., of
counsel

Family Advocates, Inc., attorney for respondents, RosaLee Charpentier, Esq., of counsel

### DECISION

Petitioner, the Board of Education of the Carmel Central School District, appeals from
the decision of an impartial hearing officer which found that it failed to offer an appropriate
educational program to respondents' daughter and ordered it to reimburse respondents for their
daughter's tuition costs at the Kildonan School (Kildonan) for the 2006-07 school year. The
appeal must be sustained.

Preliminarily, I will address a procedural issue. The regulations of the Commissioner of
Education provide that a memorandum of law shall not exceed 20 pages in length (8 NYCRR
279.8[a][5]), and specifically state that documents that fail to comply with the form requirements
may be rejected in the sole discretion of a State Review Officer (8 NYCRR 279.8[a]; Application
of a Child with a Disability, Appeal No. 06-065; Application of the Bd. of Educ., Appeal No. 04-
080). The memorandum of law that respondents submitted at the time of their answer exceeded
20 pages in length and was rejected. Although respondents subsequently filed with the Office of
State Review an amended memorandum of law consisting of 20 pages, the amended
memorandum of law did not comply with the font size and line spacing requirements of the state
regulations (8 NYCRR 279.8[a][2]). Therefore, in the exercise of my discretion, I reject
respondents' amended memorandum of law and will not consider the document.

At the commencement of the impartial hearing, respondents' daughter was attending ninth grade at Kildonan (Tr. pp. 6, 7). Kildonan has not been approved by the Commissioner of Education as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student was described as a friendly and capable student, who was sometimes reticent to initiate social interaction (Dist. Exs. 1d at p. 4; 33 at p. 2; 39a at p. 61). Her cognitive abilities were described in the average range of functioning and her academic achievement test scores were primarily in the low average to average range with relative strengths in understanding directions and writing samples (above average) and relative weakness in math fluency (low) (Dist. Exs. 29 at p. 4; 33 at p. 4). The student's eligibility for special education programs and services and classification as a student with a learning disability are not in dispute in this proceeding (see 8 NYCRR 200.1[zz][6]).

The student's prior educational history is described in Application of a Child with a Disability, Appeal No. 05-063 and Application of a Child with a Disability, Appeal No. 06-005 and will not be repeated here in detail. Briefly, the student was initially classified as learning disabled by petitioner's Committee on Special Education (CSE) when she was in first grade (Tr. p. 41). The student's overall intellectual functioning falls within the average range, and she has received varying levels of special education services throughout her elementary school years to address her deficits in reading, math, and spelling (Dist. Ex. 21 at p. 3). For the 2002-03 and 2003-04 school years, respondents unilaterally enrolled the student in private placements (Tr. p. 58; see Dist. Ex. 21 at p. 3). Respondents unilaterally placed the student at Kildonan for the 2004-05 and 2005-06 school years (Application of a Child with a Disability, Appeal No. 06-005; Application of a Child with a Disability, Appeal No. 05-063).

The February 2006 progress reports from Kildonan indicated that the student was performing satisfactorily except in her science class (Dist. Ex. 39a at pp. 59-64). The student's science instructor reported that the student had a difficult term and achieved limited success due to the student's frequent absences that prevented her from receiving repetition of the concepts covered in class, which was necessary for the student's mastery of the concepts (id. at p. 63). The Kildonan instructor who provided individual language training tutorials to the student reported that the student had a good memory for spelling words, including words learned during the 2005-06 school year; recognized when her writing did not flow; and was an "outstanding" independent reader (id. at p. 59). The student received a grade of B in literature and was reported to demonstrate a willingness to read aloud in class as well as to role-play different characters in plays (id. at p. 61). The student's math instructor reported that the student made good progress in math and improved her grades by completing all her assignments, correcting those assignments, and increasing her test grades (id. at p. 60). The instructor opined that the student had a high aptitude in math and needed to continue to apply herself (id.).

The CSE convened on March 28, 2006 for the student's annual review and to develop her individualized education program (IEP) for the 2006-07 school year (Dist. Ex. 1c). CSE meeting notes stated that the March 2006 CSE reviewed reports from the student's teachers at Kildonan and determined that she had made excellent progress in language training, math, literature, and history, but that science was more difficult for her (id. at p. 1). The March 2006 CSE proposed placement at petitioner's high school with a program of consultant teacher for all academic classes, special class reading, and counseling (id.). CSE meeting notes stated that the March

2006 CSE would schedule another meeting with representatives from petitioner's high school to finalize the student's IEP (id.).

Achievement testing of the student by Kildonan in May 2006 yielded standard (and percentile) scores of 86 (18) in word identification and 97 (41) in word attack, as measured by the Woodcock Reading Mastery Test-R/NU; and 8 (25) in rate, 7 (16) in accuracy, and 6 (9) in fluency as measured by the Gray Oral Reading Test-Fourth Edition (Dist. Ex. 39a at p. 73). On the Test of Written Spelling-4, the student achieved a standard (and percentile) score of 90 (26) (id.). Administration of the Gates-MacGinitie Reading Tests-Fourth Edition yielded grade equivalent (and percentile) scores of 6.9 (33) in vocabulary and 10.2 (63) in comprehension (id.). In the area of mathematics, the student achieved grade equivalent (and percentile) scores of 10.2 (63) in problem solving, 6.9 (27) in procedures, and a total score of 8.7 (48), as measured by the Stanford Achievement Test (id. at p. 74).

The June 2006 progress reports from Kildonan indicated that the student received grades of B in math, B+ in literature, B in history, and C in science (Dist. Ex. 39a at pp. 67-70). The Kildonan instructor who provided individual language training tutorials to respondents' daughter, reported that the student's scores on the diagnostic testing administered in May 2006 revealed significant gains in her reading rate, accuracy, and fluency; great improvement in spelling; and gains in both reading comprehension and word attack (id. at p. 66).

Petitioner conducted an educational evaluation of the student on August 8, 2006 (Dist. Ex. 33). Administration of Form A of the Woodcock-Johnson III Tests of Achievement (WJ III) yielded standard scores in broad reading and broad written language consistent with previous testing completed by petitioner in June 2004, with some increase in each area (id. at p. 1). The student achieved standard (and percentile) subtest scores of 90 (25) in letter-word identification, 85 (16) in reading fluency, 91 (26) in story recall, 112 (78) in understanding directions, 88 (21) in calculation, 63 (1) in math fluency, 88 (22) in spelling, 80 (9) in writing fluency, 96 (39) in passage comprehension, 93 (31) in applied problems, and 118 (88) in writing samples (id. at p. 4). The evaluator determined that compared to other students her age, the student exhibited average English oral language skills, low average academic skills, an average ability to apply academic skills, and that her fluency with academic tasks was low (id. at p. 3). No discrepancies were noted among her achievement areas (id.).

The CSE reconvened on August 10, 2006 to finalize the student's IEP for the 2006-07 school year (ninth grade) (Dist. Ex. 1d). The August 2006 CSE recommended that the student be placed at petitioner's high school and recommended a program of consultant teacher support for English, math, science, and social studies; special class reading daily; and counseling one time per week in a small group (id. at pp. 1-2.). Program modifications included refocusing and redirection, preferential seating, copy of class notes, extended time for in class assignments, books on tape, use of a calculator, and modified homework assignments (id. at p. 2). Assistive technology devices and services included use of a word processor, books on tape, and an unspecified assistive technology consultation (id.). The student was afforded the following testing modifications: extended time (1.5); directions read/explained; clarification of test questions; special location; spelling requirements waived; and use of a word processor (id.). The

proposed IEP contained annual goals related to study skills, reading, writing, mathematics, and social emotional needs (id. at pp. 5-8).

By two letters both dated August 23, 2006, respondents rejected the August 2006 CSE's recommended program, alleging substantive violations, gave notice of their unilateral enrollment of their daughter in Kildonan for the 2006-07 school year, and requested transportation to Kildonan (Dist. Ex. 2a; Parent Ex. Q). By due process complaint notice dated August 23, 2006, respondents requested an impartial hearing seeking tuition reimbursement for the 2006-07 school year (Dist. Ex. 2b).

The impartial hearing commenced on April 10, 2007 and ended on June 26, 2007 after seven days of testimony. By order dated August 24, 2007, the impartial hearing officer found that he was without jurisdiction to determine procedural issues because none were raised in the due process complaint notice (IHO Decision at p. 18).[1] The impartial hearing officer then found that, although much discussion occurred during the August 2006 CSE meeting and adequate information was gathered and reflected in the August 2006 IEP, petitioner did not provide the student with a free appropriate public education (FAPE)[2] because of the "uninspired rendition" of the student's present levels of performance in the August 2006 IEP (id. at p. 19). The impartial hearing officer further found that Kildonan was an appropriate placement for the student and that the equities favored an award of tuition reimbursement and related costs to respondents (id. at pp. 23-26).

Petitioner appeals and requests that the impartial hearing officer's decision awarding tuition and transportation reimbursement be overturned. Petitioner asserts that the impartial hearing officer exceeded his jurisdiction and erred by basing his determination upon contentions not asserted in the due process complaint notice. Petitioner further contends that the impartial hearing officer erred by finding that it failed to offer a FAPE based on the "uninspired rendition" of the student's present levels of performance in the August 2006 IEP because that is not the proper legal standard for review. Further, petitioner alleges that respondents failed to demonstrate that the August 2006 IEP was inappropriate based upon their arguments asserted in the due process complaint notice. Petitioner asserts that the August 2006 IEP was appropriate and would have led to continued educational gains for the student. Petitioner also contends that the impartial hearing officer erred in finding that Kildonan was appropriate because he did not consider the legal requirement of placement of a student with a disability in the least restrictive environment (LRE). Therefore, petitioner requests a finding that respondents failed to meet their

---

[1] The page numbers cited in this decision were added to the impartial hearing officer's decision upon its receipt by the Office of State Review staff in the interests of clarity and accuracy. They were not a part of the hearing record before the State Review Officer.

[2] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]).

burden of demonstrating the inappropriateness of the August 2006 IEP, that petitioner offered the student an appropriate program for the 2006-07 school year, and that respondents failed to demonstrate that Kildonan was an appropriate placement.

In their answer, respondents request that the impartial hearing officer's decision be upheld in its entirety and that petitioner's appeal be dismissed.

The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 546 U.S. 49, 51 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]).  A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17[d];[3] see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).  While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]).  Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]).  A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203).  However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189).  The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379).  Additionally, school districts are not required to "maximize" the potential of students

---

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the IDEA, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. For convenience, citations in this decision refer to the regulations as amended because the regulations have been reorganized and renumbered.

with disabilities (<u>Rowley</u>, 458 U.S. at 189, 199; <u>Grim</u>, 346 F.3d at 379; <u>Walczak</u>, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (<u>Cerra</u>, 427 F.3d at 195, quoting <u>Walczak</u>, 142 F.3d at 130 [citations omitted]; <u>see</u> <u>Perricelli</u>, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (<u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1120 [2d Cir. 1997]; <u>see</u> <u>Rowley</u>, 458 U.S. at 192).

The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; <u>see</u> <u>Walczak</u>, 142 F.3d at 132). The LRE is defined as "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled" (<u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 535 [3d Cir. 1995]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a child by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (<u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359 [1985]; <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 [1993]). In <u>Burlington</u>, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (<u>Burlington</u>, 471 U.S. at 370-71; <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 111 [2d Cir. 2007]; <u>Cerra</u>, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the child a FAPE (<u>Burlington</u>, 471 U.S. at 370-71; <u>see</u> 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (<u>Application of the Dep't of Educ.</u>, Appeal No. 07-018; <u>Application of a Child with a Disability</u>, Appeal No. 06-059; <u>Application of the Dep't of Educ.</u>, Appeal No. 06-029; <u>Application of a Child with a Disability</u>, Appeal No. 04-046; <u>Application of a Child with a Disability</u>, Appeal No. 02-014; <u>Application of a Child with a Disability</u>, Appeal No. 01-095; <u>Application of a Child Suspected of Having a Disability</u>, Appeal No. 93-9).

The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (<u>see</u> <u>Schaffer</u>, 546 U.S. at 59-62 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

As an initial matter, I concur with petitioner's contention that the impartial hearing officer erred by considering evidence concerning issues not raised in respondents' due process complaint notice. Under the 2004 amendments to the IDEA, the party requesting an impartial hearing may not raise issues at the due process hearing that were not raised in its original due process complaint notice unless the original complaint is amended prior to the impartial hearing (20

U.S.C. § 1415[c][2][E]), or the other party otherwise agrees (20 U.S.C. § 1415[f][3][B]). The Senate Report pertaining to this amendment to the IDEA noted that "the purpose of the sufficiency requirement is to ensure that the other party, which is generally the school district, will have an awareness and understanding of the issues forming the basis of the complaint" (S. Rep. 108-185, Individuals with Disabilities Education Act Senate Report No. 108-185, "Notice of Complaint," [November 3, 2003]). The Senate Committee reiterated that they assumed with the earlier 1997 amendments' notice requirement that it "would give school districts adequate notice to be able to defend their actions at due process hearings, or even to resolve the dispute without having to go to due process" (id.). In the instant case, a review of respondents' due process complaint notice reveals that they specifically alleged three substantive violations regarding the student's August 2006 IEP (Dist. Ex. 2b). The due process complaint notice does not include any allegations pertaining to the appropriateness of the goals or present levels of performance in the August 2006 IEP (id.). During the impartial hearing, counsel for respondents questioned the propriety of the goals listed in the June 2006 IEP, at which time petitioner's counsel objected, noting that the issue was not properly before the impartial hearing officer because it had not been raised in respondents' due process complaint notice (Tr. pp. 171, 1031, 1038-39). The impartial hearing officer allowed counsel for respondents to question the witnesses on the development and appropriateness of the goals in the August 2006 IEP, and further determined that he had subject matter jurisdiction with respect to this issue, although it was not raised in respondents' due process complaint notice. The impartial hearing officer also permitted witnesses to testify in response to questions from respondents' counsel regarding procedural matters that were not contained in the due process complaint notice over the objections of petitioner's counsel (Tr. pp. 583-88, 676-78, 689). Furthermore, the impartial hearing officer assumed subject matter jurisdiction with respect to the student's present levels of performance in the August 2006 IEP even though it was not raised in respondents' due process complaint notice or at the impartial hearing. A review of the hearing record also indicates that at no point during the impartial hearing did respondents' counsel amend the due process complaint notice, nor did she make any request to do so. Under the circumstances, I agree with petitioner that the impartial hearing officer should have confined his determination to issues raised in respondents' due process complaint notice (see 20 U.S.C. § 1415[c][2][E], [f][3][B]; 34 C.F.R. §§ 300.508[d][3], 300.511[d]; 8 NYCRR 200.5 [i][7][i], [j][1][ii]; Application of a Child with a Disability, Appeal No. 07-051; Application of a Child with a Disability, Appeal No. 07-047; Application of a Child with a Disability, Appeal No. 06-139; Application of a Child with a Disability, Appeal No. 06-065; Application of a Child with a Disability, Appeal No. 04-019; Application of a Child with a Disability, Appeal No. 03-095; Application of a Child with a Disability, Appeal No. 02-024; Application of a Child with a Disability, Appeal No. 01-024; Application of a Child with a Disability, Appeal No. 99-060).

Petitioner further contends that the challenged IEP for the 2006-07 school year was appropriate and would have led to continued educational gains for the student. For the reasons discussed below, I agree.

The CSE convened on March 28, 2006 for the student's annual review and to develop her IEP for the 2006-07 school year (Dist. Ex. 1c). The hearing record reflects that the May 2006 CSE reviewed reports from the student's teachers at Kildonan and determined that she had made excellent progress in language training, math, literature, and history, but that science was more

difficult for her (Tr. pp. 194, 197, 225; Dist. Ex. 1c at p. 1). The student's father testified that the consultant teacher model at petitioner's high school was proposed, but not "solidified" and that a reading program was discussed (Tr. p. 200). The student's father further testified that he asked for the meeting to be adjourned because representatives from petitioner's high school were not in attendance (Tr. p. 198). CSE meeting notes indicate that another CSE meeting would be scheduled to include representatives from the high school in order to finalize the student's IEP (Dist. Ex. 1c at p. 1).

The CSE reconvened on August 10, 2006 (District Ex. 1d). The student and her mother were in attendance as were a middle school psychologist, a high school special education consultant teacher, and a ninth grade regular education English teacher (id. at p. 4). The August 2006 CSE chairperson was also the psychologist at petitioner's high school (Dist. Ex. 42 at p. 1). The hearing record reflects that the August 2006 CSE reviewed updated evaluative information, including progress reports from the student's private placement; discussed in detail the student's strengths and needs; proposed goals to address the student's identified areas of deficit; and explained the recommended placement and related services (Dist. Ex. 42). The student was included in the August 2006 CSE's discussions (id. at pp. 2, 3, 5, 13, 14, 16, 18).

The August 2006 CSE recommended that the student be placed at petitioner's high school and receive a program of consultant teacher support for English, math, science, and social studies, special class reading daily, and counseling one time per week in a small group (District Ex. 1d at pp. 1-2.). Program modifications included refocusing and redirection, preferential seating, copy of class notes, extended time for in class assignments, books on tape, use of a calculator, and modified homework assignments (id. at p. 2). Assistive technology devices and services included use of a word processor, books on tape, and an unspecified assistive technology consultation (id.). The student was afforded the following testing modifications: extended time (1.5); directions read/explained; clarification of test questions; special location; spelling requirements waived; and use of a word processor (id.). The proposed IEP contained annual goals related to study skills, reading, writing, mathematics, and social emotional needs (id. at pp. 5-8).

The consultant teacher model at petitioner's high school consists of a regular education teacher and a special education teacher working together within one classroom (Tr. p. 418). A regular education curriculum is followed (Tr. pp. 90, 1014-15). The role of the special education teacher is to support the students who are identified as special education students and to provide them with specific accommodations and any modifications to the curriculum or materials to ensure that the students are successful within the regular education and Regents curriculum (Tr. pp. 418-19, 959). A ninth grade special education consultant teacher testified that the consultant teacher also supports the regular education teacher to meet the needs of the "different learners" in the classroom (Tr. p. 1024; Dist. Ex. 42 at p. 6). She indicated that consultant teacher services are "subtle" so that students do not feel targeted as special education students within a regular education classroom (Tr. pp. 1024-25). Petitioner's CSE chairperson and the special education consultant teacher both testified that classification alone is not a criterion for placement in the consultant teacher model but that students must have the cognitive ability to understand the curriculum when provided with individualized support (Tr. p. 1092). Consideration of the consultant model as a placement for a student is based on standard scores, information from

teachers regarding the student's progress and level of motivation, and the student's ability to understand language and the curriculum (Tr. pp. 419-20). Accommodations and modifications, in addition to those specified on a student's IEP, such as a reading station that students can report to when they are having difficulty reading or writing in a class or are taking a test, are available to students throughout the day (Tr. pp. 889-92). The CSE chairperson testified that after school help is also available to all students and is provided by a group of five teachers, including a special education teacher (Tr. p. 445).

The special reading class proposed for the student is taught by a special education teacher certified in levels one and two of the Wilson reading program (Wilson) (Tr. pp. 876-77). She described Wilson as a systematic language-based program based on the Orton-Gillingham methodology used specifically with adolescents who have problems with decoding, encoding, and reading fluency (Tr. pp. 877-79). The special reading class recommended for the student meets daily for 40 minutes and is comprised of seven students who all exhibit difficulty with decoding, spelling, and their reading fluency (Tr. pp. 881, 884). The reading teacher administers pre-tests at the start of the school year and assesses the students' progress on a daily basis (Tr. pp. 902, 929-932). The special education reading teacher testified at length about how she would address the student's reading and writing deficits including methods of direct instruction, assessment of progress, and use of assistive technology and opined that the content taught was the same as what the student had been taught at Kildonan (Tr. pp. 885-89, 897, 928-29; see Dist. Ex. 39d). Within the special reading class, the student would have received both individual and group instruction dependent upon her areas of need and those of the other students in the class (Tr. pp. 902, 911, 926). The special education reading teacher testified that she meets with the special education consultant teachers every other day to discuss students and use of assistive technology programs and accommodations (Tr. pp. 940-41).

The student's cognitive functioning is in the average range (full scale IQ score 105) and the results of educational achievement testing completed two days prior to the August 2006 CSE meeting indicate that compared to other students her age, she exhibits skills primarily in the low average to average range with relative strengths in understanding directions and writing samples (above average) and relative weakness in math fluency (low) (Dist. Exs. 29 at p. 4; 33 at p. 4). Her oral language skills are average as is her ability to apply academic skills (Dist. Ex. 33 at p. 4). Petitioner's director of pupil services testified that the student has the ability to understand what is said and can participate commensurate with her cognitive ability (Tr. p. 1093). The special reading class teacher testified that the student's passage comprehension and oral language standard scores indicated that she could absorb the material presented in a regular education classroom at the same rate as other students (Tr. p. 892; see Dist. Exs. 39d; 39e). Progress reports from the student's instructors at Kildonan indicated the student performed satisfactorily, was typically prepared for class, and that she demonstrated the willingness and initiative to improve her grades when needed (Dist. Ex. 39a at pp. 59-64). The Kildonan instructor who provided individual language training tutorials to respondents' daughter reported that the student's scores on diagnostic testing administered in May 2006 revealed significant gains in her reading rate, accuracy, and fluency; great improvement in spelling; and gains in both reading comprehension and word attack (id. at p. 66). The Kildonan academic dean testified that the student demonstrated "substantial growth" in comprehension and vocabulary (Tr. p. 322).

9

The student achieved a broad reading cluster standard score of 88 and a broad math cluster standard score of 85 as measured by the WJ-III, and a processing speed index standard score of 100 (average range) as measured by the WISC-IV (Dist. Exs. 29 at pp. 2, 5; 33 at p. 4). Class profiles contained in the hearing record reflect that the special education students enrolled in the classes that the CSE proposed for the student have IQ scores ranging from 87 to 113 and reading achievement standard scores ranging from 68 to 94 in the proposed reading class, 84 to 100 in the proposed science class, 80 to 100 in the proposed English class, and 80 to 100 in the proposed global studies class (Dist. Ex. 35 at pp. 2, 4-6). In the student's proposed math class, the math achievement standard scores ranged from 85 to 102 (id. at p. 3). Processing speed scores ranged from 70 to 134, with an average score of 92 (Dist. Ex. 36).

Based on the hearing record before me, I find that petitioner's proposed program was reasonably calculated to provide educational benefits to the student during the 2006-07 school year, reflected the requisite alignment between the student's needs and her goals necessary for the provision of an appropriate program in the LRE, and provided for respondents' daughter to be grouped with students of similar special education needs and abilities.

Several times throughout the August 2006 CSE meeting, the student's mother was provided the opportunity to voice any concerns or disagreements with the recommendations being made, but she did not do so (Tr. pp. 6, 14, 15, 16, 18, 19). Moreover, although the Kildonan dean testified that in January or February 2006 he had recommended to respondents that the student remain at Kildonan for the 2006-07 school year, this was not shared by respondents at either the March or August 2006 CSE meetings (Tr. pp. 226, 296, 335; Dist. Ex. 42). Respondents' contentions in their due process complaint notice that the student works at a very slow rate, that she would be the slowest student in the class recommended by the August 2006 CSE, and that she must be taught with other students who have been diagnosed with dyslexia by the Orton-Gillingham methodology are not supported by the hearing record (see Dist. Ex. 2b). Testimony elicited from the Kildonan academic dean indicated that with the exception of math, placement of students in subject matter classes at Kildonan is based on their cognitive functioning without regard to their reading level (Tr. pp. 327-30). The Kildonan academic dean further testified that none of the student's instructors at Kildonan possess any level of Orton-Gillingham certification, including the instructor who provided individual language training tutorials to respondents' daughter (Tr. p. 348-49).

Moreover, I agree with petitioner's assertion that the impartial hearing officer erred in finding that it failed to offer the student a FAPE because of the "uninspired rendition" of the student's present levels of performance in the August 2006 IEP. The student's August 2006 IEP contained a statement of her present levels of performance in a number of areas, including stating her abilities and needs (Dist. Ex. 1d at p. 3). It described her cognitive abilities as "average, with the exception of processing speed," her math skills as "in the low average range," and her reading and writing skills as "below average" (id.). Under the area of academic achievement, functional performance, and learning characteristics, the proposed IEP referenced broad as well as subtest scores resulting from recent educational achievement testing (id.). The proposed IEP also stated that the student's social and emotional levels and abilities were "within age expectations overall" but that she was "sometimes reticent to initiate social interactions" (id. at p. 4).

Global statements such as "[the student's] cognitive abilities are average with the exception of processing speed" and "[the student's] reading and writing skills are below average," by themselves do not clearly convey the student's present levels of educational performance nor identify the specific deficits that need to be addressed (Dist. Ex. 1d at p. 3). However, here the inclusion of the student's subtest standard scores provides additional details necessary to identify the specific areas within reading, math, and writing that require remediation and provides a baseline from which to project goals (id.). Furthermore, there is ample evidence in the hearing record indicating that at the March 2006 CSE meeting, the CSE reviewed progress reports from Kildonan and discussed the student's present levels (Tr. pp. 194, 197, 225) and that at the August 2006 CSE meeting, the student's present levels of performance were reviewed and discussed in detail by the special education teacher who would have taught the student in math (Tr. pp. 425, 960; Dist. Ex. 42 at pp. 1-6). Although the student's present levels of performance as written on the August 2006 IEP do not, standing alone, comply with the requirements of federal and state law (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), for the reasons discussed above, this did not impede the student's right to a FAPE, significantly impede respondents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or cause a deprivation of educational benefits to the student (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233, 144 F.3d 692, 703-04 [10th Cir. 1998]; Application of the Bd. of Educ., Appeal No. 07-043; Application of the Bd. of Educ., Appeal No. 04-031; compare Application of the Bd. of Educ., Appeal No. 02-025, with Application of a Child with a Disability, Appeal No. 04-046). I therefore caution petitioner that it is required to develop present levels of performance in the student's IEP consistent with federal and state regulations (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]).

As a final matter, I note that petitioner was remiss in not filing the record of the proceeding before the impartial hearing officer together with the petition for review as required by section 279.9(b) of the regulations of the Commissioner of Education. I caution petitioner to comply with Part 279 of the state regulations pertaining to the filing of a hearing record.

**THE APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the impartial hearing officer's decision dated August 24, 2007 is annulled to the extent that it determined that petitioner did not offer the student a FAPE for the 2006-07 school year and granted respondents' request for tuition and transportation reimbursement for that year.

Dated:    **Albany, New York**
            **November 14, 2007**

                                        **PAUL F. KELLY**
                                        **STATE REVIEW OFFICER**

# EXHIBIT D

CARMEL CENTRAL SCHOOL DISTRICT - GENERAL FUND                    NO. 228314

```
3845 - DAVIS, LAURA                    Date: 10/11/06    Check Num:   228314
76 BRYANT TRAIL ROAD CARMEL, NY 10512
  P O #     ACCOUNT              INVOICE                          AMOUNT
 208520    A225047006           REIMBURS 04-05 SCHOOL YR        2,500.00
                                                              ------------
                                              CHECK TOTAL      $2,500.00
```



OCT 11 2006

PAID/CCSD



ENDORSE HERE

FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
THE KILDONAN SCHOOL
082-699

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

ORIGINAL



# The Kildonan School
### Founded in 1969



RECEIVED

NOV 17 2006

Carmel Central School District
Pupil Services Department

October 20, 2006

Ms. Laura Davis
76 Bryant Trail
Carmel, NY 10512

2004/05 Kildonan School Year Tuition : Chloe Dabrowski

JAN -5 2007

Tax ID # 23-1713405

Tuition for Day is $ 28,000.00.

10/20/06    Payment Received    $ 2,500.00 Ck#3101 Dated 10/19/06

Ann E. Still
Business Manager

OK

10/17/06

425 Morse Hill Road, Amenia, NY 12501  ~  Telephone: 845/373-8111  ~  Facsimile: 845/373-9793



LAURA DAVIS
76 BRYANT TRAIL
CARMEL, NY 10512

50-7098/2219
8985400574

938

DATE 10/11/06

PAY TO THE ORDER OF _Kildonan_ $ 2,500.00

_Two Thousand five hundred_ DOLLARS

PCSB Putnam County Savings Bank
KENT LAKES, N.Y. 10512

MEMO _Chloes 2004-05_        _Laura Davis_
_Tuition_

⑆221970980⑆ 898 5⑈00574⑈ 0938  ⑆0000250000⑈

ENDORSE HERE
FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
THE KILDONAN SCHOOL
082 6983 6 6
X 7 7 7
DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 229416

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 209077 | A225047006 | TUITION REIMBURSEMENT | $  2500.00 |

VENDOR: DAVIS, LAURA                          CHECK TOTAL $      2500.00



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 229416

1-2/210

GENERAL FUND                    DATE: 01/05/2007

PAY  *VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID*     $*****2,500.00

TO THE ORDER OF
  **DAVIS, LAURA**
  **76 BRYANT TRAIL ROAD**
  **CARMEL, NY 10512**

NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**



# The Kildonan School
### Founded in 1969

**RECEIVED**

FEB 28 2007

Carmel Central School District
Pupil Services Department

February 13, 2007

PAID/CCSD
MAR - 9 2007

Ms. Laura Davis
76 Bryant Trail
Carmel, NY 10512

2004/05 Kildonan School Year Tuition : Chloe Dabrowski

Tax ID # 23-1713405

Tuition for Day is $ 28,000.00.

2/13/07 Payment Received    $ 2,500.00 Ck# 987 Dated 1/3/07

Shary L. Hertel
Accounts Receivable
Business Office

425 Morse Hill Road, Amenia, NY 12501    ~    Telephone: 845/373-8111    ~    Facsimile: 845/373-9793

We are happy to provide you with a copy of the item you requested.

**LAURA DAVIS**
76 BRYANT TRAIL
CARMEL, NY 10512

50-7009/2219
8385400574

987

DATE *1/3/07*

PAY TO THE ORDER OF *Kildonan School* $ *2,500*

*two Thousand five hundred* DOLLARS

**PCSB** Putnam County Savings Bank
KENT LAKES, N.Y. 10512

MEMO *2004-2005 Tuition*    *Laura Davis*

⑂221970980⑂ 878 5400574⑂ 0987 ⑂0000250000⑂

ENDORSE HERE
FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
THE KILDONAN SCHOOL
082 699 5

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563          No. 230424

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 209689 | A225047006 | TUITION REIMBURS | $    2500.00 |

| | | | |
|---|---|---|---|
| VENDOR: DAVIS, LAURA | | CHECK TOTAL $    2500.00 | |



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 230424

1-2/210

**GENERAL FUND**                    DATE: 03/09/2007

**PAY**  *VOID   VOID   VOID   VOID   VOID   VOID   VOID   VOID   VOID*       $*****2,500.00

TO THE ORDER OF
    **DAVIS, LAURA**
    **76 BRYANT TRAIL ROAD**
    **CARMEL, NY 10512**

## NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**



Sent To District
6/14/07
2ND time sent 7/15/07



Chloe Dabrowsk
1045

LAURA DAVIS
76 BRYANT TRAIL
CARMEL, NY 10512

DATE 6/27/07

PAY TO THE ORDER OF _Kildonan_                    $ 2500.00

_Two thousand five hundred_ DOLLARS

**PCSB** Putnam County Savings Bank
KENT LAKES, N.Y. 10512

MEMO 2004-2005 Tuition          _Laura Davis_

⑆221970980⑆ 898 5400576⑈ 1045 ⑆0000250000⑆

8/16/07          PAID/CCSD
                 AUG 3 0 2007

| Account | 0000008054005740 | | Routing | 221970980 |
| Amount | 2500.00 | | OF6 | 0 |
| Post Date | 20070705 | | Check | 0000001045 |
| Sequence | 443181934 | | Tran | 000051 |



PUTNAM COUNTY SAVINGS BANK                                    7/6/2007

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 232410

| PO# | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|---|---|---|---|
| 211753 | A225047006 | TUITION REIMBURS | $ 2500.00 |

VENDOR: DAVIS, LAURA

CHECK TOTAL $   2500.00

---



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 232410

1-2/210

GENERAL FUND                    DATE: 08/30/2007

PAY  *VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID*     $*****2,500.00

TO THE ORDER OF
    DAVIS, LAURA
    76 BRYANT TRAIL ROAD
    CARMEL, NY 10512

NON-NEGOTIABLE

---



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

DAVIS, LAURA
76 BRYANT TRAIL ROAD
CARMEL, NY 10512

**RECEIVED**                    1

Carmel School District
81 South Street
Patterson, New York 12563
September 14, 2007

SEP 1 4 2007

**Carmel Central School District
Pupil Services Department**

Dear Ms Rohe:

Enclosed is a copy of the front and back of check #1012 payment date 9/4/07 to Kildonan from Laura Davis (mother) towards the 2004/05 tuition for Chloe Dabrowski at Kildonan School, 425 Morse Hill Road, Amenia, New York 12501, 2004-05 school year.

Ms. Rohe, you have stated that you are the person accountable for initiating reimbursement; there fore I am asking you as financial expeditor for the Carmel School District to promote a speedy reimbursement for this payment as per the hearing officers decision of 2005.

I want to remind you that reimbursement for parent, Laura Davis' check #1045 took you over seventy-one days (71) to bet reimbursed to the parent as per Kathy Rohe's directive to the District treasurer. There fore, I am putting the Carmel School district on a five-day notice that we will be taking the District to court if payment is not received by September 28, 2007.

Sincerely,

*Laura Davis*

Laura Davis, Mother

PAID/CCSD

SEP 2 1 2007

Cc: Rosa Lee Charpentier, attorney for parent

L. Davis-76 Bryant Trail-Carmel-NY-10512~845-225-1304~work: 914-925-5449

\*\* TOTAL PAGE.02 \*\*

Page 1 of 1



| | | | |
|---|---|---|---|
| Account | 0000008054005740 | Routing | 221970980 |
| Amount | 2500.00 | OF6 | 0 |
| Post Date | 20070910 | Check | 0000001012 |
| Sequence | 442062470 | Tran | 000051 |



PUTNAM COUNTY SAVINGS BANK                    9/12/2007

No. 232680

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 212101 | A225047006 | TUITION REIMBURSMENT | $ 2500.00 |

| VENDOR:  DAVIS, LAURA | | CHECK TOTAL $ | 2500.00 |



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 232680

1-2/210

GENERAL FUND          DATE: 09/21/2007

PAY  *VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID*    $*****2,500.00

TO THE ORDER OF
  **DAVIS, LAURA**
  **76 BRYANT TRAIL ROAD**
  **CARMEL, NY 10512**

NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**

1

Carmel School District
81 South Street
Patterson, New York 12563
December 18, 2007

RECEIVED

DEC 19 2007

Carmel Central School District
Pupil Services Department

Dear Ms Rohe:

Please send reimbursement of the 11/29/07 payment of $2,500 Check #1018 to: Laura
Davis (mother) of Chloe Dabrowski as this is a payment towards the 2004/05 tuition at
Kildonan. Considering that the District has a history of disregarding requests for
reimbursement, we are putting the Carmel School district on a five-day notice that we
will be taking the District to court if payment is not received by December 26, 2007.

PAID/CCSD

JAN - X 2008

7

Sincerely,

Laura Davis
Mother

~~~Laura Davis~76 Bryant Trail~Carmel~New York 10512~(845)-225-1304~~~

RECEIVED

DEC 19 2007

Carmel Central School District
Pupil Services Department

LAURA DAVIS
76 BRYANT TRAIL
CARMEL, NY - 10512

50-7098/2219
8985400574-

1018

DATE 11/29/07

PAY TO THE
ORDER OF _Kildonan School_ $ 2500.

_two thousand five hundred_ DOLLARS

**PCSB** Putnam County
Savings Bank
KENT LAKES, N.Y. 10512

MEMO 2004-05

⑈221970480⑈ 878 5400574⑈ 1018

FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
THE KILDONAN SCHOOL
082 699 5

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

**No. 234259**

| P.O. # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|--------|----------------|----------------|--------|
| 212924 | A225047006 | | $ 2500.00 |

VENDOR: DAVIS, LAURA    **CHECK TOTAL** $ 2500.00

---



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

**No. 234259**

1-2/210

**GENERAL FUND**    DATE: 01/07/2008

PAY  *VOID*  *VOID*  *VOID*  *VOID*  *VOID*  *VOID*  *VOID*  *VOID*  *VOID*    $*****2,500.00

TO THE ORDER OF
**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**

# NON-NEGOTIABLE

---



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

DAVIS, LAURA
76 BRYANT TRAIL ROAD
CARMEL, NY 10512

RECEIVED

JAN 14 2008

Carmel Central School District
Pupil Services Department

Carmel School District
81 South Street
Patterson, New York 12563
January 14, 2008
Fax845-878-4337

Dear Ms Rohe:

Enclosed is a copy of the front and back of check #1036 payment
date 1/9/08 to Kildonan from Laura Davis (mother) towards the
2004/05 tuition for Chloe Dabrowski at Kildonan School, 425 Morse
Hill Road, Amenia, New York 12501 2004-05 school year.

Ms. Rohe, you have stated that you are the person accountable for
initiating reimbursement; there fore I am asking you as financial
expeditor for the Carmel School District to promote a speedy
reimbursement for this payment. There fore, I am putting the Carmel
School district on a five-day notice that we will be taking the District
to court if payment is not received by January 22, 2008.

Sincerely,                                            PAID/CCSD

                                                      JAN 1 8 2008

Laura Davis, Mother


Cc: Rosa Lee Charpentier, attorney for parent


L. Davis-76 Bryant Trail-Carmel-NY-10512~845-225-1304~work:
914-925-5449


**WACHOVIA**

PAID/CCSD

JAN 1 8 2008

## ONLINE IMAGE
Account Number: 1010187038777

| Check Number | Amount | Date Posted |
|---|---|---|
| 1036 | $2,500.00 | 01/11/2008 |

---

LAURA E. DAVIS
PETER J. LAPLACA
76 BRYANT TRAIL
CARMEL, NY 10512

1-1200/200                1036

1/9/08

Pay to the order of _Kildaan School_  $2,500.00

_Two thousand, five hundred_ Dollars

**WACHOVIA**
Wachovia Bank, N.A.
wachovia.com

For _2004 Tuition_   (Laura Davis)

⑆026012881⑆ 1010187038777⑆ 1036  ⑈0000250000⑈

FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
THE KILDONAN SCHOOL
082 699 5

1/14/08

---

How To Save This Image

PC users
Internet Explorer:
Right-click on the check image, and choose "Save Picture As..."
Others:
Right-click on the check image, and choose "Save Image As..."

MAC users
Internet Explorer:
Click & hold on the check image, and choose "Download Image to Disk."
Others:
Click & hold on the check image, and choose "Save this Image as..."
Hide Instructions

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 234584

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 213080 | A225047006 | TUITION REIMBURSEMENT | $ 2500.00 |

VENDOR: DAVIS, LAURA

CHECK TOTAL $ 2500.00



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 234584

1-2/210

GENERAL FUND                    DATE: 01/18/2008

PAY  *VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID*    $*****2,500.00

TO THE ORDER OF
DAVIS, LAURA
76 BRYANT TRAIL ROAD
CARMEL, NY 10512

**NON-NEGOTIABLE**



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

DAVIS, LAURA
76 BRYANT TRAIL ROAD
CARMEL, NY 10512

Carmel School District/ Fax845-878-4337
81 South St
Patterson, N.Y.
3/26/08

Dear Ms. Kathy Rohe:

   Enclosed is a copy of the front & back of check #1056 payment date
3/9/08 to Kildonan from Laura Davis (mother) towards the 2004/05
tuition for Chloe Dabrowski at Kildonan School, 425 Morse Hill Road,
Amenia, New York 12501.

Ms. Rohe, you have stated that you are the person accountable for
initiating reimbursement; there fore I am asking you as financial
expeditor for the Carmel School District to promote a prompt
reimbursement for this payment. There fore, I am putting the Carmel
School district on a five-day notice that we will be taking the District
to court if payment is not received by April 2, 2008.

Sincerely,

Laura Davis, Mother

76 Bryant Trail, Carmel, Ny 10512

Cc: Rosa Lee Charpentier, attorney for parent

L. Davis-76 Bryant Trail-Carmel-NY-10512~845-225-1304~work:
914-925-5449

MAR 26 2008 13:28 FR    TO 9184587843378056 P.02/02

| Check Number | Amount | Date Posted |
|---|---|---|
| 1056 | $2,500.000 | 3/11/2008 |

LAURA E. DAVIS
PETER J. LAPLACA
76 BRYANT TRAIL
CARMEL, NY 10512

1-1286/260    1056

3/9/08

Pay to the order of  Kildonanx School  $ 2,500.00

Two Thousand five hundred Dollars

WACHOVIA
Wachovia Bank, N.A.
wachovia.com

For 2004 Tuition Chloe    Laura Davis

⑆0260❘288❘ 10❘018703877⑈ 1056

FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
THE KILDONAN SCHOOL
082 699 5

How To Save This Image

PC users
Internet Explorer:
Right-click on the check image, and choose "Save Picture As..."
Others:
Right-click on the check image, and choose "Save Image As..."

MAC users
Internet Explorer:
Click & hold on the check image, and choose "Download Image to Disk."
Others:
Click & hold on the check image, and choose "Save this Image as..."

3/26/2008

** TOTAL PAGE.02 **

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

# No. 235515

| P.O. # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|---|---|---|---|
| 213583 | A225047006 | | $ 2500.00 |
| | | | |

| VENDOR: DAVIS, LAURA | | CHECK TOTAL $ | 2500.00 |



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

# No. 235515

1-2/210

GENERAL FUND                DATE: 04/03/2008

PAY  *VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID*   $*****2,500.00

TO THE ORDER OF
**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**

## NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

DAVIS, LAURA
76 BRYANT TRAIL ROAD
CARMEL, NY 10512

8784337

**RECEIVED**

Carmel School District
81 South Street
Patterson, New York 12563
April 16, 2008

APR 1 6 2008

Carmel Central School District
Pupil Services Department

Dear Ms Rohe:

Enclosed is a copy of the front and back of check #1058 payment to Kildonan from Laura Davis (mother) towards the 2004/05 tuition for Chloe Dabrowski at Kildonan School, 425 Morse Hill Road, Amenia, New York 12501 2004-05 school year.

Ms. Rohe, you have stated that you are the person accountable for initiating reimbursement; there fore I am asking you as financial expeditor for the Carmel School District to promote a speedy reimbursement for this payment as per the hearing officers decision of 2005.

There fore, I am putting the Carmel School district on a five-day notice that we will be taking the District to court if payment is not received by April 23, 2008.

Sincerely,

*Laura Davis*

Laura Davis, Mother

PAID/CCSD

MAY - 2 2008

Cc: Rosa Lee Charpentier, attorney for parent

L. Davis-76 Bryant Trail-Carmel-NY-10512~845-225-1304~work: 914-925-5449

4/17/08

P.O. #21383

Online Services - Online Image

| Check Number | Amount | Date Posted |
|---|---|---|
| 1058 | $2,500.00 | 04/07/2008 |



PAID/CCSD

MAY - 2 2008

How To Save This Image

PC users
Internet Explorer:
Right-click on the check image, and choose "Save Picture As..."
Others
Right-click on the check image, and choose "Save Image As. ."

MAC users
Internet Explorer:
Click & hold on the check image, and choose "Download Image to Disk."
Others.
Click & hold on the check image, and choose "Save this Image as..."

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 235819

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 213583 | A225047006 | REIMB 04/05 TUITION. CK # 1058 | $ 2500.00 |

VENDOR: DAVIS, LAURA                                    CHECK TOTAL $    2500.00



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 235819

1-2/210

**GENERAL FUND**

DATE: 05/02/2008

PAY   *VOID   VOID   VOID   VOID   VOID   VOID   VOID   VOID   VOID*      $*****2,500.00

TO THE ORDER OF
    **DAVIS, LAURA**
    **76 BRYANT TRAIL ROAD**
    **CARMEL, NY 10512**

**NON-NEGOTIABLE**



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**

1

Carmel School District/ Fax845-878-4337
81 South St
Patterson, N.Y.
5/13/08

**PAID/CCSD**
**MAY 3 0 2008**

Dear Ms. Kathy Rohe:

    Enclosed is a copy of the front & back of check #1055 payment date
5/9/08 to Kildonan from Laura Davis (mother) towards the 2004/05
tuition for Chloe Dabrowski at Kildonan School, 425 Morse Hill Road,
Amenia, New York 12501.

Ms. Rohe, you have stated that you are the person accountable for
initiating reimbursement; there fore I am asking you as financial
expeditor for the Carmel School District to promote a prompt
reimbursement for this payment. There fore, I am putting the Carmel
School district on a five-day notice that we will be taking the District
to court if payment is not received by May 22, 2008.

Sincerely,

*Laura Davis*

Laura Davis, Mother

76 Bryant Trail, Carmel, Ny 10512

Cc: Rosa Lee Charpentier, attorney for parent

L. Davis-76 Bryant Trail-Carmel-NY-10512~845-225-1304~work:
914-925-5449

MAY 13 2008 09:37 FR                                                    TO 918458784387855 P.02/02

$2,500.00

05/12/2008

1055

---

LAURA E. DAVIS                                                    1055
PETER J. LAPLACA
76 BRYANT TRAIL
CARMEL, NY 10512

                                                         5/9/08

Kildoran                                      $2,500.°°

Two Thousand five hundred                          $

**WACHOVIA**

Wachovia Bank, N.A.
wachovia.com
200.4-05                  Laura Davis

⑆026012881⑆ ⑈101018703877⑈' 1055 ⑈0000250000⑈'
DABROSKI

FOR DEPOSIT ONLY
THE BANK OF MILLBROOK
f/c KILDONAN SCHOOL
7777
632 639 5

** TOTAL PAGE.02 **

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 236116

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 213583 | A225047006 | TUITION REIMBURS. CK # 1055 | $ 2500.00 |

| | | | |
|---|---|---|---|
| VENDOR: DAVIS, LAURA | | CHECK TOTAL $ | 2500.00 |



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

JPMORGAN CHASE BANK
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 236116

1-2/210

GENERAL FUND

DATE: 05/30/2008

PAY   *VOID*   *VOID*   *VOID*   *VOID*   *VOID*   *VOID*   *VOID*   *VOID*   *VOID*   |$*****2,500.00|

TO THE ORDER OF
**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**

## NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**DAVIS, LAURA**
**76 BRYANT TRAIL ROAD**
**CARMEL, NY 10512**

# EXHIBIT E



# The Kildonan School
### Founded in 1969

**RECEIVED**

MAR 0 6 2008

Carmel Central School District
Pupil Services Department

March 05, 2008

Kathryn W. Rohe
Carmel Central School District
P.O. Box 296
81 South Street
Patterson, NY 12563

2007/08 Kildonan School Year  Tuition :  Chloe Dabrowski

*1/2008 - 1727.50*
*2/1/08 - 2/29/08*
*3455.00*
*5182.50*

| | |
|---|---|
| Tuition due 09 / 2007 | $3,455.00 |
| Tuition due 10 / 2007 | $ 3,455.00 |
| Tuition due 11 / 2007 | $ 3,455.00 |
| Tuition due 12 / 2007 | $ 3,455.00 |
| Tuition due 01 / 2008 | $ 3,455.00 |
| Tuition due 02 / 2008 | $ 3,455.00 |
| Tuition due 03 / 2008 | $ 3,455.00 |

**PAST DUE**  *1727.50*

*213532*

| | |
|---|---|
| Total due | $24,185.00 |

*3/24/08*

PAID/CCSD

APR 0 8 2008

*Paying:*
*1/17/08 - 1/31/08 - 1727.50*
*2/1/08 - 2/29/08 - 3455.00*
*$ 5182.50*

Ann E. Still
Business Manager

425 Morse Hill Road, Amenia, NY 12501   ~   Telephone: 845/373-8111   ~   Facsimile: 845/373-9793

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 235530

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 213532 | A225047006 | 1/17/08 - 2/29/08 | $    5182.50 |

VENDOR: KILDONAN SCHOOL

CHECK TOTAL $    5182.50



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**JPMORGAN CHASE BANK**
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 235530

1-2/210

GENERAL FUND

DATE: 04/03/2008

PAY   *VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID  VOID*   $*****5,182.50

TO THE ORDER OF
   KILDONAN SCHOOL
   425 MORSE HILL ROAD
   AMENIA, NY 12501

NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

   KILDONAN SCHOOL
   425 MORSE HILL ROAD
   AMENIA, NY 12501



# The Kildonan School
### · Founded in 1969

**RECEIVED**

MAY 0 8 2008

*Carmel Central School District*
*Pupil Services Department*

May 6, 2008

Kathryn W. Rohe
Carmel Central School District
P.O. Box 296
81 South Street
Patterson, NY 12563

*PAID/CCSD*

MAY 3 0 2008

2007/08 Kildonan School Year Tuition : Chloe Dabrowski

| | |
|---|---|
| Tuition due 09 / 2007 | $ 3,455.00 |
| Tuition due 10 / 2007 | $ 3,455.00 |
| Tuition due 11 / 2007 | $ 3,455.00 |
| Tuition due 12 / 2007 | $ 3,455.00 |
| Tuition due 01 / 2008 | $ 3,455.00 |
| Tuition due 02 / 2008 | $ 3,455.00 |
| Tuition due 03 / 2008 | $ 3,455.00 |
| Tuition due 04 / 2008 | $ 3,455.00 |
| Tuition due 05 / 2008 | $ 3,455.00 |
| Tuition due 06 / 2008 | $ 3,455.00 |
| | |
| Total due | $34,550.00 |
| | |
| Paid to date | $ 5,182.50 |
| | |
| Balance due | $ 29367.50 |

**PAST DUE**

DUE
5/9/08

P.O. #
213734

$ 6,910

Ann E. Still
Business Manager

425 Morse Hill Road, Amenia, NY 12501   ~   Telephone: 845/373-8111   ~   Facsimile: 845/373-9793

Carmel Central School District * 81 South Street, P.O. Box 296 * Patterson, NY 12563

No. 236155

| PO # | BUDGET ACCOUNT | INVOICE NUMBER | AMOUNT |
|------|----------------|----------------|--------|
| 213734 | A225047006 | MAR & APR 08 | $  6910.00 |

| | | |
|---|---|---|
| VENDOR: KILDONAN SCHOOL | | CHECK TOTAL $   6910.00 |



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**JPMORGAN CHASE BANK**
4 CHASE METRO TECH CENTER
BROOKLYN, NY 11245

No. 236155

1-2/210

**GENERAL FUND**    DATE: 05/30/2008

PAY  *VOID   VOID   VOID   VOID   VOID   VOID   VOID   VOID   VOID*    $*****6,910.00

TO THE ORDER OF
**KILDONAN SCHOOL**
**425 MORSE HILL ROAD**
**AMENIA, NY 12501**

## NON-NEGOTIABLE



**Carmel Central School District**
81 South Street, P.O. Box 296
Patterson, NY 12563

**KILDONAN SCHOOL**
**425 MORSE HILL ROAD**
**AMENIA, NY 12501**

# EXHIBIT F

*Carmel Central School District*
*81 South Street, P. O. Box 296*
*Patterson, NY 12563*
*845-878-2094*

Individualized Education Program
*2007-2008*

*Confidential Student Information*

## STUDENT AND GUARDIAN INFORMATION

**Student Name:** Chloe Dabrowski
**Native Language:** English
**Address:** 76 Bryant Trail Road
**State:** NY
**Home #:** 225-1304
**Parent/Guardian:** Laura E Davis
**Relation:** Mother
**Additional Guardians:**
  **Guardian:** Edward Dabrowski
  **Relation:** Father
  **Address:** 256 N. Terry Hill Road
  **State:** NY
  **Home #:** (845) 225-7905

**Birth Date:** 03/09/1992 (15:4)
**Interpreter:** No

**Zip:** 10512

**Native Lang.:** English
**Interpreter:** No

**Native Lang.:** English
**Interpreter:** No

**Zip:** 10512

**Alt ID#:** 0012415
**Gender:** Female
**City:** Carmel
**County:** Putnam

**City:** Carmel
**County:** Putnam

**Special Alerts:**

## RECOMMENDED CLASSIFICATION AND PLACEMENT INFORMATION

**Committee:** Committee on Special Education
**Reason:** Program Review
**Disability:** Learning Disability
**Recommended Placement:** Carmel High School
**Projected Start:** 09/05/2007
**End By:** 06/27/2008
**Extended School Year:** Ineligible

**Date:** 07/16/2007

**Decision:** Classified
**Grade:** 10
**Projected Next Review:** 05/07/2008
**Projected Reevaluation:** 04/03/2008

**Special Transportation:** *In determining and documenting a student's special transportation needs, the following should be considered and specified: Special Seating, Vehicle and/or Equipment Needs, Adult Supervision, Type of Transportation, Other Accommodations.*

**Special Transportation:** No

## RECOMMENDED SPECIAL EDUCATION PROGRAMS AND SERVICES

**Special Education Programs:**

|  | Start | End | Ratio | Freq | Period | Duration | Location |
|---|---|---|---|---|---|---|---|
| Consultant Teacher - English | 09/05/2007 | 06/27/2008 | Direct | 5 | Weekly | 39 mins | Integrated |
| Consultant Teacher - Math | 09/05/2007 | 06/27/2008 | Direct | 5 | Weekly | 39 mins | Integrated |
| Consultant Teacher - Science | 09/05/2007 | 06/27/2008 | Direct | 5 | Weekly | 39 mins | Integrated |
| Consultant Teacher - Social Studies | 09/05/2007 | 06/27/2008 | Direct | 5 | Weekly | 39 mins | Integrated |
| Resource Room | 09/05/2007 | 06/27/2008 | 5-1 | 5 | Weekly | 39 mins | Non-Integrated |
| Special Class Reading | 09/05/2007 | 06/27/2008 | 15-1+1 | 5 | Weekly | 39 mins | Non-Integrated |

**Related Services:**

|  | Start | End | Ratio | Freq | Period | Duration | Location |
|---|---|---|---|---|---|---|---|

| Counseling | 09/05/2007 | 06/27/2008 | 5-1 | 1 | Weekly | 30 mins | Non-Integrated |

## Program Modifications/Accommodations/Supplementary Aids and Services:

| Service/Support | Start | End |
|---|---|---|
| Refocusing and Redirection | 9/5/2007 | 6/27/2008 |
| Preferential Seating | 9/5/2007 | 6/27/2008 |
| Copy of Class Notes | 9/5/2007 | 6/27/2008 |
| | 9/5/2007 | 6/27/2008 |

Notation: Extended time for in-class assignments.

| Audio Books | 9/5/2007 | 6/27/2008 |
| Use of calculator | 9/5/2007 | 6/27/2008 |

## Assistive Technology Devices/Services:

| Start | End |
|---|---|
| 9/5/2007 | 6/27/2008 |

Notation: Use of word processor, books on tape.

## Support for School Personnel on Behalf of Student:

| Service/Support | Start | End | Freq | Period | Duration | Location |
|---|---|---|---|---|---|---|
| Assistive Technology Consultation | 9/5/2007 | 6/27/2008 | 2 | Yearly | 30 minutes | By Phone |

Notation: At the beginning of each semester an OT consult by a member of our Assistive Tech team will be held to monitor and adjust, if warranted, Chloe's software and/or hardware. This will include an observation of Chloe and input from her teachers.

## Testing Accommodations:

The following individual accommodations are necessary to measure the academic achievement and functional performance of the student on State and districtwide assessments. Recommended testing accommodations will be used consistently:

- in the student's education program,
- in the administration of districtwide assessments of student achievement, consistent with school district policy, and
- in the administration of State assessments of student achievement, consistent with State Education Department policy.

| Testing Accommodation | Conditions/Specifications |
|---|---|
| Extended Time (1.5) | |
| Directions Read/Explained | |
| Clarify Test Questions | |
| Special Location | |
| Spelling Requirements Waived | |
| Use of Word Processor | use of appropriate technology and software to scribe for multi-paragraph written assignments. |
| Tests Read | |

## Participation in State and Local Assessments:

Required The student will participate in the same state or local assessments that are administered to general education students.

**Removal from the General Education Environment** occurs only when the nature or severity of the disability is such that, even with the use of supplementary aids and services, education cannot be satisfactorily achieved.

**Explanation of the extent, if any, to which the student will not participate in general education programs, including extra curricular and other nonacademic activities:**

The student will not participate in regular education in the following areas: Reading

**Physical Education:**

General Physical Education : The student will participate in the general education physical education program.

**Language Other than English Requirement:**
Exempt : The student's disability adversely affects the ability to learn a language, and the student is excused from the language other than English requirement.

## PRESENT LEVELS OF ACADEMIC ACHIEVEMENT, FUNCTIONAL PERFORMANCE AND INDIVIDUAL NEEDS

Current functioning and individual needs in consideration of:
* the results of the initial or most recent evaluation, the student's strengths, the concerns of the parents, the results of the student's performance on any State or districtwide assessment programs;
* the student's needs related to communication, behavior, use of Braille, assistive technology, limited English proficiency;
* how the student's disability affects involvement and progress in the general curriculum; and
* the student's needs as they relate to transition from school to post-school activities for students 14 years of age and older.

**How the Student's Disability Affects Involvement and Progress in the General Education Curriculum:**

A processing speed deficit impacts the acquisition of skills needed to progress in the general education curriculum.

**Transcript Information - Secondary Students Only:**

**Expected Diploma:** Regents Diploma              **Expected Date of High School Completion:** 06/2010

**Academic Achievement, Functional Performance and Learning Characteristics:**
Current levels of knowledge and development in subject and skill areas, including activities of daily living, level of intellectual functioning, adaptive behavior, expected rate of progress in acquiring skills and information and learning style.

**Levels/Abilities**
Chloe's cognitive abilities are average.

Chloe's math skills are in the low average range. Chloe's reading and writing skills are low average.

Chloe's academic skills are limited to average in math calculation. Sight reading ability and spelling are limited. Academic fluency with reading & writing are low to low average.
Math fluency is limited. Chloe's oral language abilities are in the average range. Academic fluency with reading and writing are low to low average. Recent tests show reading accuracy is limited & reading fluency is depressed, although additional measures show average word identification and word attack skills and average problem solving skills with weaker procedural knowledge skills.

**Needs**
Chloe needs to improve math calculation, reading, decoding and fluency and writing skills.
She needs time to demonstrate her mastering of skills.

**Standardized Test Results:**

| Date | Test | SubTest | Score/Type |
|---|---|---|---|
| 05/01/2007 | GMRT-4 (Gates MacGinitie Reading Tests - 4th Ed.) | Comprehension | 91 %ile |
| | | Vocabulary | 26 %ile |
| | Gray Oral Reading Test 4th edition | Accuracy | Scaled Scores =6 |
| | | Fluency | Scaled Scores =5 |
| | | Reading Rate | Scaled Scores=8 |
| | Stanford Achievement Test - Advanced | Problem Solving | 55 %ile |
| | | Procedures | 28 %ile |
| | | Total | 41 %ile |
| | TWS-4 (Test of Written Spelling - 4) | Form A | Standare Scores=95 |
| | WRMT-R/NU: Woodcock Reading Mastery Tests | Word Identification | Standard Scores=94 |
| | | Word Attack | Standard Scores =102 |
| 08/08/2006 | Woodcock-Johnson-III ACH Tests | Broad Reading Cluster | Standard Scores 88/nce33 |
| | | Letter-Word Identification | Standard Scores90/nce36 |
| | | Passage Comprehension | Standard Scores 96/nce44 |

| | Reading Fluency | Standard Scores 85/nce29 |
|---|---|---|
| | Broad Math Cluster | Standard Score 85/nce28 |
| | Calculation | Standard Score 88/nce33 |
| | Applied Problems | Standard Score 93/nce40 |
| | Math Fluency | standard Score 63/nce1 |
| | Broad Written Language Cluster | Standard Score 89/nce34 |
| | Writing Fluency | Standard Score 80/nce22 |
| | Writing Samples | Standard Score 118/nce75 |
| | Spelling | Standard Scores 88/nce34 |
| 04/03/2005 Wechsler Individual Achievement Test-II | Basic Reading | 108 |
| | Math Total | 81 |
| | Written Expression | 89 |
| | Oral Language Composite | 133 |
| | Total Composite | 101 |
| Wechsler Intelligence Scale for Children-IV | Verbal Comprehension Index | 100 |
| | Perceptual Reasoning Index | 102 |
| | Working Memory Index | 110 |
| | Processing Speed Index | 100 |
| | Full Scale | 105 |

## Social Development:

The degree and quality of the student's relationships with peers and adults, feelings about self and social adjustment to school and community environments.

### Levels/Abilities

The student's social and emotional levels and abilities are within age expectations overall. However, it has been reported that Chloe is sometimes reticent to initial social interactions.

Current reports indicate she has made good progress in engaging in classroom discussion.

### Needs

This reticence should be addressed through counseling.

Counseling should be employed to aid initial reticence in achieving transition to Carmel High School.

## Physical Development:

The degree or quality of the student's motor and sensory development, health, vitality and physical skills or limitations that pertain to the learning process.

### Levels/Abilities

Chloe's hearing is within limits. Chloe wears corrective lenses.

### Needs

There are no physical or motor needs that should be addressed through special education, at this time.

## Management Needs:

The nature of and degree to which environment modifications and human or material resources are required to enable the student to benefit from instruction. Management needs are determined in accordance with the factors identified in the areas of academic achievement, functional performance and learning characteristics, social development and physical development.

The student has moderate delays and requires some subjects to be taught in a small teacher-to-student ratio program with minimal distractions within a regular school enviornment in order to academically progress.

## MEASURABLE POST-SECONDARY GOALS (AGES 15 AND OLDER)

For students beginning with the first IEP to be in effect when the student turns age 15 (and younger if deemed appropriate), identify the appropriate measureable postsecondary goals based upon age appropriate transition assessments relating to training, education, employment and, when appropriate, independent living skills.

### Education\Training

The student intends to pursue a college education.

### Employment

The student plans to pursue competitive employment opportunities after graduation.

**Independent Living Skills**

The student is planning to live at home.

## COORDINATED SET OF TRANSITION ACTIVITIES (SCHOOL TO POST SCHOOL)

- For students beginning with the first IEP to be in effect when the student turns age 15 (and younger if deemed appropriate) needed transition services/activities to facilitate the students movement from school to post-school activities.

| Coordinated Set of Transition Activities | Activity | School District/Agency Responsible | Date |
|---|---|---|---|
| Instruction | The student will be provided the opportunity to take a course of study including the recommended special education services which leads to a high school Regents diploma. The student will be provided with the information on how to visit post school programs and/or colleges. | School District | 6/27/2008 |
| Development of Employment/Other Post-School Adult Living Objectives | The student will be provided with the opportunity to participate in activities which discuss and research various career choices of interest. | School District | 6/27/2008 |
| Community Experience | The student will be provided the opportunity to participate in a variety of community-based activities consistent with skills and abilities that will help foster community participation and a sense of belonging. | School District | 6/27/2008 |

## COMMITTEE MEETING OR AGREEMENT INFORMATION

**Committee:** Committee on Special Education                          **Date:** 07/16/2007

**Reason:** Program Review

**Expected Grade:** 10

**Attendance:** L. Valesey, Chairperson
M. Karoglanian, Psychologist
T. Gambardella, Department Chair, Special Education
K. Paetsch, Special Education Teacher
J. Krivak, Gen. Ed. Teacher
E. Heitman, General Education Teacher
Attempts to contact parents by phone were unsuccessful.
S. Mason, Parent Member

**Comments:** 7/16/07 The CSE met today for a Program Review to include the parents since they had not participated by phone or in person the week before. We did not receive notice from either parent that they would not be available and thus proceeded with the meeting. The meeting was arranged to provide an opportunity for the parents to participate in the development of their daughter's IEP. It was noted that Kildonan staff were invited to participate in the July 9th meeting but were not available to do so. The CSE reviewed the IEP developed at the July 9, 2007 meeting and determined it to be appropriate to address Chloe's needs.

7/9/07 - The CSE met today as a follow-up to the May 7th meeting due to concerns expressed by the mother. Ms. Davis had called and left a message stating she had received a notice canceling the meeting. Multiple calls were made both to her and Mr. Dabrowski stating the meeting was on but they were not returned. The committee reviewed updated academic evaluations and Chloe's end of the year grades from Kildonan. Educational needs were identified and goals were selected and discussed. Program and testing modifications/accommodations and assistive technology services were reviewed and modified. Teachers knowledgeable of the 9th and 10th grade curriculum were present and participated in the discussion. It is recommended that Chloe have a consultant teacher program for English, Social Studies, Math and Science, with resource room, and Special Class Reading. Additionally, the related service of Counseling once a week in a small group setting is recommended to assist in any transition to Carmel High School. Kildonan staff were not available to participate.

5/7/07 The CSE is meeting today for an annual review to develop Chloe's IEP for the 2007-2008 school year. Chloe's parents have unilaterally enrolled her at Kildonan for the 2006-2007 school year. Phone contact with Kildonan was attempted. No one was available to participate. Chloe's report card grades and progress notes were reviewed. A recent observation and previous assessments were reviewed. Her educational needs were identified and based upon this these needs, goals were selected.

It is recommended that Chloe have a program of special class reading, consultant teacher for all academics, resource room, and counseling as a related service. Out-of-district options were brought up by the parent. The CSE shared this would be too restrictive for Chloe.

A transition plan was developed, and post secondary goals were identified.

Based Upon: Kildonan Reports, 06/04/2007
Report Card, 06/04/2007
Writing Sample, 05/15/2007
Observation, 05/02/2007
Report Card, 04/30/2007
Progress Report Summary, 02/26/2007
Report Card, 01/22/2007
Progress Report Summary, 01/03/2007
Progress Report Summary, 11/20/2006
Report Card, 10/16/2006
Educational Evaluation, 08/08/2006
Teacher Report, 02/27/2006
Psychological Evaluation, 04/03/2005
Social History, 04/03/2005
Assistive Technology Evaluation, 06/23/2004
Physical Examination, 06/08/2004

## OTHER OPTIONS CONSIDERED

**Other Options Considered**

The Committee considered a general education setting with support services such as related services and consultation services.

**Reasons for Rejection**

This option was rejected because the student's current academic functioning indicates that a more intensive setting with support is needed to address the student's needs.

This support will include direct instruction in reading and resource room.

## REPORTING PROGRESS TO PARENTS

Identify when periodic reports on the progress the student is making toward meeting the annual goals will be provided to the student's parents:

**Manner:** Written Reports                    **Frequency:** 4 times during the school year.

## MEASURABLE ANNUAL GOALS

* For students with severe disabilities who would meet the eligibility criteria to take the New York State Alternate Assessment, the IEP must also include short term instructional objectives and benchmarks for each annual goal.
**Annual Goal:** What the student will be expected to be able to do by the end of the year in which the IEP is in effect.
**Evaluation Criteria:** How well and over what period of time the student must demonstrate performance in order to consider the annual goal to have been met.
**Procedures to Evaluate Goal:** The method that will be used to measure progress and determine if the student has met the annual goal.
**Evaluation Schedule:** The dates or intervals of time by which evaluation procedures will be used to measure the student's progress.

---

**STUDY SKILLS**

_Annual Goal_

1.  **Chloe will construct study guides to assist in memorizing information in preparation for selected tests.**
    Evaluation Criteria: 4 out of 5 trials, over 10 months
    Procedure to Evaluate Goal: Structured observations of targeted behavior
    Evaluation Schedule: monthly
    Primary Responsibility: Special Education Teacher

_Annual Goal_

2.  **Chloe will use a computer as a compensatory learning strategy to assist in producing written work with correct spelling and punctuation for selected assignments.**
    Evaluation Criteria: 4 out of 5 trials, over 10 months
    Procedure to Evaluate Goal: Portfolio materials
    Evaluation Schedule: monthly
    Primary Responsibility: Special Education Teacher

_Annual Goal_

3.  **Chloe will independently alert the teacher to arrange for special needs or accommodations for tests.**
    Evaluation Criteria: 4 out of 5 trials, over 10 months
    Procedure to Evaluate Goal: Observation checklists
    Evaluation Schedule: monthly
    Primary Responsibility: Special Education Teacher

**READING**

_Annual Goal_

4.  **Chloe will identify and use 10 sight words.**
    Evaluation Criteria: 90% success, over 10 months
    Procedure to Evaluate Goal: Recorded observations
    Evaluation Schedule: weekly
    Primary Responsibility: Special Education Teacher

_Annual Goal_

5.  **When given a list of 10 multi-syllabic (many syllables) words (e.g. transformation, purposeful), Chloe will identify the number of syllables in the word, divide the words into syllables and decode the words.**
    Evaluation Criteria: 90% success, over 10 months
    Procedure to Evaluate Goal: Recorded observations
    Evaluation Schedule: weekly
    Primary Responsibility: Special Education Teacher

_Annual Goal_

6.  **When given reading material at the beginning of the 10th grade level, Chloe will read a paragraph or story out loud with appropriate expression and fluency.**
    Evaluation Criteria: 75% success, over 10 months
    Procedure to Evaluate Goal: Recorded observations
    Evaluation Schedule: weekly
    Primary Responsibility: Special Education Teacher

**WRITING**

_Annual Goal_

7.  **When given a list of 10 vocabulary words, Chloe will use them in a writing assignment.**
    Evaluation Criteria: 4 out of 5 trials, over 10 months

---

Procedure to Evaluate Goal: Portfolio materials
Evaluation Schedule: monthly
Primary Responsibility: Special Education Teacher

### Annual Goal
8. **Chloe will write an interpretative response of 5 paragraphs to a literary selection.**
   Evaluation Criteria: 75% success, over 10 months
   Procedure to Evaluate Goal: Portfolio materials
   Evaluation Schedule: quarterly
   Primary Responsibility: Special Education Teacher

## MATHEMATICS
### Annual Goal
9. **Chloe will correctly translate two-step verbal expressions into algebraic expressions.**
   Evaluation Criteria: 75% success, over 10 months
   Procedure to Evaluate Goal: Classroom tests
   Evaluation Schedule: quarterly
   Primary Responsibility: Special Education Teacher

### Annual Goal
10. **Chloe will solve problems requiring the solution of multi-step equations by combining like terms, using the distributive property, or moving variables to one side of the equation.**
   Evaluation Criteria: 70% success, over 10 months
   Procedure to Evaluate Goal: Classroom tests
   Evaluation Schedule: quarterly
   Primary Responsibility: Special Education Teacher

### Annual Goal
11. **Chloe will solve problems requiring the factoring of algebraic expressions using the greatest common factor.**
   Evaluation Criteria: 75% success, over 10 months
   Procedure to Evaluate Goal: Classroom and standardized tests
   Evaluation Schedule: quarterly
   Primary Responsibility: Special Education Teacher

### Annual Goal
12. **Chloe will solve two-step word problems.**
   Evaluation Criteria: 70% success, over 10 months
   Procedure to Evaluate Goal: Classroom and standardized tests
   Evaluation Schedule: quarterly
   Primary Responsibility: Special Education Teacher

## SOCIAL/EMOTIONAL/BEHAVIORAL
### Annual Goal
13. **Chloe will identify 3 strategies for fostering positive relationships with peers.**
   Evaluation Criteria: 4 out of 5 trials, over 10 months
   Procedure to Evaluate Goal: Structured interview
   Evaluation Schedule: quarterly
   Primary Responsibility: Service Provider

# EXHIBIT G

RECEIVED

AUG 2 2 2007

Carmel Central School District
Pupil Services Department

Carmel School District
81 South St
Patterson, New York 12563
August 22, 2007

**Re: We the parents of Chloe Dabrowski are requesting an Impartial Hearing.**

Dear Ms Rohe:

We are the parents of Chloe Dabrowski. We are writing to inform you that we are rejecting the IEP for 2007/08 and will be unilaterally enrolling our daughter, Chloe Dabrowski at Kildonan School, 425 Morse Hill road, Amenia, New York 12501, 10th grade for the 2007/08 school year. We intend to seek full tuition reimbursement and all related costs. As for the IEP it has not been reasonably calculated to enable Chloe to receive educational benefits, we believe it will not produce progress, but instead Chloe will regression. The I.E.P. does not accurately reflects the results of evaluations to identify the Chloe's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services. The IEP does not provide visual, auditory, and kinesthetic presentations to supplement textbooks in subject matter courses.

Unlike the Carmel School District 2007-08 I.E.P., Kildonan is very appropriate for the needs of Chloe because it is meaningful progress that addresses her dyslexia, slow processing abilities, helps her decode, and repeats information and decoding so she can store information from her short term memory to her long term memory. At Kildonan Chloe is taught by a language tutor privately, therefore she is progressing in decoding, comprehension, vocabulary, and fluency because of her one-on-one private continued intensive work in reading. Chloe meets the admissions criteria for Kildonan in that she had at least an average IQ and solid cognitive functioning but also had difficulty or lags in basic language skills. Kildonan has a wait list and does not have any need to keep Chloe unless she fits the criteria for placement. The curriculum used by Kildonan is approved by New York State and designed to be multisensory in nature. Kildonan academic program revolves around the intensive, daily, one-to-one Orton-Gillingham tutoring, which structures and dictates the language training sessions, also influences all the subject matter teaching. All of Kildonan School's subject matter teachers are trained and mentored in Orton-Gillingham, as well as multisensory teaching methodology. Carmel does not have any of this. Chloe's tutor at Kildonan provides review of information. Chloe is able to work on her handwriting, phonetic concepts, spelling, fluency, sentence structure, and writing paragraphs. She is practicing typing as well as handwriting her compositions, which included expanded paragraphs.

We believe the proposed IEP is inappropriate for Chloe Dabrowski because The 2007-08 I.E.P. was improper due to the lack of parents participation; the goals

and objectives listed on the IEP were inadequate and failed to properly account for Chloe's present levels of performance; our unilateral placement of Chloe meets her needs and allowed her to progress; the I.E.P. has Chloe in regular education with a large class of students consultant for 39 min in English, 39 min. Math, 39 min. Science, 39 min. Social Studies, then Resource Room with no one who specializes in Orton-Gillingham method (which for four years has been the method of teaching Chloe successfully! and Special Class Reading with a ratio of 15 students <printed on the 7/16/07 I.E.P. for 2007-08 school year, which allows Ms. Paech to contend with a class full of students while trying to have students in "one-on-one" reading would create mere trivial advancement. To our knowledge 39 min would give Chloe at the most 5 min of one-on-one instruction? We know Chloe's scores would not continue to increase with 5 mins of one-on-one, her scores and success were from Kildonan School individual educational program of 45 min of one-on-one tutorial individually structured for Chloe's ability to learn" at her pace" (and only Chloe's learning style) and with a tutor in her day time study hall for an additional 45 min, as well as educators accredited in the Orton-Gillingham approach teacher her all day long (this adds 180 more mins of Orton Gillingham teaching) for all her other academic classes at Kildonan. Ms. Paech would be hard pressed to say her 39 mins. one-on-one in a class full of children could stuff in the full day of services Chloe has been receiving consistently to address her learning disability (dyslexia). Even the several SRO reports cite Chloe's success and proper placement at Kildonan. Chloe often needs information explained a second time or to spend additional time on a topic the IEP does not provide for this. We know that Chloe has benefited from an intensive study of the elements of the language; an exploration of the systematic, structured writing process; teaching of vocabulary, comprehension, pragmatics, and study skills; with lesson plans. Please inform the CSE committee that Kildonan teachers are mentored weekly in Orton-Gillingham method as well as being certified in Orton-Gillingham. Which of Chloe's teachers from the district meet weekly with a certified Orton-Gillingham instructional leader? How would the reading teacher overlap, code, and us system of symbolic relationships when teaching Chloe to master this in 5 min of one-on-one? Chloe's learning style requires her to read and reread in order to comprehend information.

I am very upset that the Carmel District Chairperson did not contact Kildonan to get proper information and input from Chloe's current educators. He stated he tried but do you think calling for Dr. Lanes input five minutes into the meeting counts as addressing Kildonan input! I was in the room when the chairperson called Dr. Lane five minutes into the May 7, 2007 meeting. The I.E.P. did not address our request for consideration of other placement options, in particular, special school options, like State Approved Private Schools for students with dyslexia. Our efforts to convey information I had on the Landmark School fell on closed ears at the May 7, 2007 meeting. As the I.E.P. states: page 5 "Out-of District Options were brought up by parent" "the C.S.E. shared this would be too restrictive" THIS IS AN OUT AND OUT UNTRUTH. What really happened was that the Carmel District Chairperson disregarded my efforts to convey information I had on the Landmark School at the meeting. When I requested the

RECEIVED

AUG 2 2 2007

Central School District

discussion of State Approved Private Schools available to meet Chloe's disability (Dyslexia), I asked the Committee to consider Landmark, but he stopped all discussion. My participation was significantly impeded by not having based respect for my input and questions during the formulation of the IEP. My involvement was made to be completely superficial and disrespected. He stated he had no knowledge of State Approved School, and that "I sprung this on him". I came to this meeting thinking that the Chairperson was knowledgeable about the options for Chloe but he turned red and shut down my conversation by stating he would "look into the out-of –state options and get back to me. Instead I was given the May7, 2007 I.E.P. on July, 6, 2007 with this fictitious account of what occurred: page 5 "Out-of District Options were brought up by parent" "the C.S.E. shared this would be too restrictive". My participation was significantly impeded by not having based respect for my input and questions during the formulation of the IEP.

In particular, we want a program that revolves around intensive, daily, one-to-one private Orton-Gillingham tutoring which structures and dictates the language training sessions, and also influences the subject matter teaching, because that is what works for years for Chloe's learning style. We want a program where visual, auditory, and kinesthetic presentations supplement textbooks in Science, Global Studies, Math, and English courses. Chloe has already received resource room and consultant teacher services to assist her in her first grade classroom, and in second through fourth grades without success in the Carmel School District. Chloe was placed in integrated classrooms where she received varying levels of consultant teacher services and the result was that her processing speed continued to slow down each year. Even during Chloe's testing last year it was noted that Chloe's response to test items was delayed. As compared to same-age peers, Chloe's performance is low average in Mathematics and written expression; and low average in broad reading, basic reading skills, math calculation skills, and written language skills Based on the results of the Carmel School district testing, in our opinion Chloe would find age-level tasks requiring computational skills and automaticity with basic math facts difficult. In addition, due to delays in processing speed and on tasks requiring visual perceptual speed, we are aware that Chloe would find age-level tasks requiring "cognitive speediness" VERY difficult.

At Kildonan Chloe has been able to study phonetic concepts and sentence types, and learned to write basic paragraphs in a one-on-one tutorial for 45min. with educational program of 45 min of one-on-one private tutorial, individually structured for Chloe's ability to learn (and only Chloe's learning style) and with a tutor in her day time study hall for an additional 45 min, as well as educators accredited in the Orton-Gillingham approach teacher her all day long (this adds 180 more mins of Orton Gillingham teaching) for all her other academic classes at Kildonan.

In math, Chloe continues to learn how to master using a calculator and to have difficulty with reaching a level of automaticity with pre-algebra & algebra. The

RECEIVED

AUG 2 2 2007

Carmel Central School Di

Carmel School District I.E.P. would have Chloe in an geometry & trigonometry class!!! Chloe is also very limited on tasks requiring visual perceptual speed, so how would she keep up with other class members in her English, Global Studies, Science, and Math, course work. She has significant weaknesses in spelling which could not be addressed by the Carmel School District's I.E.P.

Chloe will not succeed in the Carmel school system due to her slow processing speed and her problems with reading, and we observed that Chloe has succeeded with Kildonan one-to-one instruction for language arts and also Chloe having assertion that she had dyslexia. In addition:

1) The CSE meeting for the May 7, 2007   was not run by a qualified, informed administrator/ Chairperson, and the regular education teacher did not serve a critical role in participating in the review and revision of Chloe's I.E.P, including the determination of appropriate behavioral interventions and strategies and the determination of supplementary aids and services, program modifications, and support for school personnel. She did not participate in discussions and decisions about how to modify the general curriculum in the regular classroom to ensure Chloe's involvement and progress in the general curriculum and participation in the general education environment

2) The CSE meeting for the July 6, 2007 meeting was without a five-day notice.

3) The CSE meeting for the July 9, 07 was canceled on July 8, 07!!!

4) The CSE composition for a July 16, 07 was not held with the parent's participation, even though the district receptionist, Lisa from your office called my husband Peter LaPlaca stating such. Peter then had our lawyer call your lawyer to confirm I was on family medical leaving for care of my mother who at the time was diagnosed with stage 4-pancreatic cancer. I believe the resulting I.E.P. is seriously compromised by not having our input. The result is that my daughter, Chloe Dabrowski, has been denied educational benefits. And it is unclear how the CSE determined appropriate goals and objectives for our daughter?

We feel the purpose behind the Individuals with Disabilities Education Act is to ensure that due to Chloe having a disability she needs to have available special education and related services designed to meet her unique needs, provided in conformity with a comprehensive written IEP. As we have stressed in the May 7, 2007 meeting we were willing to a program approved by the state but our request was terminated page 5 May 7, 2007 I.E.P. We feel you have not demonstrated the appropriateness of the program recommended by the Carmel School district CSE because the CSE did not complied with the procedural requirements set forth in the IDEA, and the IEP developed by Carmel's CSE was not reasonably calculated to enable Chloe to receive educational, seriously infringed on the parents' opportunity to participate in the IEP formulation process. Therefore we have great concern over Chloe's ability to be successful in the general education environment, even with additional support .

The IEP also does not have benchmarks or short-term objectives, related to meeting Chloe's needs arising from her disability to enable her to be involved in



5

and progress in the general curriculum, and meeting Chloe's other educational needs arising from her disability. In addition, by not having us (the parents) at the IEP we do not know how Chloe's progress towards the annual goals will be measured and how we would have been informed of such progress?

I am also concerned about Chloe's self-esteem decreasing as she has stated being fearful of attending the Carmel High school and states that at Kildonan she has regained a desire to succeed. At Kildonan Chloe has been prepared with the necessary materials, attentive, answering questions, and interacting with her teacher and the other students. She told me this is because she identifies with these students and feel she is not just a disability but also a whole person.

If you feel as we do that the district has not reviewed the evaluations completely, we invite you to either do so, or refer Chloe back to the Carmel School District for evaluation, if need be.

Ms. Rohe, Chloe's I.E.P. is extremely important to us! We want our daughter to be afforded to proper education. Once again, Kildonan is not in the market for keeping children past completion of meet the criteria for needing Kildonan population and learning methods. You are aware that there is a wait list of children with diagnoses of dyslexia wait to get into Kildonan. Chloe continues to need the Orton-Gillingham one-on-one teaching. Especially Chloe seeing as the Carmel School District is extremely late in paying the tuition even when Chloe had Status Quos. **We are requesting an Impartial Hearing.**

Sincerely,

Laura Davis
Mother

Ed Dabrowski
Father

RECEIVED
AUG 2 2 2007
Carmel Central School District
Pupil Services Department

Laura Davis ~ 76 Bryant Trail ~ Carmel ~ NY ~ 10512 ~ 845-225-1304

# EXHIBIT H

RECEIVED

SEP 07 2007

Carmel Central School District
Pupil Services Department

Carmel School District
81 South Street
Patterson, New York 12563
September 7, 2007

Dear Ms Rohe:

Please be advised that we are the parents of Chloe Dabrowski, and we are withdrawing from our August 22, 2007 hearing request for the time being, as we understand that the CSE needs to review the hearing officers decision and correct Chloe's 2007-08 IEP to conform to his decision. It is our understanding that the hearing would be premature giving the hearing officers directive to the Carmel School District, and his decision is final. It is our understanding that the District will immediately convene to correct as per the hearing officer and notify us soon afterward. Should we at that point disagree with the corrected IEP, we are aware that we have one year to re-enstated a hearing for 2007-08 school year.

Sincerely,

*Laura Davis*

Laura Davis
Mother

*E Dabrowski*

Edward Dabrowski
Father

*9/7/07*

*76 Bryant Trail Carmel NY 10512*

# EXHIBIT I

1

Carmel School District
81 South St
Patterson, New York 12563
November 17, 2007

Re: Chloe Dabrowski Impartial Hearing.

Dear Ms Rohe:

We are the parents of Chloe Dabrowski. We are requesting an Impartial Hearing regarding the School District's failure to provide for 'pendency' placement during its appeal to the State Review Officer. $10,365.00 is outstanding at this date to Kildonan School District, 425 Morse Hill Road, Amenia, NY 12501. Since we have rejected the proposed 2007-08 IEP, notice sent: August 22, 2007i 10 day letter, and since the district has chosen to appeal the IHO decision, status quo placement as defined by the last unappealed decision (which identifies Kildonan as Chloe's appropriate placement), must be continued.

Carmel School District has not paid the 2007/08 Kildonan School tuition even when Chloe had Status Quos.

Sincerely,

*Laura Davis*
Laura Davis
Mother

*Edward Dabrowski*
Edward Dabrowski
Father

RECEIVED

NOV 1 9 ...

Carmel Central School District
Pupil Services Department

Laura Davis ~ 76 Bryant Trail ~ Carmel ~ NY ~ 10512 ~ work 914-925-5449

# EXHIBIT J

STATE OF NEW YORK

IMPARTIAL HEARING OFFICER, Eric Nachman

CARMEL CENTRAL SCHOOL DISTRICT
-------------------------------------------------------------------X

ED DABROWSKI AND LAURA DAVIS


     -against-

CARMEL CENTRAL SCHOOL DISTRICT


-------------------------------------------------------------------X


**MOTION FOR PRELIMINARY ORDER ON THE**

**STUDENT'S PENDENCY PLACEMENT**


January 17, 1007                          RosaLee Charpentier, Esq.

                                         Attorney for family

                                         Family Advocates, Inc.

                                         209 Clinton Avenue

                                         Kingston, New York 12401


**ATTENTION:  Enclosed/Attached:  SRO Decision No. 05-063 and 06-005
SEVERAL LETTERS SENT BY THE PARENTS TO THE DISTRICT MUST
ALSO BE CONSIDERED WITH THIS BRIEF.  THEY ARE TO BE FAXED.**

## INTRODUCTION

This case began nearly four years ago. On August 19, 2004, the parents of Chloe Dabrowski ("student") rejected the District's proposed placement and IEP calling for her, a student with learning disabilities, to attend the public school with special class part-time for English, math and reading and attend general education classes with resource room support for social studies and science, see page 4, of the **unappealed SRO decision No. 05-063**, attached hereto. The parents requested an impartial hearing to specifically review their claim that the student required one-to-one instruction for language arts, Id. The SRO, in his unappealed decision of August 10, 2005, affirmed the parents' position that the District's IEP was inappropriate and that the "unilateral placement [at Kildonan] was appropriate", Id.

Upon receipt of this final decision the District took no steps to adhere to, or even acknowledge, the findings and conclusions set forth on issues raised in that proceeding. Rather, the District failed to pay for the specific educational services obtained for this student by her parents regardless of the unappealed order. Moreover, the District refused to revise or modify its IEP wherein its CSE once again proposed placement into the public high school with special classes part-time for reading and math (but not English) and general education classes with consultant teacher services (not resource room support) for social studies, science and English, see page 3, of the unappealed **SRO decision No. 06-005**.

On August 18, 2005, the parents once again rejected the District's plan for their daughter and another impartial hearing was undertaken. On March 7, 2006,

the SRO issued a final decision holding once again that the IEP was inappropriate and that the parents' unilateral placement at the Kildonan School was appropriate, see **pages 10-12, SRO decision No. 06-005, ATTACHED HERETO**.

Once again, the District failed to conform to, or even acknowledge, the unappealed SRO decision. Three weeks after receipt of the second SRO decision supporting placement at Kildonan, the CSE convened to develop an IEP for 2006-07, (received by the parent at the August 10, 2006 meeting). The CSE generated a written notice of the March 28, 2006 meeting, stating that it "*agrees on placement at CHS [Carmel H.S.] She will receive Consultant Teacher for all academic classes, Special Class Reading, and Counseling as a Related Service. Goals, program and test modifications were reviewed*", Id. Thus, for a third time, the District proposed placement of the student into the public school with part-time special class (this time only for reading) and general education classes with consultant teacher services for everything else. At that March 28, 2007 meeting, there was no input from a Kildonan representative and no input from any special or regular education 9th grade teachers. Not one person knew the student.

On August 23, 2006, the parents again rejected the proposed IEP and placement; they notified the District that they were rejecting the proposals as described at the August 10, 2006 CSE meeting and that they would continue the student at Kildonan School for 2006-07 at the District's expense.

A third impartial hearing was undertaken regarding the 2006-07 year and it is this claim which is currently outstanding, unresolved and pending. On August

24, 2007, the impartial hearing officer issued a decision concluding once again that the student had been denied access to a free appropriate public education and declaring that the Kildonan School was the appropriate placement.

Once again, the District failed to conform to, or even acknowledge, the hearing officer's decision. Once again, an IEP for the student was developed calling for her removal from Kildonan and return to the public high school.

On August 22, 2007, the parents notified the District that they were rejecting the public school's proposed placement and that they were maintaining Chloe's then-current educational placement at the Kildonan School for 2007-08, see **FAX.**

Meanwhile, the 2007-08 school year started. The District failed to make any provision for payment of the student's tuition in September, October or November, 2007. Kildonan sent notices of tuition due to both the District administrator, Kathy Rohe, and the parents, see **FAX**. The parents repeatedly wrote to inquire as to the District's failure to pay for the student's proper educational placement at Kildonan, see **FAX**. There was absolutely no action by the District. They failed to respond to the parents' letters. On November 17, 2007, the parents wrote the District request the instant Impartial Hearing review and resolve the District's non-compliance with the pendency provision of the IDEA, see **FAX**. To date, no tuition payments have been made to or received by the Kildonan School. The student's placement is in jeopardy, see **FAX**.

Ultimately, the District took an appeal to the SRO who determined to reverse his prior rulings about FAPE for this student and held in favor of the

District, SRO Decision 07-114.  The parents subsequently took an appeal from this decision to the United States District Court, S.D.N.Y., where the matter is pending, see **FAX**.

The parents herein request this hearing officer consider the facts and history of this case and declare that the student's 'pendency' placement for the period beginning September 2007 and continuing through today's date is the Kildonan School.  The parents request an order directing the School District to immediately undertake necessary steps to ensure the student's 2007-08 tuition payments are up-to-date.

### ARGUMENT

Chloe is a disabled student, classified by the respondent School District of Education as Learning Disabled.  As such she is entitled to a free appropriate public education which emphasizes special education and related services designed to meet her unique needs.

Congress enacted the IDEA 'to assure that all children with disabilities have available to them... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs" Cedar Rapids Cmty. Sch. Dist. V. Garret F. 526 U.S. 66, at 68, 119 S. Ct. 992 (1999) (quoting 20 U.S.C. Section 1400(c).  The centerpiece of the law's education delivery system is the "individualized education program", or IEP, Honig v. Doe, 484 U.S. 305, at 311 108 S. Ct. 592 (1988).  The IEP is the result of collaborations between parents, educators, and representatives of the school district.  It "sets out the child's present educational performance, establishes

annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Id.

Clearly concerned that parental input into the creation of the IEP would not be sufficient to safeguard a child's right to a free and appropriate education, Congress also included within the law's procedural safeguards that enable parents to challenge the school district's decisions, Murphy v. Arlington C.S.D. 297 F. 3d 195 (2002), citing 20 U.S.C. Section 1415. New York has adopted a two-tier system of administrative review, N.Y. Edc. Law Section 4404 (McKinney 1999). First, the parents bring their complaint to a locally-appointed hearing officer, and then aggrieved parties may pursue an appeal to a state review officer, at section 4404(2). Thereafter, the aggrieved parties may take an appeal by the N.Y. Educ. Law Section 4404 to State Court via the CPLR Article 4 (replacing earlier Article 78).

During the pendency of the mandated complaint review procedures, and explicitly inclusive of both the administrative and judicial procedures, the child's placement is not to be changed unilaterally by the School District. See for example: In the Matter of Pawling Central School District, v. New York State Education School District et al., Supreme Court of New York, Appellate Division, Third Dept. 3 A.D.3d 821; 771 N.Y.S.2d 572; 2004 N.Y. App. Div. (2004). This is the law from which the School District presently seeks to be exempted.

The student is entitled to "stay-put" services as a matter of law. For the 2006-07 school year, the School District proposed a change in the child's IDEA-

approved educational placement. The parents objected in the same way they had in each of the previous school years. The parents moved to exercise their due process rights to challenge the proposed change. On August 19, 2004, the parents of Chloe Dabrowski ("student") rejected the District's proposed placement for her to attend the public school with special class part-time for English, math and reading and attend general education classes with resource room support for social studies and science, see page 4, of the unappealed SRO decision No. 05-063. They had requested the impartial hearing to specifically review their claim that the student required one-to-one instruction for language arts within a special private school setting, Id. The SRO, in this unappealed decision of August 10, 2005, affirmed the parents' position that the District's IEP was inappropriate and that the "unilateral placement [at Kildonan] was appropriate", Id.

This final, unappealed decision regarding the 2004-05 school year, established the Kildonan School as the student's "stay put" or "pendency" placement for purposes of future disputes.

Upon receipt of this final decision the District took no steps to adhere to, or even acknowledge, the findings and conclusions set forth on issues raised in that proceeding. On August 18, 2005, the parents again rejected the District's plan for their daughter and another impartial hearing was undertaken. On March 7, 2006, the SRO issued a second, unappealed final decision holding once again that the proposed 2005-06 IEP was inappropriate and that the parents' unilateral placement at the Kildonan School was appropriate, see pages 10-12, SRO

decision <u>No. 06-005</u>  The District failed to revise, correct or otherwise modify its IEP and its CSE once again proposed placement into the public high school with special classes part-time for reading and math (but not English) and general education classes with consultant teacher services (not resource room support) for social studies, science and English, see page 3, of the unappealed SRO decision.

Once again, the District failed to conform to, or even acknowledge, the parents' objections and/or the corresponding final SRO decision.  Three weeks after receipt of the second SRO decision, the CSE convened to develop an IEP for 2006-07.  The CSE generated a written notice of the March 28, 2006 meeting, stating that it "*agrees on placement at CHS [Carmel H.S.]  She will receive Consultant Teacher for all academic classes, Special Class Reading, and Counseling as a Related Service. Goals, program and test modifications were reviewed*".  Thus, for a third time, the District proposed placement of the student into the public school with part-time special class (this time only for reading) and general education classes with consultant teacher services for everything else.

### 1. Defining Pendency and its Importance to the Statute

The IDEA's assurance (and its state counterpart, at Article 89 of the NY Educ. Law) that "all children with disabilities have available to them . . . a free appropriate education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. §1400(c) resulted from a congressional determination that "*handicapped children were not being properly*

*educated and were, in most instances, excluded from the classroom. Congress concluded that the problem was the result not only of financial constraints at state and local levels but was due to state and local laws which enabled school districts to exclude children without consultation with their parents."* <u>Thomas v. Cincinnati Board of Education</u> 918 F.2d 618,619 (6th Cir. 1990). As a result, Congress not only ensured all children access to a free and appropriate education ("FAPE"), but additionally and explicitly outlined numerous procedural safeguards to be provided to parents.

Procedures are every bit as important as the provision of services. *"The Act's procedural guarantees are not mere procedural hoops through which Congress wanted state and local educational agencies to jump. Rather, 'the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decision making.'"* <u>Daniel R.R. v. State Board of Educ.</u>, 874 F.2d 1036, 1041 (5th Cir. 1989) (quoting <u>Jackson v. Franklin County School Board</u>, 806 F.2d 623, 630 (5th Cir. 1986). Both Congress and the Supreme Court place great importance on the procedural provisions incorporated into § 1415. See <u>Rowley</u>, 458 U.S. at 102 (*"the importance Congress attached to these procedural safeguards cannot be gainsaid."*)

One of the highly specific procedural safeguards mandated by the IDEA is the "pendency" provision,[1] found at 20 U.S.C. 1415(j). "Stayput" is one such procedural safeguard and provides as follows:

---

[1] Also referred to as "status quo" or "stay-put" provision.

> *During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child ... until all such proceedings have been completed.*

"*Under the IDEA, during the pendency of any proceeding pursuant to special education law, a student is entitled to remain in his/her then current educational placement unless the parents and the school district decide otherwise also known as "Stay-Put*", Verhoeven v. Brunswick School Committee, 207 F.3d 1, 3 (1st Cir. 1999). That is, both the federal statute and the state regulations permit the parties to agree to a placement other than the one to which the student is entitled. Verhoeven v. Brunswick School Committee, 207 F.3d 1,3 (1st Cir. 1999). Here, there was an agreement between the parents and the state that the student belonged at the Kildonan School, at public expense during 2005-06 and for the duration of any future disputes.

The litigation surrounding stay-put generally involves two issues. First, one must determine the "then-current educational placement" of the student whose placement is being challenged. The "then current placement" has generally been defined by decisional case law as the last operating IEP to which both parties agreed. The second issue that is frequently addressed is the assignment of financial responsibility for the child's education. Because stay-put acts to freeze the status quo, courts have demanded that the party who bore the financial burden of the then current placement must continue to bear that burden during the proceedings.

The right to Stay-Put extends throughout the pendency of "*all*" the proceedings, administrative and judicial, regarding a student's educational disputes until they are completed, <u>S.W. and Joanne W. v. Holbrook Public Schools</u>, 221 F. Supp. 2d 222 (2002); 20 U.S.C. 1415(j); and <u>Verhoeven v. Brunswick School Committee</u>, 207 F.3d 1, at 3 (1st Cir. 1999).   In the instant case, the parents have continued to object to the placement of the student in a public regular education high school.  Their claims regarding 2004-05 and 2005-06 are finalized and their claim regarding 2006-07 is still pending.

Consistent with the statute, the Federal Regulations regarding the status of a child during the pendency of a proceeding state that:

> (a)          Except as provided in § 300.526, during the pendency of any administrative or judicial proceeding regarding a complaint under 300.507, unless the State or local agency and the parents or the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.
>
> (b)          If the complaint involves an application for initial admission to public school, the child with the consent of the parents, must be placed in the public school until the completion of all the proceedings.
>
> (c)          If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of paragraph a of this section.

This provision acts as a preliminary injunction and freezes the status quo of the child's placement so as to ensure the child is receiving an appropriate education throughout the proceedings.  Stay-put presumes a placement proposed by the

school district and accepted by the parents. In the alternative, stay-put presumes a placement identified by an unappealed, final decision.

The pendency provision acts *"like an automatic preliminary injunction,"* unlike an injunction the statute absolutely favors the status quo and gives the court no discretion of irreparable harm. <u>Monahan v. Nebraska</u>, 491 F. Supp. 903 F. 2d 635 (9th Cir. 1990), at 1088. To comply with the statutory provision, it must first be determined where the student's "then current educational placement" is and then it must be decided who is to pay the costs of this placement, <u>Id.</u> at 1088.

In <u>Zvi D. v. Ambach</u>, 694 F. 2d 904 (2d Cir. 1982), the Second Circuit Court held that the current educational placement is the IDEA placement existing at the time the dispute arose and that it is meant to serve as an *"automatic preliminary injunction"*, <u>Zvi D., supra.</u> Similarly, and nearly fifteen years later, in <u>Susquenita Sch. Dist. v. Raelee S.</u>, 96 F.3d 78, 83 (3d Cir. 1996), the Third Circuit referred to the specific language in Section 1415(j)[2] and characterized the "current educational placement" for purposes of pendency, as the placement "actually functioning when the 'stay put' is invoked." Also see other early cases: <u>Grkman v. Scanlon</u>, 528 F. Supp. 1032 (W.D. Pa. 1981). Also see: Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships <u>Drinker v. Colonial School Dist.</u>, 78 F.3d 859 [3d Cir. 1996].

---

[2] Then codified at Section 1415(e)(3).

Both state and federal law require that a child remain in his or her then current placement, unless the child's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child (20 U.S.C. § 1415[j]; Education Law § 4404[4]). Its purpose is to maintain the "status quo" while the placement-review is pending. Stacey G at 953.

In Woods v. New Jersey School District of Education, 12 IDELR 439 (3rd Cir. 1993) at 440, the court held that "*the purpose of the 'stay put' is to preserve the status quo of the child's functioning placement and program until the underlying IDEA litigation is resolved unless there is an effective waiver.*" Here, there is underlying IDEA litigation which is as yet unresolved. In Woods, the court noted that the provision is "a statutory injunction" and meant to preserve the programming provided to the student while the adults argue the proposed change. This provision demonstrates "*Congress's policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.*" Wood at 440. Affirmed in Drinker v. Colonial School District, 78 F.3d 859 (3rd Cir. 1996).

Thus, both the statute and relevant caselaw unequivocally requires that the child must "stay-put" during that period of time where the State or local education agency and the parents litigate the issue of what is appropriate for the child. In this case, the parents are litigating the issue of what is appropriate for

2006-07.  The parents also rejected the proposal for 2007-08.  No hearing on 2007-08 has, as yet, been undertaken as the proceedings on 2006-07 are still pending.  As a result, this hearing officer must look to the earlier school years to find an agreed-upon, or pendency, placement.  The SRO decision declaring Kildonan School appropriate in 2005-06 defines the student's current educational, "stay-put" or "statuo quo" placement as of this motion.

The pendency provision "*is intended to maintain some stability and continuity in a child's school placement during the pendency of review proceedings.*" Board of Education v. Ambach, 612 F.Supp. 230, 233 (E.D.N.Y. 1985). The purpose of the pendency provision is to provide stability and consistency in the education of a child with a disability, Honig v. Doe, 484 U.S. 305 (1987).

As a final matter, the 2006-07 SRO decision is not controlling on the issue of 'stay put' for 2007-08, Murphy v. Arlington C.S.D., 297 F. 3d 195 (2002).  In this recent decision, the Court ruled that the "*administrative process is 'inadequate' to remedy violations of Section 1415(j) because, given the time-sensitive nature of the IDEA's stay-put provision, 'an immediate appeal is necessary to give realistic protection to the claimed right'*, citing Miss America Org. V. Mattel, Inc. 945 F. 2d 536, at 545 (2d Cir. 1991).  Thus, the parents continued prosecution of the 2006-07 claim in the U.S. District Court, S.D.N.Y. represents a "pending" review proceeding and requires maintenance of the prior final IDEA placement.

The Courts have held that "*Section 1415(j) establishes a student's right to a stable learning environment during what may be a lengthy administrative and judicial review*" citing <u>Tenn. Dept. of Mental Health & Mental Retardation v. Paul B.</u> 88 F. 3d 1466, at 1472 (6th Cir. 1996), <u>Carl B. v. Mundelein H.S. Dist. 120 Bd of Ed.</u>, 93 CV 5304, (N.D. Ill. 1993).  In this case, the "*lengthy administrative and judicial review*" proceedings are with regard to 2006-07.  Until such time as a final, unappealed decision is issued with regard to 2006-07, the final, unappealed decision with regard to 2005-06 controls the student's 'stay-put' or 'status quo' placement.

**WHEREFORE**, the parents respectfully request this hearing officer grant a preliminary and interlocutory judgment on the issue of 'status quo' enjoining the School District from imposing its illegal policy and practice of terminating funding for the disabled child's current educational placement.  The hearing officer is asked to enter an Order requiring immediate and ongoing compliance with the decision of the SRO regarding 2005-06.

DATED:  January 17, 2008                    Respectfully submitted,

                                            RosaLee Charpentier, Esq.

                                            Attorney for Parents
                                            Family Advocates, Inc.
                                            209 Clinton Avenue
                                            Kingston, New York 12477

To: Michael Lambert, Esq.



## The University of the State of New York

## The State Education Department
### State Review Officer

No. 05-063

**Application of the BOARD OF EDUCATION OF THE CARMEL CENTRAL SCHOOL DISTRICT for review of a determination of a hearing officer relating to the provision of educational services to a child with a disability**

**Appearances:**

Kuntz, Spagnuolo, Scapoli & Schiro, P.C., attorney for petitioner, Leah L. Murphy, Esq., of counsel

Family Advocates, Inc., attorney for respondents, RosaLee Charpentier, Esq., of counsel

### *DECISION*

Petitioner, the Board of Education of the Carmel Central School District, appeals from the decision of an impartial hearing officer which found that it failed to offer an appropriate educational program to respondents' daughter and ordered it to reimburse respondents for their daughter's tuition costs at the Kildonan School (Kildonan) for the 2004-05 school year. The appeal must be dismissed.

Respondents' daughter was 12 years old and attending seventh grade at Kildonan when the impartial hearing began on January 18, 2005 (Tr. pp. 387, 445). The Commissioner of Education has not approved Kildonan as a school with which school districts may contract to instruct students with disabilities. The student began attending Kildonan at the beginning of the 2003-04 school year and had attended Crossroads School (Crossroads) for the 2002-03 school year (Tr. pp. 412-13, 418-19). The student attended petitioner's schools through the 2001-02 school year (fourth grade) (Parent Exs. 27, 28). The student's eligibility for special education as a student with a learning disability (LD), as determined during the 1998-99 school year, is not in dispute (Tr. pp. 34, 77, 458-59; see 8 NYCRR 200.1[zz][6]).

The student was initially classified as LD in December 1998 when she was attending first grade at petitioner's Kent Primary School (Tr. pp. 458-59). At the time, the student's overall intellectual functioning fell within the average range (Dist. Ex. 19 at

pp. 2, 3), however, she demonstrated significant deficits in reading, math, and spelling, as well as fine motor delays (Dist. Ex. 19 at p. 5). In addition, the student failed both hearing and vision screenings (Dist. Exs. 21, 22) and evaluators noted that she had difficulty understanding information presented orally (Dist. Ex. 18 at p. 1, Dist. Ex. 19 at p. 2). The student received resource room and consultant teacher services to assist her in her first grade classroom (Tr. pp. 77, 393, 458-59; Dist. Ex. 62). For second through fourth grades the student was placed in integrated classrooms where she received varying levels of consultant teacher services (Tr. pp. 78-80; Parent Exs. 27, 28).

In February 2002, the student was administered intelligence testing as part of a psychological reevaluation (Dist. Ex. 14). The student's scores on the Wechsler Intelligence Scale for Children-III (WISC-III) revealed that her general cognitive ability was within the average range of intellectual functioning (verbal IQ score 100, performance IQ score 98, and full scale IQ score 99) (Dist. Ex. 14 at p. 1). Although the student's processing speed index score was in the average range (SS 93) (Dist. Ex. 14 at p. 3), the psychologist testified that the student's response to test items was delayed and that as compared to the results of earlier testing the student's processing speed was slowing down (Tr. pp. 173-74). For fifth grade (2002-03) the Committee on Special Education (CSE) recommended that the student's reading, Mathematics, and writing instruction be provided in a special class (Tr. pp. 179, 413; Dist. Ex. 63 at pp. 1, 8). Consultant teacher services were also recommended for social studies and science (Tr. pp. 180, 413; Dist. Ex. 63 at pp. 1, 8) and weekly counseling services were added to the student's individualized education program (IEP) (Dist. Ex. 63 at p.1).

The student's mother reported that she was becoming concerned about her daughter's poor self-esteem and lack of desire to succeed (Tr. pp. 413-14). In September 2002, respondents decided to unilaterally enroll the student in Crossroads, a Montessori school, for fifth grade (Tr. p. 413). In April 2003, respondents referred the student back to petitioner's CSE for evaluation (Parent Ex. 16; Tr. pp. 415-16). In May 2003, petitioner administered the Woodcock-Johnson III Tests of Cognitive Abilities (WJ-III COG) and Woodcock-Johnson III Tests of Achievement (WJ-III ACH) to the student (Dist. Ex. 12; Tr. p. 1226). Compared to same-age peers, the student's performance was average in Mathematics and written expression; and low average in broad reading, basic reading skills, math calculation skills, and written language skills (Dist. Ex. 12 at p. 3). There were no discrepancies found among the student's cognitive and achievement abilities (Tr. p. 1229; Dist. Ex. 12 at p. 3). Based on the results of testing, petitioner's evaluator opined that the student would probably find age-level tasks requiring computational skills and automaticity with basic math facts difficult (Dist. Ex. 12 at p. 2). In addition, due to delays in processing speed and on tasks requiring visual perceptual speed, the evaluator suggested that the student would find age-level tasks requiring "cognitive speediness" very difficult (Dist. Ex. 12 at p. 2).

In September 2003, respondents unilaterally enrolled the student in Kildonan for the sixth grade (Tr. p. 419). At Kildonan the student studied phonetic concepts and sentence types, and learned to write basic paragraphs (Dist. Ex. 10 at p. 1, Dist. Ex. 68). In math, the student continued to have difficulty with multiplication facts (Dist. Ex. 10 at

p. 6). On April 28, 2004, when the CSE met for the student's annual review, respondents expressed concern that updated testing was needed, and the CSE agreed to update the testing and reconvene (Dist. Ex, 5, Dist. Ex. 65 at pp. 3-4). Although the CSE reconvened on May 26, 2004, no updated educational or cognitive testing had been performed (Dist. Ex. 4 at p. 4). The academic dean from Kildonan participated in this meeting by phone and gave an overview of the student's program and progress (id.). His comments were summarized in the draft IEP generated from this meeting, which reflected that the student was progressing in decoding, comprehension, vocabulary, and fluency but needed continued intensive work in reading (id.). A discussion regarding touch-typing and computers led the CSE to recommend an assistive technology evaluation (id.; Parent Ex. 24 at pp. 34-40). The meeting was tabled with the understanding that another meeting would be scheduled to review the results of the recommended evaluations (Dist. Ex. 4 at p. 4).

In May 2004, Kildonan assessed the student's reading and writing abilities using a variety of standardized tests (Parent Ex. 8 at p. 2). According to her language tutor, the student's scores on the Gray Oral Reading Test, Fourth Edition (GORT-4) showed significant improvement in the student's reading rate and accuracy (Parent Ex. 11 at p. 1, Parent Ex. 8). The tutor also noted a marked improvement in the student's spelling (Parent Ex. 11 at p. 1, Parent Ex. 8). As measured by the Gates-MacGinitie Reading Test the student's vocabulary had improved, however, the tutor reported that the student's reading comprehension score did not reflect the gains that she had made (Parent Ex. 11 at p. 1, Parent Ex. 8). The student's math teacher reported that the student had mastered most of her multiplication facts but that she had not reached a level of automaticity in relation to long division processes (Parent Ex. 11 at p. 2).

On June 16, 2004 the district conducted a cognitive and educational evaluation of the student using the WJ-III COG and WJ-III ACH (Tr. p. 243; Dist. Ex. 8). As measured by the WJ-III COG the student's overall processing speed score was in the low average range (Dist. Ex. 8 at p. 1) and the student's performance was described as "very limited" on tasks requiring visual perceptual speed (SS 74) (Tr. pp. 264-65, 294; Dist. Ex. 8 at p. 1). On the WJ-III ACH, the student's performance was average in reading comprehension and written expression, and low average in broad reading, basic reading skills and basic writing skills (Dist. Ex. 8 at p. 2). Significant weaknesses were noted in spelling (Tr. p. 271). The student's math skills were not reassessed (Tr. pp. 274, 317; Dist. Ex. 8 at p. 2). Also in June 2004, an assistive technology evaluation was completed by the school district, and both assistive technology devices and services were recommended for the student (Dist. Ex. 7).

On August 17, 2004 the CSE met, reviewed and discussed the results of petitioner's educational and cognitive and assistive technology evaluations (Dist. Ex. 3 at p. 4). For the 2004-05 school year (seventh grade) the CSE recommended that the student be placed in a special class part-time for English, math and reading and attend general education classes with resource room support for social studies and science (id.). Recommended program modifications included refocusing and redirection, preferential seating, copy of class notes, extended time for in class assignments and books on tape

(Dist. Ex. 3 at p. 2). Assistive technology devices and services included access to a word processor, books on tape, Dragon Naturally Speaking and an unspecified assistive technology consultation (id.). The student was afforded the following testing modifications: extended time (1.5), directions read/explained, clarification of test questions, special location, and spelling requirements waived (Dist. Ex. 3 at pp. 1-2). The proposed IEP contained goals and objectives related to study skills, reading, writing, Mathematics and social/emotional/behavioral needs (Dist. Ex. 3 at pp. 4-6).

Respondents rejected the proposed 2004-05 placement by letter dated August 19, 2004, which was received by petitioner on August 20, 2004 (Parent Ex. 30). Respondents stated their belief that the student would not succeed in the Carmel school system due to her slow processing speed and her problems with reading (id.). They opined that their daughter required one-to-one instruction for language arts and also the multisensory nature of the Orton-Gillingham approach, used at Kildonan, due to their assertion that she had dyslexia, amblyopia, and had one eye that was "almost completely unusable" (id.). Respondents informed the district that they would be sending the student to Kildonan and requested reimbursement for tuition and related costs (id.). Respondents signed the Kildonan contract on August 20, 2004 (IHO Ex. 6).

In response to respondents' letter, petitioner attempted to schedule a CSE meeting for August 30, 2004 but respondents were unable to attend (Dist. Ex. 51; Parent Ex. 29). The CSE reconvened with respondents on September 9, 2004 and modified the IEP by replacing the recommendation for mainstream social studies and science with resource room support with a recommendation for special class part-time for those subjects (Dist. Ex. 2). In addition the student was recommended for weekly group counseling sessions to support her transition (Dist. Ex. 2 at p. 4). Respondents kept the student at Kildonan (Tr. p. 445). By letter dated December 7, 2004, respondents requested an impartial hearing (Dist. Ex. 25).

The impartial hearing commenced on January 18, 2005 and concluded on April 15, 2005 after ten days of testimony. On May 19, 2005, the impartial hearing officer rendered his decision finding that the district had failed to offer a free appropriate public education (FAPE) to the student for the 2004-05 school year, that respondents' unilateral placement was proper, and that equitable considerations supported granting tuition reimbursement to respondents for the 2004-05 school year. Specifically, he held as follows: 1) the CSE composition for the August 17, 2004 CSE meeting was improper due to the lack of a proper special education teacher and regular education teacher; 2) the evaluations considered by the CSE were deficient; 3) the goals and objectives listed on the IEP were inadequate and failed to properly account for the student's present levels of performance; 4) respondents' unilateral placement of the student met her needs and allowed her to progress; and 5) equitable considerations supported respondents' claim for tuition reimbursement (IHO Decision, pp. 16, 23, 27, 28).

On appeal, petitioner requests reversal of the impartial hearing officer's decision insofar as it found that the IEP offered to the student by petitioner for the 2004-05 school year was inappropriate, found that the placement of the student at Kildonan was appropriate and that equitable considerations supported awarding tuition reimbursement to respondents, and granted the award of tuition reimbursement for the 2004-05 school year.

I agree with the determination of the impartial hearing officer that the student's 2004-05 IEP was inappropriate, that respondents' unilateral placement was appropriate and that equitable considerations support tuition reimbursement. The purpose behind the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400 - 1487) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]).[1]  A FAPE consists of special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20 U.S.C. § 1401[8][D]; 34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]). A board of education may be required to pay for educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]). The parent's failure to select a program approved by the state in favor of an unapproved option is not itself a bar to reimbursement (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]). The board of education bears the burden of demonstrating the appropriateness of the program recommended by its CSE (M.S. v. Bd. of Educ., 231 F.3d 96, 102 [2d Cir. 2000], cert. denied, 532 U.S. 942 [2001]; Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 [2d Cir. 1998]; Application of a Child with a Disability, Appeal No. 04-043).

To meet its burden of showing that it had offered to provide a FAPE to a student, the board of education must show (a) that it complied with the procedural requirements set forth in the IDEA, and (b) that the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). Not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]), e.g., resulted in the loss of educational opportunity (Evans v. Bd. of Educ., 930 F. Supp. 83, 93-94 [S.D.N.Y. 1996]), seriously infringed on the parents' opportunity to participate in the IEP formulation process (see W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 [D. Conn. 2001]; Brier v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromised the development of an appropriate IEP in a way that deprived the student of educational benefits under that IEP (Arlington Cent. Sch. Dist. v. D. K., 2002 WL 31521158 [S.D.N.Y. Nov. 14, 2002]). As for the program itself, the Second Circuit has observed that "'for an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression'" (Weixel v. Bd. of Educ., 287 F.3d 138, 151 [2d Cir. 2002], quoting M.S., 231 F.3d at 103 [citation and internal quotation omitted]; see Walczak, 142 F.3d at 130). This progress, however, must be meaningful; i.e., more than mere trivial advancement (Walczak, 142 F.3d at 130). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and

short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Federal regulation requires that an IEP include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Section 1, Question 1).

An amended IEP supersedes the initial IEP (Application of a Child with a Disability, Appeal No. 05-021; Application of the Bd. of Educ., Appeal No. 02-076; Application of a Child with a Disability, Appeal No. 99-54). The August 17, 2004 IEP (Dist. Ex. 3) amended and superseded the April and May IEPs (Dist. Exs. 5, 4).

Petitioner argues that, contrary to the impartial hearing officer's findings, the August 17, 2004 CSE was properly composed and that the impartial hearing officer erred in finding that the evaluations used by the CSE were deficient. Petitioner also argues that the impartial hearing officer erred in finding that it had failed to properly describe the student's current levels of performance on her IEP and had failed to appropriately set forth annual goals and short-term objectives.

In New York State, a CSE must include the parent of the child, at least one regular education teacher of the child (if the child is, or may be participating in the regular education environment), at least one special education teacher of the child or, if appropriate, at least one special education provider of the child, a school psychologist, an additional parent of a student with a disability residing in the district, a representative of the school district who is qualified to provide or supervise the provision of special education, and an individual who can interpret the instructional implications of evaluation results, and persons having knowledge or special expertise regarding the student, and if appropriate, the student (34 C.F.R. § 300.344[a]; 8 NYCRR 200.3[a][1]).

The IDEA, its implementing regulations, and New York law require that the CSE include "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)" (20 U.S.C. § 1414[d][1][B][ii]; see 34 C.F.R. § 300.344[a][2]; 8 NYCRR 200.3[a][1][ii]). The regular education teacher member "shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate behavioral interventions and strategies and the determination of supplementary aids and services, program modifications, and support for school personnel" (20 U.S.C. § 1414[d][3][C]; see 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]). The regular education teacher must also "participate in discussions and decisions about how to modify the general curriculum in the regular classroom to ensure the child's involvement and progress in the general curriculum and participation in

the regular education environment" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 24), and participate in any review and revision of the IEP (20 U.S.C. § 1414[d][4][B]; 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]). In its official interpretation of the regulations, the U.S. Department of Education explains that the regular education teacher member "should be a teacher who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions about how best to teach the child" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 26).

The U.S. Department of Education has explained that the purpose behind the regular education teacher requirement is for that teacher to serve a critical role in providing input on modifications and supplementary aids and services that would allow the child to remain in the regular education environment to the maximum extent appropriate (64 Fed. Reg. No. 48, at p. 12591). State Review Officers have found that although a board of education cannot always be expected to know who the student's regular education teacher will be prior to the CSE meeting, it should nevertheless have sufficient information about the student to designate a regular education teacher who is not only appropriately certified to teach the student, but who is also teaching in the subject matter or grade level in one of the programs which might be appropriate for the student (Application of a Child with a Disability, Appeal No. 04-088; Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-100, n.1; Application of a Child with a Disability, Appeal No. 02-080; Application of the Bd. of Educ., Appeal No. 02-056; Application of a Child with a Disability, Appeal No. 00-060).

It is well established, however, that the existence of a procedural flaw in the formulation of a student's IEP does not automatically require a finding of a denial of a FAPE (Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-015; see also Grim, 346 F.3d at 381; Pawlet Sch. Dist., 224 F.3d at 69; Evans, 930 F.Supp. at 93-94; Pascarella, 153 F.Supp.2d at 153; Brier, 948 F.Supp. at 1255; Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158. Rather, a denial of a FAPE occurs only if the procedural violation results in a loss of educational opportunity for the child, or seriously infringes upon respondents' opportunity to participate in the process of formulating the IEP, or compromised the development of an appropriate IEP in a way that deprived the student of educational benefits under that IEP. Members of the August 17, 2004 CSE included the student's mother and father, the CSE Chairperson, a psychologist from the district's elementary school, a fifth grade special education teacher and a fourth grade general education teacher (Tr. pp. 188, 801-02; Dist. Ex. 3 at p. 4). The additional parent member did not attend pursuant to a written request made by respondent on August 17, 2004 that the additional parent member not attend the CSE meeting (Dist. Ex. 53; see 8 NYCRR 200.3[a][1][viii]; 200.5[c][2][v]).

I concur with the impartial hearing officer in his finding that the August 17, 2004 CSE meeting was improperly composed due to the lack of a proper regular education teacher. The student's recommended placement included participation in general education social studies and science classes as well as computer technology, art, music

and physical education (Tr. pp. 105-06). The regular education teacher present at the August 17, 2004 CSE meeting was a fourth grade teacher (Tr. pp. 802, 1020; Parent Ex. 25 at p. 11).[2] It does not appear that she spoke or contributed at the August CSE meeting (Parent Ex. 25) and she did not testify at the impartial hearing. There was no evidence presented that she had any seventh grade teaching experience or that there was any possibility that she would have been the student's teacher (Tr. p. 987). Petitioner does not dispute the improper composition at the August 2004 meeting, but argues that respondents were able to meaningfully participate in the IEP process at the two prior CSE meetings in April and May 2004. It should be noted, however, that the April and May 2004 CSE meetings were tabled to enable petitioner to obtain updated educational and cognitive testing, which was not available for discussion until the August 17, 2004 meeting (Dist. Exs. 3-5).

The contribution from the proper regular education teacher was essential because petitioner was recommending mainstream classes for the student (Dist. Ex. 3). Consideration of curriculum modifications or other specialized instruction or support services is integrally related to an appropriate program for a child with a learning disability (see 34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 24). The record reveals that the special education teacher on the committee expressed concern over the student's ability to be successful in the general education environment, even with additional support (Parent Ex. 25). I find that there was a lack of contribution at the August 17, 2004 CSE meeting from a required regular education teacher of the student, who could discuss the specific curriculum requirements and could provide input on the modifications and supplementary aides and services to ensure involvement and progress in the general curriculum, and participation in the regular education environment to the maximum extent appropriate. The lack of contribution compromised the development of the student's IEP, significantly impeded parental participation in the formulation of the IEP and denied the student educational benefits. I concur with the impartial hearing officer that the student was thereby not offered a FAPE for the 2004-05 school year (Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. Nov. 14, 2002]; Application of the Bd. of Educ., Appeal No. 02-056; Application of a Child with a Disability, Appeal No. 01-105; Application of a Child with a Disability, Appeal No. 01-083). Having found that the absence of an appropriate regular education teacher in the development of the student's IEP at the August 17, 2004 CSE meeting resulted in the development of an inadequate IEP, it is not necessary that I consider petitioner's contention regarding the special education teacher.

Even if the CSE had been properly constituted, I would be constrained to find that the 2004-05 IEP was deficient.

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of

Having a Disability, Appeal No. 93-9). An IEP must include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Section 1, Question 1).

An IEP must also include a statement of the special education and related services and supplementary aids and services to be provided to or on behalf of the student, as well as a statement of the program modifications or supports for school personnel that will be provided to the student (34 C.F.R. § 300.347[a][3]; see 8 NYCRR 200.4[d][2][iv]). Such education, services and aids must be sufficient to allow the student to advance appropriately toward attaining his or her annual goals (34 C.F.R. § 300.347[a][3][i]; see 8 NYCRR 200.4[d][2][iv][a]).

An IEP must also include measurable annual goals, including benchmarks or short-term objectives, related to meeting the student's needs arising from his or her disability to enable the student to be involved in and progress in the general curriculum, and meeting the student's other educational needs arising from the disability (34 C.F.R. § 300.347[a][2]; see 8 NYCRR 200.4[d][2][iii]). In addition, an IEP must describe how the student's progress towards the annual goals will be measured and how the student's parents will be regularly informed of such progress (34 C.F.R. § 300.347[a][7]; 8 NYCRR 200.4[d][2][x]).

The impartial hearing officer found that the district's evaluations of the student that were available to the CSE at its August 17, 2004 meeting were deficient (IHO Decision, pp. 16-21). I agree.

When the CSE initially convened for the student's annual review in April 2004, respondents were concerned that the CSE did not have updated information and the CSE agreed to update the educational testing (Dist. Ex. 5). In June 2004, the CSE conducted an educational and cognitive evaluation, which included a writing sample and an assistive technology evaluation (Dist. Exs. 7, 8, 9). The August 17, 2004 IEP indicates that the CSE considered the following additional information: a social history dated October 14, 1998, a psychological evaluation dated February 22, 2002, a physical examination dated September 3, 1998, an observation dated October 22, 1998, an IEP teacher report dated April 15, 1999, a mainstream teacher report dated April 23, 1999, and a report card dated March 7, 2001 (Dist. Ex. 3 at p. 4).

Petitioner argues that during the hearing neither respondents nor their attorney raised any concern that the student's hearing or vision had not been properly evaluated or addressed. However, testimony from multiple school district representatives revealed that petitioner was aware that the student had vision and hearing problems that impacted her ability to benefit from instruction (Tr. 92, 155, 163, 164, 178, 264, 297-98, 299, 1274). Additionally, concerns about the student's vision and hearing had been noted in a

prior IEP (Dist. Ex. 63). Further, respondents' August 2004 letter to petitioner, which was sent several months prior to their request for a hearing, noted that the student had severely impaired vision in one eye and that her eye was "almost completely unusable" (Parent Ex. 30). Despite this information, the CSE did not seek additional information from the student's physician or, in the alternative, recommend an updated physical examination.

The impartial hearing officer noted a classroom observation of the student in her current educational setting, i.e., Kildonan, was lacking (IHO Decision, p. 19). A classroom observation in the student's then "current educational placement" is required in an initial classification (34 C.F.R. § 300.533[a][1][ii]; 8 NYCRR 200.4[b][1][iv]), and, when appropriate, in any subsequent annual evaluation (34 C.F.R. § 300.533[a][1][ii]; 8 NYCRR 200.4[b][5][i]). Due to the fact that the student had been out of petitioner's school system for almost two years, an observation of respondents' daughter in her current classroom placement at Kildonan would have been appropriate in this instance in aiding in the determination of the child's present levels of performance and in setting individual goals and objectives for the upcoming school year (see Application of a Child with a Disability, Appeal No. 01-007). However, while the impartial hearing officer references a possible need for a functional behavioral assessment (FBA) (IHO Decision, pp. 21-22), there is nothing in the record to show that the student's behavior impedes her learning or that of others (see 8 NYCRR 200.1[r], 200.4[b][1][v]).

No Kildonan test results were considered according to the August 2004 IEP. (Dist. Ex. 3 at pp. 2-3). The record contains evidence that some CSE members may have reviewed some Kildonan testing prior to the August 17, 2004 CSE meeting, but there was no evidence that it was discussed at the meeting (Tr. pp. 138, 184, 188-89, 224, 1051-52).

I concur with the impartial hearing officer that the evaluative data considered by the CSE on August 17, 2004 was insufficient for the CSE to determine the student's present levels of performance and areas of need, and to develop appropriate goals and objectives for each of the student's need areas.

The lack of appropriate evaluations and anecdotal information regarding the student's performance in the classroom is reflected in the August 17, 2004 IEP, which fails to adequately describe the child's present levels of performance (Dist. Ex. 3). Global statements such as "[the student's] cognitive abilities are average with the exception of processing speed" and "[the student's] "reading and writing skills are below average," do not provide a meaningful description of the student's abilities or needs,

or suggest specific deficits that need to be addressed (Dist. Ex. 3 at p. 2). For example, although the August 2004 IEP indicates that the student needs to improve her reading skills, it does not indicate if the student needs to improve her decoding skills, reading comprehension skills or some other aspect of reading such as fluency (Dist. Ex. 3). Furthermore, the IEP does not describe the student's current reading abilities or state what grade level material the student is capable of reading (Dist. Ex. 3 at p. 2). The IEP as written contains no baseline from which to project goals and objectives. The present levels of performance and individual needs outlined on a student's IEP serve as the foundation on which the CSE builds to identify goals and services to address the student's individual needs (see 34 C.F.R. Part 300, Appendix A, Section 1, Question 1; see also Office of Vocational and Educational Services for Individuals with Disabilities (VESID), "Sample Individualized Education Program and Guidance Document," p. 40 [December 2002]). Without performing appropriate evaluations of the student and developing a detailed description of her present functioning, it is unclear how the CSE determined appropriate goals and objectives for respondents' daughter.

The student's specific needs are not addressed appropriately in the August 17, 2004 IEP. One goal is actually identical to a goal from the 2000-01 IEP ("Demonstrate an improvement in word recognition and decoding skills necessary to read for information and understanding.") (compare August 2004 IEP, Dist. Ex. 3, at p. 4 (goal 4), with 2000-01 IEP, Parent Ex. 27 at p. 4 [goal 1]). The goals and objectives section also fails to set forth appropriate short-term objectives because all objectives are evaluated at the end of the school year (Dist. Ex. 3 at pp. 4-6). It is not clear what intermediate progress the student would have been expected to achieve. The manner in which the objectives are written is not sufficient to allow a teacher to evaluate progress and conceptualize subsequent direction, to gauge the need for continuance of a task, or to identify the need to adjust the student's goals. Additionally, the goals are too vague and immeasurable to meet the requirements set forth in state and federal regulations. For example, the goals recite generally that the student should "demonstrate an improvement . . ." (Dist. Ex. 3 at pp. 4-6). The goals and objectives are not reflective of the student's present levels of performance and therefore are not reasonably calculated to enable this student to receive educational benefit (see Rowley, 458 U.S. at 206, 207).

Based upon the improper CSE composition at the August 17, 2004 meeting, the insufficiency of the evaluations considered by the CSE and the inappropriateness of the goals and objectives listed in the IEP generated on August 17, 2004, I find that the district failed to provide a FAPE to the student for the 2004-05 school year.

Having determined that petitioner has not met its burden of proving that it had offered to provide a FAPE to the student during the 2004-05 school year, I must now consider whether respondents have met their burden of demonstrating that the Kildonan placement selected for the student for that school year was appropriate (Burlington, 471 U.S. 359; Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-080). In order to meet that burden, the parents must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

There is sufficient evidence in the record to conclude that the student's special education needs were met during her 2004-05 school year at Kildonan. The academic dean of Kildonan testified in support of respondents' claim for tuition reimbursement. He testified that the student met the admissions criteria for Kildonan in that she had at least an average IQ and solid cognitive functioning but also had difficulty or lags in basic language skills (Tr. pp. 877, 882). He reported that curriculum used by Kildonan was approved by New York State and designed to be multisensory in nature (Tr. p. 886). Documents in the record indicate that Kildonan's academic program revolves around the intensive, daily, one-to-one Orton-Gillingham tutoring (Parent Exs. 4, 5). According to the academic dean, the Orton-Gillingham philosophy that structures and dictates the language training sessions, also influences the subject matter teaching (Tr. p. 886). Reportedly all of the school's subject matter teachers are trained and mentored in Orton-Gillingham, as well as multisensory teaching methodology (Tr. p. 886). Visual, auditory, and kinesthetic presentations supplement textbooks in subject matter courses (Parent Ex. 5).

Testing conducted during the 2003-04 school year revealed weaknesses in the student's ability to perform tasks requiring visual perceptual speed (Dist. Ex. 8). In addition the student performed in the low average range on measures of basic reading skills, basic writing skills and spelling (Dist. Ex. 8; Parent Ex. 8 at p. 2-spelling). The student's performance on the GORT-4 suggests that she continued to struggle with reading fluency (Parent Ex. 8 at p. 2). The dean reported that at the beginning of seventh grade the student continued to have difficulties in the areas of spelling, basic written expression, comprehension, and decoding (Tr. pp. 881-82). He also reported that the student had difficulty in processing language (Tr. pp. 881, 926). Notes from the student's seventh grade teachers indicate that as of October 2004 the student's weaknesses included spelling and reading multisyllabic words, learning vowel teams, writing, and

verbal expression (Dist. Ex. 6). The school psychologist suggested that the student had dysgraphia (Parent Ex. 25 at p. 24).

The record demonstrates that the Kildonan placement was appropriate to meet the student's needs at the time placement was effectuated and that the student's academic needs were in fact addressed by the private school. At Kildonan the student participated in a one-to-one tutorial designed exclusively for the student to address her strengths and weaknesses in the areas of reading, writing, and spelling (Tr. pp. 882-83). Notes from the student's tutor indicate that during language training sessions the student worked on handwriting, phonetic concepts, spelling, fluency, decoding, grammar and sentence structure, and writing sentences (Parent Ex. 9 at p. 1, Parent Ex. 39 at p. 1). Keyboarding or touch-typing was included in the student's academic program (Tr. p. 897). The academic dean reported that in terms of subject matter classes the student was at an appropriate cognitive level for science, social studies and literature and that those classes controlled for independent reading and writing demands (Tr. p. 883, see also Tr. p. 919). The academic dean testified that the student's processing delay was addressed within her language training tutorial and in her classes (Tr. pp. 953-54). Specifically, her teachers knew that the student might need information explained a second time or might need to spend additional time on a topic (Tr. pp. 953-54). The dean reported that the teachers would take information from a textbook and put it in note form at the student's reading level (Tr. p. 955). For seventh grade the student was placed in a math class consisting of six students with similar needs (Tr. p. 885). The dean opined that based on his observations of the student in her language training tutorial and her performance in academic classes she was continuing to make progress (Tr. p. 908). He acknowledged that the student had not made enormous progress but indicated the progress was highly appropriate given her processing speed and the one-to-one Orton-Gillingham teaching provided to the student (Tr. p. 909).

Petitioner challenged the appropriateness of Kildonan based on the lack of certified teachers employed by the school, the testimony of the academic dean that Kildonan had not recommended assistive technology for the student and a comment made by the academic dean related to subject area courses which is discussed below. Petitioner also suggested that the student was inappropriately placed in the upper school at Kildonan because the dean had commented that contact with the older students was overwhelming to the student. I find these arguments to be without merit. It is well settled that a private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. at 14; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105). Although Kildonan did not recommend assistive technology for the student, it was providing the student with several of the devices and services recommended on the student's August 17, 2004 IEP. Specifically, the student had some access to a word processor and spellcheck (Tr. p. 897), the student was learning keyboarding and/or touch-typing (Tr. p. 897) and the Kildonan teachers provided students with textbook notes written at a reading level appropriate to the student (Tr. p. 955). The dean indicated that based on the student's age and abilities he thought it was better to spend time teaching the student remedial strategies rather than her spending that same time learning to use books

on tape (Tr. pp. 907-08). He indicated that books on tape might eventually be appropriate for the student. Petitioner's assertion that the dean testified he thought it would be a "waste of time" for students to be educated in grade level science or social studies, as long as they had access to a curriculum that was appropriate to their abilities, does not appear to accurately characterize the dean's testimony (Tr. pp. 918-21, 948). Finally, while the dean did testify that the student had "come back into her shell a little bit" after moving to the upper school, he indicated that it was "not to the level that she was in the beginning of sixth grade" when the student first entered Kildonan (Tr. pp. 949-50).

Based upon the record, respondents have met their burden of demonstrating that Kildonan offered a program that met their daughter's special education needs.

The final criterion for an award of tuition reimbursement is that respondents' claim be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]); see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]). Such considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). With respect to equitable considerations, a parent may be denied tuition reimbursement upon a finding of a failure to cooperate with the CSE in the development of an IEP or if the parent's conduct precluded the CSE's ability to develop an appropriate IEP (Warren G. v. Cumberland Co. Sch. Dist., 190 F.3d 80, 86 [3rd Cir. 1999]; see Application of the Bd. of Educ., Appeal No. 04-102; Application of the Bd. of Educ., Appeal No. 04-026).

In the absence of evidence demonstrating that respondents failed to cooperate in the development of the IEP or otherwise engage in conduct that precluded the development of an appropriate IEP, equitable considerations generally support a claim of tuition reimbursement (Application of a Child with a Disability, Appeal No. 04-049). Petitioner asserts that respondents improperly failed to share Kildonan information, but this is not supported in the record. There is no evidence in the record establishing that respondents failed to sign consent forms for petitioner, that petitioner ever asked Kildonan for records and was refused, or that respondents were ever informed of an ongoing problem petitioner was having obtaining Kildonan records. The record reveals that respondents attended and participated in the CSE meetings and cooperated with petitioner's CSE in the student's evaluations and in preparing the student's IEP. I find that respondents' claim for tuition reimbursement is supported by equitable considerations.

I have considered petitioner's remaining contentions and I find them to be without merit.

**THE APPEAL IS DISMISSED.**

Dated:    Albany, New York
          August 10, 2005                          _____
                                                   **PAUL F. KELLY**
                                                   **STATE REVIEW OFFICER**

[1] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEIA], Pub. L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute as it existed prior to the 2004 amendments. Petitioner initiated this proceeding prior to the effective date of the 2004 amendments to the IDEA, therefore, the provisions of the IDEIA do not apply.

[2] I concur with the impartial hearing officer that the transcripts of the CSE meetings were established to be too inaccurate to be relied upon as accurate representations of the minutes of the meetings (Parent Exs. 24, 25). Parent Exhibit 25 is relied upon herein and is given its appropriate weight insofar as it consists of respondents' notes of the August 27, 2004 CSE meeting.



## The University of the State of New York

### The State Education Department
#### State Review Officer

No. 06-005

**Application of a CHILD WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Carmel Central School District**

**Appearances:**

Family Advocates, Inc., attorneys for petitioners, RosaLee Charpentier, Esq., of counsel

Kuntz, Spagnuolo, Scapoli & Schiro, P.C., attorneys for respondent, Jeffrey J. Schiro, Esq., of counsel

### DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition costs at the Kildonan School (Kildonan) for the 2005-06 school year. The appeal must be sustained in part.

Petitioners attach to their Petition the following documents not introduced into evidence at the impartial hearing: 1) correspondence from May and September 2005 from respondent and respondent's attorney regarding class profile information; 2) hospital records showing treatment on October 14, 2005 for petitioner mother; 3) the student's 2004-05 individualized education program (IEP); and 4) correspondence from Kildonan dated September 9, 2005 regarding payment of tuition. Additionally, petitioners submitted an affidavit of the Kildonan Academic Dean, sworn to November 9, 2005, with the following documents annexed: 1) the Academic Dean's curriculum vita; 2) a Kildonan brochure; and 3) various Kildonan school records and test results from May

2003 through June 2005 pertaining to the student's academic performance at Kildonan. Respondent objects to petitioners' attempt to introduce new information, asserting that petitioners had the opportunity to present the information to the impartial hearing officer. Generally, documentary evidence not presented at a hearing may be considered in an appeal from an impartial hearing officer's decision only if such additional evidence could not have been offered at the time of the hearing and the evidence is necessary in order to render a decision (see, e.g., Application of a Child with a Disability, Appeal No. 05-080; Application of a Child with a Disability, Appeal No. 05-068; Application of the Bd. of Educ., Appeal No. 04-068). The impartial hearing concluded on October 14, 2005, and all of the above documents would have been available at the time of the hearing with the exception of the October 14, 2005 hospital records and the November 9, 2005 Affidavit of the Academic Dean of Kildonan. Neither the hospital records nor the affidavit are necessary for the rendering of my decision. Therefore, the additional documentary evidence submitted by petitioners is not accepted.

At the time of the impartial hearing in the fall of 2005, petitioners' daughter was thirteen years old and attending eighth grade at Kildonan. The Commissioner of Education has not approved Kildonan as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.7). The student's eligibility for special education services and classification as a student with a learning disability (see 8 NYCRR 200.1 [zz][6]) are not in dispute.

The student's prior educational history is described in Application of a Child with a Disability, Appeal No. 05-063 and will not be repeated here in detail. Briefly, the student experienced vision problems at an early age which were reportedly addressed through surgery and corrective lenses (Tr. p. 254). The student was initially reviewed and classified as learning disabled by the respondent's Committee on Special Education (CSE) in December 1998 when she was attending first grade (Tr. p. 13). According to psychological testing, the student's overall intellectual functioning fell within the average range; however, she demonstrated deficits in reading, math, and spelling (Tr. pp. 13-14). She received varying levels of special education services throughout her elementary school years.

The student's mother testified that when her daughter was to transition to the fifth grade in respondent's middle school, she became concerned about the size of the school and her daughter's ability to move from class to class in a typical middle school schedule (Tr. p. 282). Petitioners enrolled the student in a private school, identified in the record as Crossroads School, for the 2002-03 school year (Tr. pp. 16, 283) and in April 2003, referred her back to respondent's CSE for evaluation (Dist. Ex. 1 at p. 2). Respondent administered the Woodcock-Johnson III Tests of Cognitive Abilities (WJ-III COG) and the Woodcock-Johnson III Tests of Achievement (WJ-III ACH) (Dist. Ex. 1 at p. 2). The student achieved test scores in the average range in mathematics and written expression, and the low average range in broad reading (Dist. Ex. 1 at p. 2). Her subtest scores in basic reading skills, math calculation skills, and written language skills were also in the low average range (Dist. Ex. 1 at p. 2). There were no discrepancies identified among the student's cognitive and achievement abilities (id.).

In September 2003, petitioners unilaterally enrolled the student in Kildonan, which she attended for the 2003-04 school year (id.). In August 2004, respondent's CSE met for the student's annual review and to develop her IEP for the 2004-05 school year when the student would be in seventh grade (Dist. Ex. 1 at p. 3). Petitioners rejected the CSE's recommended program, unilaterally enrolled their daughter in Kildonan for seventh grade, and requested an impartial hearing seeking tuition reimbursement for the 2004-05 school year (Tr. p. 17; Dist. Ex. 1).

The impartial hearing related to the 2004-05 school year commenced on January 18, 2005 and concluded on April 15, 2005 (Dist. Ex. 1 at p. 4). An impartial hearing officer rendered a decision on May 19, 2005, holding that respondent had failed to offer petitioners' daughter a free appropriate public education (FAPE) for the 2004-05 school year because the CSE had been improperly composed, the evaluations considered were deficient, and because the goals and objectives on the IEP were inadequate and failed to properly account for the student's present levels of performance (id.). He further found that petitioners' unilateral placement of the student at Kildonan met the student's needs and allowed her to progress, and that equitable considerations supported granting tuition reimbursement to the parents for the 2004-05 school year (id.). Respondent subsequently filed a petition for review to a State Review Officer, resulting in a decision being issued on August 10, 2005 upholding the impartial hearing officer's decision and dismissing the appeal (Application of a Child with a Disability, Appeal No. 05-063).

Regarding the student's academic abilities, testing conducted during the 2004-05 school year revealed a relative weakness in the student's ability to analyze and synthesize abstract visual stimuli (Dist. Ex. 9 at p. 4). In addition, the student performed in the low average range on measures of numerical operations, math reasoning, and spelling (Dist. Ex. 10 at p. 1). March 2005 progress reports from Kildonan indicated that the student was performing satisfactorily (Dist. Ex. 8). Narrative reports from the student's teachers at Kildonan indicate that as of March 2005 the student's weaknesses included the mechanical aspects of writing and inconsistent class participation (Dist. Ex. 8 at pp. 3, 5-6). The Kildonan instructor who provided individual language training tutorials to petitioners' daughter during the 2004-05 school year reported that the student was working on more advanced phonemic concepts, including learning the Latin roots for words, and was continuing to work with expanded paragraphs (Dist. Ex. 8 at p. 3). In mathematics, she was reported to have a thorough understanding of the material presented in class (Dist. Ex. 8 at p. 4).

On April 3, 2005, respondent conducted psychological and educational evaluations of the student as part of her triennial review (Dist. Exs. 9, 2). Administration of the Wechsler Intelligence Scale for Children-IV (WISC-IV) yielded a verbal comprehension score of 100, a perceptual reasoning score of 102, a working memory score of 110, a processing speed score of 100, and full scale IQ score of 105, which placed the student in the average range of cognitive functioning (id.). The evaluator reported that there was no significant discrepancy between any of the composite scores and that "her profile did not differ significantly from her previous assessment" (Dist. Ex. 9 at pp. 5-6). On the Wechsler Individual Achievement Test-II (WIAT-II), the student

achieved standard (and percentile) scores of 108 (70) in reading, 81 (10) in mathematics, 89 (23) in written language, 133 (99) in oral language, and a total composite score of 101 (53) (Dist. Exs. 10, 2). Relative strengths were noted in oral expression, reading comprehension, and listening comprehension with notable weaknesses identified in spelling, numerical operations, and math reasoning (Dist. Ex. 10 at p. 5).

On May 17, 2005, while the decision of the impartial hearing officer was still pending regarding the 2004-05 school year, respondent's CSE met for the student's annual review and to develop her individualized education program (IEP) for the 2005-06 school year (eighth grade), which is the IEP in dispute in this proceeding (Dist. Ex. 2). Both parents and an additional parent member were present (Dist. Ex. 2 at p. 4). CSE meeting notes reflect that respondent's CSE considered the results of psychological and educational evaluations conducted in April 2005, the assistive technology evaluation conducted in June 2004, the student's April 2004 interim report card and reports from her teachers at Kildonan, and results of a classroom observation of the student conducted in May 2005 (id.). For the 2005-06 school year (eighth grade), the CSE recommended that the student be placed in a special class for reading and mathematics, and attend general education classes with consultant teacher support for social studies, science, and English (id.). Counseling was also recommended (id.). Recommended program modifications included refocusing and redirection, preferential seating, copy of class notes, extended time for in class assignments, and Books on Tape (Dist. Ex. 2 at p. 2). Assistive technology devices and services included AlphaSmart trials, access to a word processor, books on tape, and an unspecified assistive technology consultation (Dist. Ex. 2 at p.2). The student was afforded the following testing modifications: extended time (1.5), directions read/explained, clarification of test questions, special location, and spelling requirements waived (id.). The proposed IEP contained goals and objectives related to study skills, reading, writing, mathematics, and social emotional needs (Dist. Ex. 2 at pp. 4-7).

Petitioners were mailed the proposed IEP on August 9, 2005 (Dist. Ex. 22) and by letter dated August 18, 2005, they rejected the CSE's recommended program, gave notice of their unilateral enrollment of their daughter at Kildonan for the 2005-06 school year, and requested an impartial hearing seeking tuition reimbursement for the 2005-06 school year (Dist. Ex. 23).

The impartial hearing was held on August 30, October 7, and October 14, 2005. At the impartial hearing, petitioners asserted that the IEP prepared at the May 17, 2005 CSE meeting failed to offer their daughter a FAPE for the 2005-06 school year. Respondent asserted that the recommendations contained within the May 17, 2005 IEP were made after considering updated evaluations and that they offered the student a FAPE. Respondent asserted that all procedural requirements were met and that the substantive program was appropriate and that therefore petitioners should be denied tuition reimbursement.

The impartial hearing officer issued a decision dated November 23, 2005 and held that respondent had made an appropriate recommendation for the student's eighth grade year (IHO Decision, pp. 15, 28, 41). She determined that the goals and objectives "may appear to have stayed the same" as the prior IEP, but that the

student's "knowledge in each of these areas will grow" and that the goals were capable of implementation and were reasonably calculated to confer educational benefit (IHO Decision, pp. 15, 41). She concluded that the academic levels and goals and objectives in the IEP were appropriate, and that therefore petitioners were not entitled to tuition reimbursement for Kildonan (IHO Decision, p. 41).

On appeal, petitioners make the following assertions: 1) they were denied their due process right to present a complaint to the impartial hearing officer; 2) the CSE was improperly constituted due to the presence of a seventh grade regular education teacher as opposed to an eighth grade regular education teacher; 3) the recommended program that would have been provided was not reflected on the IEP; 4) the CSE had insufficient information about the student; 5) the goals and objectives were inappropriate and identical to the goals and objectives found deficient in a prior appeal regarding the 2004-05 IEP; 6) the IEP contained a typographical error; and 8) the evaluations conducted by the district did not support a change in the student's program from full time special education to part time special education and support in general education. On appeal, petitioners seek an annulment of the impartial hearing officer's decision and tuition reimbursement for their daughter's 2005-06 school year at Kildonan. Respondent submitted an answer with affirmative defenses disputing petitioners' assertions above, and also asserting that petitioners' failure to properly litigate the case before the impartial hearing officer precludes them from relitigating the matter on appeal to the Office of State Review.

First, I will address petitioners' argument that they were denied their due process right to present their special education complaint at an impartial hearing. Petitioners argue that the impartial hearing officer improperly terminated the impartial hearing and denied the parents an opportunity to present testimony by either their independent evaluator or representatives of Kildonan. I disagree. As set forth in more detail below, the impartial hearing officer granted multiple adjournments of the impartial hearing and any failure of petitioners to present evidence was not due to any improper actions or inactions of the impartial hearing officer.

The hearing was conducted in a manner consistent with the requirements of due process (34 C.F.R. § 300.510[b][2]; Education Law § 4404[2]). The timeframe for impartial hearings, as set forth in the IDEA implementing regulations, are as follows:

"The public agency shall insure that not later than 45 days after the receipt of a request for a hearing - (1) A final decision is reached in the hearing; and (2) A copy of the decision is mailed to each of the parties." (34 C.F.R. § 300.511[a]; see also Engwiller v. Pine Plains Cent. Sch. Dist., 110 F. Supp. 2d 236 [S.D.N.Y. 2000]). New York regulations set forth the 45 day timeframe, but also allow an impartial hearing officer to grant extensions of time beyond the 45 days if requested by a party (8 NYCRR 200.5[i][4]).[1] Specific factors for an impartial hearing officer to consider prior to granting an extension are also set forth (8 NYCRR 200.5[i][4][ii]).

The impartial hearing officer may grant a request for an extension only after fully considering the cumulative impact of the following factors:

(a)     the impact on the child's educational interest or well-being which might be occasioned by the delay;

(b)     the need of a party for additional time to prepare or present the party's position at the hearing in accordance with the requirements of due process;

(c)     any financial or other detrimental consequences likely to be suffered by a party in the event of a delay;

(d)     whether there has already been a delay in the proceeding through the actions of one of the parties.

(8 NYCRR 200.4[i][4][ii]). Additionally, the regulations provide that agreement of the parties is not a sufficient basis for granting an extension, and further that "[a]bsent a compelling reason or a specific showing of substantial hardship, a request for an extension shall not be granted because of school vacations, a lack of availability resulting

from the parties' and/or representatives' scheduling conflicts, settlement discussions

between the parties or other similar reasons." (8 NYCRR 200.4[i][4][iii]).

In the present case, the hearing was initially scheduled for August 30, 2005 and September 9, 2005 (IHO Ex. 1). The first day of the hearing was held on August 30, 2005 as planned and the district presented their case and rested (Tr. p. 211-12). The impartial hearing officer noted at the conclusion of the day on August 30, 2005 that on September 9, 2005 it would be the parents' turn to present their case and that "if they are going to have a witness from Kildonan to make sure that this witness appears on the 9th ..." (Tr. p. 212).

On September 7, 2005 petitioners' attorney sent a letter to the impartial hearing officer, requesting an adjournment of the September 9, 2005 hearing date on consent due to unavailability of parent witnesses due to the first week of school (IHO Ex. 2). Respondent's attorney noted in a later letter on the same date that she had only agreed to an adjournment if a date certain could be set in the next few weeks (IHO Ex. 3), which condition was not included in the letter to the impartial hearing officer (IHO Ex. 2). The impartial hearing officer scheduled a new date certain of October 7, 2005, granting close to the maximum extension permissible under state regulations (30 days) (8 NYCRR 200.4[i][4][i]), and warning that there would not be further extensions (IHO Ex. 4).

A few days prior to the October 7, 2005 scheduled date certain, staff from petitioners' law firm contacted the impartial hearing officer to request an extension due to attorney scheduling conflicts due to a family emergency with one attorney and a court appearance for the other attorney in the firm representing petitioners (IHO Exs. 5, 6). The impartial hearing officer neither granted an adjournment nor advised petitioners' attorneys that the October 7, 2005 hearing date was cancelled (Tr. pp. 300-01). However, staff at petitioners' law firm reportedly believed that the hearing date was cancelled and immediately cancelled the parent witnesses (IHO Ex. 6). Respondent's attorneys objected to this adjournment in light of the date certain that had been set and the detrimental financial consequences that would be suffered because respondent was paying for petitioners' daughter's private school during the pendency of the proceedings (IHO Ex. 5). The impartial hearing officer ordered the hearing to proceed on October 7, 2005 (IHO Ex. 7).

On October 7, 2005, the impartial hearing officer listed her reasons for continuing the hearing on that day, noting that petitioners' law firm has two attorneys, that such a last minute adjournment would affect the schedules of many other attorneys and witnesses, and that the financial obligation of respondent for the pendency placement is continuing, all in addition to the 45 day timeline set for hearings (Tr. pp. 231-33). Petitioners' attorney indicated on the October 7 hearing date that their independent evaluator and a Kildonan representative had been available but their appearances that day had been cancelled by petitioners' law firm, and that upon being re-contacted by the firm 2 hours later, they were both unavailable (Tr. pp. 245-46). Petitioner mother began her testimony on October 7, 2005, but had to leave early for work because she had believed the hearing had been cancelled after being so informed by her law firm (Tr. pp. 250-51, 294). The impartial hearing officer offered to take any exhibits that petitioners' attorney could offer into evidence, but petitioners' attorney indicated that he did not have exhibits to introduce with him (Tr. pp. 301-02). Over respondent's objection, the impartial hearing officer granted one further extension of five business days, setting October 14, 2005 as the final day of the hearing (IHO Ex. 8).

On October 12, 2005, petitioners' attorney requested an extension of the October 14, 2005 date to November 1, 2005, citing unavailability of witnesses as the reason (IHO Ex. 9). The impartial hearing officer denied the request for a further extension and reminded petitioners' attorney that witnesses could appear by phone (IHO Ex. 8). On October 14, 2005, petitioners did not have their independent evaluator or a Kildonan representative ready to testify and petitioner mother was unable to continue her testimony due to her own medical problem (Tr. pp. 331-32). Petitioners' attorney did not offer any exhibits to be entered into evidence (Tr. pp. 325-44). After considering all of the circumstances, including the best interests of the student, and the history of the proceedings, the impartial hearing officer closed the hearing on October 14, 2005 (Tr. p. 340-43).

The impartial hearing officer was well within her discretion to close the hearing and stop granting extensions in light of the circumstances and history of this case as detailed above. Notably, the October 7, 2005 date would have proceeded with petitioners' private evaluator and Kildonan representative, except for the fact that petitioners' own law firm erroneously cancelled their appearances and reportedly could not re-engage them 2 hours later (Tr. pp. 245-46). While recognizing that circumstances may arise that warrant consideration of a hearing extension, it must be noted that the granting of extensions is constrained by regulation, as the impartial hearing officer herein was aware. Although one of petitioners' attorneys suffered a family emergency and one of the petitioners had a medical problem for one day of the hearing, these situations do not mitigate the unrelated last minute requests for extensions, the inaccurate information circulated by petitioners' law firm (IHO Exs. 2, 3, 6; Tr. pp. 300-01) and the expressed lack of preparation for the hearing by petitioners' law firm.[2] The impartial hearing officer properly gave consideration to the factors listed in state regulations and acted appropriately in her correspondence with the parties regarding extensions and with her granting and denial of extensions. Therefore, petitioners' due process claim is dismissed.

Next, I will address petitioners' claim that the goals and objectives on the 2005-06 IEP were inappropriate and identical to the goals and objectives found deficient in a prior appeal regarding the 2004-05 IEP (Application of a Child with a Disability, Appeal No. 05-063). Although I find that the CSE had sufficient evaluative information for the student, I agree that the goals and objectives on the 2005-05 IEP were inappropriate and failed to offer the student a FAPE, and in light of this, I do not reach petitioners' remaining assertions that CSE composition was improper; that the recommended program that would have been provided was not reflected on the IEP; that the IEP contained a typographical error; and that the evaluations conducted by the district did not support a change in the student's program.

A purpose behind the IDEA (20 U.S.C. §§ 1400 - 1487)[3] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 126 S. Ct. 528 [2005]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20 U.S.C. § 1401[8]; 34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]).[4] A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). In Burlington, the court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (id.). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (Burlington, at 370-71; see Application of the Bd. of Educ., Appeal No. 05-073). The parent's failure to select a program approved by the state in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14).

A FAPE is offered to a student when the board of education (a) complied with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). A denial of a FAPE occurs when procedural inadequacies either result in a loss of educational opportunity for the student, or seriously infringe on the parents' opportunity to participate in the IEP formulation process (see Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005]; W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 [D. Conn. 2001]; Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that IEP

(see Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. 2002]).  In evaluating the substantive program developed by the CSE, the Second Circuit has observed that "'for an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression'" (Weixel v. Bd. of Educ., 287 F.3d 138, 151 [2d Cir. 2002] [quoting M.S. v. Bd. of Educ., 231 F.3d 96, 103 [2d Cir. 1998][citation and internal quotation omitted]).  This progress, however, must be meaningful; i.e., more than mere trivial advancement (Walczak, 142 F.3d at 130).  The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d at 379; Walczak, 142 F.3d at 132; Antonaccio v. Bd. of Educ., 281 F. Supp. 2d 710, 726 [S.D.N.Y. 2003]).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).  Federal regulation requires that an IEP include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]).  School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Section 1, Question 1).

In April 2005, respondent conducted psychological and educational reevaluations of the student in preparation for her annual review.  Administration of the WISC-IV yielded a verbal comprehension score of 100, a perceptual reasoning score of 102, a working memory score of 110, a processing speed score of 100, and full scale IQ score of 105; which placed the student in the average range of cognitive functioning (Dist. Exs. 9, 2).  On the WIAT-II, the student achieved standard (and percentile) scores of 108 (70) in reading, 81 (10) in mathematics, 89 (23) in written language, 133 (99) in oral language, and a total composite score of 101 (53) (Dist Exs. 10, 2).  Relative strengths were noted in oral expression, reading comprehension, and listening comprehension with notable weaknesses identified in spelling, numerical operations, and math reasoning (Dist. Ex. 10 at p. 5).  The CSE chairperson testified that the student's scores on the WISC-IV were in the average to high average range and opined that her cognitive ability to access learning and participate in the learning environment was very strong (Tr. p. 151).  He further testified that based on the results of the psychological and educational assessments the CSE felt that the student would be able to "keep pace with her class" (Tr. p. 152).

Although testimony indicates that the results of these evaluations were fully considered at the May 17, 2005 CSE meeting, the 2005-06 IEP developed by the CSE on May 17, 2005 fails to reflect this and does not adequately or accurately describe the student's present levels of performance.  The 2005-06 IEP contains global statements similar to those found to be deficient in the student's 2004-05 IEP (Dist. Ex. 1 at p. 10).  Statements such as "[the student's] cognitive abilities are average with the exception of processing speed" and "[the student's] reading and writing skills are below average," do not provide a meaningful description of the student's abilities or needs, or suggest specific deficits that need to be addressed (Dist. Ex. 2 at p. 3).  For example, the May 2005 IEP indicates that the student needs to improve her reading and writing skills; however, it does not identify the student's specific areas of weakness to be addressed.  Descriptions of the student's present performance levels on the IEP do not indicate if the

student needs to improve her decoding skills, reading comprehension skills, spelling, penmanship or some other aspects of reading and writing such as fluency or paragraph development (Dist. Ex. 2 at p. 3). Additionally, these statements appear to be discrepant with the record, which indicates that the student's processing speed score and reading composite score were in the average range (Dist. Ex. 9 at p. 2; Dist. Ex. 10 at p. 2; Tr. p. 145). Despite the CSE having sufficient current evaluative information to detail the student's present levels of performance and individual needs, the IEP as written contains an inadequate and inaccurate baseline from which to develop goals and objectives. The present levels of performance and individual needs outlined on a student's IEP serve as the foundation on which the CSE builds to identify goals and services to address the student's individual needs (see 34 C.F.R. Part 300, Appendix A, Section 1, Question 1; see also Office of Vocational and Educational Services for Individuals with Disabilities (VESID), "Sample Individualized Education Program and Guidance Document," p. 40 [December 2002]).

The student's specific needs are neither articulated accurately nor addressed appropriately in the May 17, 2005 IEP. For example, the IEP contains one goal and five short term objectives related to reading comprehension despite the fact that the student achieved a score in the superior range for reading comprehension when evaluated in April 2005 (Dist. Ex. 2 at p.5; Tr. pp. 146-47) and the evaluator who conducted the April 2005 educational and psychoeducational evaluations of petitioners' daughter reported that the student was able to decode the words in the passages she read, respond to questions requiring factual information and had no difficulty when required to draw an inference from the material read (Dist. Ex. 9 at p. 6). Additionally the CSE chairperson testified that the student's "really strong reading comprehension scores" were a factor in determining her ability to succeed in the general education classroom for English, social studies and science (Tr. p. 152). The IEP also contains a goal and a corresponding objective related to decoding, which is not consistent with the student's score in the 68th percentile on the pseudoword decoding subtest of the WIAT II in April 2005 or with the evaluator's report that "[the student] has well developed phonetic skills" (Dist. Ex. 10 at pp. 1, 3).

Another area of discrepancy can be seen in the objectives for proposed written language goals for the student, specifically those short-term objectives developed to address paragraph writing (Dist. Ex. 2 at p. 6). The CSE chairperson testified that the student had shown evidence of a "good foundation" to go into the next grade level in writing, which he described as "going into now three to five paragraph essays" (Tr. p. 160). The student's March 2005 report card from Kildonan indicates that she was beginning to compose five paragraph essays (Dist. Ex. 8 at p. 3), however the 2005-06 IEP contains an objective to "write a short paragraph that includes a topic sentence" (Dist. Ex. 2 at p. 6).

In the area of mathematics, the 2005-06 IEP appropriately contains objectives related to word problems, consistent with statements in the April 2005 educational evaluation report indicating difficulty in this area (Dist. Ex. 10 at p. 3). However, the objectives as written do not contain sufficient specificity by which to guide instruction,

evaluate the student's progress or gauge the need for continuation or revision of the objectives (Dist. Ex. 2 at p. 6). For example, one objective states that the student will "understand the language necessary to solve word problems" with mastery at the 80 per cent level, but does not describe how the student would demonstrate this understanding (id.). All of the objectives for the student's math goal indicate that evaluation will be conducted using "recorded observations, as assessed by the special education teacher" but do not provide any criteria by which these assessments and observations would have been measured (id.). In addition, although the evaluator noted that the student's performance on the numerical operations subtest of the WIAT-II suggested that "her addition and subtraction math facts are automatic," the IEP continues to include objectives related to addition and subtraction (Dist. Ex. 10 at p. 3; Dist. Ex. 2 at p. 6).

The student's 2005-06 IEP also contains a study skills goal with one objective to address attending skills (Dist. Ex. 2 at p. 5). Lack of attention was not reported as a problem by any of the student's teachers and the student achieved a score in the high average range on the working memory index of the WISC-IV (Dist. Ex. 9 at p. 5).

In the area of social emotional skills, the IEP contains a goal with objectives related to initiating and maintaining social interaction with both peers and adults (Dist. Ex. 2 at pp. 6-7), inconsistent with reports in the record indicating that the student "easily engaged in conversation about a variety of topics both adult and self selected" and "should work on eliminating private conversations with her friends during class time" (Dist. Ex. 9 at p. 1; Dist. Ex. 8 at p. 3). However, progress reports from the student's teachers at Kildonan consistently indicated that the student needed to participate more in class and add her own insights to the class discussions (Dist. Ex. 8), and respondent's CSE chairperson also testified that the student was reluctant to participate in class discussions (Tr. p. 155), yet the IEP does not contain goals and objectives which specifically address this identified need.

Overall, the goals and objectives in the 2005-06 IEP do not accurately reflect the student's needs and her present levels of performance. Additionally, the goals are not measurable and are too vaguely stated to meet the requirements set forth in state and federal regulations. For example, the goals recite generally that the student should "demonstrate an improvement . . ." (Dist. Ex. 2 at pp. 4-7) without articulating criteria or standards of measurement to assess improvement. The impartial hearing officer's conclusion that the goals were capable of implementation and blanket statement that the student's knowledge would grow is not supported is not supported by the record because the goals were not based upon an accurate statement of the student's needs, and because the goals and objectives are not only vague but inaccurate and not aligned with the student's actual needs. I disagree with the impartial hearing officer's conclusion that the IEP was reasonably calculated to confer educational benefit because, based upon the current evaluative data in the record, the goals and objectives are not reflective of the student's present levels of performance and are not aligned to address those needs. As a result the IEP is not reasonably calculated to enable this student to receive educational benefit (see Rowley, 458 U.S. at 206, 207). Although it is suggested in the record that the recommended program would have addressed many of the student's needs, without a

detailed description of the student's present functioning and appropriate goals and objectives, it is not possible to conclude what specific instruction would have been provided to her. I conclude that the 2005-06 IEP failed to offer petitioners' daughter a FAPE.[5]

Having determined that petitioners' daughter was not offered a FAPE by respondent for the 2005-06 school year, I must now consider whether petitioners established that Kildonan offered an educational program which would meet the student's special education needs during that school year (Burlington, 471 U.S. 359; Application of the Bd. of Educ., Appeal No. 05-015). In order to meet that burden, the parents must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

There is sufficient evidence in the record to conclude that the student's special education needs were met during her 2004-05 school year at Kildonan and to anticipate that they would continue to be met during the 2005-06 school year. While noting that petitioner mother provided limited testimony at the impartial hearing and was the only witness for petitioners, as discussed above, I also note the test scores and Kildonan records that are a part of the record.

On testing conducted during the 2004-05 school year, the student performed in the low average range on measures of mathematics skills, and written language skills (Dist. Ex. 10). The evaluator reported that when reading aloud, the student read slowly and frequently lost her place, and often placed emphasis on the wrong syllables of words (Dist. Ex. 10 at p. 3). Additionally she exhibited difficulties in the areas of spelling, math reasoning, and numerical operations such as multiplication, division, and fractions (Dist. Ex. 10 at p. 1).

The record demonstrates that the Kildonan placement was appropriate to meet the student's needs at the time placement was effectuated and that the student's academic needs were in fact addressed by the private school. At Kildonan, the student participated in a one-to-one tutorial designed to address her strengths and weaknesses in the areas of reading, writing, and spelling (Tr. p. 292; Dist. Ex. 8 at p.3). Petitioner mother testified that the student's tutoring was "at her pace" and that the tutor provided review of information as required (Tr. p. 292). Notes from the tutor in March 2005 indicate that during language training sessions the student worked on handwriting, phonetic concepts, spelling, fluency, sentence structure, and writing paragraphs (Dist. Ex. 8 at p. 3). The student practiced typing as well as handwriting her compositions, which included expanded paragraphs (Dist. Ex. 8 at p. 3). Notes from the student's seventh grade math teacher in March 2005 indicate that instruction focused on multiplying and dividing, as well as prime and composite numbers and factorizations (Dist. Ex. 8 at p. 4) although respondent's CSE chairperson testified that the CSE questioned whether a standard math curriculum was utilized at Kildonan (Tr. pp. 159-60). An observation of the student at Kildonan was conducted by the district special education department chairperson in March 2005. The observation occurred in a history class and the chairperson reported that the teacher was teaching in a lecture style and had distributed typed "fill in the blank" notes for the students to complete while he read them aloud (Dist. Ex. 12 at p. 2). Petitioner's daughter was reported to be prepared with the necessary materials, attentive, answering questions, and interacting with her teacher and the other students (id.).

Based upon the record and under the circumstances of the present case, I find that Kildonan was an appropriate placement for this student for the 2005-06 school year. The program selected by the parents was appropriate to meet the student's special education needs for the 2005-06 school year.

The final criterion for an award of tuition reimbursement is that the parents' claim be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; Mrs. C v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]); see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]). Such considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). With respect to equitable considerations, a parent may be denied tuition reimbursement upon a finding of a failure to cooperate with the CSE in the development of an IEP or if the parent's conduct precluded the CSE's ability to develop an appropriate IEP (Warren G. v. Cumberland Co. Sch. Dist., 190 F.3d 80, 86 [3rd Cir. 1999]; see Application of the Bd. of Educ., Appeal No. 04-102; Application of the Bd. of Educ., Appeal No. 04-026). The record reveals that petitioners attended and participated in the CSE meeting and there was no evidence of any lack of cooperation with respondent's CSE in the student's evaluations and in preparing the student's IEP. In the absence of any other equitable factor, I find that petitioners' claim for tuition reimbursement is supported by equitable considerations.

## THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.

Dated:     Albany, New York
           March 1, 2006                    _____
                                            PAUL F. KELLY
                                            STATE REVIEW OFFICER

[1] The New York regulation regarding the 45 day limit was one of a group of regulations that were alleged to violate procedural due process in a complaint in the District Court of the Southern District of New York, however the court held that such regulations were in fact contemplated by IDEA (Does v. Mills, 2005 WL 900620 (S.D.N.Y.).

[2] Application of a Child with a Disability Appeal No. 05-086 determined that an impartial hearing officer properly declined to grant a request by petitioner's counsel for an adjournment made at the hearing after earlier in the day acceding to petitioner's counsel's demand for a hearing "that day" and driving two hours to preside at the evening hearing. Petitioner's counsel in that matter is the same as petitioner's counsel in the instant case. A petitioner should not request an impartial hearing and then impede the impartial hearing process (see generally, Application of a Child with a Disability, Appeal No. 04-105; Application of a Child with a Disability, Appeal No. 04-010)).

[3] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEIA], Pub L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute as it existed prior to the 2004 amendments. The relevant events in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA, therefore, the provisions of the IDEIA do not apply.

[4] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and

without charge;

(B) meets the standards of the State educational agency;
(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and,
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
20 U.S.C. § 1401[8]; see also 34 C.F.R. § 300.13; 20 U.S.C. § 1414[d].

[5] This determination would remain if during the administrative hearing the burden had been placed on the parents, the parties challenging the IEP, as the Supreme Court recently established in Schaffer v. Weast, 126 S. Ct. 528, 537 (2005) (see Application of the Bd. of Educ., Appeal No 05-120).

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

LAURA DAVIS and EDWARD DABROWSKI

        as parents of a disabled student, C.D.

             Plaintiffs,

                                          **COMPLAINT**

     -against-                            **INDEX NO.**


CARMEL CENTRAL SCHOOL DISTRICT,

Defendant.

---------------------------------------------------------------X

## PRELIMINARY STATEMENT

    1.    Plaintiffs are the parents of a disabled child and seek relief pursuant to the Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. §1415.  The IDEA authorizes this Court to award all appropriate relief for violations of this federal statute, including, but not limited to declaration of a parent-selected private school placement as proper for the child. Plaintiffs were the prevailing party in an IDEA administrative hearing that arose from a disagreement with the defendant Board of Education of the Carmel Central School District regarding the Plaintiffs' disabled child's eligibility for IDEA entitlements to appropriate special education services.

    2.    In achieving prevailing party status at the administrative hearing, Plaintiffs obtained relief from a State certified trier of fact.  Thereafter, when the school district appealed to the

State Review Officer, they were denied access to any and all appropriate relief.  That SRO decision dated November 14, 2007, is appealed herein, see SRO Decision 07-114.

3.  Plaintiffs now seek reversal of the 07-114 State Review Officer's decision requesting application of and deference to, the two previous, unappealed SRO decisions, reinstatement of the hearing officer's decision and declaration that the 2006-07 Individualized Education Plan ("IEP") provided by the Defendant School District denied the student access to a free appropriate public expense.

## JURISDICTION AND VENUE

4.  This Court has original jurisdiction of this action under the IDEA, 20 U.S.C. 1415(e)(4)(A); as well as 28 U.S.C. §§1331 and 1343(a)(4).  This Court is authorized to grant the requested prospective, declaratory and injunctive relief pursuant to 28 U.S.C. §2201-02.

5.  The venue for this action lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391.  The Southern District of New York is the judicial district in which both the defendant operates and Plaintiff, and disabled daughter, reside, and in which the claim arose.

## PARTIES

6.  Plaintiffs Laura Davis and Edward Dabrowski ("plaintiffs" hereafter) are the parents of Chloe D. ("the student" hereafter) and residents of the Defendant CARMEL CENTRAL SCHOOL DISTRICT.  Laura Davis resides at 76 Bryant Trail, Carmel, N.Y. 10512 and Ed Dabrowski resides at 256 North Terry Hill, Carmel, New York 10512.

7.  Defendant Carmel Central School District ("Defendant School District" hereafter) is the Board of Education for the local education agency responsible for the provision of

2

appropriate special education and related services to children classified under the IDEA as disabled who reside in its district. The Defendant is responsible for the development and provision of an Individualized Education Plan (hereafter "IEP") for the student prior to the start of each school year, including 2006-07. At all relevant times, Defendant has classified the student as eligible for IDEA services and an IEP under a classification of "Learning Disabled".

## BACKGROUND FACTS

8. Herein, as they had in each of the two prior school years, Plaintiffs seek an order declaring their 2006-07 alternative private school placement of the student at Kildonan School, in Amenia, New York, appropriate and proper. This placement in 2006-07 represented a continuation of the appropriate education as defined in prior school years by the State Education Department, see **SRO Decisions, Appeal No. 05-063 and Appeal No. 06-005**.

9. Plaintiffs first raised their complaints regarding the provision of special education by the Defendant School District to their disabled daughter on August 19, 2004. They had rejected the public school's proposed placement and removed the student two years earlier.

10. Plaintiffs objections to Defendant's actions were sustained and appropriate declaratory and prospective relief was granted for 2004-05, **SRO Decision, Appeal No. 05-063**. One basis of the instant claim, regarding 2006-07, is that the Defendant School District continued to violate Plaintiffs' IDEA rights in each of the subsequent school years and in precisely the same ways as deemed illegal in 2004-05. For 2006-07, the Defendant proposed a similar placement for the student as was proposed and deemed inadequate in 2004-05.

11. In 2004-05, the proposal was for the student to be removed from the intensive, special private school where she had demonstrated success, and returned to the public school

with much less support and special assistance. The IEP called for special education classes part-time in English, math and reading. The remainder of the student's day was proposed for general education with supplemental services in the form of a resource room, see page 4, of the unappealed **SRO decision No. 05-063**.

12.  As mandated by the unappealed **SRO decision No. 05-063,** the student was entitled to appropriate educational placement at the parent-selected alternative private school, Kildonan. That final decision, dated August 10, 2005, finally concluded that a free appropriate public education had been denied where there was no "*contribution [to the IEP] from the proper regular education teacher*", p. 8.

13.  As mandated by the unappealed **SRO decision No. 05-063,**  the student was entitled to an IEP developed by individuals who had considered, i.e. reviewed and discussed the test results performed by the student then-current educators at Kildonan, p. 10. The SRO held that the student was entitled to an IEP which adequately describes the students present levels of performance with a "*meaningful description of the student's abilities and needs, or suggest specific deficits that need to be addressed*", p. 10. The SRO put the Defendant on notice that the student's IEP had to indicate if the student needs to improve her decoding skills, reading comprehension skills or some other aspect of reading such as fluency.

14.  As mandated by the unappealed **SRO decision No. 05-063,** the student was entitled to an IEP which stated what grade level material the student was capable of reading, p. 10. The SRO notified the Defendant that the student was entitled to an IEP with appropriate evaluations and anecdotal information to serve as a "*baseline from which to project goals and objectives*", p. 10.    The SRO notified the Defendant that the student was entitled to an IEP with appropriate short-term objectives to determine "*what intermediate progress the student*

4

*would have been expected to achieve*".    Additionally, he declared that vague and immeasurable goals were "*not reflective of the student's present levels of performance and therefore are not reasonably calculated to enable this student to receive educational benefit*", **p. 11**.

15.   The SRO finally declared that, for this student, an IEP that was not based upon properly-composed CSE, sufficient evaluations and inappropriate goals and objectives, constituted a denial of FAPE to the student, see 2004-05 decision, at **p. 11**.

16.   In the SRO's decision brought before this Court herein, i.e. **SRO decision 07-114**, the SRO relied upon "*[t]he student's prior educational history described in Application of a Child with a Disability, Appeal No. 05-063...*" but declared that only issues "*raised in [the parents'] due process complaint notice*" could be considered by the hearing officer, **p. 6**.

17.   During 2006-07, the Defendant continued in violation of the prior SRO decisions regarding adequacy of the IEP.   Defendant refused to pay for Kildonan, regardless of the unappealed SRO decision and order.

18.   The District did not correct, revise or modify its IEP for 2005-06 to conform to the State's decision.   The plan once again proposed a placement into the public high school with special classes part-time for reading and math (but not English) and general education classes with supplemental services, i.e. consultant teacher services (not resource room support) for social studies, science and English, see page 3, of the unappealed **SRO decision No. 06-005**.

19.   On August 18, 2005, the parents once again objected and yet another impartial hearing was undertaken.   On March 7, 2006, the SRO issued a final decision holding once again concurring with the parents, declaring that the IEP was inappropriate /inadequate and

5

holding that the parents' unilateral private school placement at the Kildonan School was appropriate, see **SRO decision No. 06-005, pp 10-12**.

20.    On March 28, 2006, three weeks after receipt of the second SRO decision supporting the student's private placement at Kildonan, the Defendant re-convened its CSE to develop an IEP for the year in question here, 2006-07, see **Parents' Exhibit R**[1].

21.    The parents objected to the Defendant's continued, uncorrected, practice of convening a CSE that lacked essential membership. Defendant had once again not invited critical personnel to the planning meeting on March 28, 2006, see **record of testimony, at transcripts pp. 196-8**. The March 28, 2006 meeting was adjourned.

22.  On March 29, 2006, the parents wrote the Defendant explicitly objecting to the lack of input from critical personnel, including 9th grade teachers, and specifically requesting a proper constituted CSE "*as soon as possible*", **Parents' Exhibit D**.  Their request was altogether ignored.

23.  On May 24, 2006, Plaintiffs again provided written notice to the District reiterating their complaints and desire for a new and proper CSE review, see **Parents' Exhibit E**.  On July 13, 2006, Plaintiffs again notified the District in writing of their objection to the delay in providing them access to a properly-constituted annual review and valid IEP, **Exhibit F**.

24.  Plaintiffs sent a fourth letter notifying the Defendant of their desire to participate in the IEP development process, see **Exhibit #31**.  At this point, the parents asked the Defendant to ensure that current test results available from the student's current school should be

---

[1] References to any and all exhibits and/or transcripts of testimony correspond to the administrative record developed before the hearing officer and then reviewed by the SRO.  This administrative record shall be filed in its entirety by the State with the Clerk of this Court pursuant to statute.

obtained by the CSE and reviewed/discussed by the CSE,  **see Parents' Exhibit A and M, and Exhibit #31**.

25.  On July 14, 2006, the parents wrote the District to complain about the Defendant School District's failure to pay tuition for 2004-05, per the SRO decision, **Exhibit H**. Defendant's intentional and knowing refusal to acknowledge the SRO decision regarding 2004-05 and 2005-06 created on-going environment of discrimination and exclusion from the IEP development process.

26.  On July 26, 2007, the parents wrote a second letter reiterating their request for the District's consideration of the student's most recent report cards and testing, **Exhibit O**.  This too was ignored.

27.  On August 8, 2006, the District conducted testing of the student, see page 3 of **Exhibit R**.  The evaluator did not meet with, review or otherwise discuss the results with the parent, **see testimony at p. 612**.

28.  On August 10, 2006, at a CSE meeting called by the, a plan for placing the student at the regular high school was discussed see **testimony at p. 613**.  Once again, there was no contribution from a "*proper regular education teacher*", see **05-063, p, 8. and transcripts at p. 631, or see Exhibit GG.**  At the meeting, the improper teacher member confirmed that there was no possibility that she would have been the student's teacher", **p. 8**.

29.  On August 10, 2006, altogether ignoring the parents' position regarding the need for continued placement at Kildonan, the CSE yet again proposed the student for a "*placement at CHS [Carmel H.S.] She will receive Consultant Teacher for all academic classes, Special Class Reading, and Counseling as a Related Service. Goals, program and test modifications*

7

*were reviewed*", Id.  There was no consideration or review of current Kildonan test results nor was new anecdotal information considered, p. 3, **Exhibit 1D**.

30.  The CSE did not consider or include an adequate statement of the student's present performance as required by the SRO, see **p. 3, Exhibit 1D**.  At the August 10, 2006 meeting, no test results from Kildonan were reviewed, Id.  A high school special education teacher, Ms. Tomassi, globally reviewed the Defendant's August 8th testing data, **transcripts, p. 617**.  That explanation confused the parent because only standard scores were available; when she asked about the scoring, the parent was told that a standard score between 90 and 100 was average.  Later, she was told that a standard score of 80 was average, Id.  The chairperson of that August meeting agreed that review of test scores was *"a little confusing"*, **p. 130**.

31.  On August 10, 2006, the CSE explained to the parent that the proposed placement called for a placement into Defendant's "Consultant Teacher model", defined at 8 NYCRR 200.1 (m) and 200.6(d).  The placement was described to the parent *"as 15 children with disabilities, and that there was one teacher, one aide and that there were regular ed. children in the class and that the consultant teacher... said [they] don't let the regular ed. kids know that the disabled children are in the room, and in fact [the special education teacher] tend[s] to work more with the regular ed. children because the disabled children know the ropes"*, **p. 619, also see p. 9, Exhibit GG**.

32.  The CSE advised Plaintiffs that based on the student's standard scores, she would be placed in a consultant teacher model for everything except reading, p. 622.  The CSE recommended a goal for the student to assert herself and tell the teacher when and how she

8

needed IEP-mandated accommodations because the teacher could have as many as 125 students to keep track of, **pp. 623-4**.

33. Plaintiffs were not given a meaningful opportunity to participate in the development of IEP goals, **see p. 615, p. 627**. This substantially impeded their ability to make objections known to the Defendant. When the parent requested access to a copy of the goals that were being selected at the August 10, 2006 meeting for the student, she was given a single page, see **Parents' Exhibit C**. This did not reflect goals and/or objectives. It was merely a long list of school-based skills.

34. The parents were not provided a form of a draft IEP, **p. 539**, and the discussion of goals and objectives was undertaken in code, i.e. goal "147" was proposed for English, **p. 628**. Clearly, the parent was provided no opportunity of participating in this discussion, Id.

35. Plaintiffs were not provided an IEP developed by a proper CSE. At the August 10, 2006 meeting, only a consultant teacher model was considered; the teacher present did not work in any of the Defendant's consultant teacher programs, **p. 630**. She did not participate in the discussion about possible modifications or accommodations to the regular education curriculum, **p. 631, or see Exhibit GG**.

36. The CSE did not consider Kildonan test results as required in the past by the SRO and requested by the parents. The IEP developed by Defendant does not reflect what grade level material the student is capable of reading as previously required by the SRO. She reads 4th – 6th grade level books independently, **p. 633**, yet there was no discussion as to use of a textbook in English or science, **p. 632**.

37.   The CSE only considered one interim report card, (dated February 27, 2006), ignoring Plaintiff's request for consideration of evaluative information available about the student's current placement at Kildonan, **p. 639**.

38.   The CSE never considered the findings and conclusions of the SRO and no one on the CSE had read either of the two existing SRO decisions, **p. 640**.

### THE CLAIM HERE

39.   Based upon the above facts, Plaintiffs' complaint constitutes the same claim as raised for a third time.  The 2006-07 proposal called for placement of the student into the public school with part-time special class (this time only for reading) and general education classes with consultant teacher services for everything else, **Parents' R**.  According to the SROs prior decisions, the definition of a free appropriate education for the student in both 7th and 8th grades was at the Kildonan School yet the Defendant failed to consider this as an option.

40.   Plaintiffs and their disabled daughter were denied an appropriate IEP for 2006-07 in precisely the same manner that they were denied appropriate IEPs in 2004-05 and 2005-06.  Once again, there was no input from the student's current school or her teachers (i.e. Kildonan).  Not one person planning her education knew the student or the contents of the two SRO decisions, **transcripts p. 197**.

41.   Once again the IEP offered to the student here was developed by a CSE that did not include a regular education teacher who might have been assigned to teach the student as required by the prior SRO decisions, **p. 630**.

42.   The Defendant's own conduct compromised the parents' ability to address this.  Ten days prior to the start of school when Plaintiffs' notice to the Defendant regarding a

10

possible objection and/or claim 2006-07 was due, no notice of any specific IEP had been offered by Defendants.

43.  On August 23, 2006, Plaintiffs gave their ten-day notice by writing the Defendant School District explaining that they were rejecting the placement as described verbally at the August 10, 2006 CSE meeting and that they would continue the student at Kildonan School for 2006-07 at the District's expense, **p. 649, Joint Exhibit 2A.**  They also submitted the State's form for initiating due process, **Exhibit 2B.**

44.  As of August 23, 2006, the parent still had not been provided any form of an IEP, **pp. 646-7.**  Again, they had requested, but were not provided the following:  notice of specific goals and objectives; an IEP statement of proposed program modifications, and/or a class schedule, **p. 648**.

45.  Plaintiffs received a final IEP on August 27, 2006 and immediately wrote to express further objection to the IEP's reflection of placement into 10$^{th}$ grade English, see **Exhibit S and T**.  The parent also called the District to address specific concerns, **p. 651-2**, i.e. IEP called for the student to attend a 10$^{th}$ grade English classes at the high school.    The CSE did not reconvene nor respond to the parent prior to the start of school.  The CSE did not request clarification of the parents' objections.

46.  The IEP provided at the end of August 2006 was **Exhibit T**, and called for placement into a 10$^{th}$ grade English class**, p. 652.**  The IEP in effect for this eligible handicapped child at the start of the school year called for placement into 10$^{th}$ grade English class.

47.  The parent reiterated the request for impartial hearing on September 15, 2006 stating that the District's plan for placing their daughter into general education classes with

11

consultant teachers who focused their services on the non-disabled students was inappropriate, see **District Exhibit #2C**. This objection was not a new one. This objection was not reviewed or considered by the SRO.

48. By September 15, 2006, the District had full *"awareness and understanding of the issues forming the basis of the complaint"*, **p. 7, SRO Decision 07-114**. It was the third consecutive school year wherein the parents rejected the public school placement in favor of special private day school for dyslexia.

49. Defendant waited until it was too late to move to correct and notify the parents of actual "clerical errors" to the proposed IEP, see earlier correspondence at **Exhibit #32, #45**. The corrected IEP was received on September 14, long after the start of school, and placements had to be made.

50. At hearing, Plaintiffs argued that many of the specific issues raised regarding the 2006-07 IEP had been litigated in prior proceedings and should not be re-heard. They argued the District was on notice of the long-standing objections held by the parents regarding the District's development of IEPs for their disabled child. They argued that further written notice to the District, including any amendments to the "due process complaint" is futile where the District maintains a policy and practice of refusing and/or failing to concern itself with their complaints and corresponding final administrative rulings.

51. The parents' complaints were originally raised and fully litigated in 2004-05, then again in 2005-06. Each time the parents prevailed on their claim and each time the District did not appeal beyond the SRO level. At hearing, the parents argued and prevailed, on their claim that Defendant's 2006-07 IEP denied the student access to a free appropriate public

12

education.  The Defendant offered the student an IEP that was clearly "uninspired" by any of the complaints registered by the parents, and by the corresponding SRO decisions.

52.  At the outset of the 2006-07 hearing, the hearing officer understood and observed that the Defendant's objections to the parents' written complaint notice was spurious.  The parents received a favorable decision from the Board-appointed impartial hearing officer declaring that the proposed 2006-07 IEP was improper and inappropriate, declaring that the parents' continuation of the student in her current placement at the Kildonan School was proper and holding the District responsible for full tuition.  Relief was based upon application of the facts to law and was warranted on all grounds.

53.  Herein, the Court is asked to review and reverse the SRO final decision, dated November 14, 2007 at **07-114**.  SRO Kelly abused judicial discretion and unfairly penalized the parents for not detailing what they did not yet know was specifically deficient and objectionable about the IEP, **SRO Decision 07-114, p. 6**.  It was inequitable and an abuse of discretion to dismiss the hearing officer's findings regarding issues not explicitly "*raised in respondents due process complaint notice*", **p. 7,** where parents had no reasonable prior notice of the IEP details and where the District had received substantial, specific notice via two SRO decisions and correspondence from the parents.

54.  The SRO committed error of law in ignoring the unappealed findings and conclusions promulgated by his two prior decisions.  Here, Defendant engaged in the same violations yielding multiple defects, procedurally and substantively, in the 2006-07 IEP.  The SRO arbitrarily disregarded what he had previously concluded was improper for the student in 2004-05 and 2005-06.

13

55. The SRO mischaracterized the evidence here and was too quick to side with the school district. There was an insufficiency of evaluative information considered at either CSE meeting, and goals and objectives were inappropriate, see **Exhibit T**, and SRO decisions. The CSE failed to carefully or accurately obtain and secure Kildonan test documents critical to the student's performance and did not consider term report cards or assistive technology evaluations. Indeed, the IEP generated at the meeting references only one interim, teacher report, see February 27th 2006 reports, **Exhibit R, also Exhibit T** ("Based Upon" section).

56. An allegedly "corrected version" of the IEP document was not prepared or offered to Plaintiffs until after the start of school and not received by the parents until more than 10 business days after notice to the District of their intent to place C.D. at Kildonan, see **Parents' Exhibit 2A and Parents' Exhibit U**.

57. Plaintiffs selected a near-by school for students with the same type of learning disability that they suspected their daughter to have, i.e. dyslexia. Plaintiffs reasonably calculated that the student could make progress in the areas of her disability as Kildonan is a school specially established to remediate such deficits. Kildonan has had thirty years to refine and revise their programs and develop systematic interventions for teaching the dyslexic child. The school is nationally recognized and responsible for providing teacher-training to regional public schools.

58. Finally, the parents' decision to continue the student at the Kildonan School during 2006-07, and while the District continued in breech of state rulings and law, was justified by the SRO's prior findings of the appropriateness of Kildonan for the student.


## FIRST CAUSE FOR RELIEF

14

57.  Plaintiffs carried their burden of proof as to Defendant's failure to comply with mandated procedural safeguards and SRO directives.  The District's failed to convene a properly-constituted CSE team to develop the student's 2006-07 IEP; this constituted a violation of the IDEA and case-specific SRO decisions.  The District failed to review, consider or discuss available test results and failed to provide meaningful interpretive information about psychometrics, i.e. standard scores.  The District failed to include an adequate statement of the student's present performance and failed to develop appropriate goals and short-term objectives.

58.  Based upon the above facts, the improper CSE composition, the insufficiency of the evaluations considered by the CSE and the inappropriateness of the goals and objectives listed in the IEP, all constitute a denial of a free appropriate public education.  This denial warrants appropriate relief pursuant to the Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. §1400, et seq.

## SECOND CAUSE FOR RELIEF

59.  Plaintiffs carried their burden of proof as to compliance with mandated substantive safeguards.  The IEP failed to offer the student a level of specially-designed supports to enable her to carry a regular high school course load, i.e. she had been appropriately removed from the regular high school for both 7th and 8th grades.  No evaluations supported a change in placement back to regular education.  Further, the IEP improperly called for the student to attend 10th grade English class, a level beyond her ability.  T

60.  Based upon the above facts, the proposed IEP, including placement, statement of needs and the goals and objectives are substantively inappropriate and constitute a denial of a

15

free appropriate public education. This denial warrants appropriate relief pursuant to the Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. §1400, et seq.

### THIRD CAUSE FOR RELIEF

61. At hearing, Plaintiffs established that the Kildonan School was both appropriate and least restrictive given the student's severe deficits in math, writing, reading and spelling. Updated evaluative information reflects that the student thrived in that restrictive setting and that those professionals familiar with her and her disabilities recommended and continue to recommend that she receive that level of support.

62. Based upon the above facts, the proposed IEP, including placement, statement of needs and the goals and objectives are substantively inappropriate and constitute a denial of a free appropriate public education. This denial warrants appropriate relief pursuant to the Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. §1400, et seq.

### FOURTH CAUSE FOR RELIEF

63. The equities weigh heavily in favor of granting Plaintiffs the requested declaratory relief that Defendant failed to provide a free appropriate public education prior to the start of the 2006-07 school year and that the student was properly placed by her parents that year at the Kildonan School.

64. Based upon the above facts, the Defendant violated Plaintiffs', and the student's, right to a proper and appropriate IEP pursuant to the Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. §1400, et seq, the federal regulations promulgated thereunder, Article 89 of the New York State Education Law, and the Regulations of the Commissioner of Education, Part 200. Defendant school district violation of the IDEA and case-specific administrative rulings, constituted a denial of a free appropriate public education.

16

63. Plaintiffs are herein entitled to all appropriate relief available under its provisions.

**WHEREFORE**, Plaintiffs respectfully request the following relief from the Court:

1. Assume jurisdiction over this action;

2. Conduct an independent review of both the administrative record, the three SRO decisions relevant to this case and supplementary evidence provided by Plaintiff;

3. Reverse and annul the decision of the State Review Officer denying deference to his findings;

4. Declare that the IEP developed for the 2006-07 school year continued to be inappropriate, procedurally and substantively;

5. Declare that parent's decision to maintain the student in her IDEA placement at the Kildonan School was proper and appropriate;

6. Declare that equitable considerations require declaratory relief;

7. Grant such other, further and different relief as the Court deems just and proper.

Dated: January 14, 2008                    Submitted by,

                                           **RosaLee Charpentier,Esq.**

                                           Bar roll # RLC-2515

                                           Family Advocates, Inc.

                                           **209 Clinton Avenue,**

                                           **Kingston, NY 12401**
                                           **Tel.: (845) 339-8080**

17

18

# EXHIBIT K

# In the Matter of CD and the Carmel Central School District

## STUDENT'S PENDENCY MOTION

I was appointed to hear this matter on November 27, 2007 by the Carmel CSD. The resolution period ended on January 4, 2008. On January 9, 2008 the record close date was extended to February 1, 2008. On January 31, 2008 the record close date was extended to February 28, 2008.

## POSITION OF THE PARTIES

A motion was made on behalf of the family to determine CD's pendency placement. It is the family's position "that the student's 'pendency' placement for the period beginning September 2007 and continuing through today's date is the Kildonan School. The parents request an order directing the School District to immediately undertake necessary steps to ensure the student's 2007-08 tuition payments are up-to-date." (Motion pg. 5) I note the 'today's date' as set forth on the motion is January 17, 2008.

The District maintains that it is not obligated under the pendency provisions of State or Federal law to make 2007/2008 tuition payments to Kildonan. It is also the position of the District that this motion only covers the period from the second week of September, 2007 through November 14, 2007.

## BACKGROUND

On August 19, 2004, the parents of CD rejected the District's proposed placement and IEP for the 2004/2005 school year. The parents requested an

impartial hearing to specifically review their claim that the student required one-to-one instruction for language arts, Id. The SRO, in his unappealed decision of August 10, 2005 (SRO Decision No. 05-063) affirmed the parents' position that the District's IEP was inappropriate and that the "unilateral placement [at Kildonan] was appropriate",

The parents did not agree with the IEP for the 2005/2006 school year. On August 18, 2005, the parents once again rejected the District's plan for CD and another impartial hearing was undertaken. On March 7, 2006, the SRO issued a final decision (SRO Decision No. 06-005) holding that the IEP was inappropriate and that the parents' unilateral placement at the Kildonan School was appropriate.

On August 23, 2006, the parents rejected the proposed IEP and placement for the 2006/2007 school year. An impartial hearing was undertaken regarding the 2006-07 year. On August 24, 2007, the impartial hearing officer issued a decision concluding that the student had been denied access to a free appropriate public education and declaring that the Kildonan School was the appropriate placement.

The District took an appeal to the SRO who on November 14, 2007 reversed the Hearing Officer's decision regarding FAPE and held in favor of the District (SRO Decision No. 07-114). The parents subsequently took an appeal from this decision to the United States District Court, S.D.N.Y. (08 Civ. 0445, Judge Karas, filed January 17, 2008), where the matter is now pending.

The District developed an IEP for the 2007/2008 school year. On August 22, 2007 the parents requested an impartial hearing to determine if a FAPE was offered for that school year. The parents

were seeking tuition payment at Kildonan for the 2007/2008 school year. By letter dated September 7, 2007 the parents withdrew the August 22, 2007 hearing request.

On November 19, 2007 the parent requested "an Impartial Hearing regarding the School District's failure to provide for 'pendency' placement during its appeal to the State Review Officer." This is the request that I was appointed to hear.

FINDINGS OF LAW

Application of a Child with a Disability, Appeal No. 02-068 clearly states that "the pendency provisions of the Individuals with Disabilities Education Act (IDEA) and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child (20 U.S.C. § 1415[j]; N.Y. Educ. Law section 4404[4]). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (Zvi D. v. Ambach, 694 F.2d 904 [2d Cir. 1982]; Drinker v. Colonial School Dist., 78 F.3d 859 [3d Cir. 1996]). The purpose of the pendency provision is to provide stability and consistency in the education of a child with a disability (Honig v. Doe, 484 U.S. 305 [1987]). It does not mean that a student must remain in a particular site or location (Application of the Bd. of Educ., Appeal No. 99-90) or at a particular grade level (Application of a Child with a Disability, Appeal No. 95-16).

The pendency provisions of the IDEA and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child (20 U.S.C. § 1415[j]; N.Y. Educ. Law section 4404[4]). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (Zvi D. v. Ambach, 694 F.2d 904 [2d Cir. 1982]; Drinker v. Colonial School Dist., 78 F.3d 859 [3d Cir. 1996]). The purpose of the pendency provision is to provide stability and consistency in the education of a child with a disability (Honig v. Doe, 484 U.S. 305 [1987]).

Under the IDEA, the inquiry focuses on identifying the child's then current educational placement (Zvi D., 694 F.2d at 906). Although not defined by statute, the term "then current placement" has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced (Application of a Child with a Disability, Appeal No. 97-80). The U.S. Department of Education has opined that a child's then current placement would " … generally be taken to mean current special education and related services provided in accordance with a child's most recent [IEP]" (Letter to Baugh, EHLR 211:481; see also Drinker, 78 F.3d at 867; Gregory K. v. Longview School Dist., 811 F.2d 1307 [9th Cir. 1987]).

The pendency provisions of the IDEA and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the school district otherwise agree, during the pendency of any

proceedings relating to the identification,
evaluation or placement of the child.  20 U.S.C.
§1415; N.Y. Educ. Law §4404(4).  The inquiry
focuses on identifying the child's then current
education placement.  This term has been found to
mean the last agreed upon IEP at the moment when
the impartial hearing was requested.  See
Application of a Child with a Disability, Appeal
No. 07-063; Application of a Child with a
Disability, Appeal No. 02-023; Application of a
Child with a Disability, Appeal No. 97-080.

Under the IDEA, the inquiry focuses on
identifying the child's then current educational
placement (Zvi D., 694 F.2d at 906). Although not
defined by statute, the term "then current
placement" has been found to mean the last agreed
upon placement at the moment when a due process
proceeding is commenced (Application of a Child
with a Disability, Appeal No. 97-80). However,
pursuant to 34 C.F.R. § 300.514(c) if the decision
of the SRO agrees with the child's parents that a
change of placement is appropriate, such placement
must be treated as an agreement between the state
or local agency and the parents for the purposes of
pendency (Schutz, 137 F. Supp. 2d 83).

Pendency has the effect of an automatic
injunction, which is imposed without regard to such
factors as irreparable harm, likelihood of success
on the merits, and a balancing of the hardships. It
is clear that a child shall remain in his or her
then current placement, unless the child's parents
and the school district otherwise agree, during the
pendency of any proceedings relating to the
identification, evaluation or placement of the
child.

It is not disputed that an Impartial Hearing
Officer found that Carmel did not offer CD a FAPE

04/15/2008 18:08 9149684915 NAUHMAN PAGE 04

for the 2006/2007 school. The Hearing Officer also
found that Kildonan was an appropriate. The parents
were awarded tuition at Kildonan. The District
appealed to the SRO. In decision No. 07-114, on
November 14, 2007, the SRO reversed the Hearing
Officer's decision regarding FAPE and held in favor
of the District. This SRO decision was not appealed
until January 17, 2008 (U.S.D.C., S.D.N.Y. (08 CIV.
0445) The parents also initiated a due process
proceeding on August 22, 2007 and withdrew that
proceeding on September 7, 2008.

The District is not responsible for the
2007/2008 Kildonan tuition.

200.5(2)(m) *Student's status during
proceedings.* (1) Except as otherwise provided
in paragraph (2) of this subdivision and
section 200.16 of this Part and Part 201 of
this Title, during the pendency of any
proceedings conducted pursuant to subdivisions
(j) or (k) of this section, unless the local
board of education and the parents otherwise
agree, the student shall remain in the then
current placement of such student. During the
pendency for any due process proceeding
relating to the evaluation and initial
placement in special education, unless the
local board of education and the parents
otherwise agree, the student shall not be
evaluated and shall remain in the then current
educational placement of such student or, if
applying for initial admission to a public
school, shall be placed in the public school
program until all such proceedings have been
completed.

There is currently no due process proceeding for
pendency to attach. On August 22, 2008, when a due
process proceeding hearing was requested, pendency
was the last unappealed SRO decision (No. 07-114)

denying tuition reimbursement. The parents withdrew
there due process request on September 7, 2008;
from that date through the present there are no due
process requests that the requested pendency could
attach. If there was a due process request;
pendency might have attached on January 17, 2008
when the when unappealed SRO decision (No. 07-114)
was appealed.

  For the purpose of this motion I need not and
have not made a decision regarding future pendency
and any future due process requests.

  I will allow the parents time to amend there
pendency request to include any other appropriate
due process requests.

**REGULATIONS OF THE COMMISSIONER OF EDUCATION 200.5**
(i) *Due process complaint notification requirements.* (1) A parent or school district
may file a due process complaint with respect to any matter relating to the
identification, evaluation or educational placement of a student with a disability,
or a student suspected of having a disability, or the provision of a free
appropriate public education to such student. The party presenting the
complaint, or the attorney representing such party, shall provide a written due
process complaint notice to the party, which shall include:
(i) the name of the student;
(ii) the address of the residence of the student or in the case of a
homeless student as defined in section 200.1(hhh) of this Part,
available contact information for the student and the name of the
school the student is attending;
(iii) the name of the school the student is attending;
(iv) a description of the nature of the problem of the student relating to
such proposed or refused initiation or change, including facts relating
to such problem; and
(v) a proposed resolution of the problem to the extent known and
available to the party at the time.
(2) A party may not have an impartial due process hearing until the party, or
the attorney representing the party, files a due process complaint notice
that meets the requirements of paragraph (1) of this subdivision.

(7) Amended due process complaint notice. (i) A party may amend its due
process complaint notice only if:

(b) the impartial hearing officer grants permission, except that the

impartial hearing officer may only grant such permission at any
time not later than five days before an impartial due process
hearing commences

An Impartial Hearing Officer may grant
permission to amend a due process complaint notice
at any time not later than five days before an
impartial due process hearing commences. In the
instant matter the impartial due process hearing
will not commence with in five days.

## ORDER

IT IS HEREBY ORDERED the parents request for
Kildonan tuition payments under the theory of
pendency is denied.

In addition, **IT IS HEREBY ORDERED** that an
amended due process complaint may be submitted on
or before March 3, 2008.

The amended complaint shall be submitted to:

Eric Nachman, Esq., IHO
245 Rumsey Road
Suite 2K
Yonkers, NY 10701
914-968-4915 Fax

Mike Lambert, Esq.
Shaw and Perelson, Esqs.
2-4 Austin Court
Poughkeepsie, NY 12603
845-486-4268 Fax

_____
Eric Nachman, I.H.O.

2/15/08
_____
Date

# EXHIBIT L

K. Rohe, CSE
Carmel School District
81 South Street
Patterson, New York 12563

**RECEIVED**

FEB 2 5 2008

Carmel Central School District
Pupil Services Department

February 22, 2008

Dear Ms Rohe:

We are the parents of Chloe Dabrowski. We are writing to re-instating
our request for hearing regarding the IEP for 2007/08 school year. As
you are aware have placed our daughter at the Kildonan School for
students with dyslexia, 425 Morse Hill Road, Amenia, New York 12501, and
seek full tuition and related costs.  We believe the proposed IEP is
inappropriate for Chloe Dabrowski (please include the contents of the
attached 10 day letter sent August 22, 2007 as part of this letter), and
nothing has been done by the district to correct  our objections.
Mr. Nochman has granted us the right to make this re-instated hearing
and claim as an amendment to the current hearing in front of him. Let us
know he is on track with this.
We "waive" the resolution meeting with K. Rohe.  We also demand that
due to the pendency of this part of the hearing, the District must pay
Kildonan to continue Chloe's education without interruption.  We re-
instate our request to the hearing officer for the stay put order and
ask he tell the District to make necessary payment arrangements with
Kildonan School.

Respectfully,

*Laura Davis*
Laura Davis
Mother

*Ed Dabrowski*
Ed Dabrowski
Father

*100 UO 2/25/08*

*76 Bryant Trail Carmel NY 10512*

**RECEIVED**

FEB 2 5 2008

**Carmel Central School District**
**Pupil Services Department**

RECEIVED

AUG 2 2 2007

Carmel Central School District
Pupil Services Department

Carmel School District
81 South St
Patterson, New York 12563
August 22,2007

### Re: We the parents of Chloe Dabrowski are requesting an Impartial Hearing.

Dear Ms Rohe:

We are the parents of Chloe Dabrowski. We are writing to inform you that we are rejecting the IEP for 2007/08 and will be unilaterally enrolling our daughter, Chloe Dabrowski at Kildonan School, 425 Morse Hill road, Amenia, New York 12501, 10th grade for the 2007/08 school year. We intend to seek full tuition reimbursement and all related costs. As for the IEP it has not been reasonably calculated to enable Chloe to receive educational benefits, we believe it will not produce progress, but instead Chloe will regression. The I.E.P. does not accurately reflects the results of evaluations to identify the Chloe's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services. The IEP does not provide visual, auditory, and kinesthetic presentations to supplement textbooks in subject matter courses.

Unlike the Carmel School District 2007-08 I.E.P., Kildonan is very appropriate for the needs of Chloe because it is meaningful progress that addresses her dyslexia, slow processing abilities, helps her decode, and repeats information and decoding so she can store information from her short term memory to her long term memory. At Kildonan Chloe is taught by a language tutor privately, therefore she is progressing in decoding, comprehension, vocabulary, and fluency because of her one-on-one private continued intensive work in reading. Chloe meets the admissions criteria for Kildonan in that she had at least an average IQ and solid cognitive functioning but also had difficulty or lags in basic language skills. Kildonan has a wait list and does not have any need to keep Chloe unless she fits the criteria for placement. The curriculum used by Kildonan is approved by New York State and designed to be multisensory in nature. Kildonan academic program revolves around the intensive, daily, one-to-one Orton-Gillingham tutoring, which structures and dictates the language training sessions, also influences all the subject matter teaching. All of Kildonan School's subject matter teachers are trained and mentored in Orton-Gillingham, as well as multisensory teaching methodology. Carmel does not have any of this. Chloe's tutor at Kildonan provides review of information. Chloe is able to work on her handwriting, phonetic concepts, spelling, fluency, sentence structure, and writing paragraphs. She is practicing typing as well as handwriting her compositions, which included expanded paragraphs.

We believe the proposed IEP is inappropriate for Chloe Dabrowski because The 2007-08 I.E.P. was improper due to the lack of parents participation; the goals

and objectives listed on the IEP were inadequate and failed to properly account for Chloe's present levels of performance; our unilateral placement of Chloe meets her needs and allowed her to progress; the I.E.P. has Chloe in regular education with a large class of students consultant for 39 min in English, 39 min. Math, 39 min. Science, 39 min. Social Studies, then Resource Room with no one who specializes in Orton-Gillingham method (which for four years has been the method of teaching Chloe successfully! and Special Class Reading with a ratio of 15 students <printed on the 7/16/07 I.E.P. for 2007-08 school year, which allows Ms. Paech to contend with a class full of students while trying to have students in "one-on-one" reading would create mere trivial advancement. To our knowledge 39 min would give Chloe at the most 5 min of one-on-one instruction? We know Chloe's scores would not continue to increase with 5 mins of one-on-one, her scores and success were from Kildonan School individual educational program of 45 min of one-on-one tutorial individually structured for Chloe's ability to learn" at her pace" (and only Chloe's learning style) and with a tutor in her day time study hall for an additional 45 min. as well as educators accredited in the Orton-Gillingham approach teacher her all day long (this adds 180 more mins of Orton-Gillingham teaching) for all her other academic classes at Kildonan. Ms. Paech would be hard pressed to say her 39mins. one-on-one in a class full of children could stuff in the full day of services Chloe has been receiving consistently to address her learning disability (dyslexia). Even the several SRO reports cite Chloe's success and proper placement at Kildonan. Chloe often needs information explained a second time or to spend additional time on a topic the IEP does not provide for this. We know that Chloe has benefited from an intensive study of the elements of the language; an exploration of the systematic, structured writing process; teaching of vocabulary, comprehension, pragmatics, and study skills; with lesson plans. Please inform the CSE committee that Kildonan teachers are mentored weekly in Orton-Gillingham method as well as being certified in Orton-Gillingham. Which of Chloe's teachers from the district meet weekly with a certified Orton-Gillingham instructional leader? How would the reading teacher overlap, code, and us system of symbolic relationships when teaching Chloe to master this in 5 min of one-on-one? Chloe's learning style requires her to read and reread in order to comprehend information.

I am very upset that the Carmel District Chairperson did not contact Kildonan to get proper information and input from Chloe's current educators. He stated he tried but do you think calling for Dr. Lanes input five minutes into the meeting counts as addressing Kildonan input! I was in the room when the chairperson called Dr. Lane five minutes into the May 7, 2007 meeting. The I.E.P. did not address our request for consideration of other placement options, in particular, special school options, like State Approved Private Schools for students with dyslexia. Our efforts to convey information I had on the Landmark School fell on closed ears at the May 7, 2007 meeting. As the I.E.P. states: page 5 "Out-of-District Options were brought up by parent" "the C.S.E. shared this would be too restrictive" THIS IS AN OUT AND OUT UNTRUTH. What really happened was that the Carmel District Chairperson disregarded my efforts to convey information I had on the Landmark School at the meeting. W<sub>RE</sub>C<sub>E</sub>C<sub>I</sub>V<sub>E</sub>D

RECEIVED

FEB 2 5 2008

Carmel Central School District
Pupil C...

RECEIVED

AUG 2 2 2007

Carmel Central School District
Pupil Services Department

discussion of State Approved Private Schools available to meet Chloe's disability (Dyslexia), I asked the Committee to consider Landmark, but he stopped all discussion. My participation was significantly impeded by not having based respect for my input and questions during the formulation of the IEP. My involvement was made to be completely superficial and disrespected. He stated he had no knowledge of State Approved School, and that "I sprung this on him". I came to this meeting thinking that the Chairperson was knowledgeable about the options for Chloe but he turned red and shut down my conversation by stating he would "look into the out-of -state options and get back to me. Instead I was given the May7, 2007 I.E.P. on July, 6, 2007 with this fictitious account of what occurred: page 5 "Out-of District Options were brought up by parent" "the C.S.E. shared this would be too restrictive". My participation was significantly impeded by not having based respect for my input and questions during the formulation of the IEP.

In particular, we want a program that revolves around intensive, daily, one-to-one private Orton-Gillingham tutoring which structures and dictates the language training sessions, and also influences the subject matter teaching, because that is what works for years for Chloe's learning style. We want a program where visual, auditory, and kinesthetic presentations supplement textbooks in Science, Global Studies, Math, and English courses. Chloe has already received resource room and consultant teacher services to assist her in her first grade classroom, and in second through fourth grades without success in the Carmel School District. Chloe was placed in integrated classrooms where she received varying levels of consultant teacher services and the result was that her processing speed continued to slow down each year. Even during Chloe's testing last year it was noted that Chloe's response to test items was delayed. As compared to same-age peers, Chloe's performance is low average in Mathematics and written expression; and low average in broad reading, basic reading skills, math calculation skills, and written language skills Based on the results of the Carmel School district testing, in our opinion Chloe would find age-level tasks requiring computational skills and automaticity with basic math facts difficult. In addition, due to delays in processing speed and on tasks requiring visual perceptual speed, we are aware that Chloe would find age-level tasks requiring "cognitive speediness" VERY difficult.

RECEIVED   FEB 2 5 2008

Carmel Central School District
Pupil Services Department

At Kildonan Chloe has been able to study phonetic concepts and sentence types, and learned to write basic paragraphs in a one-on-one tutorial for 45min. with educational program of 45 min of one-on-one private tutorial, individually structured for Chloe's ability to learn (and only Chloe's learning style) and with a tutor in her day time study hall for an additional 45 min, as well as educators accredited in the Orton-Gillingham approach teacher her all day long (this adds 180 more mins of Orton Gillingham teaching) for all her other academic classes at Kildonan.

In math, Chloe continues to learn how to master using a calculator and to have difficulty with reaching a level of automaticity with pre-algebra & algebra. The

RECEIVED

AUG 2 2 2007

Carmel Central School District

Carmel School District I.E.P. would have Chloe in an geometry & trigonometry class!!! Chloe is also very limited on tasks requiring visual perceptual speed, so how would she keep up with other class members in her English, Global Studies, Science, and Math, course work. She has significant weaknesses in spelling which could not be addressed by the Carmel School District's I.E.P.

Chloe will not succeed in the Carmel school system due to her slow processing speed and her problems with reading, and we observed that Chloe has succeeded with Kildonan one-to-one instruction for language arts and also Chloe having assertion that she had dyslexia. In addition:

1) The CSE meeting for the May 7, 2007 was not run by a qualified, informed administrator/ Chairperson, and the regular education teacher did not serve a critical role in participating in the review and revision of Chloe's I.E.P, including the determination of appropriate behavioral interventions and strategies and the determination of supplementary aids and services, program modifications, and support for school personnel. She did not participate in discussions and decision about how to modify the general curriculum in the regular classroom to ensure Chloe's involvement and progress in the general curriculum and participation in the general education environment

2) The CSE meeting for the July 6, 2007 meeting was without a five-day notice.

3) The CSE meeting for the July 9, 07 was canceled on July 8, 07!!!

4) The CSE composition for a July 16, 07 was not held with the parent's participation, even though the district receptionist, Lisa from your office called my husband Peter LaPlaca stating such. Peter then had our lawyer call your lawyer to confirm I was on family medical leaving for care of my mother who at the time was diagnosed with stage 4-pancreatic cancer. I believe the resulting I.E.P. is seriously compromised by not having our input. The result is that my daughter, Chloe Dabrowski, has been denied educational benefits. And it is unclear how the CSE determined appropriate goals and objectives for our daughter?

We feel the purpose behind the Individuals with Disabilities Education Act is to ensure that due to Chloe having a disability she needs to have available special education and related services designed to meet her unique needs, provided in conformity with a comprehensive written IEP. As we have stressed in the May 7, 2007 meeting we were willing to a program approved by the state but our request was terminated page 5 May 7, 2007 I.E.P. We feel you have not demonstrated the appropriateness of the program recommended by the Carmel School district CSE because the CSE did not complied with the procedural requirements set forth in the IDEA, and the IEP developed by Carmel's CSE was not reasonably calculated to enable Chloe to receive educational, seriously infringed on the parents' opportunity to participate in the IEP formulation process. Therefore we have great concern over Chloe's ability to be successful in the general education environment, even with additional support .

The IEP also does not have benchmarks or short-term objectives, related to meeting Chloe's needs arising from her disability to enable her to be involved in

RECEIVED FEB 25 2008
Carmel Central School District
Pupil Services Department

RECEIVED
AUG 2 2 2007
Carmel Central Scho
...l Services Dep

and progress in the general curriculum, and meeting Chloe's other educational needs arising from her disability. In addition, by not having us (the parents) at the IEP we do not know how Chloe's progress towards the annual goals will be measured and how we would have been informed of such progress?

I am also concerned about Chloe's self-esteem decreasing as she has stated being fearful of attending the Carmel High school and states that at Kildonan she has regained a desire to succeed. At Kildonan Chloe has been prepared with the necessary materials, attentive, answering questions, and interacting with her teacher and the other students. She told me this is because she identifies with these students and feel she is not just a disability but also a whole person.

If you feel as we do that the district has not reviewed the evaluations completely, we invite you to either do so, or refer Chloe back to the Carmel School District for evaluation, if need be.

Ms. Rohe, Chloe's I.E.P. is extremely important to us! We want our daughter to be afforded to proper education, Once again, Kildonan is not in the market for keeping children past completion of meet the criteria for needing Kildonan population and learning methods. You are aware that there is a wait list of children with diagnoses of dyslexia wait to get into Kildonan. Chloe continues to need the Orton-Gillingham one-on-one teaching. Especially Chloe seeing as the Carmel School District is extremely late in paying the tuition even when Chloe had Status Quos. **We are requesting an Impartial Hearing.**

Sincerely,

Laura Davis
Mother

Ed Dabrowski
Father

**RECEIVED**
AUG 2 2 2007
Carmel Central School District
Pupil Services Department

**RECEIVED**
FEB 2 5 2008
Carmel Central School District
Pupil Services Department

Laura Davis ~ 76 Bryant Trail ~ Carmel ~ NY ~ 10512 ~ 845-225-1304

# EXHIBIT M

# In the Matter of CD and the Carmel Central School District

## Accept Parents Due Process Complaint
## STUDENT'S PENDENCY MOTION

I was appointed to hear this matter on November 27, 2007 by the Carmel CSD. The resolution period ended on January 4, 2008. On January 9, 2008 the record close date was extended to February 1, 2008. On January 31, 2008 the record close date was extended to February 28, 2008.

Pursuant to my decision dated that should have been dated February 15, 2008 and **REGULATIONS OF THE COMMISSIONER OF EDUCATION 200.5**

(i) *Due process complaint notification requirements.* (1) A parent or school district may file a due process complaint with respect to any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student. The party presenting the complaint, or the attorney representing such party, shall provide a written due process complaint notice to the party, which shall include:
(i) the name of the student;
(ii) the address of the residence of the student or in the case of a homeless student as defined in section 200.1(hhh) of this Part, available contact information for the student and the name of the school the student is attending;
(iii) the name of the school the student is attending;
(iv) a description of the nature of the problem of the student relating to such proposed or refused initiation or change, including facts relating to such problem; and
(v) a proposed resolution of the problem to the extent known and available to the party at the time.
(2) A party may not have an impartial due process hearing until the party, or the attorney representing the party, files a due process complaint notice that meets the requirements of paragraph (1) of this subdivision.

(7) Amended due process complaint notice. (i) A party may amend its due process complaint notice only if:

(b) the impartial hearing officer grants permission, except that the

<u>impartial hearing officer may only grant such permission at any
time not later than five days before an impartial due process
hearing commences. (Underlining added)</u>

I hereby accept the amended due process
complaint and hearing dates shall be scheduled.

In addition, the parents are requesting a
pendency decision regarding payment of 2007/2008
Kildonan tuition. I hereby grant all parties until
March 11, 2008 (I will be out of town from March 5th
to 10th 2008) to answer the pendency motion.

I respectfully request that all parties supply
hearing availability dates. I am available the
weeks of March 17 and March 31.


_____          _____
                                        2/26/08
Eric Nachman, I.H.O.                      Date

To:

Mike Lambert, Esq.
Shaw and Perelson, Esqs.
2-4 Austin Court
Poughkeepsie, NY 12603
845-486-4268 Fax

RosaLee Charpentier, Esq.
Family Advocates, Inc.
209 Clinton Avenue
Kingston, NY 12401
845-339-8089 (fax)

Laura Davis and Edward Dabrowski
76 Bryant Trail
Carmel, NY 10512

Eric Nachman
Attorney-at-Law
Suite 2K
245 Rumsey Road
Yonkers, NY 10701
914-963-7381
914-968-4915 fax



February 28, 2008

Michael Lambert, Esq.
Shaw and Perelson, Esqs.
2-4 Austin Court
Poughkeepsie, NY 12603

   And by fax:  845-486-4268

RosaLee Charpentier, Esq.
Family Advocates, Inc.
209 Clinton Avenue
Kingston, NY 12401

   And by fax:  845-339-8089

Laura Davis and Edward Dabrowski
76 Bryant Trail
Carmel, NY 10512

Re: Chloe Dabrowski, Student


   Enclosed please find my reply and Orders
regarding Mr. Lambert's February 26, 2008 letter.

Respectfully,

Eric Nachman, Esq., IHO

# In the Matter of CD and the Carmel Central School District

## TIME LINES
## AND
## STUDENT'S PENDENCY MOTION

I was appointed to hear this matter on November 27, 2007 by the Carmel CSD. The resolution period ended on January 4, 2008. On January 9, 2008 the record close date was extended to February 1, 2008. On January 31, 2008 the record close date was extended to February 28, 2008.

I am in receipt of a letter dated February 26, 2008 from Michael Lambert, Esq., attorney for the District.

Mr. Lambert is correct in noting that when an amended due process complaint is filed, all applicable are reset.

(7) Amended due process complaint notice. (i) A party may amend its due process complaint notice only if:
(a) the other party consents in writing to such amendment and is given the opportunity to resolve the complaint through a meeting held pursuant to subdivision (j)(2) of this section; or
(b) the impartial hearing officer grants permission, except that the impartial hearing officer may only grant such permission at any time not later than five days before an impartial due process hearing commences
(ii) The applicable timelines for an impartial due process hearing, including the timelines for the resolution process, shall recommence at the time the party files an amended due process complaint notice.

I am also in receipt of and accepted the parents amended due process complaint. The complaint is stamped RECEIVED FEB 25 2008 Camel Central School District Pupil Services Department.

The timelines have therefore recommenced as of
February 25, 2008 and will run from that date.

The parents in the amended due process
complaint have waived the resolution meeting; the
District has not.

200.5(2) Resolution process. (i) Resolution meeting. Prior to the opportunity for
an impartial due process hearing under paragraph (1) of this subdivision, the
school district shall, within 15 days of receiving the due process complaint
notice from the parent, convene a meeting with the parents and the relevant
member or members of the committee on special education, as determined
by the school district and the parent, who have specific knowledge of the
facts identified in the complaint, which shall include a representative of the
school district who has decision-making authority on behalf of the school
district and may not include an attorney of the school district unless the
parent is accompanied by an attorney, where the parents of the student
discuss their complaint and the facts that form the basis of the complaint,
and the school district has the opportunity to resolve the complaint. The
school district shall take steps to ensure that one or both of the parents of
the student with a disability are present at the resolution meeting, including
notifying parents of the meeting early enough to ensure that they will have
the opportunity to attend and scheduling the resolution meeting at a
mutually agreed on time and place and in a location that is physically
accessible to the parents.
(ii) When conducting meetings and carrying out administrative matters
(such as scheduling) under this paragraph, the parent and the school
district may agree to use alternative means of meeting participation,
such as video conferences and conference calls.
(iii) Waiver of resolution process. The parent and the school district may
agree, in writing, to waive the resolution process or agree to use the
mediation process described in subdivision (h) of this section to
resolve the dispute.

(v) Resolution period. If the school district has not resolved the due
process complaint to the satisfaction of the parents within 30 days of
the receipt of the due process complaint notice, the impartial due
process hearing may occur consistent with the time period provided in
section 200.5(j)(3)(iii) of this Part.
(vi) Failure to convene or participate. Except where the parties have
jointly agreed to waive the resolution process or use mediation, the
failure of a parent filing a due process complaint to participate in the
resolution meeting will delay the timeline for the resolution process
and due process hearing until the meeting is held.
(a) If the school district is unable to obtain the participation of the

parent in the resolution meeting after reasonable efforts have
been made (and documented), the school district may, at the
conclusion of the 30-day period, request that an impartial hearing
officer dismiss the parents' due process complaint.
(b) If the school district fails to hold the resolution meeting within 15
days of receipt of the parents' due process complaint or fails to
participate in the resolution meeting, the parent may seek the
intervention of the impartial hearing officer to begin the due
process hearing timeline.

The parents, in the amended due process
complaint, state "We reinstate our request to the
hearing officer for the stay put order and ask he
tell the District to make necessary payment
arrangement with Kildonan School." I will accept
the parents request for a stay put order and
2007/2008 tuition payments at Kildonan. I hereby I
hereby grant all parties until March 11, 2008 (I
will be out of town from March 5$^{th}$ to 10$^{th}$ 2008) to
answer the stay put request (pendency motion).

This request will be heard simultaneous with
the resolution process. Murphy v Arlington Central,
297 Fed3d 195 (CA2, 2002), held:

During the pendency of these administrative proceedings, the IDEA mandates that
"unless the State or local educational agency and the parents otherwise agree, the child
shall remain in the then-current educational placement of such child . . . ." 20 U.S.C. §
1415(j). "[I]mplicit in [this provision] is the requirement that a school district continue to
finance an educational placement made by the agency and consented to by the parent
before the parent requested a due process hearing. To cut off public funds would amount
to a unilateral change in placement, prohibited by the Act." *Zwi D. v. Ambach*, 694 F.2d
904, 906 (2d Cir. 1982)

While continuing to pursue their administrative remedies, plaintiffs filed a motion before
the district court seeking an order to compel defendant to pay Joseph's tuition for the
1999-2000 school year during the pendency of the administrative process. The district
court held that the SRO's decision constituted an "agreement" by the state that Joseph's
current educational placement was Kildonan. *Murphy v. Arlington Cent. Sch. Dist.*, 86 F.
Supp. 2d 354, 365-67 (S.D.N.Y. 2000) ("*Murphy* III"). Pursuant to the IDEA's stay-put
provisions, the district court entered an order requiring Arlington to finance Joseph's
education at Kildonan from December 13, 1999, the date the SRO issued its decision

with respect to tuition reimbursement for the 1998 school year, until such time as Joseph's educational placement changes.

> The Court went on to state:

The United States, appearing as *amicus curiae*, suggests that the exhaustion requirement does not extend to § 1415(j). *See Cole v. Metro. Gov't of Nashville*, 954 F. Supp. 1214 (M.D. Tenn. 1997) (explaining that the stay- put provision is "less a substantive promise of the IDEA than a protective mechanism designed to preserve the status quo *while* the plaintiff seeks to enforce the provisions of the IDEA" and hence is not subject to the statute's procedural demands). We need not decide whether the exhaustion requirement is generally applicable to all claims arising under the IDEA because assuming *arguendo* that it is, an action alleging violation of the stay-put provision falls within one, if not more, of the enumerated exceptions to this jurisdictional prerequisite.

> In addition, *Bd. of Educ. v. Schutz*, 290 F.3d 476 (2d Cir. 2002). The *Schutz* court therefore ordered the school district to pay the costs of the student's tuition during the pendency of administrative proceedings. As *Schutz* is factually indistinguishable from the case at bar, we affirm the judgment of the district court and hold that Arlington is financially responsible for Joseph's tuition until such time as Joseph's placement is changed in accordance with the terms of the IDEA.

> The administrative proceeding started when the due process complaint was filed. A motion regarding pendency or stay put can and will be heard prior to the end of the resolution process.

IT IS HEREBY ORDERED THAT:

> All parties are granted until March 11, 2008 (I will be out of town from March 5$^{th}$ to 10$^{th}$ 2008) to answer the pendency (request) motion.

> The timelines recommenced as of February 25, 2008 and will run from that date.

I NOTE THAT:

The parents in the amended due process complaint have waived the resolution meeting; the District has not.

_____          _____2/28/08_____
Eric Nachman, I.H.O.                      Date

To:

Mike Lambert, Esq.
Shaw and Perelson, Esqs.
2-4 Austin Court
Poughkeepsie, NY 12603
845-486-4268 Fax

RosaLee Charpentier, Esq.
Family Advocates, Inc.
209 Clinton Avenue
Kingston, NY 12401
845-339-8089 (fax)

Laura Davis and Edward Dabrowski
76 Bryant Trail
Carmel, NY 10512

# EXHIBIT N

RECEIVED

MAR 17 2008

# In the Matter of CD and the Carmel Central School District

## STUDENT'S UPDATED PENDENCY MOTION

I was appointed to hear this matter on November 27, 2007 by the Carmel CSD. The resolution period ended on January 4, 2008. On January 9, 2008 the record close date was extended to February 1, 2008. On January 31, 2008 the record close date was extended to February 28, 2008. On February 26, 2008 I accepted the amended due process complaint and updated pendency motion (see Order dated 2/26/08). I granted all parties until March 11, 2008 to answer the pendency motion regarding Kildonan tuition payments for the 2007/2008 school year.

## POSITION OF THE PARTIES

The parent's position has not changed. This motion, with an updated fact pattern, was made on behalf of the family to determine CD's pendency placement. It is the family's position "that the student's 'pendency' placement for the period beginning September 2007 and continuing through the completion of this due process hearing and any appeals is the Kildonan School. The parents request an order directing the School District to immediately undertake necessary steps to ensure the student's 2007-08 tuition payments are up-to-date." (First Motion pg. 5).

The District maintains that with respect to pendency the student is permitted to remain at the Kildonan School under pendency theory from the date of the appeal of the 2006/2007 SRO decision until all appeals are exhausted.

BACKGROUND

On February 28, 2008, I accepted an amended due process complaint with included the 2007/2008 tuition at the Kildonan School.

On August 19, 2004, the parents of CD rejected the District's proposed placement and IEP for the 2004/2005 school year. The parents requested an impartial hearing to specifically review their claim that the student required one-to-one instruction for language arts, Id. The SRO, in his unappealed decision of August 10, 2005 (SRO Decision No. 05-063) affirmed the parents' position that the District's IEP was inappropriate and that the "unilateral placement [at Kildonan] was appropriate",

The parents did not agree with the IEP for the 2005/2006 school year. On August 18, 2005, the parents once again rejected the District's plan for CD and another impartial hearing was undertaken. On March 7, 2006, the SRO issued a final decision (SRO Decision No. 06-005) holding that the IEP was inappropriate and that the parents' unilateral placement at the Kildonan School was appropriate.

On August 23, 2006, the parents rejected the proposed IEP and placement for the 2006/2007 school year. An impartial hearing was undertaken regarding the 2006-07 year. On August 24, 2007, the impartial hearing officer issued a decision concluding that the student had been denied access to a free appropriate public education and declaring that the Kildonan School was the appropriate placement.

The District took an appeal to the SRO who on November 14, 2007 reversed the Hearing Officer's decision regarding FAPE and held in favor of the District (SRO Decision No. 07-114). The parents

subsequently took an appeal from this decision to the United States District Court, S.D.N.Y. (08 Civ. 0445, Judge Karas, filed January 17, 2008), where the matter is now pending.

The District developed an IEP for the 2007/2008 school year. On August 22, 2007 the parents requested an impartial hearing to determine if a FAPE was offered for that school year. The parents were seeking tuition payment at Kildonan for the 2007/2008 school year. By letter dated September 7, 2007 the parents withdrew the August 22, 2007 hearing request.  The hearing request was renewed and accepted as an amended due process complaint on February 26, 2008.

On February 26, 2008 the parent requested "an Impartial Hearing regarding the School District's failure to provide for 'pendency' placement during its appeal to the State Review Officer."

FINDINGS OF LAW

Application of a Child with a Disability, Appeal No. 02-068 clearly states that "the pendency provisions of the Individuals with Disabilities Education Act (IDEA) and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child (20 U.S.C. § 1415[j]; N.Y. Educ. Law section 4404[4]). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (Zvi D. v. Ambach, 694 F.2d 904 [2d Cir. 1982]; Drinker v. Colonial School Dist., 78 F.3d 859 [3d

Cir. 1996]). The purpose of the pendency provision
is to provide stability and consistency in the
education of a child with a disability (Honig v.
Doe, 484 U.S. 305 [1987]). It does not mean that a
student must remain in a particular site or
location (Application of the Bd. of Educ., Appeal
No. 99-90) or at a particular grade level
(Application of a Child with a Disability, Appeal
No. 95-16).

The pendency provisions of the IDEA and the New
York State Education Law require that a child
remain in his or her then current placement, unless
the child's parents and the board of education
otherwise agree, during the pendency of any
proceedings relating to the identification,
evaluation or placement of the child (20 U.S.C. §
1415[j]; N.Y. Educ. Law section 4404[4]). Pendency
has the effect of an automatic injunction, which is
imposed without regard to such factors as
irreparable harm, likelihood of success on the
merits, and a balancing of the hardships (Zvi D. v.
Ambach, 694 F.2d 904 [2d Cir. 1982]; Drinker v.
Colonial School Dist., 78 F.3d 859 [3d Cir. 1996]).
The purpose of the pendency provision is to provide
stability and consistency in the education of a
child with a disability (Honig v. Doe, 484 U.S. 305
[1987]).

Under the IDEA, the inquiry focuses on
identifying the child's then current educational
placement (Zvi D., 694 F.2d at 906). Although not
defined by statute, the term "then current
placement" has been found to mean the last agreed
upon placement at the moment when the due process
proceeding is commenced (Application of a Child
with a Disability, Appeal No. 97-80). The U.S.
Department of Education has opined that a child's
then current placement would " … generally be taken
to mean current special education and related
services provided in accordance with a child's most

recent [IEP]" (Letter to Baugh, EHLR 211:481; see also <u>Drinker</u>, 78 F.3d at 867; <u>Gregory K. v. Longview School Dist.</u>, 811 F.2d 1307 [9th Cir. 1987]).

The pendency provisions of the IDEA and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the school district otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child.  20 U.S.C. §1415; N.Y. Educ. Law §4404(4).  The inquiry focuses on identifying the child's then current education placement.  This term has been found to mean the last agreed upon IEP at the moment when the impartial hearing was requested.  <u>See Application of a Child with a Disability</u>, Appeal No. 07-063; <u>Application of a Child with a Disability</u>, Appeal No. 02-023; <u>Application of a Child with a Disability</u>, Appeal No. 97-080.

Under the IDEA, the inquiry focuses on identifying the child's then current educational placement (<u>Zvi D.</u>, 694 F.2d at 906). Although not defined by statute, the term "then current placement" has been found to mean the last agreed upon placement at the moment when a due process proceeding is commenced (<u>Application of a Child with a Disability</u>, Appeal No. 97-80). However, pursuant to 34 C.F.R. § 300.514(c) if the decision of the SRO agrees with the child's parents that a change of placement is appropriate, such placement must be treated as an agreement between the state or local agency and the parents for the purposes of pendency (<u>Schutz</u>, 137 F. Supp. 2d 83).

Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success

on the merits, and a balancing of the hardships. It is clear that a child shall remain in his or her then current placement, unless the child's parents and the school district otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child.

It is not disputed that an Impartial Hearing Officer found that Carmel did not offer CD a FAPE for the 2006/2007 school. The Hearing Officer also found that Kildonan was an appropriate. The parents were awarded tuition at Kildonan. The District appealed to the SRO. In decision No. 07-114, on November 14, 2007, the SRO reversed the Hearing Officer's decision regarding FAPE and held in favor of the District. This SRO decision was not appealed until January 17, 2008 (U.S.D.C., S.D.N.Y. (08 CIV. 0445) The parents also initiated a due process proceeding on August 22, 2007 and withdrew that proceeding on September 7, 2008.

I agree with the District. The District is now responsible for the 2007/2008 Kildonan tuition from January 17, 2008 through the completion of the appeal process.

200.5(2)(m) *Student's status during proceedings*. (1) Except as otherwise provided in paragraph (2) of this subdivision and section 200.16 of this Part and Part 201 of this Title, during the pendency of any proceedings conducted pursuant to subdivisions (j) or (k) of this section, unless the local board of education and the parents otherwise agree, the student shall remain in the then current placement of such student. During the pendency for any due process proceeding relating to the evaluation and initial placement in special education, unless the local board of education and the parents

otherwise agree, the student shall not be
evaluated and shall remain in the then current
educational placement of such student or, if
applying for initial admission to a public
school, shall be placed in the public school
program until all such proceedings have been
completed.

There is now a due process proceeding for
pendency to attach. On August 22, 2008, when a due
process proceeding hearing was first requested,
pendency was the last unappealed SRO decision (No.
07-114) denying tuition reimbursement. The parents
withdrew there due process request on September 7,
2008; from that date through the present there are
no due process requests that the requested pendency
could attach. A due process request was made on
February 26, 2008 and pendency now attaches on
January 17, 2008 when the when unappealed SRO
decision (No. 07-114) was appealed.

## ORDER
IT IS HEREBY ORDERED the District pay CD's
Kildonan tuition payments under the theory of
pendency from January 17, 2008 through the
completion of the appeal process.

NOTE
The resolution period ends on or about March
28, 2008. Please submit any motions regarding the
resolution meeting to my office on or before April
4, 2008. If motions are not made please submit
three 9:30 AM hearing dates during the week of
April 7$^{th}$ and April 21$^{st}$. I am also available April
14$^{th}$ and 18$^{th}$.


_____          _____
                                          3/12/08
Eric Nachman, I.H.O.                      Date

# EXHIBIT O

RECEIVED
MAR 17 2008

## In the Matter of CD and the Carmel Central School District

### STUDENT'S UPDATED PENDENCY MOTION

I was appointed to hear this matter on November 27, 2007 by the Carmel CSD. The resolution period ended on January 4, 2008. On January 9, 2008 the record close date was extended to February 1, 2008. On January 31, 2008 the record close date was extended to February 28, 2008. On February 26, 2008 I accepted the amended due process complaint and updated pendency motion (see Order dated 2/26/08). I granted all parties until March 11, 2008 to answer the pendency motion regarding Kildonan tuition payments for the 2007/2008 school year.

POSITION OF THE PARTIES

The parent's position has not changed. This motion, with an updated fact pattern, was made on behalf of the family to determine CD's pendency placement. It is the family's position "that the student's 'pendency' placement for the period beginning September 2007 and continuing through the completion of this due process hearing and any appeals is the Kildonan School. The parents request an order directing the School District to immediately undertake necessary steps to ensure the student's 2007-08 tuition payments are up-to-date." (First Motion pg. 5).

The District maintains that with respect to pendency the student is permitted to remain at the Kildonan School under pendency theory from the date of the appeal of the 2006/2007 SRO decision until all appeals are exhausted.

BACKGROUND

On February 28, 2008, I accepted an amended due process complaint with included the 2007/2008 tuition at the Kildonan School.

On August 19, 2004, the parents of CD rejected the District's proposed placement and IEP for the 2004/2005 school year. The parents requested an impartial hearing to specifically review their claim that the student required one-to-one instruction for language arts, Id. The SRO, in his unappealed decision of August 10, 2005 (SRO Decision No. 05-063) affirmed the parents' position that the District's IEP was inappropriate and that the "unilateral placement [at Kildonan] was appropriate",

The parents did not agree with the IEP for the 2005/2006 school year. On August 18, 2005, the parents once again rejected the District's plan for CD and another impartial hearing was undertaken. On March 7, 2006, the SRO issued a final decision (SRO Decision No. 06-005) holding that the IEP was inappropriate and that the parents' unilateral placement at the Kildonan School was appropriate.

On August 23, 2006, the parents rejected the proposed IEP and placement for the 2006/2007 school year. An impartial hearing was undertaken regarding the 2006-07 year. On August 24, 2007, the impartial hearing officer issued a decision concluding that the student had been denied access to a free appropriate public education and declaring that the Kildonan School was the appropriate placement.

The District took an appeal to the SRO who on November 14, 2007 reversed the Hearing Officer's decision regarding FAPE and held in favor of the District (SRO Decision No. 07-114). The parents

subsequently took an appeal from this decision to
the United States District Court, S.D.N.Y. (08 Civ.
0445, Judge Karas, filed January 17, 2008), where
the matter is now pending.

The District developed an IEP for the 2007/2008
school year. On August 22, 2007 the parents
requested an impartial hearing to determine if a
FAPE was offered for that school year. The parents
were seeking tuition payment at Kildonan for the
2007/2008 school year. By letter dated September 7,
2007 the parents withdrew the August 22, 2007
hearing request.  The hearing request was renewed
and accepted as an amended due process complaint on
February 26, 2008.

On February 26, 2008 the parent requested "an
Impartial Hearing regarding the School District's
failure to provide for 'pendency' placement during
its appeal to the State Review Officer."

FINDINGS OF LAW

Application of a Child with a Disability,
Appeal No. 02-068 clearly states that "the pendency
provisions of the Individuals with Disabilities
Education Act (IDEA) and the New York State
Education Law require that a child remain in his or
her then current placement, unless the child's
parents and the board of education otherwise agree,
during the pendency of any proceedings relating to
the identification, evaluation or placement of the
child (20 U.S.C. § 1415[j]; N.Y. Educ. Law section
4404[4]). Pendency has the effect of an automatic
injunction, which is imposed without regard to such
factors as irreparable harm, likelihood of success
on the merits, and a balancing of the hardships
(Zvi D. v. Ambach, 694 F.2d 904 [2d Cir. 1982];
Drinker v. Colonial School Dist., 78 F.3d 859 [3d

Cir. 1996]). The purpose of the pendency provision is to provide stability and consistency in the education of a child with a disability (Honig v. Doe, 484 U.S. 305 [1987]). It does not mean that a student must remain in a particular site or location (Application of the Bd. of Educ., Appeal No. 99-90) or at a particular grade level (Application of a Child with a Disability, Appeal No. 95-16).

The pendency provisions of the IDEA and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child (20 U.S.C. § 1415[j]; N.Y. Educ. Law section 4404[4]). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (Zvi D. v. Ambach, 694 F.2d 904 [2d Cir. 1982]; Drinker v. Colonial School Dist., 78 F.3d 859 [3d Cir. 1996]). The purpose of the pendency provision is to provide stability and consistency in the education of a child with a disability (Honig v. Doe, 484 U.S. 305 [1987]).

Under the IDEA, the inquiry focuses on identifying the child's then current educational placement (Zvi D., 694 F.2d at 906). Although not defined by statute, the term "then current placement" has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced (Application of a Child with a Disability, Appeal No. 97-80). The U.S. Department of Education has opined that a child's then current placement would " … generally be taken to mean current special education and related services provided in accordance with a child's most

recent [IEP]" (Letter to Baugh, EHLR 211:481; see also Drinker, 78 F.3d at 867; Gregory K. v. Longview School Dist., 811 F.2d 1307 [9th Cir. 1987]).

The pendency provisions of the IDEA and the New York State Education Law require that a child remain in his or her then current placement, unless the child's parents and the school district otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child.  20 U.S.C. §1415; N.Y. Educ. Law §4404(4).  The inquiry focuses on identifying the child's then current education placement.  This term has been found to mean the last agreed upon IEP at the moment when the impartial hearing was requested.  See Application of a Child with a Disability, Appeal No. 07-063; Application of a Child with a Disability, Appeal No. 02-023; Application of a Child with a Disability, Appeal No. 97-080.

Under the IDEA, the inquiry focuses on identifying the child's then current educational placement (Zvi D., 694 F.2d at 906). Although not defined by statute, the term "then current placement" has been found to mean the last agreed upon placement at the moment when a due process proceeding is commenced (Application of a Child with a Disability, Appeal No. 97-80). However, pursuant to 34 C.F.R. § 300.514(c) if the decision of the SRO agrees with the child's parents that a change of placement is appropriate, such placement must be treated as an agreement between the state or local agency and the parents for the purposes of pendency (Schutz, 137 F. Supp. 2d 83).

Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success

on the merits, and a balancing of the hardships. It is clear that a child shall remain in his or her then current placement, unless the child's parents and the school district otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the child.

It is not disputed that an Impartial Hearing Officer found that Carmel did not offer CD a FAPE for the 2006/2007 school. The Hearing Officer also found that Kildonan was an appropriate. The parents were awarded tuition at Kildonan. The District appealed to the SRO. In decision No. 07-114, on November 14, 2007, the SRO reversed the Hearing Officer's decision regarding FAPE and held in favor of the District. This SRO decision was not appealed until January 17, 2008 (U.S.D.C., S.D.N.Y. (08 CIV. 0445) The parents also initiated a due process proceeding on August 22, 2007 and withdrew that proceeding on September 7, 2008.

I agree with the District. The District is now responsible for the 2007/2008 Kildonan tuition from January 17, 2008 through the completion of the appeal process.

200.5(2)(m) *Student's status during proceedings.* (1) Except as otherwise provided in paragraph (2) of this subdivision and section 200.16 of this Part and Part 201 of this Title, during the pendency of any proceedings conducted pursuant to subdivisions (j) or (k) of this section, unless the local board of education and the parents otherwise agree, the student shall remain in the then current placement of such student. During the pendency for any due process proceeding relating to the evaluation and initial placement in special education, unless the local board of education and the parents

otherwise agree, the student shall not be
evaluated and shall remain in the then current
educational placement of such student or, if
applying for initial admission to a public
school, shall be placed in the public school
program until all such proceedings have been
completed.

There is now a due process proceeding for
pendency to attach. On August 22, 2008, when a due
process proceeding hearing was first requested,
pendency was the last unappealed SRO decision (No.
07-114) denying tuition reimbursement. The parents
withdrew there due process request on September 7,
2008; from that date through the present there are
no due process requests that the requested pendency
could attach. A due process request was made on
February 26, 2008 and pendency now attaches on
January 17, 2008 when the when unappealed SRO
decision (No. 07-114) was appealed.

## ORDER

IT IS HEREBY ORDERED the District pay CD's
Kildonan tuition payments under the theory of
pendency from January 17, 2008 through the
completion of the appeal process.

NOTE
The resolution period ends on or about March
28, 2008. Please submit any motions regarding the
resolution meeting to my office on or before April
4, 2008. If motions are not made please submit
three 9:30 AM hearing dates during the week of
April 7th and April 21st. I am also available April
14th and 18th.

_____              _____3/12/08_____
Eric Nachman, I.H.O.                        Date

# EXHIBIT P

# FAMILY ADVOCATES, INC.

**(845) 339-8080**

*209 Clinton Avenue, Kingston, NY 12401*

April 17, 2008     *FAX (845) 339-8089*

Hon. Kenneth M. Karas
U.S.D.C., Southern District of New York
300 Quarropas St.
White Plains, NY 10601-4150

Re: <u>Dabrowski v. Carmel CSD</u> 7:08 cv 00445
**PRE-MOTION CONFERENCE**

Honorable Judge Karas:

Plaintiffs request a Pre-Motion Conference to discuss their need for interlocutory relief via a Motion for Preliminary Injunction pending full review and disposition of the underlying claim. The Complaint herein was brought pursuant to the Individuals with Disabilities Education Act, ("IDEA"), as amended by Congress in 2004, which provides detailed entitlements for a *free appropriate public education*" to disabled students and explicit procedural mandates protecting and encouraging parental input, 20 U.S.C. §1400(c). Plaintiffs initiated the instant special education claim on August 23, 2006 because they believe their child was denied FAPE during the 2006-07 school year. It is this (2006-07) claim which is pending before the Court here.

Plaintiffs require interlocutory judicial intervention in order to obtain access to IDEA protections to the child during the "pendency" of both the administrative and judicial review proceedings. The Defendant School District operates in violation of the Act in that it has contributed only limited funds for plaintiffs' daughter's continued school attendance and her placement in school is in jeopardy, see **attached current notice of tuition non-payment from the Kildonan School.** The IDEA mandates that during the pendency of the IDEA complaint-review procedure, the child's placement is not to be changed unilaterally by the School District, see "pendency" provision,[1] found at 20 U.S.C. 1415(j), also see <u>Honig v. Doe</u>, 484 U.S. 305 (1987) and <u>Board of Education v. Ambach</u>, 612 F.Supp. 230, 233 (E.D.N.Y. 1985).

---

[1] Also referred to as "status quo" or "stay-put" provision.

Plaintiffs are not required to first exhaust administrative remedies on the issue of "pendency" or 'stay put', Murphy v. Arlington C.S.D., 297 F. 3d 195 (SDNY 2002). In Murphy, this Court reviewed the Act's "pendency" provision and found it to fall under an exception to the administrative exhaustion prerequisite. The Court ruled that "*administrative process is 'inadequate' to remedy violations of Section 1415(j) because, given the time-sensitive nature of the IDEA's stay-put provision, 'an immediate appeal is necessary to give realistic protection to the claimed right*', citing Miss America Org. V. Mattel, Inc. 945 F. 2d 536, at 545 (2d Cir. 1991). The Murphy Court went on the hold that "*Section 1415(j) establishes a student's right to a stable learning environment during what may be a lengthy administrative and judicial review*" citing Tenn. Dept. of Mental Health & Mental Retardation v. Paul B. 88 F. 3d 1466, at 1472 (6th Cir. 1996), Carl B. v. Mundelein H.S. Dist. 120 Bd of Ed., 93 CV 5304, (N.D. III. 1993).

Here, the Carmel Central School District has failed to respect and afford plaintiffs access to the "pendency" provision during these administrative and judicial proceedings. Until the parents' claim on 2006-07 is finally resolved, the student's IDEA placement is at the Kildonan School. Defendant has unlawfully failed to make proper, timely or adequate financial payments for the student to continue there this year. Plaintiffs' proposed motion is meritorious and straight-forward: both school years prior to the one in question here required the District to fund the student at Kildonan. In 2004-05, a similar parental complaint was raised and resolved in parents' favor; the District chose not to appeal see **SRO decision at No. 05-063**, dated August 10, 2005, attached hereto. The SRO affirmed the parents' position that the District's IEP was inappropriate and that their "*unilateral placement [at the Kildonan School, Amenia, New York] was appropriate*", Id. In 2005-06, a second complaint was raised and resolved in parents' favor; the District again chose not to appeal see, **SRO decision No. 06-005**, also attached.

Thus, the student's lawful placement at the time this claim was initiated, August 23, 2006, was the Kildonan School. She is entitled to "maintenance" of this placement until the instant claim is resolved.

Some additional legal support for plaintiffs' need to bring a motion for interlocutory relief at this time:

* "Under the IDEA, during the pendency of any proceeding pursuant to special education law, a student is entitled to remain in his/her then current educational placement unless the parents and the school district decide otherwise" Verhoeven v. Brunswick School Com, 207 F.3d 1, 3 (1st Cir. 1999). Also see Woods v. New Jersey School District of Education, 12 IDELR 439 (3rd Cir. 1993) at 440, where the court held that "the purpose of the 'stay put' is to preserve the status quo of the child's functioning placement and program until the underlying IDEA litigation is resolved unless there is an effective waiver." In Woods, the court also noted that the provision demonstrates "Congress's policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." Wood at 440. Affirmed in Drinker v. Colonial School District, 78 F.3d 859 (3rd Cir. 1996).

* The Section 1415(j) placement freeze extends throughout the pendency of "all" the proceedings, administrative and judicial, S.W. and Joanne W. v. Holbrook Public Schools, 221 F. Supp. 2d 222 (2002); 20 U.S.C. 1415(j); and Verhoeven, (supra.

* Because stay-put acts to freeze the status quo, courts have demanded that the party who bore the financial burden of the then current placement must continue to bear that burden during the proceedings, Monahan v. Nebraska, 491 F. Supp. 903 F. 2d 635 (9th Cir. 1990), at 1088.

The Motion for Preliminary Injunction is necessary and justified.  Plaintiffs respectfully request the Court permission in moving forward on this motion.

RosaLee Charpentier, Esq. (rlc-2515)

Att'y for Plaintiffs, Family Advocates, Inc

To: Mark Rushfield, Esq.

Shaw & Perelson, et. al., for the Defendants



# The Kildonan School
### Founded in 1969

April 16, 2008

Ms. Laura Davis
70 Bryant Trail
Carmel, N.Y. 10512

Re: Chloe Dabrowski
2007/08 Tuition

Dear Ms. Davis:

We have received a check from the Carmel School District in the amount of $5,182.50.
We have applied it as follows: September 2007 - $1,727.50  (half month) and October -
$3,455.00 (full month).  The balance on the tuition account is $30,267.50.  Of this
$22,457.50 is past due ($1,727.50 for September and $3,455.00 per month for November
through April.  This payment schedule is not acceptable and in order for Chloe to remain
at Kildonan, the tuition must be brought up to date.

Very truly yours,

Ann E. Still
Business Manager